# Court of Queen's Bench of Alberta

**Citation: Globex Foreign Exchange Corporation v. Kelcher, 2009 ABQB 471**

**Date:** 20090930
**Docket:** 0501 08056
**Registry:** Calgary

2009 ABQB 471 (CanLII)

Between:

**Globex Foreign Exchange Corporation**

Plaintiff

\- and -

**David Kelcher, Mark MacLean, Luciano Oliverio,
Axiom Foreign Exchange International Inc., Axiom Partnership,
1162134 Alberta Corporation, 1162170 Alberta Corporation,
1162174 Alberta Corporation, 1162127 Alberta Corporation,
1162168 Alberta Corporation, 1162816 Alberta Corporation**

Defendants

---

**Reasons for Judgment
of the
Honourable Mr. Justice G.C. Hawco**

---

## Introduction

[1] The Plaintiff ("Globex") is in the foreign currency exchange business. The Defendants David Kelcher ("Kelcher"), Mark MacLean ("MacLean"), and Luciano Oliverio ("Oliverio") were employed by the Plaintiff's Calgary office from 2000, 2001 and 2003 respectively until they all left the Plaintiff's employ in March 2005. Each Defendant had signed an agreement agreeing that they would not solicit any customers of Globex and that they would not compete in any business similar to the business of Globex for a period of twelve months from the date of their termination of their employment.

EXHIBIT 1

[2] The Defendants formed a foreign currency exchange company in April 2005. They did compete with the Plaintiff and did solicit some business from Globex clients. The primary issue to be determined is whether they were prohibited at law from doing so.

[3] In my view, there was no consideration paid by Globex to any of the Defendants in exchange for the covenants not to compete or to not solicit clients. The covenants were therefore not enforceable. In the event it is found that there was consideration exchanged, I am satisfied that the non-competition covenants were unreasonable and therefore not enforceable against any of the Defendants. The non-solicitation covenants were reasonable and thus enforceable, but only as against Kelcher.

2009 ABQB 471 (CanLII)

**Facts**

[4] As stated, Globex is engaged in the foreign currency exchange business. It makes its money by buying and selling foreign currencies for its clients and charging a mark-up on each transaction. This mark-up is called "the spread" and represents the difference between the "recovery" (the amount paid by Globex to purchase the currency) and the "exchange rate" (the amount which Globex charges its client for the currency).

[5] A Calgary Globex office was opened in January 2000. It served Calgary, southern Alberta, Red Deer and Kelowna. Mr. Jay Cowles was transferred from the Edmonton office to open a Calgary office and served as the Calgary branch manager from that time until he resigned from his employment in March 2008.

[6] The Defendants were foreign exchange traders employed in the Calgary office until March 2005. Oliverio commenced employment with Globex in December 2000. Kelcher commenced employment with Globex on January 2, 2001 and MacLean commenced his employment with Globex on December 1, 2003. There was another trader in the Calgary office during this time by the name of Derrick Kachiuk, who was also the assistant manager. He left the Globex office in December 2004.

[7] None of the Defendants had any foreign exchange trading experience prior to commencing employment with Globex. There is some dispute as to the amount of on-the-job training which they received at Globex. The Plaintiff alleges that they received a great deal of training. The Defendants recollection was that they received the somewhat bare minimum on the mode of obtaining business which was referred to as "cold calling". This method of business was simply having knowledge of what the Plaintiff's business was (which, admittedly, they received from Mr. Cowles) and then going through a telephone directory (usually the Yellow Pages) and making unsolicited calls to companies which they thought might be in need of their services, that is, any company which might be doing business with customers outside of the country.

[8] Whether indeed the Defendants had a great deal of training or very little, the fact is that they did learn the business of trading in foreign currencies from the Plaintiff. The extent to which they became rather skilled in trading in foreign currencies was primarily by virtue of their own initiative, intuition and personal skills.

2009 ABQB 471 (CanLII)

[9] As stated, each of the Defendants signed non-competition and non-solicitation agreements with Globex. Kelcher signed an agreement on July 25, 2003 some two years after he began working for the company. That agreement was presented to him and it was made clear to him that he either signed the agreement or that his employment would not be continued.

