IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| AGJUNCTION LLC,<br><br>    Plaintiff,<br><br>v.<br><br>AGRIAN INC., ET AL.<br><br>    Defendant. | Case No. 14-CV-2069-DDC-KGS |

## MEMORANDUM AND ORDER

Plaintiff AgJunction LLC filed this lawsuit against Defendants Agrian Inc. and five former AgJunction employees who now work for Agrian (the "Employee Defendants"). AgJunction claims that the defendants illegally copied AgJunction's proprietary and confidential agronomy software system in order to develop and sell a nearly identical competing product. Two individual defendants, Aaron D. Hunt and Matthew C. Dedmon, filed a motion to dismiss (Doc. 19), arguing that this Court lacks personal jurisdiction over them. For the reasons set forth below, the Court grants Defendants' Motion to Dismiss.

I.   **Factual Background**

Because this matter is before the Court on a motion to dismiss, all well pleaded factual allegations in the Complaint are accepted as true and viewed in the light most favorable to the plaintiff, to the extent they are uncontroverted by affidavits or other written evidence. *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995). If the parties provide conflicting affidavits, the Court must resolve those factual disputes in the plaintiff's favor. *Id.*

AgJunction is a Delaware limited liability company that develops and sells precision agronomy hardware and software. Its headquarters are located in Hiawatha, Kansas. Agrian is a

1

California corporation that has its own line of agronomy-related software products. In addition, Agrian sometimes acts as a reseller and sub-licenser of agricultural software made by other companies. In December 2012, AgJunction and Agrian entered into an agreement under which AgJunction granted Agrian access to its software in order to license the software to other firms.

On February 16, 2014, AgJunction filed a lawsuit against Agrian, alleging that Agrian unlawfully copied AgJunction's proprietary software to create and begin selling its own competing product. The lawsuit also named as defendants five former AgJunction employees now working for Agrian. One by one, from April 2013 through December 2013, those Employee Defendants resigned from AgJunction and began working for Agrian. AgJunction alleges that the Employee Defendants took confidential information about AgJunction's proprietary software with them when they left AgJunction and illegally provided it to Agrian.

Two of the Employee Defendants, Aaron D. Hunt and Matthew C. Dedmon, challenge AgJunction's proposition that this Court properly may exercise personal jurisdiction over them. In 2008, a company named GVM hired both Hunt and Dedmon, and they began working in Pennsylvania for a division of GVM known as "AgJunction." In January 2012, a Canadian company named Hemisphere GPS, which was headquartered in the province of Alberta, "acquired"[1] the "AgJunction" division of GVM. Hemisphere GPS eventually changed its name to AgJunction LLC, the plaintiff in this case.

When Hemisphere acquired "AgJunction" from GVM, Hemisphere presented both Hunt and Dedmon with employment agreements to sign. Among other things, those agreements prohibited Hunt and Dedmon from disclosing confidential information about AgJunction's software to third parties. They contained an Alberta choice-of-law provision and a permissive Alberta

---

[1] The parties do not specify the form of the transaction by which Hemisphere "acquired" the AgJunction division from GVM, but that is not relevant for purposes of this motion.

2

forum-selection clause.[2]  In late January 2012, both Hunt and Dedmon signed their respective employment contracts in Pennsylvania and returned them to company headquarters in Alberta.

AgJunction remained a Canada-based company until November 2012,[3] when it moved its headquarters from Alberta to Hiawatha, Kansas.  Neither Hunt nor Dedmon signed another employment agreement or made any amendments to the existing agreement.  Furthermore, there is no evidence that either Defendants' work duties changed in any way.  Both continued to work and live in Pennsylvania.

Hunt resigned from AgJunction in April 2013 and began working for Agrian.  During his time with AgJunction, Hunt worked as Director of Technology of AgJunction's Cloud Services Division.  His supervisor, Jeffrey A. Dearborn, was located in Memphis, Tennessee.  The only regular communication that Hunt had with someone in the Hiawatha, Kansas, office was a weekly conference call involving employees in the company's Pennsylvania, Arizona, and Kansas offices to discuss the status of two AgJunction software projects, "HQ" and "ConnX."  Hunt participated in the call on a regular basis, reporting his group's progress to AgJunction employee John Lueger at the Hiawatha office.  The conference calls began in January 2013 and continued until Hunt left AgJunction in April 2013.

