IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

AGJUNCTION LLC,                          )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )        Case No.:  2:14-cv-02069-DDC-KGS
                                         )
AGRIAN INC.; JEFFREY DEARBORN;           )
AARON HUNT; MATTHEW DEDMON;              )
DAVID NERPEL; DERRICK ANDERSON           )
                                         )
                    Defendants.          )
_____  )

## PLAINTIFF AGJUNCTION'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

### I.      Nature of the Matter and Concise Statement of Facts

This case is about a company's own employees eviscerating one of its divisions in an unlawful scheme to take its confidential information, trade secrets, and trade connections in order to gain an unfair competitive advantage. This case is about six co-conspirators, Agrian, the Employee Defendants and former AgJunction employees Hunt and Dedmon,[1] who methodically executed a calculated scheme known as the "Agrian plan" in order to undermine AgJunction from the inside and then "burn [it] to the ground" as they "walk[ed] out the door" unscathed. Doc. 25 (Mot. for Prelim. Inj. ("Motion")) at 13; Doc. 27-2

_____

[1] AgJunction's brief includes former AgJunction employees Hunt and Dedmon as "defendants" for brevity, understanding that they currently are not defendants in this matter pursuant to the Court's Memorandum and Order dated July 9, 2014 (Doc. 140). AgJunction will shortly file and serve a complaint in Pennsylvania against Defendants Hunt and Dedmon for their misconduct.

("Heiniger Decl.") at ¶ 55; Pl.'s Hr'g Ex. P25. This case is about defending AgJunction's legitimately protectable business interests against unfair competition.

This case is *not* about the freedom to compete at all costs, as Defendants have framed the issue. There is no public interest in Canada, in the United States, or in the state of Kansas that supports a company's right to unfairly compete or an employee's right to steal customers, information, or intellectual property from his employer in order to practice his trade. To allow the co-conspirators to continue to reap the illegal fruits of their unlawful plan would unjustly reward them for violating their contractual and legal duties and incentivize further misconduct, not only in this case but in other instances of similar misconduct in future cases. An injunction is the only remedy that will protect AgJunction from continuing to suffer irreparable harm pending a trial on the merits.

The Conspiracy

Even with limited discovery on an accelerated timeline, the evidence overwhelmingly demonstrates that the conspirators deliberately plotted the serial exodus of key employees and the misappropriation of proprietary information from AgJunction in order to destroy AgJunction's Cloud Services Division. The goal of the "Agrian plan" conspiracy was to put AgJunction "out of the software business." Ex. P25. As Nerpel, then Solutions Manager at AgJunction, and Agrian's CEO, Nishan Majarian, conspired, "[i]t would be best that there is a very clear realization that there is no possibility of success [at AgJunction] and that it is time for a fire sale." *Id*.

The conspirators directed their scorn at the "Kansas bunch," meaning the management in Hiawatha, and viewed themselves as outsiders.  They used this self-imposed

status as an excuse to impair new customer account development, and were not "very bullish about adding new business" for the Hiawatha-based company.  Ex. P56.

In order to effectuate the "Agrian plan," AgJunction employee Dearborn and Agrian CEO Majarian co-led the serial defection of Dearborn's colleagues Hunt, Nerpel, Dedmon, and Anderson.  This plan assured that the conspirators would have continual, unfettered access to AgJunction's confidential information and data regarding customer contacts, preferences and pain points, proprietary software, and other trade secrets during the exodus. Ex. P60.

The multiple e-mails between each of the co-conspirators and Agrian regarding their planned departures further corroborate that the "protracted, staged emigration" was an act in furtherance of the conspiracy. These communications also reveal Dearborn's lead conspirator role. Dearborn was the primary conspirator who identified employee targets for Agrian and assisted his co-conspirators in negotiating their employment contracts with Agrian *while he was still Director of Cloud Services and a fiduciary* of AgJunction. Exs. P9, P23, P25, P57, P60, Doc. 116 Ex. 9, Hr'g Tr. 140:9-141:8. In fact, Dearborn continued this surreptitious plan over a period of nine months until sealing the plot with his own defection. More disconcerting were the co-conspirators' constant assurances to AgJunction that neither Agrian nor the Employee Defendants would be competing with AgJunction. P68, P88. Nothing could have been further from the truth. None of the Employee Defendants besides Hunt (after being caught in a lie) admitted to AgJunction that they were leaving to work for Agrian, even when directly asked. *See, e.g.*, Doc. 116 Ex. 21; Ex. P88.