[10] MacLean signed his agreement when he began employment with Globex on December 1, 2003. He knew that he had to sign the agreement in order to commence his employment with Globex. Oliverio signed his first agreement on June 25, 2003 prior to starting work with Globex. Each of these Defendants had read the agreement before signing it. They understood the agreements. All agreements had the same clauses, which are set out in full:

> 2. That for a period of twelve (12) months from the date of termination of the Employee's employment with Globex, for whatever reason, he/she will not, for any reason directly of indirectly as principal, agent, owner, partner, employee, consultant, advisor, shareholder, director or officer or otherwise howsoever, own, operate, be engaged in or connected with or interested in, the operation of or in any way guarantee the debts or obligations of, or have any financial interest in or advance, lend money to, or permit his/her name or any part thereof to be used, or employed in any operation whether a proprietorship, partnership, joint venture, corporation, or other entity, or otherwise carry on, engage in, solicit customers in any manner whosoever, in any business or activity for any client of Globex with which he/she had dealings on behalf of Globex at any time within the twelve (12) months preceding the date upon which the Employee left the employment of Globex.
>
> 3. That for a period of twelve (12) months from the date of termination of the Employee's employment with Globex, for whatever reason, he/she will not for any reason, directly or indirectly as principal, agent, owner, partner, employee, consultant, advisor, shareholder, director or officer or otherwise howsoever, own, operate, be engaged in or connected with or interested in the operation of or in anyway guarantee the debts or obligations of, or have any financial interest in or advance, lend money to, or permit his/her name or any part thereof to be used or employed in any operation whether a proprietorship, partnership, joint venture, corporation, or other entity or otherwise carry on, engage in, solicit customers in any manner whosoever in any business or activity, which is the same as, or competitive with the business of Globex including, but without limitation, any businesses related to foreign currency exchange within the City of Calgary, in the Province of Alberta.

[11] The Defendants were aware that the agreements had separate non-solicitation and non-competition clauses and that there was no geographic restriction set out in the non-solicitation clause. Each acknowledged that in reading the agreements they would have noted that they were agreeing that the restrictions in the agreements were reasonable.

2009 ABQB 471 (CanLII)

[12] On March 1, 2005, Mr. Michael Oshry, the co-president of Globex presented each of the Defendants with a new form of non-competition/non-solicitation agreement. Mr. Oshry stated that he did this in an effort to better protect Globex's proprietary interest in the trader's training and in Globex's clients. Neither Kelcher nor MacLean signed the new form of agreement. They both left the office that day to obtain legal advice and never again returned to work at Globex. Oliverio was presented with a new agreement by Mr. Oshry on March 1. 2005 as well. He read it and signed it. His new agreement contained the following provision:

> 1. While the Employee is employed by Globex and for a period of eighteen (18) months after leaving the employment of Globex, for whatever reason, the Employee agrees that he/she will not, directly or indirectly:
>
> > (a) solicit any customer of Globex or knowingly assist in any manner, any person (including individuals, sole proprietors, corporations or other legal entities) directly or indirectly to solicit any customer of Globex, if solicitation is intended or calculated to obtain the business or trade of such customer for a business that competes with the business of Globex in any manner;
> >
> > (b) induce or attempt to induce any customer of Globex to reduce or curtail its business or terminate its relationship with Globex;
>
> 2. That for a period of eighteen (18) months from the termination date of the Employee's employment with Globex, for whatever reason, he/she will not, for any reason, directly or indirectly as principal, agent, owner, partner, employee, consultant, advisor, shareholder, director or officer or otherwise howsoever, own, operate, be engaged in or connected with or interested in, or associated with, or advise, or anyway guarantee the debts or obligations of, or have any financial interest in or advance, lend money to, or permit his/her name or any part thereof to be used or employed in any activity, operation or business whether a proprietorship, partnership, joint venture, corporation, or other entity or otherwise carry on, engage in, in any manner whatsoever, any activity, business or operation which is the same as or in any manner competes with the Business of Globex within the Country of Canada in any City or municipality in which Globex operates or conducts business, in any manner.