Dedmon resigned from AgJunction in August 2013 and also began working for Agrian.  Dedmon worked as a Senior Developer for AgJunction, reporting to Hunt, who, as noted above, lived and worked in Pennsylvania.  Dedmon rarely communicated with anyone in the Kansas office—in fact, AgJunction does not allege a single communication between Dedmon and Hiawatha (or any other locale in Kansas).  After Hunt left the company, AgJunction chose Dedmon

---

[2] A "permissive" forum selection clause means that the parties consent to jurisdiction in Canada, but are not required to sue there.

[3] The parties disagree about when AgJunction moved to Kansas, but at the motion to dismiss stage all factual disputes are resolved in AgJunction's favor.

to convert one of its products to Apple's iOS format. In order to perform this task, Dedmon needed to obtain an Apple Developer Certification. The arrangements for this Certification and an attendant one-time $20,000 payment to Dedmon originated from the Kansas office.

At all times relevant to this action, Hunt and Dedmon lived and worked in Pennsylvania. Hunt has visited Kansas only once, approximately five years ago and well before he began working for AgJunction. Dedmon has never had the pleasure of visiting Kansas.[4] Neither defendant owns or has ever owned property in Kansas.

AgJunction's Complaint seeks a preliminary injunction and also brings claims of breach of contract, breach of the covenant of good faith and fair dealing, intentional interference with business advantage, misappropriation of trade secrets, unfair competition, breach of the duty of loyalty, breach of fiduciary duty, tortious interference with employment contracts, and conspiracy.

## II. Legal Standard

A plaintiff bears the burden of establishing personal jurisdiction over a defendant. *Intercon, Inc. v. Bell Atlantic Internet Solutions, Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000). When a court considers a pre-trial motion to dismiss for lack of personal jurisdiction without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdiction to defeat the motion. *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1056-57 (10th Cir. 2008). "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998).

---

[4] Both Defendants made a special appearance in Kansas on June 24-25, 2014, to contest jurisdiction and attend a preliminary injunction hearing.

The Court's subject matter jurisdiction over this suit is based on diversity of citizenship. "To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show both that jurisdiction is proper under the laws of the forum state and that the exercise of jurisdiction would not offend due process." *Intercon*, 205 F.3d at 1247.  Because Kansas' long-arm statute permits the exercise of any jurisdiction that is consistent with the United States Constitution, the personal jurisdiction analysis under Kansas law collapses into the inquiry required by the Due Process Clause. *Id.*  This due process inquiry imposes two requirements:  (A) the defendant must have minimum contacts with the forum state and (B) exercising jurisdiction must not offend traditional notions of fair play and substantial justice. *OMI Holdings*, 149 F.3d at 1091.

**A.  Minimum Contacts**

The due process clause permits the exercise of personal jurisdiction over a nonresident defendant so long as the defendant purposefully established "minimum contacts" with the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).  This standard can be met in one of two ways.

First, a court may exercise general jurisdiction if the defendant's contacts with the forum are "so continuous and systematic as to render [it] essentially at home in the forum State" (brackets in original). *Fireman's Fund Ins. Co. v. Thyssen Min. Const. of Can., Ltd.*, 703 F.3d 488, 493 (10th Cir. 2012).  Hunt and Dedmon have never lived or owned property in Kansas and have visited the state a combined total of once.  Therefore, Defendants' contacts are not so "continuous and systematic" that they warrant general jurisdiction over them in Kansas.

Second, a court may exercise specific jurisdiction if:  (1) the out-of-state defendant "purposefully directed" his activities at residents of the forum state and (2) the plaintiff's injuries

arose from those purposefully directed activities. *Newsome v. Gallacher*, 722 F.3d 1257, 1264 (10th Cir. 2013). The Tenth Circuit analyzes the "purposefully directed" requirement differently depending upon the cause of action alleged. *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008). "In the tort context, we often ask whether the nonresident defendant 'purposefully directed' its activities at the forum state; in contract cases, meanwhile, we sometimes ask whether the defendant 'purposefully availed' itself of the privilege of conducting activities or consummating a transaction in the forum state." *Id.*

Recently, the Supreme Court addressed the issue of "minimum contacts" necessary to create specific jurisdiction. *Walden v. Fiore*, 134 S.Ct. 1115, 1121 (2014). In a unanimous opinion, the Court explained, "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Id.* The Court emphasized two aspects that must be present for a state to exercise jurisdiction over a nonresident defendant. *See id.* at 1121-22.