Defendants resorted to all means, including concealment and theft from AgJunction, in furtherance of the "Agrian plan." Ex. P25. Even after litigation commenced, Defendants continued to cover up their scheme with conveniently shifting stories and testimony that plainly contradict admissions in their own e-mails and the facts in the record. For example, in his declaration in support of Defendants' Opposition to AgJunction's Motion, Agrian's CEO admits that Agrian chose Ruby on Rails in order to avoid being "accused of copying AgJunction's or any other Precision Ag company's software code." Ex. P72 at ¶ 14. Yet, at the Preliminary Injunction Hearing, presumably as part of the continued scheme, Agrian's VP of Product Management, Todd Rickets, testified that Agrian chose Ruby on Rails because "all the cool kids want to develop on Ruby" and carefully avoided any reference to Agrian's true intention to avoid the appearance of copying. Hr'g Tr. 377:3-23.

The Employee Defendants committed each of these unlawful acts in violation of their employment agreements ("Agreements"), and each of them breached his common law duty not to compete with AgJunction for the duration of his employment and to maintain the secrecy of AgJunction's confidential information both during and after his employment term. Doc. 25 (Motion); Heiniger Decl. at ¶ 23-25. Dearborn and Hunt also breached their duties of loyalty, good faith, honesty, and avoidance of conflict of duty and self-interest. *Ontario Ltd. v. Little Zinger Inc.*, [2014] O.J. No. 2664 at ¶ 155 (Can. Ont. Sup. Ct. J.) (fiduciary employee cannot usurp business opportunities his employer would have been unwilling or incapable of exploiting); *Canadian Aero Serv. Ltd. v. O'Malley*, [1974] S.C.R. 592 (Can.), 1973 S.C.R. Lexis 43, at *7 (attached as Exs. A and B, respectively).

Irreparable Harm

In gaining a head start on the development of its NextGen software through the unlawful use of AgJunction's protected information and intellectual property, the co-conspirators caused AgJunction to lose one of its largest customers, Crop Production Services, Inc. ("CPS"). Heiniger Decl. at ¶ 48.  The co-conspirators similarly attempted to poach other AgJunction customers, including Agri-AFC, LLC ("Agri-AFC"). The co-conspirators were careful to disguise these customer transitions and migrations in order to deceive AgJunction and keep their operations covert. Ex. P163; Hr'g Tr. 136:23-140:8. Even AgJunction's and Agrian's customers were confused by the mid-stream bait and switch plan of customer contracts coordinated by Dearborn on the inside at AgJunction and with his cohorts at competitor Agrian. *Id*.

Until the co-conspirators implemented the "Agrian plan," Agrian had never offered – and was not in a position to offer – a product in the Precision Ag space. Hr'g Tr. 84:2-85:7. In other words, if not for the coordinated, surreptitious theft of employees, know-how, data, and information, Agrian would not have been able to offer a directly competing Precision Ag product. Additionally, AgJunction has lost a substantial amount of good will in the industry as a result of the "Agrian plan."  Not unsurprisingly, in accordance with Defendants' mission, the viability of AgJunction's Cloud Services Division has been significantly threatened.  *See* Ex. P25 ("for the success of the going-forward Agrian plan it would be best for 'AgJunction' to be out of the software business"). As a result of these losses, AgJunction even had to table merger discussions in a lucrative deal because a joint venture partner believed that AgJunction had lost value caused directly by implementation of the Agrian

plan. While those discussions may resume at a later date, the future is unclear given Defendants' ongoing unlawful interference with AgJunction's customer relationships.

## II.     Defendants Conspired to Put AgJunction "Out of the Software Business."

"Under Kansas law, civil conspiracy contains the following elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Tanksley v. Bay View Law Group, P.C.*, 2014 U.S. Dist. LEXIS 73097, at *23 (D. Kan. May 29, 2014). The law also requires "the commission of a wrong giving rise to a cause of action independent of the conspiracy claim." *Id.*

"When all elements are present, any act done by a member of the conspiracy in furtherance of the common object and in accordance with the general plan becomes the act of all, and each conspirator is responsible for the act. Because direct evidence is rarely available, a civil conspiracy may be proved by circumstantial evidence. Consequently, the existence of the conspiracy may be proved by proving the acts of the various defendants." *Vetter v. Morgan*, 22 Kan. App. 2d 1, 8 (May 5, 1995) (citation omitted). Here, abundant direct evidence demonstrates that the individual Employee Defendants and Agrian conspired with each other to put AgJunction "out of the software business." *Id.*; Ex. P25.