[13] On March 4, 2005, MacLean's employment was terminated by Mr. Oshry for failure to sign the new form of agreement and for what Mr. Oshry says was his refusal to state in writing that he was not intending to compete with Globex by joining Mr. Kachiuk at Olympia Trust Foreign Exchange.

[14] On the same date, Kelcher also provided his notice of resignation to Globex.

[15] On March 11 or 12, Oliverio resigned from his employment. His evidence was that in early March, he had no intention of leaving Globex and did not know what had happened to Kelcher or MacLean. When he signed his agreement on March 4, he had asked Mr. Cowles what had happened to Mark and David to which Mr. Cowles said he did not know. Two days later, Mr. Cowles told him that they were simply no longer working at Globex.

[16] Later in that first week of March, Mr. Oshry came to Calgary and had a discussion with Oliverio that somewhat upset him. After asking Oliverio what he had made the previous year (which was some $150,000.00), Mr. Oshry told him that he should fire him and hire someone for $60,000.00. By doing so, he would make a $100,000.00 profit on that person.

[17] Oliverio was quite upset about this and told his girlfriend, who suggested to him that he should quit Globex. Oliverio did consider doing this. His evidence was that he had never gotten the positive feedback or recognition he thought he should have gotten from the company and had for some time felt that the attitude in the office was quite poor.

[18] It was on or about March 11 that Oliverio told Mr. Cowles that he was going to resign. On March 15, he submitted his letter of resignation.

[19] Mr. Cowles response was that he was shocked and asked Oliverio if he could help out for a week or so. Oliverio agreed to do so and did work for an additional week and was going to work for a further week but became ill and was unable to do so.

[20] It was Oliverio's evidence, which I accept, that he had not talked to either Kelcher or MacLean before he decided to resign and that, when he did resign, he did not have a job or an offer for a job from anyone. It was around the end of March 2005 that Oliverio spoke with Kelcher. At that time, Kelcher asked him if he was interested in joining them, as they were setting up a foreign exchange currency business, to which Oliverio replied that he quite interested.

[21] When Oliverio left the office, he simply picked up a television which was his. He took his "black book" but did not download his computer or take anything further. The black book was a history of sales without any names within it.

[22] It was the evidence of the Plaintiff and was its argument as well that the individual Defendants conspired to leave the its employ and set up a competitive business, contrary to their express commitments not to do so. Mr. Oshry was of the view that MacLean had been planning to leave the company and to go with a competitor shortly after Mr. Kachiuk left. When MacLean refused to sign the new agreement in March 2005, Mr. Oshry fired him and then brought his attention to the non-competition clause in his original agreement.

[23] At about the same time, Kelcher refused to sign his new agreement and left the company. Mr. Oshry met with him a few days later to inquire why he had not signed his agreement. He

2009 ABQB 471 (CanLII)

thought Kelcher was acting strangely and remarked that Kelcher simply told him he could not comment on his refusal to sign the agreement and that he was acting on the advice of his lawyer.

[24] Mr. Cowles proffered no evidence to suggest that there had been or that there appeared to have been any discussions between Kelcher and MacLean about leaving the company or setting up a competing business. He did notice that Kelcher did not appear to be very happy for some time before he left but there was no incident which appeared to initiate the leaving of either Kelcher or MacLean other than the presentation and ultimatum with respect to the new non-solicitation and non-competition agreements.

2009 ABQB 471 (CanLII)

[25] The Plaintiff's argument that a conspiracy arose between Kelcher, MacLean and Oliverio involved evidence which it discovered after the individual Defendants had left the company. In early April 2005, Mr. Oshry saw an advertisement about Kelcher joining a company by the name of Axiom Foreign Exchange International Inc. ("Axiom"), one of the original Defendants in this action. He subsequently ascertained that Mr. John Hayes had registered the name "Axiom Foreign Exchange" on January 28, 2005 and had incorporated the company in February 2005. He determined that Kelcher met Mr. Hayes in December 2004 and had met him on one or two occasions between then and March 4, 2005.