First, the relationship between the defendant and the forum State must arise out of contacts that the "defendant *himself*" creates with the forum State. *Id.* at 1122. "Due process limits on a State's adjudicative authority principally protect the liberty of the nonresident defendant— not the convenience of plaintiffs or third parties." *Id.* The Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff … and the forum State." *Id.* "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be decisive in determining whether the defendant's due process rights are violated" (internal quotation marks omitted). *Id.*

Second, the jurisdictional analysis must focus on "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* A plaintiff

6

"cannot be the only link between the defendant and the forum." *Id.* "Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* "[A] defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 1123. "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985).

### B. Fair Play and Substantial Justice

Even if a defendant's actions created sufficient minimum contacts, the court must still consider whether the exercise of personal jurisdiction "would offend traditional notions of fair play and substantial justice." *Newsome v. Gallacher*, 722 F.3d 1257, 1271 (10th Cir. 2013). "Such cases are rare." *Id*. The defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477. This analysis usually involves five factors:

> (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies.

*Newsome*, 722 F.3d at 1271.

### III. Discussion and Analysis

Guided by those legal principles, the Court now turns to Defendants Hunt and Dedmon's motion to dismiss for lack of personal jurisdiction. Because the requisite analysis depends on the underlying cause of action, the Court addresses the contract and tort claims separately.

### A. Contract Claim

AgJunction brings a breach of contract claim (Count III) against Hunt and Dedmon, alleging that they breached the confidentiality provisions of their employment agreements with AgJunction.

With contract claims, courts ask whether the defendants "purposefully availed" themselves of the privilege of conducting activities or consummating transactions in the forum state. *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008). In making this determination, courts examine the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1166-67 (10th Cir. 2011). That is, the contract relied upon to establish minimum contacts must have a "substantial connection" with the forum state. *TH Agric. & Nutrition, LLC v. Ace European Group Ltd.*, 488 F.3d 1282, 1288 (D. Kan. 2007).

Defendants have done nothing to "purposely avail" themselves of the privilege of conducting activities in Kansas. Indeed, AgJunction's Memorandum in Opposition to Defendants' Motion to Dismiss (Doc. 35) effectively concedes as much—it does not even mention AgJunction's contract claims, basing its arguments for jurisdiction only on the tort claims asserted in the Complaint.

When Defendants signed their employment agreements in January 2012, AgJunction was headquartered in Alberta, Canada. Hunt and Dedmon lived in Pennsylvania, signed the agreements in Pennsylvania, and returned the agreements to AgJunction's headquarters in Canada. The contracts contain an Alberta choice-of-law provision, as well as an Alberta permissive choice-of-venue provision. Thus, at the time of contracting, Defendants did not contemplate—

8

nor could they have—that their employment agreements would have any connection with Kansas.

The only connection between Kansas and the employment agreements is that AgJunction decided, unilaterally, to move its headquarters from Alberta to Hiawatha, Kansas.  However, Defendants did not execute new agreements, nor did AgJunction make any amendments to the existing agreements.  Defendants' job duties did not change, and they had minimal communications with the new Kansas headquarters.  AgJunction's move to Kansas is the sort of "random, fortuitous, or attenuated" connection that does not establish minimum contacts.  *Walden v. Fiore*, 134 S. Ct. 1115, 1123 (2014).  As a result, this Court does not have jurisdiction based on Hunt's and Dedmon's employment agreements.

**B. Tort Claims**

AgJunction also asserts several tort claims against Hunt and Dedmon:  intentional interference with business advantage (Count IV), violation of the Kansas Uniform Trade Secrets Act (Count V), unfair competition (Count VI), breach of the duty of loyalty (Count VII), breach of fiduciary duty (Count VIII), civil conspiracy (Count X), and, against Hunt, tortious interference with contract (Count IX).

For tort claims, the relevant inquiry is whether the nonresident defendant "purposefully directed" his activities at the forum State.  *Dudnikov*, 514 F.3d at 1071.  "Purposeful direction" has three elements:  (a) an intentional action that was (b) expressly aimed at the forum state (c) with knowledge that the brunt of the injury would be felt in the forum state.  *Newsome*, 722 F.3d at 1264-65.  AgJunction has pleaded enough facts at this stage of the litigation to show that Hunt's actions and Dedmon's actions were intentional and that they knew AgJunction would be

9

harmed in Kansas. Therefore, the Court's analysis focuses on the second element—whether Defendants "expressly aimed" their activity at Kansas.