*First*, "two or more persons" are involved in this conspiracy, namely, the Employee Defendants and Agrian.

*Second*, the Defendants had multiple "object[s] to be accomplished." Notably, Defendants' primary objective was to unfairly compete with AgJunction. *See, e.g.*, Ex. P25 (defining the "Agrian plan" to steal AgJunction's customers and force a "fire sale").

*Third*, the evidence shows a clear "meeting of the minds in the object or course of action." Defendants plotted to drain AgJunction of key employees, proprietary information and intellectual property in a covert and systematic scheme while they were still employed at AgJunction in order to cause as much damage as possible to AgJunction's business from the inside. As with the other elements of civil conspiracy, circumstantial evidence is sufficient to show a "meeting of the minds." *See Meyer v. Christie*, 2009 U.S. Dist. LEXIS 114524, at *14-15 (D. Kan. Dec. 8, 2009). Here, however, the Court has the benefit of direct evidence.

For example, in order to orchestrate the "protracted, staged emigration" of his co-conspirators, Dearborn, incredibly, remained at AgJunction for nine months after he had agreed to work for Agrian. During this time, he had continued access to AgJunction's confidential and proprietary information, including the planned joint venture. Hr'g Tr. 141:17-143:16. In another example, Hunt assisted in the scheme to bleed AgJunction dry of proprietary knowledge and secrets. He e-mailed Majarian on April 6, 2013, to report "a sit down" with two other AgJunction employees, Dedmon and VonGunden, and that "[b]oth are good to go. Will call Monday to go over final details." Ex. P24.

*Fourth*, Defendants committed "one or more unlawful overt acts." Namely, Defendants stole AgJunction's confidential information, trade secrets and trade connections, and used this information to unlawfully compete with AgJunction. Contrary to Defendants' assertions, neither Canadian nor Kansas law sanctions such conduct, which is contrary to the public's interests in fair competition and the protection of intellectual property rights.

*Fifth*, Defendants' actions have caused "damages as the proximate result" of their unlawful acts. Defendants' illegal conduct has threatened AgJunction's Cloud Services

Division. Moreover, the co-conspirators' unlawful activities actually caused the loss of AgJunction's customers, including one of its primary customers, CPS, and the demise of a lucrative joint venture to expand its Cloud Services business. In addition, Defendants caused AgJunction to suffer substantial damage to its good will and reputation in the industry.

Finally, "the commission of a wrong giving rise to a cause of action independent of the conspiracy claim" exists. Specifically, Defendants' actions give rise to the independent claims of Breach of Contract, Intentional Interference with Business Advantage, and violation of the Kansas Uniform Trade Secrets Act, K.S.A. §§ 60-3320, *et seq*.; Doc. 25; Doc. 114 (AgJunction's Reply in Supp. of Mot. for Prelim. Inj.).

### III.    The Employee Defendants' Conspiratorial Acts Constitute Breaches Of Their Employment Agreements.

The issue before the Court regarding the Employment Agreements is whether the non-competition and non-solicitation provisions protecting AgJunction's confidential information and trade secrets constitute valid restraints of trade. *See, e.g.* Hr'g Tr. 293:24-301:9. The evidence is clear that the covenants provide reasonable restrictive limitations on the Employee Defendants' ability to: (1) solicit former customers or employees of AgJunction; and (2) compete directly with AgJunction using the specialized skills, unique knowledge, and confidential, proprietary information they acquired during their tenure with AgJunction.