[26] Mr. Hayes is accused by the Plaintiff of being a major co-conspirator in the establishment of Axiom and the bringing together of Messrs. Kelcher, MacLean and Oliverio, but it is the individual Defendants against whom most of the allegations and "blame", if you will, are directed. Because of a meeting held by Mr. Hayes, Kelcher, MacLean and Mr. Vern Fauth and Mr. Sean Fauth within a day of MacLean and Kelcher leaving Globex, it is argued that the Defendants had, for some time before leaving Globex, been conspiring to leave the company and set up a competing business to deliberately harm the Plaintiff.

[27] I am not satisfied at all that was the case. In fact, I prefer the evidence of the individual Defendants who deny any concerted plan to leave Globex and set up a competing business to the suspicions and suggestions of the Plaintiff. However, it really does not matter in the end result. Whether Globex was a sweat-box or a chocolate factory is not relevant to the issue. Whether the Defendants conspired to compete with Globex or had a number of fortuitous meetings and that circumstances simply evolved is not relevant to the issue.

[28] The issue is whether they were permitted by law to do what they did or were alleged to have done. There is another issue with respect to consideration that will be dealt with later.

[29] Where the Defendants' good faith or lack thereof may come into consideration is whether there was any deliberate attempt to solicit clients from Globex, knowing they were clients of Globex. That may come into consideration in assessing damages.

[30] Let me turn now to what did occur following the individual Defendants leaving Globex. Shortly after leaving, Kelcher and MacLean got together with Mr. Hayes to discuss forming an entity to carry on the business of foreign exchange currency trading. Mr. Hayes, whose

background was in securities trading, had already incorporated the company. The three of them then began to prepare a business plan, modelled on the Globex business plan. Oliverio was a late-comer to the group, but was certainly warmly welcomed. In early April 2005, Axiom opened its doors for business.

2009 ABQB 471 (CanLII)

[31] All three individual Defendants were aware of the agreements which they had signed. All had decided they would not solicit any clients with whom they had contact while at Globex. As a result, they prepared a list of all the clients whose names they could recall, which they referred to as a "Do Not Call List". They agreed that none of them would call any of the clients on that list. The Defendants admitted that there were occasional breaches with respect to contacting previous Globex clients, but that these were inadvertent and innocent, unless they involved clients that had initiated the contact and had asked the Defendants if they could move to them. The Defendants agreed to such a move only if the clients signed a letter saying that they had not been solicited by the Defendants.

[32] Another exception, in Oliverio's case, was that he did admit to contacting some of his former clients after September 15, 2006, which he believed to be the expiry date of his non-solicitation covenant, whereas in fact, it was September 30, 2006.

[33] Clearly, there were contacts made that ought not to have been made. However, I am satisfied on the evidence of Messrs. Kelcher, Oliverio and MacLean that these individuals attempted to abide by the terms of the non-solicitation covenant that they had each signed. They obviously made no attempt to not compete with Globex.

[34] In July, 2005, Globex applied for an injunction against the Defendants to prohibit them from soliciting clients from Globex and competing with Globex. The application was heard before Madam Justice Ross on July 25, 2005. On September 7, 2005, Justice Ross issued her judgment wherein she stated that she was satisfied that the non-competition covenants were no wider than reasonably required to afford adequate protection to Globex and thereby upheld the validity of those covenants, as well as the non-solicitation covenants. She found that MacLean had been wrongfully terminated and that the Plaintiff could therefore not enforce covenants against him.

[35] That decision was appealed. On November 30, 2005, our Court of Appeal allowed the appeal with respect to the non-competition covenants and upheld the decision of Justice Ross with respect to the non-solicitation. The Court held that the non-solicitation covenants were sufficient to protect the Plaintiff's interests in its clients as well as its goodwill. However, it held concurrently that Justice Ross erred in enforcing the non-competition covenants as they were too broad. They were of the view that covenants which contain a blanket restriction against competition are generally unenforceable as being an unreasonable restraint of trade. Such a covenant in restraint of trade is enforceable only if it is reasonable between the parties and with reference to the public interest. These were not. It concluded that the evidence supported the view that a non-competition covenant of this breadth was not necessary in this case. (para. 38)

[36] This matter proceeded to trial in March and April of this year. Counsel submitted written briefs and responses in May and June.