AgJunction leads with an argument that Kansas can exercise personal jurisdiction over Defendants simply because they could foresee that their conduct would harm AgJunction in this state.[5] AgJunction asserts that Hunt and Dedmon took proprietary and confidential information belonging to AgJunction, a Kansas company, and used that information to develop its own identical product to compete with AgJunction. It also argues that Defendants breached their duties of loyalty to AgJunction and interfered with AgJunction's business relationships and contracts. Based on those facts, according to AgJunction, the "constitutionally-required minimum contacts are present here despite the fact that defendants worked for AgJunction in out-of-state offices."[6]

The Supreme Court's *Walden* opinion rejects the argument that foreseeability of harm in the forum state is, by itself, enough to satisfy minimum contacts. There, the plaintiffs were traveling home to Nevada after a trip to Puerto Rico. *Walden v. Fiore*, 134 S. Ct. 1115, 1119 (2014). While changing planes in Atlanta, the defendant, a DEA agent, seized a large amount of money from the plaintiffs. *Id.* Upon returning home, the plaintiffs sued the DEA agent in Nevada federal court for, among other things, falsifying a probable cause affidavit used to seize the money. *Id.* at 1120. The Ninth Circuit held that the defendant "expressly aimed" his tortious conduct at Nevada by submitting the affidavit with knowledge that it would affect Nevada residents. *Id.*

The Supreme Court reversed the Ninth Circuit, holding that the "mere fact that [the defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Id.* at 1126. The relations between the defendant and the forum "must arise

---

[5] Doc. 35 at 20 (AgJunction's Opposition to Defendants' Motion to Dismiss).

[6] Doc. 35 at 21 (AgJunction's Opposition to Defendants' Motion to Dismiss) (internal quotation marks omitted).

out of contacts that the 'defendant *himself*' creates with the forum State" and "the plaintiff cannot be the only link between the defendant and the forum." *Id.* at 1122.  Because the only connection between the defendant DEA agent and Nevada was the fact that his conduct affected Nevada residents, the Supreme Court held that the Nevada court lacked personal jurisdiction.  *Id.* at 1126.

Applying *Walden* to AgJunction's theory of personal jurisdiction here, AgJunction's allegations that Hunt and Dedmon could foresee that their conduct would harm a Kansas company are insufficient, on their own, to confer jurisdiction.  *See also Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, No. 13-3005, 2014 WL 1849269, at *5 (7th Cir. Jan. 7, 2014) (holding that any pre-*Walden* decision that implies that harming a plaintiff in the forum state alone creates minimum contacts "can no longer be considered authoritative.").  Rather, the "proper question is not where the plaintiff experienced a particular injury but whether the defendant's conduct connects him to the forum in a meaningful way."  *Walden*, 134 S. Ct. at 1125.  After reviewing AgJunction's Complaint and its Opposition to Defendants' Motion to Dismiss, the Court has identified AgJunction's efforts to connect Hunt and Dedmon to Kansas and discusses each, in turn, below.

### 1. Defendants worked for AgJunction

First, AgJunction analogizes the facts of this case to *Thermal Components Co. v. Griffith*, in which our Court found that Kansas had specific jurisdiction over nonresident former employees of a Kansas company.  98 F. Supp. 2d 1224, 1230-31 (D. Kan. 2000).

At the outset, AgJunction does not cite, nor has the Court found, any case holding that employment alone establishes jurisdiction in the state where the employer is headquartered.  Rather, the employee must initiate other contacts with the state, beyond the mere fact of employ-

11

ment, for a court to exercise jurisdiction.  *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n. 13 (1984) ("[J]urisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him …."). In this respect, *Thermal Components* is different—the nonresident employees there had substantially more contacts with Kansas than the employees in this case. The *Thermal Components* employees maintained regular contacts with the Kansas office "by telephone, mail and electronic data communications," and each defendant was physically present in Kansas at some point in their tenures as employees. 98 F. Supp. 2d at 1229-30. The Court also noted that the employees' "payroll and benefits records were maintained and processed by plaintiff's Kansas office." *Id*.