AgJunction lawfully and openly bargained for these protections, and the Employee Defendants unequivocally agreed to them in writing. Moreover, these restrictions are in line with applicable Canadian case law as well as the Employee Defendants' common law duties: 1) not to disclose confidential information during and after their employment with

AgJunction; 2) not to surreptitiously set about to establish a competitive business while continuing to work for their soon-to-be former employer, AgJunction; and 3) with respect to fiduciaries Hunt and Dearborn, to act in the best interests of their former employer. *Imperial Sheet Metal Ltd. v. Landry*, 2007 NCBA 51, ¶¶ 33-4 (Doc. 79-6); *Carlsen v. Physique Health Club Ltd.*, [1996] ABCA 358, ¶ 4 (Doc. 79-13); Exhibit B (*Canadian Aero* at *7-8). Canadian courts have long recognized the freedom to contract and upheld reasonable restraints of trade, understanding employers' need for a way to protect against former employees divulging trade secrets, putting them to their own use, and improperly enticing away the company's customers.  Doc. 79-13 (*Carlsen* at ¶¶ 14-15); *see Morris v. Saxelby*, [1916] 1 A.C. 688, 700 (Doc. 116-9).

### A.     The Non-Competition Provisions Constitute Valid Restraints Of Trade.

Non-solicitation and non-competition clauses are valid restraints of trade if they are reasonable with reference to the public interest. *Elsley v. J.G. Collins Ins. Agencies*, [1978] 2 S.C.R. 916, 923 (Doc. 79-10). In an exceptional case like this one, a covenant is justified if it restricts the Employee Defendants from working for a competitor *while still employed at AgJunction* and for a short post-employment period to prevent the misappropriation of confidential information, trade secrets, and trade connections. *Id*. at 924. AgJunction's proprietary interests in its software, business plans, and customer information and relationships would not be adequately protected by a simple non-solicitation clause because AgJunction's employees could simply co-opt these interests for their own in a competing enterprise, crippling AgJunction without fear of repercussion. *Id*. at 926. There is no public interest in allowing or condoning this type of unlawful competition, and Agrian has failed to

demonstrate any such interest exists under Canadian or U.S. law. *Id.* at 928; *see* Doc. 116-9 (*Morris v. Saxelby*) (the party attacking the reasonableness of a restrictive covenant bears the burden of proving that the covenant is contrary to the public interests). In fact, Defendants fail to address the issue of public interest in this context at all. Nothing in the record suggests that the covenants would prevent the Employee Defendants from practicing their occupations or earning a living as long as they did not violate the narrowly tailored provisions of their employment agreements.

<blockquote>

**1.      The Non-Competition Provisions Are Reasonable Under The Test Articulated In *Elsley v. J.G. Collins Ins. Agencies, Ltd.***

</blockquote>

Although Canadian law permits a non-fiduciary employee to engage in fair competition with a former employer, he is not allowed to do so if doing so would breach the terms of his confidentiality, non-competition, or non-solicitation agreements. Doc. 79-10 (*Elsley*). A fiduciary, such as Dearborn and Hunt, has an additional duty at common law – separate and apart from his contractual duties – to act in the best interests of the company. Ex. B (*Canadian Aero* at *7-8; Ex. A (*Little Zinger, Inc.* at ¶¶ 153-55); Doc. 79-13 (*Carlsen* at ¶ 4); Doc. 79-6 (*Imperial Sheet Metal* at ¶ 43-44). This duty prohibits Dearborn and Hunt from: 1) soliciting AgJunction's customers for a reasonable period of time; 2) taking a maturing business opportunity from AgJunction during or after termination; and 3) taking confidential and selective customer lists or trade secrets for use in a competing enterprise. Doc. 79-13 (*Carlsen* at ¶ 4). Canadian courts have recognized that post-employment fiduciary obligations last for approximately one year, and eighteen (18) months is reasonable as the period of time necessary to enable a former employer to contact its clients and attempt to retain their loyalty. *Imperial Sheet Metal Ltd. v. Landry* at ¶¶ 80-81 (Doc. 79-6).

The evidence in this case demonstrates that conspirators Dearborn and Hunt were fiduciaries of AgJunction because they were 1) even in their own minds integral and indispensable components of the management team responsible for guiding the business affairs of the Cloud Services Division; 2) necessarily involved in the decision-making processes of the Cloud Services Division; and 3) had broad access to Confidential Information that, if disclosed, would significantly impair the competitive advantages that AgJunction enjoyed. Doc. 79-6 (*Imperial Sheet Metal v. Landry*, at ¶ 63). Dearborn was the Director of AgJunction's Cloud Services Division and one of the primary individuals on whom AgJunction's CEO relied for executive managerial functions such as reporting employee status, determining business strategy, and making independent financial decisions. Hr'g Tr. 76:18-77:1, 70:15-23, 434:8-13. Hunt, as Director of Technology, also guided the Cloud Services Division's technical roadmap and implementation. Ex. P39. As fiduciaries, Hunt and Dearborn "should not be in a position to use the intimacies and knowledge which [they] had acquired in the course of [their] employment in order to . . . undermine the business and the connection" of AgJunction. Doc. 79-10 (*Elsley* at 926).