**Issues**

[37] The Plaintiff has argued that the agreements which the Defendants signed were reasonable and enforceable and that the Defendants breached their agreements, thereby causing damage to the Plaintiff.

[38] In the alternative, the Plaintiff argues that the Defendants breached their common law duty of fidelity and confidentiality not to compete unfairly with Globex and exploit Globex's information for their own purposes.

[39] The Defendants have argued that there was no consideration given by either party with respect to the employment agreements and that they are therefore unenforceable. They argue further that the Kelcher and MacLean agreements are unenforceable in any event and that the non-competition and non-solicitation covenants are also unenforceable. There was, they say, no breach of any duty not to compete unfairly. With respect to the damages claimed by the Plaintiff, the Defendants deny that the Plaintiff has suffered any damages.

**Decision**

1. There was no consideration given for the covenants. They are therefore unenforceable.
2. Even if there was consideration, the non-competition covenants were unreasonable and therefore unenforceable as against the Defendants.
3. If there was consideration, only Kelcher was bound by the non-solicitation covenant.
4. There was no breach of any common law duty that the Defendants may have owed to the Plaintiff.
5. The damages suffered by the Plaintiff with respect to the breach by Kelcher of the non-solicitation covenant are set at $17,927.00.

**Reasonings**

**1. Consideration**

[40] Justice Ross considered, as do I, that MacLean was wrongfully terminated. That being so, the restrictive covenants were not enforceable as against him. The consideration issue is not relevant in so far as he is concerned.

[41] With respect to Messrs. Kelcher and Oliverio, their contracts of employment were entered into during the course of their employment. As such, this Court must consider whether there was any consideration given by the Defendants or received by them.

[42] Justice Ross found that continued employment and an implied promise to forbear from dismissal for a reasonable period of time can constitute consideration. The Court of Appeal upheld Justice Ross, but I must say, with respect, it seemed to be a lukewarm approval. I turn to para. 26 of the Court of Appeal decision wherein the Court stated: "... the chambers judge found

2009 ABQB 471 (CanLII)

that Globex implicitly agreed not to dismiss Kelcher and Oliverio for some reasonable period of time in return for them signing the Agreements. We cannot say that this finding was wholly unsupported by the evidence."

2009 ABQB 471 (CanLII)

[43] The Court went on, in paragraph 27, to state:

> There is some evidence to support the findings of the chambers judge and her conclusion that the facts of this case satisfy the requirements for consideration set out by the Supreme Court of Canada in *Maguire*. Although it would be possible to come to a different conclusion on the evidence, given the high standard of review we cannot say the chambers judge's findings are clearly unreasonable and we decline to interfere with her conclusion on this issue.

[44] The Plaintiff has argued that once Kelcher signed his agreement, there was an understanding that his employment would continue unchanged and that he would not be dismissed. The Plaintiff also argued that Oliverio knew that if he did not sign the agreement his employment would be terminated; the corollary to which is that he knew that if he did sign the agreement his employment would be continued.

[45] I am not satisfied that there was such an understanding reached between either Oliverio or Kelcher and Mr. Oshry, nor am I satisfied that it was a necessary corollary to them signing the agreement.Having heard all of the evidence, I am simply not satisfied that there was any promise made or implied or otherwise to not fire either of them for any period of time if they signed their agreements.

[46] Mr. Oshry's evidence was that Kelcher was told to sign or lose his employment. Mr. Oshry considered Kelcher's continued employment to be the consideration. On cross-examination he admitted that there was nothing given to either Defendant to sign the agreements. They were not told that if they do sign, their employment would be guaranteed for any particular period of time.

[47] Mr. Cowles stated that when he was given his contract to sign after having been with the company for a number of years, he received nothing. He was told that he had to sign. He was paid nothing to do so. No promises were made to him with respect to continued employment.

[48] The same situation existed when the Defendants were presented with their new agreements in February or March of 2005: sign or resign.

[49] These contracts are to be distinguished from contracts which provide for any notice of termination. These contained nothing with respect to notice periods.