It is undisputed that neither Hunt nor Dedmon traveled to Kansas during their time as AgJunction employees. Dedmon has never been to Kansas (except for his special appearance at the injunction hearing, which does not count), and Hunt has visited only once. In addition, and in contrast to the defendants in *Thermal Components*, Hunt and Dedmon lack the regular communications with their employer's Kansas office. AgJunction does not identify any contacts between Dedmon and the Kansas office. It alleges just one specific communication between Hunt and the Kansas office: Hunt's participation in a weekly conference call from January through April 2013. On the conference calls, Hunt reported his team's progress on two AgJunction software projects, "HQ" and "ConnX," to a Hiawatha-based employee named John Lueger.

The *Thermal Components* defendants regularly communicated with the Kansas office through multiple mediums, contacts that suggest a much stronger connection to the forum than one weekly conference call. Furthermore, even assuming that Hunt's conference call constitutes conduct "purposefully directed" at Kansas, AgJunction does not link the call to Defendants' litigation-specific activities. For the specific jurisdiction analysis, a plaintiff must establish that its

injuries arose from the activities that the defendant purposefully directed at Kansas. *Newsome v. Gallacher*, 722 F.3d 1257, 1264 (10th Cir. 2013). The only way that Hunt's participation in the conference call would matter is if it somehow related to Hunt's allegedly unlawful activity. AgJunction—which has the burden of proof here—has not established such a connection. The company makes no allegation, for instance, that the "HQ" or "ConnX" software projects discussed on the calls are connected to the allegedly misappropriated software code that is the subject of this lawsuit. Because AgJunction has failed to demonstrate that its alleged injuries "arise out of" the conference calls, the calls cannot serve as a basis for jurisdiction. *Id.*

Our *Thermal Components* opinion also noted that the plaintiffs maintained the defendants' payroll and benefits in Kansas. 98 F. Supp. 2d at 1229-30. But after *Walden*, those contacts are insufficient to confer jurisdiction. Jurisdiction "must arise out of the contacts that the 'defendant *himself*' creates with the forum State." *Walden*, 134 S. Ct. at 1122. Hunt and Dedmon were hired by a Canadian company. That the company moved its headquarters to Kansas and then began using Kansas companies to process payroll and benefits was a unilateral decision by AgJunction, not anything either Defendant did. *See Proud Veterans, LLC*, 2014 WL 791200, at *9 ("Likewise, the Plaintiff's selection of a Kansas bank as a place from which to transfer funds is not the act of a Defendant.").

In sum, *Thermal Components* not only involved different facts; *Walden* also may require a different analysis today. The contacts with Kansas created by virtue of Defendants' employment with AgJunction are insufficient to confer jurisdiction over them.

### 2. Defendants took confidential and proprietary information stored on file servers located at AgJunction's Hiawatha, Kansas headquarters

AgJunction also claims that Defendants Hunt and Dedmon "purposefully directed" their conduct at Kansas because some of the confidential and proprietary information they allegedly misappropriated was stored on Kansas-based servers.

A significant number of AgJunction's confidential and proprietary files are stored exclusively on its file servers which are located at its Hiawatha, Kansas, headquarters. AgJunction also stored confidential information on servers located in Arizona, Texas, and Pennsylvania. As part of their employment with AgJunction, Defendants had access to this information via the internet, but their employement agreements prohibited them from disclosing it to third parties.

For some time now, courts around the country have grappled with personal jurisdiction in the internet context. The Tenth Circuit has held that jurisdiction should be evaluated "by placing emphasis on the internet user or site *intentionally directing* his/her/its activity or operation *at* the forum state rather than just having the activity or operation accessible there" (emphasis in original). *Shrader v. Biddinger*, 633 F.3d 1235, 1240 (10th Cir. 2011). A recent Second Circuit case also provides guidance on this specific issue.