Turning to the restrictive covenants, the Court's analysis must be made on a case-by-case basis because there is no objective bright line test for reasonableness. *Shafron v. KRG Ins. Brokers*, [2009] 1 S.C.R. 157, 159 (Doc. 34-5). Here, the evidence demonstrates that 1) AgJunction has a strong proprietary interest to protect; 2) the covenants are appropriately limited temporally or geographically; and 3) the covenants are not against competition generally. Doc. 79-10 (*Elsley* at 925).

*First*, as discussed in Section V below, AgJunction possessed a proprietary interest in its highly specialized software system, which formed the basis of its Cloud Services business. *See* Hr'g Tr. 44:3-48:22. In addition, AgJunction had valuable customer, product, pricing, and marketing information and specialized business insight developed as a result of its trade connections. The protection of AgJunction's confidential information and intellectual property was an essential component of the Hemisphere GPS acquisition of AgJunction and an integral part of the Cloud Services Division. *See* Hr'g Tr. 49:19-61:17.

*Second*, the temporal scope of the restrictive covenants is unquestionably reasonable. The non-competition clause is limited to six (6) months or twelve (12) months, depending on the Employee Defendant. The geographic scope also is reasonable given that AgJunction's products are sold globally and the Cloud Services software system has been deployed in the United States and Canada. Hr'g Tr. 48:23-49:2. In fact, each of the Employee Defendants signed a non-competition and non-solicitation agreement with their new employer, Agrian, *on more restrictive terms* than their existing Agreements with AgJunction. *See, e.g.*, Ex. P58 at ¶ 7 (restrictive covenant lasting two years).

*Third*, the non-competition covenant is limited exclusively to persons or entities that compete or plan to compete with AgJunction, or to whom any disclosure of AgJunction's Proprietary Information would be of material value. *See*. Ex. P54 at 4. The covenant is not against competition generally and does not restrict any of the Employee Defendants from pursuing his livelihood in the fields of programming or sales, whether in agronomy or elsewhere. Defendants failed to present any evidence that the Employee Defendants would not be able to practice their livelihoods as a result of the non-competition covenant.

Beyond the non-competition covenant, the Agreements' "Conflict of Interest" provision further obligates the Employee Defendants to refrain from competing or preparing to compete with AgJunction during their respective terms of employment with AgJunction. *See id*. This contractual provision is wholly consistent with the Employee Defendants' common law duties. Moreover, it accurately reflects the highly sensitive nature of AgJunction's business and proprietary information, as well as AgJunction's vulnerability to improper competition if an employee were to breach his confidentiality or conflict of interest duties. Doc. 79-13 (*Carlsen* at ¶ 11) (evidence that former employee acquired special or unique knowledge that rendered company more vulnerable to competition at the hands of its former employee may justify a restrictive covenant).

> ## 2.     Sufficient Consideration Exists To Support The Restrictive Covenants.

In exchange for agreeing to the Confidentiality and Intellectual Property Agreement, the Employee Defendants received new employment contracts with Hemisphere GPS. Part of the consideration under those contracts included salary, commission (bonuses), vacation days, 401k benefits, employee stock option plan benefits, health and dental benefits and company contributions to employee health expenses.  Exs. P17, P22, P47, P54, P17.

> ### B.     The Non-Solicitation Provisions Constitute Valid Restraints Of Trade.

The reasonableness analysis of the non-solicitation covenants is the same as the analysis of the non-competition covenants. Moreover, the threshold for the Court's analysis is lower because a non-solicitation clause does not have the capacity to prevent competition *per se*. Accordingly, the non-solicitation covenants constitute valid restraints of trade.

An injunction is further warranted because the Employee Defendants agreed to a "Remedies" provision acknowledging that "irreparable damage will result" to AgJunction and it "shall be entitled . . . to injunctive relief." *See, e.g.*, Ex. P54 at 5.

## IV.   AgJunction Has Been Irreparably Harmed by the Defendants' Conspiracy to Steal AgJunction's Proprietary Trade Secret Information.