[50] I note that the Court of Appeal, in considering the reasoning of Justice Ross, spent some time analysing the Supreme Court of Canada decision in ***Maguire v. Northland Drug Co.***, [1935] S.C.R. 412 and ***Techform Products Limited v. Wolda*** (2001), 56 O.R. (3d) 1. It also

considered the Ontario Court of Appeal's decision in ***Francis v. Canadian Imperial Bank of Commerce*** (1994), 120 D.L.R. (4th) 393. It seems to me that the Court of Appeal was approving the reasoning of the Ontario Court of Appeal in ***Francis*** to the effect that continued employment, without more, is simply insufficient consideration to support the introduction of a restrictive covenant into the employment relationship. They quoted with approval the following paragraph in ***Hobbs v. TDI Canada Ltd.*** (2004), 246 D.L.R. (4th) 43, at para. 32:

> ***Francis*** makes it clear the law does not permit employers to present employees with changed terms of employment, threaten to fire them if they do not agree to them, and then rely on the continued employment relationship as the consideration for the new terms.

[51] I note the Court of Appeal also distinguished ***Maguire*** and ***Techform*** on the basis that in those cases the employer had made a promise to the employee to forbear from exercising its rights to terminate the employee for a reasonable period.

[52] I find no promises made to any of the Defendants that any of them would be given any type of security of employment. There was no consideration.

**2. Non-competition covenants**

[53] Justice Ross was of the view that the non-competition covenants were reasonable because Globex had a legitimate proprietary interest to protect and that the geographic scope of the covenants were not too broad.

[54] The Court of Appeal reviewed her decision and held that:

> Covenants that contain a blanket restriction against competition are generally held unenforceable as being an unreasonable restraint of trade. (para. 30)

[55] It went on to say, at para. 35:

> If a blanket restriction on competition is not reasonably necessary to protect the employer's interests, then the non-competition covenant is unenforceable. The chambers judge correctly expressed her view that such a blanket restriction was not necessary in this case. Her view is amply supported by the evidence. She erred in granting the non-competition injunction despite these concerns.

[56] At para. 38, the Court stated that:

> The evidence supports the view that a non-competition covenant of this breadth was not necessary in this case.

2009 ABQB 471 (CanLII)

[57] The Plaintiff asks this Court to revisit the Court of Appeal's decision on the basis that it is not binding and that the evidence presented before me should establish that the Defendants were soliciting clients and did take a number of clients with them that they should not have taken. That may be so. However, that has no impact upon the reasonableness of the non-competition clauses themselves.

[58] What this Court must do, according to the Supreme Court in ***Elsley v. J.G. Collins Insurance Agencies Ltd.***, [1978] 2 S.C.R. 916, is to assess the reasonableness of the restrictive covenant against three criteria:

1. Does the employer have a proprietary interest entitled to protection?

2. Are the temporal or spatial features of the clause too broad?

3. Is the covenant unenforceable as being against competition generally, and not limited to proscribing solicitation of clients of the former employer? (para. 19)

[59] These covenants under attack are broader than necessary for the Plaintiffs reasonable protection. While the Defendants were all good producers, given the nature of the business, which was basically cold calling customers, they could hardly be considered to be the face, voice or personification of the Plaintiff.

[60] The training which was received by the Defendants was minimal. It was not responsible for their success. These brokers were successful because of their attributes. They were young, smart, aggressive and personable individuals. The cold call method is nothing new. There is simply nothing which came before me at the trial which would lead me to reach any different conclusion than did the Court of Appeal. The Court of Appeal has said, and I agree, that the non-solicitation covenants were sufficient to protect the interests of the Plaintiff and its goodwill.

[61] This is a much different situation than where a business is sold and a vendor agrees not to compete for a period of time. As Justice Rothstein said, in ***K.R.G. Insurance Brokers Inc. v. Shafron*** (2009) S.C.C. 6, at para. 23, the reasonableness test (under ***Elsley***) is to be analysed differently depending on whether the restrictive covenant is part of a contract for the sale of a business or an employment contract. He pointed to the absence of payment for goodwill and was of the view that the generally accepted imbalance of power between an employee and an employer will justify more vigorous scrutiny of restrictive comments in employment contracts.