In *MacDermid, Inc. v. Deiter*, a Connecticut company sued its nonresident former employee for misappropriating confidential company information, in violation of her employment agreement. 702 F.3d 725, 727 (2d Cir. 2012). The employee, located in Canada, had forwarded proprietary company data from her work email account to her personal email account. *Id.* The defendant-employee argued that the Connecticut court lacked jurisdiction over her as a nonresident. *Id*. However, the defendant's employment agreement included a provision crucial to the outcome. It required the signer to acknowledge that her employer stored all confidential and proprietary information on servers *physically located in Connecticut*. *Id.* at 730. The Second

14

Circuit found that the defendant "purposefully [had] availed herself of the privilege of conducting activities within Connecticut because she was aware 'of the centralization and housing of the companies' email system and the storage of confidential, proprietary information and trade secrets' in Waterbury, Connecticut, and she used that email system and its Connecticut servers in retrieving and emailing confidential files." *Id.* The Second Circuit held that while "[m]ost Internet users, perhaps, have no idea of the location of the servers through which they send their emails," this particular defendant "knew that the email servers she used and the confidential files she misappropriated were both located in Connecticut." *Id.*

In contrast, AgJunction does not claim that Defendants knew where the files they allegedly accessed and misappropriated were stored. Furthermore, there was no reason for Defendants to think that the confidential information—to which they had access through their employment—was stored in Kansas as opposed to AgJunction's other servers located in Arizona, Texas, or Pennsylvania. Thus, AgJunction has not discharged its burden to show that Defendants "intentionally directed" their activity at Kansas simply by accessing files that happened to be stored there, as AgJunction argues. Rather, the fact that the files were stored in Kansas is the type of "random, fortuitous, or attenuated" contact that does not satisfy due process. *Walden*, 134 S. Ct. at 1123.

### 3. Defendants' co-conspirator committed an act in furtherance of the conspiracy in Kansas

AgJunction next argues that Kansas may exercise jurisdiction over Hunt and Dedmon because they were participants in a conspiracy involving Agrian and the other Employee Defendants.

AgJunction alleges that the five Employee Defendants, including Hunt and Dedmon, "planned, agreed, and conspired to breach their individual employment agreements, each of

15

which contained confidentiality, no conflict of interest, non-competition and non-solicitation clauses."[7] Specifically, the Employee Defendants "agreed [with their purported co-conspirators] to cease their employment with AgJunction and obtain employment with Defendant Agrian immediately following their termination of employment with AgJunction in order to unfairly compete with AgJunction."[8]

"[T]he existence of a conspiracy and overt acts of a co-conspirator within the forum may, in some cases, subject another co-conspirator to the forum's jurisdiction." *Newsome v. Gallacher*, 722 F.3d 1257, 1265 (10th Cir. 2013) (internal quotation marks omitted). However, the *Newsome* court recognized that "parties could potentially stretch the conspiracy cause of action to subvert the due process principles that govern personal jurisdiction," so personal jurisdiction requirements "must be met as to each defendant." *Id.* at 1265-66. Accordingly, minimum contacts can be based on the co-conspirator's presence in the forum state only "if the conspiracy is directed towards the forum, or substantial steps in furtherance of the conspiracy are taken in the forum." *Weldon v. Ramstad-Hvass*, 512 F. App'x 783, 789 (10th Cir. 2013).

First, AgJunction never alleges that the conspirators took a substantial step in furtherance of the conspiracy in Kansas. AgJunction makes just one allegation on this point. Employee Defendant Jeffrey A. Dearborn worked for AgJunction as Director of AgJunction's Cloud Services Division until December 2013, when he resigned to take a job with Agrian. AgJunction argues that Dearborn furthered the conspiracy when, during his in-person exit interview in the Hiawatha office after resigning from AgJunction, he did not disclose that he was going to work for Agrian. The purpose of the alleged conspiracy was to misappropriate collectively AgJunction's confidential information and give it to Agrian. Yet, AgJunction makes no argument about how Dear-

---

[7] Doc. 1 at ¶ 118 (Complaint).

[8] Doc. 1 at ¶ 119 (Complaint).

born's lack of candor furthered the conspiracy, let alone substantially advanced it.  As a result, AgJunction has not demonstrated that Dearborn's exit interview in Kansas was a "substantial step" in the conspiracy.

Second, AgJunction has failed to show that the Defendants' conspiracy was "directed at" Kansas.  Here again, *Walden* is instructive.  The minimum contacts analysis "looks to the defendants' contacts with the forum State itself, not to the defendants' contacts with persons who reside there." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014).  In explaining this concept, the *Walden* opinion discussed another specific jurisdiction case, *Calder v. Jones*, 465 U.S. 783 (1984).  In *Calder*, the Supreme Court allowed California courts to exercise jurisdiction over two out-of-state authors who were sued for libel. *Id.* at 784-85.  They had written, published in the *National Enquirer*, and circulated a story in California that made unflattering assertions about a California actress. *Id.* at 785.  Jurisdiction in California was proper in that case not simply because the comments were directed at a Californian. *Walden*, 134 S. Ct. at 1123.  Rather, "ample" other contacts existed:  the defendants relied on phone calls to sources in California, the article was about the plaintiff's activities in California, and, crucially, they caused reputational injury to the plaintiff in the state because the story had been read throughout California, not merely by the plaintiff. *Id.*  "[T]he 'effects' caused by the defendants' article—*i.e.*, the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to *California*, not just to a plaintiff who lived there." *Id.* at 1124 (emphasis in original).