The "Agrian plan" has allowed Agrian and its co-conspirators to unfairly and illegally shortcut the development of its competing software product through the misappropriation of Agrian's confidential, proprietary, and trade secret information, irreparably harming AgJunction in the process.  As this Court has stated, such disclosure of trade secrets "allows a competitor to cut corners in the research and development process" ensuring "the competitor will attain a competing product . . . much sooner" than otherwise possible. *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1149 (D. Kan. 2007). "[I]t is this harm . . . that is irreparable." *Id.*

Not only is an unfair head start a source of irreparable harm, but loss of customers, loss of goodwill, and threats to a business's viability can also constitute irreparable harm. *Id.* at 1148. Additionally, "unfair competition resulting from a breach of covenant not to compete is likely to constitute irreparable harm." *Id.* Further, a party can show potential harm of unfair competition where a former employee has knowledge of confidential information peculiar to his former employer's products. *Id.*

Whether Agrian completed its competing software is immaterial. It is clear that the conspirators targeted the viability of AgJunction's Cloud Services business. And, the fact remains that Defendants lifted the CPS account from AgJunction, promising full AgJunction functionality and more by 2015, which was impossible without Defendants' unlawful acts.

Horrom Dep. 26:4-6, 26:9-28:16. In addition to CPS, the conspirators, now ensconced at Agrian, have continued to attempt to sign additional AgJunction customers to their services. Hr'g Tr. 61:5-63:4. For example, Agrian tried to switch Agri-AFC's contract to Agrian without AgJunction's or even the customer's approval. Ex. P163. This type of misconduct has led to the loss of customers and goodwill. Agrian's false representations that it has a legitimate alternative to AgJunction's Precision Ag software "and more" further directly undermine customer confidence in AgJunction.

The "Agrian plan" also has caused AgJunction to lose a joint venture opportunity. From 2013 through May 2014, AgJunction was working with E4 Crop Services and International Farming Corporation to form a joint venture centered on expanding AgJunction's Cloud Services products to "evolve the current AgJunction system as it was and grow it." Hr'g Tr. 150:1-11.  Mergers and other business plans can be afforded trade secret protection if the information is not publicly known or readily ascertainable by the industry. *See Bradbury Co., Inc. v. Teissier-DuCros*, 413 F. Supp. 2d 1209, 1215, 1223 (D. Kan. 2006).  AgJunction kept this information secret and it was neither available to the public nor ascertainable by the industry. Hr'g Tr. 149:12-25. Mr. Dearborn, however, wore two hats while at AgJunction. As an AgJunction employee, he was intimately involved in the details of the joint venture while simultaneously working to benefit the "Agrian plan." *Id.* 148:18-149:11, Exs. P23, P71. As a direct result of his two-faced role and the co-conspirators' actions, it became "impossible . . . to consider contingencies on all parts," and ultimately resulted in the demise of the joint venture.  *Id.* 147:15-148:3, 159:8-160:5. This loss of opportunity has resulted in an incalculable loss constituting irreparable harm. *Id.*

342:23-343:10. Moreover, the uncertainties caused by the co-conspirators' actions prevent AgJunction from reviving joint venture plans, which is an irreparable harm that only injunctive relief can remedy.

**V.     The Co-Conspirators' Theft of Proprietary Trade Secret Information Gave Them An Illegal Head Start in the Development of Their Customer Relationships and Competing Software.**

Under Kansas law, "'trade secret' means information 'including a formula, pattern, compilation, program, device, method, technique, or process' that '(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other person who can obtain economic value from its disclosure or use, and (ii) is subject of efforts that are reasonable under the circumstances to maintain its secrecy.'" *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F. Supp. 2d 1102, 1106 (D. Kan. 2000)); K.S.A. § 60-3320(4).

Here, the conspirators have stolen at least the following from AgJunction: (1) proprietary customer information and requirements; (2) particularized know-how; and (3) the AgJunction Precision Ag product.   Hr'g  Tr.  35:10-38:15,  61:5-65:6,  169:7-24.  This information is not only confidential and proprietary, but qualifies as trade secrets.