[62] The Plaintiff has not satisfied any of the ***Elsley*** criteria. There was no particular proprietary interest which was entitled to protection. The foreign exchange business is common. The primary method of obtaining clients was certainly not unique. The spatial and temporal features of the clause might not be too broad, but the prohibition against solicitation of clients was sufficient to provide whatever protection was justified without the outright prohibition against competing in any manner with the Plaintiff. It was that prohibition which, in my mind,

2009 ABQB 471 (CanLII)

caused these covenants to be unenforceable when there is no proprietary interest which required protection in the face of the non-solicitation clause.

[63] In the end result, I find that the restrictive covenants with respect to non-competition by the Defendants are unreasonable and are unenforceable.

**3. Non-solicitation covenants**

[64] The non-solicitation covenants with each Defendant are a different matter.

[65] The Defendants have argued that the language used is ambiguous and overly broad. They amount to, it is argued, another non-competition covenant.

[66] One must be careful to distinguish between non-competition and non-solicitation covenants. As the Ontario Court of Appeal in ***H.L. Staebler Co v. Allan*** (2008), 296 D.L.R. (4th) 592 at paras. 39 and 40 noted:

> 39 In *Lyons v. Multari* (2000), 50 O.R. (3d) 526 (Ont.C.A.) at para. 31, MacPherson J.A. explained the difference between the two types of clauses in these terms:
>
>> The non-competition clause is a more drastic weapon in an employer's arsenal. Its focus is much broader than an attempt to protect the employer's client or customer base; it extends to an attempt to keep the former employee out of the business. Usually, non-competition clauses are limited in terms of space and time.
>
> 40 *Elsley* makes it clear that a non-solicitation clause is normally sufficient to protect an employer's proprietary interest and that a non-competition clause is warranted only in exceptional circumstances. ...

[67] I have already determined that the non-competition covenants in this case are unenforceable. In my mind, however, the non-solicitation clauses are enforceable.

[68] I agree with the Defendants' argument that the clauses are convoluted, and perhaps poorly worded. They are also not restricted geographically. That is, if a client were to move beyond the city of Calgary the Defendants would still be prohibited from soliciting that client. Having said that, I am satisfied that the covenant is reasonable. This is quite different than ***Staebler***. There, the Court was looking at no geographic limits with respect to a non-competition covenant as opposed to a non-solicitation covenant.

[69] The Plaintiff has a legitimate argument in protecting those clients with whom the Defendants had dealings. The Defendants recognized this themselves. They established their own Do Not Call List which became the list for Axiom. I do not believe the covenants were

2009 ABQB 471 (CanLII)

overly broad. They offered the Plaintiff reasonable protection for its business without unduly restricting Messrs. Kelcher and MacLean from carrying on business.

[70] The Oliviero agreement was quite a bit more restrictive. It attempted to prevent him from soliciting any client of Globex, whether he had any previous dealings with such client or not and no matter where they moved. Such a covenant unduly restricted Oliverio. It would make it difficult for him to enter the same business. He would have no idea whether potential customers that he would be seeking to enlist had ever had any contact with anybody else who worked for the Plaintiff. This would put him in an untenable position. As Justice Low of the Ontario Court of Justice in ***Phytoderm Inc. v. Urwin***, [1999] O.J. No. 383 at para. 13 stated:

> Even if it could be said that there is some interest in keeping the defendant away from the plaintiff's customers for a period of time sufficient to allow the plaintiff to replace her and to allow the replacement a reasonable opportunity to establish a relationship with the customers formerly trained by the defendant, there is no legitimate interest served in restraining the defendant from going to customers of the plaintiff with whom she had no previous contact or relationship.

[71] In the end result, I find the non-solicitation covenant with respect to Kelcher to be enforceable. I find the MacLean covenant to be reasonable but unenforceable due to the Plaintiff's wrongful termination. I find the Oliverio covenant unenforceable because of its broadness.