AgJunction alleges no such connection in this case.  Rather, the only Kansas connection to the Employee Defendants' almost entirely out-of-state conduct is that AgJunction chose to place its headquarters in Kansas and was therefore injured there.  In its Opposition to Defendants' Motion to Dismiss, AgJunction asserts:  "Defendants admit knowing that AgJunction is

17

headquartered in Kansas, and through such knowledge, know that any harm AgJunction suffered as a result of their conspiracy would occur in Kansas."[9] This argument ignores that *Walden* explicitly rejected the idea that harm or foreseeability of harm to a forum's resident establishes jurisdiction in that forum. *Id.* at 1125.

AgJunction also claims that the "[Employee] Defendants took AgJunction's confidential, proprietary, and secret information, which was stored in Kansas, and which they had access to solely because of their employment with AgJunction, with them when they left to join Defendant Agrian."[10] Again, while those facts establish contacts between the Employee Defendants and AgJunction, they do not connect the Employee Defendants to Kansas itself for the purposes of establishing minimum contacts sufficient for jurisdiction.

The conspiracy, as alleged, has nothing at all to do with Kansas independent of the fact that the harmed party happens to be located here. Under *Walden*, injury to a forum resident does not establish minimum contacts. *Walden*, 134 S.Ct. at 1122 ("But the plaintiff cannot be the only link between the defendant and the forum."). Therefore, the conspiracy was not "directed at" Kansas, and the Court does not have personal jurisdiction over Hunt and Dedmon because of AgJunction's conspiracy claim.

### 4. In Kansas, AgJunction authorized a $20,000 payment in Kansas in order for Dedmon to receive an Apple Developer Certification

Finally, AgJunction claims that the Court has jurisdiction because it approved and made a payment of $20,000 from its Kansas office to Dedmon so that he would obtain an Apple Developer Certification. AgJunction "selected [Dedmon] for" a project to create an iOS version of its

---

[9] Doc. 35 at 22 (AgJunction's Opposition to Defendants' Motion to Dismiss).

[10] Doc. 35 at 22 (AgJunction's Opposition to Defendants' Motion to Dismiss).

software, which required him to get an Apple Developer Certification. [11] AgJunction, from Kansas, arranged for Dedmon to receive the Certification and authorized a $20,000 payment to Dedmon to complete the project.

The problem with AgJunction's argument is that the decisions to choose Dedmon for the project, approve the payment, and make the payment all consisted of unilateral actions taken by AgJunction. Under *Walden*, unilateral action by the plaintiff cannot create minimum contacts. 134 S. Ct. at 1122. As a result, Kansas may not exercise personal jurisdiction over Dedmon because of AgJunction's decisions about the Apple Developer Certification.

## IV. Conclusion

The Court concludes that AgJunction has not met its burden to establish personal jurisdiction over Defendants Hunt and Dedmon in Kansas. AgJunction has not demonstrated that Hunt and Dedmon have had sufficient minimum contacts with the state of Kansas such that exercising jurisdiction would comport with due process. Because AgJunction fails to satisfy the first prong of the personal jurisdiction analysis, the Court need not reach the second step—whether exercising jurisdiction would offend traditional notions of fair play and substantial justice.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion to Dismiss Aaron D. Hunt and Matthew C. Dedmon for Lack of Personal Jurisdiction (Doc. 19) is granted. Defendants Hunt and Dedmon are hereby dismissed from this action because the Court lacks personal jurisdiction over them.

**IT IS SO ORDERED.**

**Dated this 9th day of July, 2014, at Topeka, Kansas.**

s/ Daniel D. Crabtree
Daniel D. Crabtree
United States District Judge

---

[11] Doc. 35 at 10 (AgJunction's Opposition to Defendants' Motion to Dismiss).