**A.     Proprietary Customer Information and Requirements**

Customer needs and requirements developed over time and experience can comprise protectable trade secret information. *See e.g.*, *Bradbury Co.*, at 1228; *Haggard v. Spine*, 2009 U.S. Dist. LEXIS 54818, at *26 (D. Colo. June 12, 2009); *Sun Media Sys. v. KDSM, LLC*, 564 F. Supp. 2d 946, 966 (S.D. Iowa 2008). Confidentiality agreements lend further support

to a finding that customer information is covered by trade secret protection.  *See Haggard*, 2009 U.S. Dist. LEXIS 54818, at *22.

Each Employee Defendant was bound by a confidentiality agreement relating to customer information. Exs. P17, P22, P47, P54, and P63. Dearborn had worked with AgJunction's customer, CPS, and knew its specific Precision Ag needs and requirements. Hr'g Tr. 213:5-7.  Dearborn was so familiar with these specialized requirements that shortly after he resigned from AgJunction, CPS' Precision Ag Services Manager Neal Horrom contacted AgJunction's CEO to inform him that CPS was not renewing with AgJunction but instead moving its operations to Agrian, who had promised to provide all of AgJunction's functionalities and more. Hr'g Tr. 61:20-62:8, Horrom Dep. 25:13-16, 19-24, 26:1-6, 9-25, 27:1-18.  For a company as large as CPS to switch from a proven system to one that was only under development necessarily requires extensive assurances that the new solution can seamlessly address all of CPS's specific requirements which were known by Dearborn.

The same scenario occurred with Agri-AFC. Hr'g Tr. 136:20-140:8; Ex. P163. In late October 2013, the co-conspirators brazenly attempted to cut AgJunction out from contacts with its own clients.  However, Agrian failed to inform at least one client, Agri-AFC, of its plan. Agrian's attempt to convert this unsuspecting client triggered a distressed e-mail from the client to AgJunction for clarification, as the client was "blindsided" and "caught off-guard" when "she was informed her contract will now go through Agrian and not" AgJunction. Ex. P163.

The customer requirement information the co-conspirators misappropriated qualifies as a trade secret.  *First*, the information derives independent economic value from its use.

Specifically, AgJunction's customers, who provide an economic benefit to AgJunction, have worked with AgJunction for years to develop specialized services with respect to their Precision Ag software and data requirements. Hr'g Tr. 87:16-88:4. *Second*, this information is subject to reasonable efforts to maintain secrecy. *See Duarte*, 519 F. Supp. 2d at 1150-54. AgJunction required its employees, including the Employee Defendants, as well as its partners, such as Agrian, to sign confidentiality agreements. Exs. P17, P22, P47, P54, P63, P88 at 1.  Further, customer interactions and feature requests regarding AgJunction's source code are protected by the JIRA system which requires a login and password. Hr'g Tr. 67:10-68:19.

### B.      Particularized Know-How

Multiple jurisdictions employing the Uniform Trade Secrets Act, like Kansas, have held that specialized "know-how" can be a trade secret. As the KUTSA states, "[c]ases from other jurisdictions are persuasive," and KUTSA "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this act among states enacting it." *Bradbury Co.*, 413 F. Supp. 2d at 1222. "A trade secret can relate to technical matters such as the composition or design of a product, a method of manufacture, or the know-how necessary to perform a particular operation or service." *Sun Media Sys.*, 564 F. Supp. 2d at 966. Technical "know-how" of process technologies is the quintessential trade secret.  *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th, 1443, 1456 (2002).

Prior to leaving AgJunction for Agrian, Hunt worked on the AgJunction Precision Ag product for over 12 years, obtaining an intimate knowledge of the product, its functionalities, source code, and processes. Hr'g Tr. 87:16-88:4. As an employee directly reporting to Hunt,

Dedmon also had similar specialized knowledge. In fact, Dedmon acknowledged that he could not help but use such specialized knowledge from his experience at AgJunction[2]. (Dedmon Dep. 9:5-10, 13-15). The Seventh Circuit has found that an injunction is warranted where a former employee "cannot help but rely on [his employer's] trade secrets as he helps plot [a competitor's] new course" and "these secrets will enable [the competitor] to achieve a substantial advantage." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1270 (1995). Although "this type of trade secret problem" arises less often, it "nevertheless falls within the realm of trade secret protection." *Id.*; *EMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 504 (5th Cir. 1982) (recognizing trade secret protection where former employee will have difficulty preventing his knowledge of former employer's techniques from infiltrating his work).