**Duty not to Compete Unfairly**

[72] I am not satisfied that there is such a duty. As stated by the Supreme Court in ***RBC Dominion Securities Inc. v. Merrill Lynch Canada, Inc.***, [2008] 3 S.C.R. 79, at paras. 18 and 19:

> 18 The majority of the Court of Appeal, by contrast, held that once the investment advisors left RBC, they were no longer under a duty not to compete with it. The view of the Court of Appeal on the law for the purposes of this issue may be summed up as follows. Generally, an employee who has terminated employment is not prevented from competing with his or her employer during the notice period, and the employer is confined to damages for failure to give reasonable notice (Southin J.A. for the majority). To this general proposition Rowles J.A. may be read as adding the qualification that a departing employee might be liable for specific wrongs such as improper use of confidential information during the notice period. This appears to be consistent with the current law, which restricts post-employment duties to the duty not to misuse confidential information, as well as duties arising out of a fiduciary duty or restrictive covenant: see England, *Employment Law in Canada* (4th ed. loose-leaf), § 11.141. Neither of the latter duties are at issue here.

2009 ABQB 471 (CanLII)

> 19 For the purposes of this case, the law may be accepted as summarized by the preceding paragraph. The contract of employment ends when either the employer or the employee terminates the employment relationship, although residual duties may remain. An employee terminating his or her employment may be liable for failure to give reasonable notice and for breach of specific residual duties. Subject to these duties, the employee is free to compete against the former employer.

2009 ABQB 471 (CanLII)

[73] I agree with the Defendants' arguments that post-employment, a parting employee has a duty not to misuse confidential information, and is also subject to duties arising out of a restrictive covenant or finding of fiduciary duty. However, these Defendants have been found to be not fiduciaries. There is no evidence before the Court to show that the Defendants used any confidential or proprietary information in any way.

**Damages**

[74] The damages in this case are somewhat difficult to determine, given my findings. Let me preface what I say on damages with the comment that I am quite satisfied that none of the Defendants deliberately intended to breach the non-solicitation covenants. Nevertheless, it is clear that there were a number of former clients of Globex who were contacted by the Defendants. Whether these contacts were intended or not, the former clients ought not to have been solicited.

[75] Mr. Derek Malcolm's report (on behalf of the Plaintiff) was based upon losses sustained by the Plaintiff arising from the Defendants' competitive activities. It is assumed that other than the competition by the Defendants, there were no other factors adversely affecting the Plaintiff's Calgary office during the non-competition period. I have concluded that the non-competition covenants were not enforceable. The underlying assumption used by Mr. Malcolm is therefore not applicable.

[76] In addition, there was at least one other factor which adversely affected the Plaintiff's Calgary office. It was the Plaintiff's evidence that the three Defendants were their best producers. Clearly, their absence alone would have had a detrimental effect upon the Plaintiff's business. That was not taken into consideration.

[77] The Plaintiff's expert, Mr. Robert White, looked at three scenarios. The scenario which most closely covers the findings I have made deals with an estimate of the losses sustained by the Plaintiff arising from the Defendants' solicitation of 80 former clients identified by the Plaintiff. The appropriate period of time is the ten months referred to by Mr. White. His calculation of the lost revenue from these 80 clients during that period was $88,332.00. From that amount should be deducted the variable costs of $34,550.00, leaving a loss in profits of $53,782.00.

[78] However, that figure is based upon inappropriate solicitation by all three Defendants. As I have found only Kelcher to be bound by the non-solicitation covenant, I would, rather than

send the matter back for re-calculation, simply take one-third of that amount. This would leave the Plaintiff with recoverable loss of $17,927.00.

[79] The Plaintiff is entitled to damages in that amount. The parties may speak to me with respect to costs.

2009 ABQB 471 (CanLII)

Heard on the 23rd, 24th, 25th, 26th, 27th, 30th, and 31st day of March, 1st and 2nd day of April, 2009.
Written submissions received on the 4th, and 30th day of May, 10th and 19th day of June, 2009.
**Dated** at the City of Calgary, Alberta this 30st day of September, 2009.

**G.C. Hawco**
**J.C.Q.B.A.**

**Appearances:**

Timothy P. Chick
Kate Saunders
DAVIS LLP
for the Plaintiff

James A. D'Andrea
Russell Kruger
BENNETT JONES LLP
for the Defendants