### C.      AgJunction's Precision Ag Product

From the start, the co-conspirators were cognizant that the "Agrian plan" involved copying the AgJunction software. Mr. Majarian admitted as much. P75 at ¶ 14. Agrian's own expert, Dr. Edwards, testified that of the ten authored files he located in the Agrian source code, all were created by Hunt or Dedmon. Hr'g Tr. 367:19-368:8; Ex. P31.

The co-conspirators primarily rely on three arguments to allege that they did not misappropriate AgJunction's Precision Ag software:  (1) any copying of AgJunction's code was not verbatim; (2) some matches in the functionalities between AgJunction and Agrian's code involved open source software; and (3) some functionalities in AgJunction's software can also be found in other third-party software. These arguments fail for several reasons.

---

[2] In fashioning relief, the Court should note that Agrian would only be barred from developing software that would take unfair advantage of Hunt and Dedmon's particularized know-how of AgJunction's systems to illegally push it "out of the software business."

*First*, both experts agree that copying does not require verbatim copying. Hr'g Tr. 229:3-230:16, 376:15-18. Indeed, the differences in source code languages made direct copying impossible. *Second*, both experts agree that there are several functionality matches between the two companies' software, not just in soil lab data, but in such functionalities as geographical mapping, asset management, and controller functions. Hr'g Tr. 280:13-282:21, 368:9-24. It is also well-established that even software fully comprised of open source code can be afforded trade secret protection. *Duarte*, 519 F. Supp. 2d at 1152 n. 39 (quoting *All W. Pet Supply Co. v. Hill's Pet Prods. Div.*, 840 F. Supp. 1433, 1438) (D. Kan. 1993) ("trade secrets often contain elements that by themselves may be in the public domain, but together nevertheless qualify as trade secrets.")).

Finally, the Tenth Circuit has held that a trade secret does not need to be exclusive to the field in order to be afforded protection. *Rivendell Forest Prods. v. Georgia-Pacific Corp.*, 28 F. 3d 1042, 1045 (10th Cir. 1994) ("Novelty and invention are not requisite for a trade secret as they are for patentability.") The Court explained, "the general principle [is] that a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Id.* (citation omitted).

Thus, even though the conspirators' expert found a good portion of the matches in source code components between AgJunction's and Agrian's software to be publicly available open source code, this does not preclude trade secret protection. Indeed, AgJunction's expert, Mr. Stillerman found evidence that 89% of the elements in

AgJunction's soil sample formats were used in Agrian's soil sample formats. Ex. P132 ¶ 29. It is the combination of those functions and features, like soil sample formatting, that confers trade secret protection to AgJunction's source code, not only the functionalities in isolation.

## VI.    Conclusion

For the foregoing reasons, Plaintiff respectfully requests that this Court issue a preliminary injunction preventing Defendants from further development of features and functionalities of its NextGen product that exist in AgJunction's Precision Ag software.

Date:   July 10, 2014

Respectfully submitted,

s/ Mark Brown
Mark Brown (Kansas Bar No. 9638)
mark@midwestip.com
Chris Debacker (Kansas Bar No. 24095)
chris@midwestip.com

LAW OFFICE OF MARK BROWN, LLC
4700 Belleview #210
Kansas City, MO 64112
Telephone: (816) 268-8950
Facsimile:  (816) 502-7898

Gerald P. Dodson (admitted *pro hac vice*)
jdodson@carrferrell.com
Robert J. Yorio (admitted *pro hac vice*)
yorio@carrferrell.com
Christine Watson (admitted *pro hac vice*)
cwatson@carrferrell.com
Bryan J. Boyle (admitted *pro hac vice*)
bboyle@carrferrell.com
Marcus H. Yang (admitted *pro hac vice*)
myang@carrferrell.com
Michael T. Adelsheim (admitted *pro hac vice*)
madelsheim@carrferrell.com

CARR & FERRELL LLP

120 Constitution Drive
Menlo Park, CA 94025
Telephone:  (650) 812-3400
Facsimile:  (650) 812-3444

Douglas D. Silvius (KS #13465)
Martin, Pringle, Oliver, Wallace & Bauer, LLP
4700 Belleview, Ste. 210
Kansas City, MO 64112
P: (816) 753-6006      F: (816) 5025-7898
ddsilvius@martinpringle.com

*Attorneys for Plaintiff AgJunction LLC*