# EXHIBIT A



FOCUS - 1 of 653 DOCUMENTS

Between 410784 Ontario Limited, Plaintiff by Counterclaim, and Little Zinger Inc. c.o.b. as Corktown Esso, Zafar Khokhar, James Stonley and Jet Transportation Limited, Defendants by Counterclaim

**INDEXED AS:** 410784 Ontario Ltd. v. Little Zinger Inc. (c.o.b. Corktown Esso)

Court File No. CV-09-00373187

Ontario Superior Court of Justice

**JUDGES:** V.R. Chiappetta J.

*[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959; 2014 ONSC 2510*

**DATE INFORMATION:** March 18-21, 24, 27 and 28, 2014 Judgment: May 16, 2014.

**JUDGMENT DATE:** May 16, 2014

**COUNSEL:**
 [*1]

Counsel:

*James Zibarras* and *John Philpott*, for the Plaintiff by Counterclaim.

*Wendy Greenspoon-Soer*, for the Defendants by Counterclaim.

**JUDGMENT:**

V.R. CHIAPPETTA J.:--

**Overview**

[1] The Plaintiff by counterclaim, 410784 Ontario Limited ("the Plaintiff" or "City Gas") operated as a fuel service station for over 25 years at 176 Front Street East, Toronto, Ontario (the "front street location").

[2] The Defendants by counterclaim, Zafar Khokhar ("Khokhar") and James Stonley ("Stonley") were long time employees of City Gas (collectively "the employees"). Khokhar and Stonley were the managers of the front street location and trusted with its day to day operations.

[3] The Defendant by counterclaim, Jet Transportation Limited ("Jet" or "landlord"), owned the entire building municipally known as 176 Front Street East and 33 Sherbourne Street in Toronto, Ontario, including the front street location. City Gas originally signed a lease with Jet to rent the front street location and operate a fuel service station. In

[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959, *1;
2014 ONSC 2510

October 1980, City Gas began to lease the front street location and continued to lease that location from Jet until vacating the premises in April 2006 in accordance with [*2]  a Notice to Vacate received from Jet.

[4] The Defendant by counterclaim, Little Zinger Inc. carrying on business as Corktown Esso ("Little Zinger"), is a company incorporated by Khokhar and Stonley.

[5] In March 2006, Little Zinger and Jet entered into a head lease for the entire building at 176 Front Street East and 33 Sherbourne Street that did not include a right to sublease the front street location.

[6] The Plaintiff submits that its long time employees and its long time landlord secretly negotiated a lease that benefitted them to the detriment of the Plaintiff. The Plaintiff pleads a number of torts and seeks damages for breach of contract, breach of fiduciary duty, breach of duty of good faith, conspiracy, and unlawful interference with economic interests.

[7] The Defendants submit that they were fully entitled to enter into their agreement. At the material time, the Plaintiff's lease with the landlord had expired and the Plaintiff was not interested in the terms for a new lease as offered by the landlord.

[8] The Defendants further submit that the claim brought by City Gas is barred by the *Limitations Act*, *2002*, S.O. 2002, c. 24, Sched. B ("the Act").

[9] For [*3]  reasons set out below, I agree with the Defendants and conclude that the claim brought by City Gas is statute barred by the Act. The Plaintiff's claim is therefore dismissed.

### Background

[10] City Gas was incorporated on March 28, 1978. The shareholders of City Gas were the late Selby Wemyss ("Selby") and his wife Dorothy Wemyss ("Dorothy").

[11] Jet is the owner of a building on the property municipally known as 176 Front Street East and 33 Sherbourne Street in Toronto, Ontario ("the premises").

[12] On October 28, 1980, City Gas as tenant and Jet as landlord signed an agreement to lease the front street location ("the lease") to be operated as a fuel service station owned by City Gas. City Gas was not the only tenant on the premises. The front street location was located at the front of the premises facing Front Street. The lease was renewed without issue on June 22, 1985, April 1, 1989, February 11, 1994, and January 8, 1998. City Gas also had two smaller fuel service stations at Martin Grove and Eastern Avenue. The Eastern Avenue location closed in 2005. The Martin Grove location was sold in August 2006.

[13] In June 2003, City Gas invested approximately $ 500,000 renovating [*4]  and upgrading the front street location.

[14] The lease of January 8, 1998 was for a fixed term expiring November 7, 2004 with an option to renew for a five year term to be exercised in writing by May 7, 2004. The option to renew was not exercised. On November 7, 2004, the lease expired. City Gas became a month to month tenant and was paying Jet $ 10,000 per month to lease the front street location.

[15] In August 1983, Stonley commenced employment at the front street location. Throughout the years he became Selby's right hand man at the front street location and was granted signing authority over the bank account for City Gas in September 2000. The only other person with signing authority for City Gas was Selby.

[16] In June 1994, Khokhar commenced employment at the front street location.

[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959, *4;
2014 ONSC 2510

[17] During the initial years of business, Selby controlled and oversaw the day to day operations of the front street location. For many years prior to December 2005, however, Selby admittedly relied on Stonley and Khokhar to run the day to day operations of the front street location with full authority and discretion as managers.

[18] On September 16, 2004, Stonley and Khokhar incorporated [*5] Little Zinger as equal shareholders.

[19] In December 2005, Little Zinger presented Jet with an Offer to Lease the premises for $ 20,000 per month. The offer included an agreement by Little Zinger to enter into separate sublease agreements with the existing tenants on the premises ("the head lease"), including City Gas.

[20] In February 2006, the terms of the head lease as presented by Little Zinger were negotiated between counsel representing Little Zinger and counsel representing Jet.

[21] On February 22, 2006, Little Zinger delivered to Jet an irrevocable Offer to Lease, which was open for acceptance until February 28, 2006. The monthly rent remained as previously agreed at $ 20,000 per month. The offer included an agreement by Jet for Little Zinger to enter into sublease agreements with all existing tenants on the premises, but for City Gas.

[22] On February 24, 2006, Jet delivered a Notice to Vacate to City Gas, which provided City Gas with a little over 60 days' notice to vacate the front street location. City Gas accepted the termination of the lease and chose to vacate earlier, at the end of 30 days, returning the keys by April 7, 2006.

[23] On February 27, 2006, City [*6] Gas terminated its front street location employees, including Stonley and Khokhar, and commenced decommissioning work for the site.

[24] On February 28, 2006, Jet signed and accepted the formal Offer to Lease for the premises as presented by Little Zinger on February 22, 2006. A formal 10 year lease was signed on March 16, 2006.

[25] In August 2006, City Gas sold its only other location at Martin Grove and instructed its lawyers to dissolve the corporation.

[26] On June 4, 2007, Little Zinger commenced operations as Corktown Esso, a fuel service station, at the front street location.

[27] On October 13, 2008, Selby passed away.

[28] In 2013, Little Zinger sold its fuel service station for $ 1,225,000.00.

**History of Proceedings**

[29] On February 26, 2009, Little Zinger issued a Statement of Claim against City Gas, Dorothy, and the Wemyss' daughter, Stephanie Silver ("Silver"). The claim sought damages alleging in part that City Gas failed to follow proper decommissioning procedures, namely, it failed to remove underground fuel storage tanks, which caused soil contamination to the front street location.

[30] On March 27, 2009, City Gas issued the within counterclaim against [*7] Little Zinger, Stonley, Khokhar, and Jet.

[31] On May 19, 2009, Little Zinger dismissed its claim against Dorothy on consent and without costs. On November 23, 2013, Little Zinger agreed to dismiss/discontinue the action against the remaining defendants.

[32] The remaining matters before the court, therefore, are the costs of Little Zinger's action and the counterclaim by City Gas.

[33] Little Zinger amended its Statement of Defence on consent, after the first day of trial, to plead a failure by City Gas to mitigate its damages.

**Evidence at Trial**

[34] Silver gave evidence at trial on behalf of the Plaintiff since Selby is deceased. Silver acted with full authority of the plaintiff in its decisions to terminate Khokhar and Stonley in February 2006 and decommission the front street location. Silver's actions at that time bind the Plaintiff and her knowledge at that time, given her position of control, is imputed to the Plaintiff.

[35] The Plaintiff advised the court that Dorothy was unable to travel from Florida to give evidence at the trial as her health requires her to be in warm weather. The Plaintiff also read in as evidence portions of the transcripts from the examinations [*8]  for discovery of Khokhar, Stonley, and the representative of Jet, Neal Nefsky ("Nefsky").

[36] The Defendants' evidence at trial was led through Stonley, Khokhar, and Nefsky. Also called to give evidence on behalf of the defendants were Stonley and Khokhar's lawyer, Mr. Mitchell Korman ("Korman"); Jet's lawyer, Mr. Joe Winch ("Winch"); and an articling student in Korman's office during 2005-2006, Ms. Sarah Williams ("Williams"). The Defendants also read in as evidence portions of the transcripts from the examinations for discovery of Dorothy and Silver.

**Issues**

[37] The legal and factual issues raised in this proceeding have been agreed as follows:

    1.   Is the claim brought by City Gas barred by the Act?

    (a) When did City Gas know that Stonley and Khokhar had entered into a lease with Jet, that City Gas had suffered damages, and that a proceeding was the appropriate means to remedy it?

    (b) When ought City Gas to have known that Stonley and Khokhar had entered into a lease with Jet, that City Gas had suffered damages, and that a proceeding was the appropriate means to remedy it?

    2.   What was the nature of Stonley's and Khokhar's duties to City Gas?

    (a) As a factual  [*9]  inquiry, what were Stonley's and Khokhar's duties as managers of City Gas and what was the nature of their relationship with City Gas/Selby?

    (b) Were Stonley and Khokhar fiduciaries of City Gas based on the nature of their responsibilities, City Gas' reliance on them, the trust and confidence bestowed on them by City Gas?

    (c) If not, were Stonley and Khokhar nonetheless barred by their employment duties from competing with City Gas?

    3.   Did Stonley and Khokhar breach their duties to City Gas

    (a) by improperly competing with City Gas?

    (b) by usurping a corporate opportunity from City Gas?

    (c) or otherwise?

    4.   If Stonley and Khokhar breached their duties, whether fiduciary-based duties or employment-based duties, what damages flow?

[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959, *9;
2014 ONSC 2510

5.   Did Jet induce Stonley and Khokhar to breach their employment contract with City Gas?

(a) Was Jet aware that Stonley and Khokhar were employees of City Gas?

(b) Did Jet's actions cause Stonley and Khokhar to breach their employment contract?

(c) If so, did this cause City Gas to suffer damages and to what extent?

(d) Is Jet jointly and severally liable for Stonley and Khokhar's breaches?

6.   Did the Defendants conspire to injure [*10]  City Gas?

(a) Did the Defendants act in concert by agreement or common design when they negotiated and executed the lease?

(b) Did the Defendants commit a tort, breach of a duty, or breach of contract by negotiating and executing the lease?

(c) Was the conduct directed towards City Gas?

(d) Was the Defendants' predominant purpose to injure City Gas or did the Defendants know or ought to have known that injury was likely to result to City Gas?

7.   Did Stonley and Khokhar intentionally interfere with City Gas' economic relations with Jet?

(a) Were City Gas and Jet engaged in economic relations?

(b) Were Stonley and Khokhar aware that City Gas and Jet were engaged in economic relations?

(c) Did Stonley and Khokhar breach any of their duties to City Gas by negotiating and crystallizing a deal with Jet?

(d) Did Stonley's and Khokhar's acts cause Jet and City Gas' economic relations to terminate?

(e) Did Stonley and Khokhar intend to cause loss to City Gas, either as an end in itself or as a means for something else?

(f) Did City Gas suffer damages?

8.   Did Jet intentionally interfere with City Gas' economic relations with Stonley and Khokhar?

(a) Was Jet aware [*11]  that City Gas had economic relations with Stonley and Khokhar?

(b) Did Jet induce Stonley and Khokhar to breach their duties to City Gas or did Jet otherwise act unlawfully?

(c) Did any acts of Jet cause Stonley's and Khokhar's economic relations with City Gas to terminate?

(d) Did Jet intend to cause loss to City Gas, either as an end in itself or as a means for something else?

(e) Did City Gas suffer damages?

9.   Based on a finding of liability on any of the torts pleaded, is City Gas entitled to be put back in

[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959, *11;
2014 ONSC 2510

the position it otherwise would have been in but for the breach(es)?

    (a) If so, what is the appropriate quantum of damages?

    (b) Did City Gas have a duty to mitigate its damages?

    (c) If so, did City Gas make reasonable efforts to mitigate its damages?

**Analysis**

    **1. Is the claim brought by City Gas barred by the Act?**

[38] Section 4 of the Act provides that a proceeding shall not be commenced in respect of a claim after the second anniversary of the day on which the claim was discovered.

[39] The Defendants argue that the Plaintiff's claim was commenced after the second anniversary of the day on which the claim was "discovered" and is therefore [*12]  statute barred by the Act.

[40] The concept of discoverability is described at s. 5 of the Act:

    5. (1) A claim is discovered on the earlier of,

    (a) the day on which the person with the claim first knew,

    (i) that the injury, loss or damage had occurred,

    (ii) that the injury, loss or damage was caused by or contributed to by an act or omission,

    (iii) that the act or omission was that of the person against whom the claim is made, and

    (iv) that, having regard to the nature of the injury, loss or damage, a proceeding would be an appropriate means to seek to remedy it; and

    (b) the day on which a reasonable person with the abilities and in the circumstances of the person with the claim first ought to have known of the matters referred to in clause (a). 2002, c. 24, Sched. B, s. 5 (1).

    (2) A person with a claim shall be presumed to have known of the matters referred to in clause (1) (a) on the day the act or omission on which the claim is based took place, unless the contrary is proved.

[41] The Act seeks to bar the commencement of stale litigation. The limitation period is presumed to begin to run from the day the act or omission on which the claim is based took place. In  [*13]  this case the period is presumed to start running on February 28, 2006 when Jet signed the lease with Stonley and Khokhar. The onus is on the Plaintiff, therefore, to persuade the court that its claim was not discoverable until after March 27, 2007 and it acted with due diligence to discover if there was a cause of action.

[42] The principle of discoverability provides that a cause of action arises for the purposes of a limitation period when the material facts on which the action is based have been discovered or ought to have been discovered by the plaintiff through exercising reasonable diligence: see *Lawless v. Anderson*, 2011 ONCA 102, 81 C.C.L.T. (3d) 220, at para. 22. Determining whether the plaintiff has discovered a claim is a fact-based analysis. The question is whether the plaintiff knows enough facts on which to base its allegations against the defendant. If the plaintiff does, then the claim has been "discovered" and the limitation period begins to run: see *Lawless*, at para. 23.

[43] The issue of discoverability in this case is narrow. When did the Plaintiff know or ought to have known that it

[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959, *13;
2014 ONSC 2510

was Stonley and Khokhar who had entered into a lease with Jet, resulting [*14] in Jet providing City Gas with a Notice to Vacate?

[44] The Plaintiff submits it did not discover the cause of action until after the Defendants' initiated a claim against it on February 26, 2009. The Plaintiff's claim against the Defendants was issued on March 27, 2009 and is therefore not statute barred.

[45] The Defendants' submit that the Plaintiff knew or ought to have known that it was Stonley and Khokhar who entered into the lease with Jet well before March 27, 2007 such that their claim is statute barred.

[46] For reasons set out below, I agree with the defendants.

>  **(a)  When did City Gas know that Stonley and Khokhar had entered into a lease with Jet, that City Gas had suffered damages, and that a proceeding was the appropriate means to remedy it?**

[47] The preponderance of evidence establishes *prima facie* grounds to infer that the Plaintiff knew that it was Stonley and Khokhar who entered into the lease with Jet well before March 27, 2007: see *Kowal v. Shyiak*, 2012 ONCA 512, *13 C.L.R. (4th) 7*.

[48] I make this conclusion based in part on the termination of Stonley and Khokhar, and an email from Korman (Stonley and Khokhar's [*15] counsel) on March 6, 2006.

**The Evidence of Dorothy Wemyss**

[49] Dorothy was not called to testify at the trial of this matter. A portion of her examination for discovery held on June 13, 2011, was read into evidence and relied upon by the Defendants as the "most compelling" evidence as to when City Gas knew that Stonley and Khokhar had entered into a lease with Jet. When asked how she first learned that Little Zinger was the new tenant at the front street location, Dorothy answered that she saw Stonley at the front street location and "assumed that something crooked was going on". At the time, the ground was closed, the station was not operating, and the store and main building were not touched "other than they were stripped of ... all the equipment".

[50] Stonley testified that he saw Dorothy and Selby drive by the front street location on many occasions; presumably on their way to Selby's dialysis appointments at St. Michael's hospital, which he attended about twice a week.

[51] By April 7, 2006, the Plaintiff vacated the front street location. The above ground equipment was removed and the ground was closed after removing the fuel tanks. The site remained in that condition [*16] until April 6, 2007.

[52] Dorothy and Selby annually travelled to Florida between December to April.

[53] Given Dorothy's description that the ground was closed when she found out Little Zinger was the new tenant, she would have seen Stonley and Khokhar at the front street location between April 8, 2006 and April 6, 2007. It would seem more probable than not that Dorothy saw Stonley and Khokhar at the front street location in 2006 upon her return from Florida and not within the first six days of April 2007 before Little Zinger broke ground. There is not sufficient evidence before the court, however, to make this finding definitively or with reasonable inference. The evidence of Dorothy as read in on this issue is therefore inconclusive and not helpful in determining when the Plaintiff knew that Stonley and Khokhar were the new tenants of the front street location.

**The Termination of Stonley and Khokhar**

[54] Silver stated that, on behalf of the Plaintiff and with the authority of Dorothy, she terminated Stonley and Khokhar on February 27, 2006 for theft.

[55] In or around the same time, the Notice to Vacate was delivered to City Gas. Silver's evidence is that on February 24,  [*17]  2006, she was advised by Winch, counsel for Jet, that a Notice to Vacate was delivered to the front street location. This is consistent with Khokhar's testimony that on February 24, 2006, he signed for a letter to the Plaintiff from Winch at the front street location and he knew what the letter was. He placed it in Selby's mail cubby.

[56] Silver stated she received an anonymous phone call from a person who told her that Stonley, Khokhar, and a third employee at the front street location, Helen Geberekiristos ("Helen"), were robbing City Gas "blind". No further details were provided. Silver then called Dorothy who was in Florida with Selby at the time. Silver stated that both her and Dorothy called Stonley and asked him to discuss the call with Silver. Stonley refused.

[57] The following Monday, February 27, 2006 Silver stated that she "confronted them" at the front street location. According to Silver, she told Stonley and Khokhar about the call that they had been stealing. She asked Khokhar if he was "in on this too". Khokhar nodded his head. Silver then asked Khokhar and Stonley for their company keys and credit cards and said "you guys are outta here". Silver never spoke to  [*18]  them again.

[58] All the other employees at the front street location were also terminated on February 27, 2006 in furtherance of the Notice to Vacate, and they were paid severance, including Helen. Silver testified that Khokhar and Stonley were not paid severance because she fired them with cause for stealing. Silver cited "misconduct" as the reason for termination on Stonley's and Khokhar's record of employment. Neither Khokhar nor Stonley were therefore eligible to collect unemployment insurance benefits.

[59] I find Silver's evidence on this issue lacking in both logic and credulity and I do not accept it.

[60] Stonley and Khokhar had been employees of the plaintiff for over 20 years and over 10 years, respectively. They were treated like sons by Selby. Stonley had signing authority for City Gas for over six years. Both employees were trusted with running the day to day operations of the front street location. In all their years of employment, there had been no allegations of theft against either employee.

[61] The allegation of theft came around the exact time that Silver was advised by Jet's lawyer that a Notice to Vacate was delivered to the front street location. The allegation [*19]  was anonymous and without detail. Following the allegation, no investigation was done, no evidence of theft was found, no suspension of employment was given pending investigation or evidence, no call was made to police, and no criminal charges were laid. Rather, after two business days had passed, a simple question was put to Khokhar and a nod of his head resulted in the immediate termination of long-term, trusted employees without severance or further communication.

[62] On the same day that Silver terminated Stonley and Khokhar, by coincidence, she picked up the Notice to Vacate from the front street location, terminated all other employees of the front street location, and commenced decommissioning the site.

[63] Moreover, the anonymous allegation did not result in a civil claim for restitution and the third employee alleged to have stolen from City Gas was paid severance. In my view, it strains credulity to conclude that Khokhar and Stonley were terminated for theft.

[64] According to Khokhar, on February 27, 2006, he walked into the office with Stonley. The letter from Jet's lawyer was on the desk. Silver was sitting at the desk with her hands and legs crossed. Silver said [*20]  "Jim and you went behind my father's back and got yourselves a sweet deal". Stonley asked Silver what she was talking about. Silver asked Stonley and Khokhar to just leave their keys and credit cards on the table and told them they were fired.

[65] At trial Stonley testified that on February 27, 2006, he and Khokhar returned from the wholesaler to the front street location and Silver's car was there. He walked into the office with Khokhar. Silver was sitting at her father's desk with her hands crossed. She shook her head and said, "looks like you went behind my father's back and got yourself a deal; looks like you guys got a lease, can't believe you did that". Stonley responded by saying that "it did not really go

[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959, *20;
2014 ONSC 2510

like that". Silver asked for their keys and credit cards and told them "to get outta here" and that they were both fired.

[66] The Plaintiff submits that Silver's evidence on this issue should be preferred to that of Stonley's and Khokhar's evidence. The plaintiff questions the credibility of Stonley's evidence at trial on this issue and submits that it was inconsistent with Stonley's evidence at discovery that he was fired for reasons unknown at the time. At discovery [*21] the Plaintiff asked Stonley about a letter he wrote, dated March 31 2006, on the advice of his counsel and with the assistance of his son. The letter stated that the dismissal occurred "for reasons unknown at the time". Silver did not say to Stonley and Khokhar on February 27, 2006 that they were being terminated for a specific reason. She referred to a "deal" or a "sweet deal" and "a lease". She did not link the deal or the lease directly to the dismissal.

[67] In my view, it is not unreasonable for Stonley, who did not graduate from high school, to say that the dismissal occurred for "reasons unknown at the time". This is particularly so when one reads the words highlighted by plaintiff's counsel in the context of the entire letter. Stonley goes on to write in the same letter that Silver "advocated misguided allegations at the time of the wrongful dismissal" and that when Silver "found out about my acquirement of the head lease she irrationally dismissed my employment at City Gas". Read as a whole, the letter is consistent with Stonley's evidence at trial that at the time of termination Silver was aware that he and Khokhar had acquired the lease.

[68] The Plaintiff further points [*22] to Korman's note of March 6, 2006, which states that Khokhar "feels Tracy [Silver] already knows he is behind Little Zinger" and "gave severance pay to everyone who worked at gas stn. except Zafar and Jim". The Plaintiff submits that this note demonstrates Silver did not mention the lease when she terminated Khokhar and Stonley.

[69] I disagree. The note demonstrates only that Khokhar believes Silver is aware that he and Stonley are the principals of Little Zinger and seems to have offered an explanation for his belief. The substance of the conversation at the time of the termination or the Plaintiff's cause for termination cannot be reasonably inferred from this note.

[70] Silver's explanation for terminating Stonley and Khokhar is nonsensical. It defies logic to accept that Khokhar and Stonley were terminated for theft based on an anonymous phone call lacking in substance and detail. I prefer Stonley and Khokhar's evidence on this issue. Silver, with the authority of the Plaintiff, terminated Stonley and Khokhar knowing that the Plaintiff was being evicted from the front street location and Stonley and Khokhar were the new tenants. It can be reasonably inferred therefrom that [*23] as of February 28, 2006, the Plaintiff knew that Stonley and Khokhar had acquired the lease with Jet for the premises and this was the reason for their termination.

**The March 6, 2006 e-mail**

[71] On March 6, 2006, Korman, counsel for Stonley and Khokhar, contacted Mr. James Zibarras ("Zibarras"), counsel for the Plaintiff, by telephone with an offer for the Plaintiff. At the request of Zibarras, Korman put the offer in writing by e-mail, which was approved by Khokhar, and sent the e-mail to Zibarras the same day. The e-mail read as follows:

> Further to our telephone conversation, we act for Little Zinger Inc. the new head landlord at 173 Front Street East and were given your name by Joel Winch as he indicated that you represent the gas bar tenant. Our client is interested in negotiating a new lease with your client for the operation of the gas bar in the alternative purchasing the pumps, awning, price sign and any other equipment that may be on the premesis (sp) at the conclusion of their tenancy.
>
> Kindly discuss with your client and advise.

[72] The Plaintiff never responded to this e-mail.

[73] Silver stated that the Plaintiff did not respond because it was not interested [*24] in the offers therein. Her understanding of the e-mail was that someone wanted to purchase the Plaintiff's equipment. She was not interested

[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959, *24;
2014 ONSC 2510

because she already had a plan to move the pumps and supplies to another fuel station operated by City Gas and she was receiving many offers from entities that wanted to "scoop up" the equipment at a discount. Further, Silver understood that, in the alternative, Little Zinger wanted the Plaintiff to be its tenant. She was not interested in that opportunity as the Plaintiff did not have the time or the money to start up a new gas station across the street from the front street location.

[74] I find Silver's evidence on this point incredulous and I do not accept it.

[75] The e-mail reads 173 Front Street and not 176 Front Street, which is the address of the front street location. Silver asks the court to find therefore that upon reading the e-mail, Silver believed the offer to negotiate a lease pertained to a green field fuel station on the property across the street from the front street location and had nothing to do with the Notice to Vacate from Jet.

[76] Reading the e-mail as a whole, however, in the context of the previous telephone conversation,  [*25]  I do not accept that Silver was unaware that the offer was for negotiating a lease for the front street location. I make this conclusion in part as a result of the following facts:

> i.  Korman testified that he would have told Zibarras during the phone call that he got his name from Jet's counsel;

> ii.  Korman testified that when he was speaking to Zibarras he would have referred to the front street location as the "Esso Station" and not by its formal address. No evidence was led by Zibarras that he misunderstood the phone call or the e-mail. Nor was privilege waived to assist the court with evidence from Silver as to why she formed the conclusion noted above, given Korman's testimony;

> iii.  Winch is referred to in the e-mail and Silver was aware that Winch represented Jet. On behalf of the Plaintiff, Silver had communicated and negotiated with Winch regarding the Plaintiff's lease with Jet.

> iv.  Winch told Silver that Jet negotiated with someone else who doubled the rent, but he refused to tell Silver who that entity was when she asked him.

[77] At the very least, one would have expected a response to the e-mail if only to clarify the address referred to therein. A failure [*26]  to respond at all and an incredulous explanation for this at trial leads to a reasonable inference that as of March 6, 2006, the Plaintiff knew the offer pertained to the front street location and the Plaintiff purposively did not respond as it knew Stonley and Khokhar were the principals of Little Zinger and the Plaintiff did not want to negotiate with its terminated employees.

[78] This inference is also reasonable within the context of the Plaintiff's failure to respond to the offer to purchase the equipment. After the e-mail, the Plaintiff removed the fuel tanks from the ground and sold them for $ 50,000. At the time of the e-mail, only the canopy had been dismantled.

[79] In August 2006, City Gas sold its only remaining location at Martin Grove for $ 250,000 plus fuel and supplies. The new tenant therein assumed the existing lease of City Gas and the fuel tanks were sold to the new tenant and left in the ground, which avoided the cost of remediation by City Gas.

[80] If the Plaintiff had sold the tanks to the new tenant at the front street location and left them in the ground, it would not have had to pay $ 150,000 to remediate the soil. It is not sufficient to say, as Silver [*27]  did, that the Plaintiff did not pursue such a sale as it was complying with the lease to remove the tanks, remediate the soil, and pave the land. Surely if there was opportunity to make some money in the best interest of the Plaintiff it would have been pursued with Jet and the new tenant, unless there was some reason the Plaintiff did not want to pursue it.

[81] Williams, an articling student working with Korman at the material time, recorded a note in her file that

[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959, *27;
2014 ONSC 2510

"Imperial Oil rep tried to reason with her re:ripping out the tanks". Williams' and Stonley's evidence is that "her" referred to Silver.

[82] In my view, considering the totality of evidence, it is reasonable to infer that the Plaintiff did not pursue the offer to purchase the equipment set out in the e-mail of March 6, 2006 as it knew that Khokhar and Stonley had acquired the lease with Jet and it did not want to do business with its terminated employees or assist them in starting up the front street location.

[83] I conclude therefore that the Plaintiff knew that Stonley and Khokhar had entered into a lease with Jet prior to March 2007.

> **(b)   When ought City Gas to have known that Stonley and Khokhar had entered  [*28]  into a lease with Jet, that had suffered damages, and that a proceeding was the appropriate means to remedy it?**

[84] If my first conclusion is incorrect, I will consider when City Gas ought to have known that Stonley and Khokhar had entered into a lease with Jet.

[85] The Plaintiff argues that the Defendants actively and fraudulently concealed their identity and wrongful acts from City Gas such that the well-established doctrine of fraudulent concealment prevents or delays the limitation period from running on the basis of reasonable diligence. The Plaintiff submits that it could not have discovered that Stonley and Khokhar had entered into a lease with Jet until after Little Zinger initiated a claim against it in March 2009. In March 2006, the Plaintiff argues that Korman purposively did not identify Stonley and Khokhar as the individuals behind Little Zinger.

[86] In *Guerin v. The Queen, [1984] 2 S.C.R. 335,* the Supreme Court of Canada clearly set out the parameters of the doctrine of fraudulent concealment as follows, at p. 390:

> It is well established that where there has been a fraudulent concealment of the existence of a cause of action,  [*29]  the limitation period will not start to run until the plaintiff discovers the fraud or until the time when, with reasonable diligence, he ought to have discovered it. The fraudulent concealment necessary to toll or suspend the operation of the statute need not amount to deceit or common law fraud. Equitable fraud, defined in *Kitchen v. Royal Air Force Association*, [1958] 1 W.L.R. 563, as "conduct which, having regard to some special relationship between the two parties concerned, is an unconscionable thing for the one to do towards the other", is sufficient.

[87] What did the Plaintiff learn from a review of Little Zinger's claim against it? It learned only that Little Zinger carries on business as a gas station called Corktown Esso at 176 Front Street East, Toronto, Ontario and that Little Zinger entered into a lease on March 16, 2006 with Jet to lease the front street location for a term of 10 years. Little Zinger's pleading makes no reference to Stonley or Khokhar personally or to anything linking Stonley or Khokhar to Little Zinger.

[88] If, as of March 2009, the Plaintiff was unaware that Stonley and Khokhar had entered into a lease with Jet, the Plaintiff would not  [*30]  have learned this by simply reviewing the claim. Rather reasonable diligence was required by way of a corporate search to determine the role of Stonley and Khokhar in Little Zinger.

[89] In my view, the Defendants did not fraudulently conceal information preventing discovery of a cause of action. As of the March 6, 2006 e-mail from Korman, the Plaintiff reasonably knew that the new head landlord of the front street location was Little Zinger. This was the same information contained in the Statement of Claim of Little Zinger that the Plaintiff says led it to discover that Stonley and Khokhar were the principals of Little Zinger. The Plaintiff cannot today hide behind an obvious typo in that e-mail to deny that a corporate search in 2006 was all that was required to link Little Zinger to Stonley and Khokhar. All the information necessary to discover the cause of action was

in the hands of the plaintiff and its solicitor effective March 6, 2006.

[90] On March 6, 2006, Korman contacted Wendy Greenspoon-Soer ("Greenspoon"), the current counsel of the Defendants, for legal advice on possible causes of action before contacting Zibarras, counsel for the Plaintiff. Korman's notes reflect  [*31]  that Greenspoon "suggested being upfront and sharing our clients want to purchase equipment". Little Zinger was the client. Little Zinger was the contracting party. It was Little Zinger and not Stonley and Khokhar who would contract with City Gas as tenant or purchaser. There was nothing inappropriate or unconscionable in referring only to Little Zinger in that e-mail.

[91] The Plaintiff's evidence is that only three years prior it spent approximately $ 500,000 to upgrade the front street location; the Notice to Vacate was a surprise; it was shocked to receive it; it always thought that a lease renewal was a simple formality. When Silver was told by Winch that Jet had negotiated a lease for the front street location with another party who had doubled the rent, Winch would not tell her who that party was when she asked.

[92] However, the e-mail of March 6, 2006 refers to Little Zinger as the new head landlord. A reasonable person with the abilities of City Gas would, in the circumstances have asked their counsel to conduct a corporate search of Little Zinger. In failing to perform the search until receipt of the claim in March 2009, the Plaintiff failed to exercise reasonable due  [*32]  diligence. Had the Plaintiff exercised reasonable due diligence and performed the search in March 2006 it would have learned that the principals of Little Zinger were Khokhar and Stonley.

[93] I therefore conclude that as of March 2006, City Gas ought to have known that Stonley and Khokhar had entered into a lease with Jet.

**Conclusions, Re *Limitations Act***

[94] For reasons set out above, I conclude City Gas has failed to prove that it did not know and ought not to have reasonably known that Stonley and Khokhar entered into a lease with Jet before March 27, 2007, being two years before the counterclaim was issued. The counterclaim is therefore dismissed.

[95] Notwithstanding my conclusion that the counterclaim is statute barred, I will nonetheless analyze the merits of the counterclaim below.

**2.   What was the nature of Stonley's and Khokhar's duties to City Gas?**

**(a)   As a factual inquiry, what were Stonley's and Khokhar's duties as managers of City Gas and what was the nature of their relationship with City Gas/Selby Wemyss?**

[96] There is no question that Stonley and Khokhar managed the front street location. They were long-time, trusted employees representing [*33]  the business with suppliers and customers.

[97] From time to time, Stonley and Khokhar would order fuel and other supplies for Martin Grove. They were also the managers of the Eastern Avenue location.

[98] From 2000 to 2006, their duties were significant, which included the following:

       i. Hiring employees;

       ii. Training employees;

       iii. Terminating employees;

       iv. Ordering supplies, including fuel;

v. Dealing with suppliers;

vi.  Paying for supplies;

vii.  Confirming deliveries and reconciling invoices;

viii.  Managing customers and customer accounts;

ix.  Managing payroll;

x.  Paying rent;

xi.  Managing inventory;

xii.  Making daily deposits of cash into the plaintiff's bank accounts, as much as $ 10,000 in a single day.

[99] Stonley was given signing authority for the plaintiff in 2000. This provided Stonley with access to the plaintiff's bank account, which was a shared account for all of City Gas' fuel stations. Stonley also was authorized to write cheques for City Gas. No other individual, other than Selby, had signing authority. When Stonley was not available, he would leave Khokhar blank cheques with his signature for Khokhar to fill in as required.

[100] As [*34]  a result of their duties Khokhar and Stonley gained significant knowledge about the plaintiff's business, which included as follows:

i. The suppliers;

ii. The customers;

iii. The cost of supplies, including fuel;

iv. The selling price of supplies, including fuel;

v. The inventory requirements;

vi. The margins;

vii.  The revenue.

[101] As managers, Stonley and Khokhar had unfettered access to the Selby's office at the front street location. Housed in the office was the confidential information of the business, which included as follows:

i. Customer lists;

ii. Supplier lists;

iii. Employee information;

iv. Income and tax information;

v. The lease with Jet;

vi. The contract with Imperial Oil.

[102] There were some responsibilities however, that Selby did not share with or delegate to Stonley and Khokhar,

[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959, *34;
2014 ONSC 2510

which included as follows:

> i. Negotiating and signing the lease(s) with Jet.

> ii. Negotiating and signing the lease(s) with Imperial Oil;

> iii. Instructing the Plaintiff's accountant;

> iv. Approving the Plaintiff's financial statements and corporate tax returns;

> v. Final approval over significant capital expenditures

[103] Silver's testimony was that  [*35]  Stonley and Khokhar were involved in lease negotiations between the Plaintiff and Jet. Other than this statement, however, the preponderance of evidence indicates, and I accept, that Selby did not delegate the lease negotiations to either Stonley or Khokhar. Neither Stonley nor Khokhar ever signed any of the five lease agreements between the Plaintiff and Jet. Stonley witnessed both signatories to the 1994 lease well before he had signing authority for the Plaintiff. Dorothy's discovery evidence was that as far as she was aware Selby always negotiated the lease with Jet. Silver's discovery evidence was that she had "no idea" if anyone other than her father was involved in the negotiation of the lease with Jet, and there was no information that Stonley had any involvement in the negotiation of the lease with Jet.

[104] As part of his remuneration, Stonley was provided with a company car and car insurance and was paid $ 49,000 annually after 23 years. Both Stonley and Khokhar received full medical, dental, and prescription drug benefits paid for by City Gas. Khokhar was paid $ 39,000 annually after 12 years. Both Khokhar and Stonley needed to earn extra income from other sources, which [*36]  Selby was aware of over the years.

[105] Neither Khokhar nor Stonley were ever appointed officers or directors of the Plaintiff and were never given any equity in the Plaintiff.

[106] Stonley and Khokhar understood that Selby trusted them to look after the best interests of the business. Although Selby signed cheques and was engaged in the day to day operations when he was at the front street location, his health deteriorated in the last two years of City Gas' operation at the front street location and he travelled to Florida annually from December to April.

> **(b)   Were Stonley and Khokhar fiduciaries of City Gas based on the nature of their responsibilities, City Gas' reliance on them, the trust and confidence bestowed on them by City Gas?**

[107] In *Canadian Aero Service Limited. v. O'Malley, [1974] S.C.R. 592, at pp. 605-607,* the Supreme Court of Canada found that, regardless of title, managers authorized to act on a company's behalf may be fiduciaries based on their duties.

[108] The analysis is a question of fact in the circumstances of the specific relationship. As directed by LaForest J. in *Hodgkinson v. Simms, [1994] 3 S.C.R. 377, at pp. 409-410:* [*37]

> The question to ask is whether, given all the surrounding circumstances, one party could reasonably have expected that the other party would act in the former's best interests with respect to the subject matter at issue. Discretion, influence, vulnerability and trust [are] non-exhaustive examples of evidential factors to be considered in making this determination.

> Thus, outside the established categories, what is required is evidence of a mutual understanding that one party has relinquished its own self-interest and agreed to act solely on behalf of the other party.

[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959, *37;
2014 ONSC 2510

[109] The defendants' position is that Stonley and Khokhar, although managers, were not fiduciaries. They did not have any authority, it is argued, to exercise any form of discretion that would guide the company. Rather, they carried on the day to day management and followed established practices and principles laid down by Selby over the years. They could not bind the company to any major contractual obligations and while they were responsible for ordering large quantities of fuel, the provisions governing their pricing and supply were determined by Selby and Imperial Oil, and the payment was handled through automatic [*38] debt.

[110] The law does not lightly impose the mantle of a fiduciary on an employee: see *Sanford Evans List Brokerage v. Trauzzi* (2000), 50 C.C.E.L. (2d) 105 (S.C.), at para. 39. In the circumstances before me however, I conclude without difficulty that Stonley and Khokhar were fiduciaries of City Gas. The Plaintiff trusted Stonley and Khokhar to operate the front street location on its behalf and in the best interests of the business. Stonley and Khokhar were in charge of the front street location. Their functions were essential to the continued operation of the business. While Stonley and Khokhar had no discretion to negotiate the lease(s) with Jet or the contract with Imperial Oil, the evidence demonstrates that the Plaintiff's business was particularly vulnerable to their departure. I make this conclusion in part for the following reasons:

> i. Stonley and Khokhar were the face of the front street location. They had direct relationships with and knowledge of all customers, suppliers and employees they hired and who reported to them.

> ii. Stonley and Khokhar controlled the day to day operations of the business without supervision. Selby depended on them to do so as he [*39] was away five months of the year, golfed in the summer when back in Toronto, and regularly attended medical appointments;

> iii. Stonley and Khokhar controlled inventory at their discretion by determining what supplies should be ordered and from whom and in what amounts;

> iv. By virtue of their entrusted responsibilities, Stonley and Khokhar knew of the margins and revenues intimate to the assets of the front street location;

> v. Stonley and Khokhar handled large sums of the Plaintiff's cash on a daily basis;

> vi. Stonley had complete access and control over City Gas' bank account for all of its fuel service stations;

> vii. Stonley and Khokhar had unfettered access to the confidential information of the business;

> viii. By their own admission Stonley and Khokhar understood that Selby trusted and relied on them to operate the front street location and was reliant on them to act in his best interests.

[111] For the reasons above, I conclude that Stonley and Khokhar were fiduciaries of City Gas.

**(c) If not, were Stonley and Khokhar nonetheless barred by their employment duties from competing with City Gas?**

[112] As I have concluded that Stonley and Khokhar were fiduciaries [*40] of City Gas, I need not address this sub issue.

**3. Did Stonley and Khokhar breach their duties to City Gas?**

[113] To resolve this issue, it is first necessary to review the evidence and make findings of fact regarding the parties' respective lease negotiations between 2004 and 2006.

**Negotiations between Jet and City Gas**

[114] For over 25 years the Plaintiff paid its monthly rent as tenant at the front street location. Whenever the exiting lease was coming to an end, the parties would negotiate a new lease with renewal options. Jet never threatened to terminate the Plaintiff's lease.

[115] In 1989 and 2003, the Plaintiff undertook extensive renovations of the front street location. The cost of the 2003 renovation was approximately $ 500,000.

[116] Under the Plaintiff's lease with Jet, dated January 8, 1998, the Plaintiff could automatically renew its tenancy for a five year period by submitting a written request to Jet by May 7, 2004. During the lease, Selby suffered an aortic aneurism that put him in the hospital for five weeks. He never fully recovered. Over time he lost peripheral vision, the ability to read and write, and suffered memory loss. He was also required [*41]  to go to the hospital three to four times a week for dialysis.

[117] Silver suggested at trial, for the first time, that Selby missed the deadline to renew the lease because of his hospitalization. She suggests that the aneurism occurred in May 2004. When examined for discovery in 2010, Silver made no mention of that and did not know who to check with to verify when Selby's aneurism occurred. Nefsky testified that no one advised him as to why the deadline was missed. Why it was missed is not relevant. The evidence does not demonstrate that Stonley or Khokhar were accountable to monitor the renewal deadline or negotiate a renewal with Jet.

[118] In or around November 2004 was the first time Jet and the Plaintiff discussed the lease.

[119] Selby telephoned Winch and indicated that he would like to negotiate a further term of the lease with Jet. Winch advised that the time to exercise the option had expired and if he wanted to renew the term he could pass on the terms he was seeking through Winch. Selby indicated that he was looking for a five year renewal on the same terms and conditions as the last lease without an increase to the base rent. Winch indicated to him that his client [*42]  was seeking a tenant for the entire building; Jet wanted to enter into a head lease. Winch mentioned to Selby that Jet would assign the leases of the two other tenants in the premises to whoever had the head lease. In response, Selby indicated to Winch that he was only seeking a renewal of the lease for the front street location and was not interested in a head lease. Winch also told him that the landlord was looking for a significant increase in the base rent. Winch had no instructions from Jet as to what the increase in base rent would have been. He states it is "highly unlikely" he would have quoted 25% as the increase in the base rent. Selby thereafter met with Winch in person and they had the same discussion.

[120] A meeting thereafter took place between City Gas and Jet at Jet's office. Present were Nefsky, Selby, and Jet's principals; Leonard Nefsky, ("Nefsky's dad") and Sam Wagman ("Wagman"). Nefsky offered to renew the lease if the plaintiff agreed to a significant increase in the base rent and a head lease for the premises. Nefsky explained that the care of the premises was becoming a burden as the principals of Jet had aged and Jet's offices had moved from the premises [*43]  to Finch Avenue.

[121] Selby refused the suggestion of a head lease and he told Nefsky that he could not afford any increase in the base rent. Selby made the same offer as he did over the phone.

[122] The Plaintiff suggests that Nefsky's description of the substance of the November 2004 meeting should be doubted as when describing this meeting at his discovery in 2010 Nefsky referred to the increase in base rent as "reasonable" and did not mention reference to a head lease. I disagree.

[123] Nefsky showed the Plaintiff where in his discovery evidence he stated that Selby refused to take on the whole property. His evidence at trial on this fact was consistent with that of Winch. I am satisfied with Nefsky's explanation as provided in cross-examination and I accept his evidence as to what was said in the November meeting.

[124] Nefsky could not remember the exact increase in base rent put forward to Selby in November 2004 and agrees it could have been 25%. The Defendants' pleading states that Jet had requested a 25% increase at this time. At

trial, none of the Defendants could recall this number or how it appeared in their pleading. In my view, Nefsky was being honest. In 2014,  [*44]  he could not recall and Nefsky admitted it could well have been 25%. Nothing more should be read into this in terms of credibility.

[125] What is relevant is that Selby turned down the offer. He did not want a head lease and he did not want to pay an increase in base rent; significant, reasonable or otherwise. The parties decided that as there was no agreement they would continue the tenancy on a month to month basis after the lease expired in November 2004.

[126] Selby's next effort to renew the lease came in May 2005. On May 16, 2005, Selby called Winch and offered a five percent increase in the base rent. Selby sought to have all other terms of the lease remain the same. Winch relayed the offer to Jet. Jet rejected the offer and made no counteroffer.

[127] Stonley learned from Selby that the lease was month to month. Selby denied a major capital expenditure at that time explaining that he was not going to spend money at the front street location as he was month to month without a fixed term lease. At trial, Stonley was confused as to the exact date in 2005 that he learned the lease was month to month. He believed it was in April or May 2005. In 2010 at his examination for discovery [*45]  he believed that it was in the summer of 2005. In his letter of March 31, 2006 (noted above) he recorded that throughout the year of 2005 Selby made it clear that he did not have a secure lease and he therefore was not permitted to make any "large" purchases. Stonley's confusion as to when he first learned the information does not in my view tarnish the substance of the recollection or question his credibility on this issue. It was not such a significant event that Stonley would remember the exact timeline almost nine years later. What matters is that Stonley consistently recollected how he learned this information from Selby, who did not want to make large expenditures in the face of an unsecured tenancy.

[128] In December 2005, Silver, on behalf of the Plaintiff, got involved in the lease negotiations with Jet. Silver and Winch agree they had telephone discussions in December 2005 about the lease. They disagree about the substance of those discussions.

[129] Silver testified that she called Winch and asked Winch what it would take to renew the lease. He told her that Jet wanted a 25% increase in rent retroactive to May 2004. She discussed this offer with her father in the presence [*46] of Stonley and Khokhar. Selby told her to accept the offer. Silver then called Winch back to accept the offer. Winch asked her "what offer?" He then told her she "should have gotten it in writing" and that he would get back to her. Silver understood this to mean that Winch was going to discuss the 25% increase in base rent with Jet. She told her parents about the conversation with Winch and told them that Winch would get back to her. Winch never got back to her on the 25% increase in base rent. On February 24, 2006, Winch called Silver to say that a Notice to Vacate was delivered to the front street location.

[130] Winch testified that it was Silver who made the offer, not him. He stated that he received a call from a woman who said she was Selby's daughter. She was seeking a renewal of the lease primarily on the same terms and conditions as the expired lease except she was prepared to offer an increase in the base rent, which he now understands to have been 25%. Winch is quite certain he would have told her that it was his client's preference to enter into a lease for the entire property. He would have thereafter relayed Silver's offer of an increase in the base rent to his client.  [*47]

[131] Winch categorically denies that he made the offer to Silver. He explains that at the time of her call he had no instructions from Jet to make a proposal to City Gas relating to any of the terms. Winch also denies that he said "what offer" or that she "should have gotten it in writing". He stated that at the time she called him back he would have told her that her proposal for a 25% base rent increase was unacceptable to his client.

[132] Korman and Winch had a telephone conversation on February 16, 2006. Korman's notes from the call indicate that Winch advised him that he "spoke to daughter 2 or 3 months ago", "offer to increase the rent", and "existing agreed to increase of 25%".

[133] Winch does not have any notes from the call. Neither, however, does Silver. Korman's notes are equivocal at

best. In my view, Winch's evidence on this issue was credible and logical, and I accept it. It does not make sense that a senior counsel would negotiate the terms of a lease on the fly with a person he has never met. Not only did he have no authorization or instructions from his client, he had no assurance that the person on the other end of the phone was authorized to act on Selby's [*48] behalf. It was Selby who reached out to him in November 2004 and May 2005. Nor is it believable that senior counsel would make such a pedestrian comment as "you should have gotten it in writing" when denying that an offer was made. Winch strikes me as an honest, credible, and ethical lawyer. It is simply not believable that he would have spoken the words or engaged in the conduct attributed to him by Silver.

[134] Dorothy's evidence as to what Silver told her in December 2005 also casts aspersions on Silver's testimony on this issue. At her discovery in 2011, Dorothy stated that Silver told her in December 2005 that what was offered was $ 20,000 per month as base rent for the front street location, retroactive for a number of years. She advised Silver, "well we have no choice but to agree to these conditions ... tell them we agree to the conditions".

### Negotiations between Jet and Little Zinger

[135] The evidence of the negotiations between Jet and Little Zinger was given by the testimony of Nefsky, Stonley, and Khokhar and through the documents prepared by Korman and Winch at the relevant time. It is consistent and uncontested and I accept it.

[136] On November 22, 2005, Dorothy, [*49] in the presence of Selby, advised Stonley and Khokhar that the Plaintiff had a 10 year lease in place for the front street location and that they should buy the front street location for $ 500,000. Selby agreed. Stonley and Khokhar were shocked. They felt that this was an offer of a lifetime. They thought the lease with Jet was month to month so they left the front street location and called Nefsky. They told him about their conversation with Dorothy. Nefsky advised Stonley and Khokhar that the Plaintiff did not have a 10 year lease, and that the Plaintiff was a month to month tenant. Sarcastically, Nefsky said "why don't you give me $ 500,000 and I will sell you the business". Nefsky then explained that Jet had no intention of signing a further lease with the Plaintiff because Selby's heath was failing; he did not know Dorothy; and he did not want to deal with Silver. Nefsky also explained that Jet was looking for a head tenant for the premises. His father and Wagman were aging and no longer wished to have the responsibility of keeping up the common areas or collecting the rent cheques for the premises. Nefsky asked Stonley and Khokhar to make Jet an offer to lease the premises as [*50] head tenant. Stonley and Khokhar asked Nefsky for some time to discuss the opportunity with their family.

[137] On December 5, 2005, Stonley and Khokhar attended Korman's office in furtherance of the opportunity presented by Nefsky. Korman's notes from that meeting reflect that Little Zinger was going to make an offer to lease the premises from Jet at $ 20,000 a month in base rent for 10 years, with an option to renew. Little Zinger would assume the two existing tenants, a framing centre and a beauty salon, as subtenants. The note indicated that the framing centre was presently paying $ 2400 in base rent and the beauty salon was paying $ 1480 in base rent.

[138] Thereafter, an offer to lease from Little Zinger to Jet was sent by Korman to Winch in December 2005. The term was for 10 years commencing January 1, 2006 with a base monthly rent of $ 20,000. Little Zinger offered to assume all three existing tenants of the premises, including the Plaintiff, and to enter into separate sublease agreements with the three existing tenants.

[139] On behalf of Jet, Winch responded to the December 2005 offer on February 7, 2006. Winch reworded the offer to lease, changed the term of the lease [*51] to five years, and only permitted the subletting of the hair salon and the framing centre, not the front street location. The counteroffer remained a head lease for the premises at a base monthly rent of $ 20,000. Through inadvertence the premise was described as 173 Front Street.

[140] On February 10, 2006, Korman responded to Winch requesting on behalf of Little Zinger a term of eight years and addition of an option to purchase clause.

[141] On February 13, 2006, Winch responded to Korman, agreeing on behalf of Jet to a right of first refusal to

[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959, *51;
2014 ONSC 2510

purchase the premises and offering a term of seven years.

[142] On February 16, 2006 Korman and Winch negotiated by telephone the term of the head lease on behalf of their respective clients. Korman's notes reflect that he advised Winch that Little Zinger "will do the deal either way vacant possession of the gas bar or assume gas tenant".

[143] On February 22, 2006, Korman sent Winch an irrevocable offer to lease the premises on behalf of Little Zinger signed by Stonley and Khokhar. The term was seven years, the base monthly rent was $ 20,000 and the right to sublet was limited to the hair salon and the framing centre.

[144] On February [*52]  28, 2006, Jet accepted the offer, which was signed by Nefsky's dad and Wagman.

[145] On March 16, 2006, the lease was executed. The term was increased to 10 years.

[146] The Plaintiff has questioned Stonley's credibility specifically as it relates to his evidence of the conversation he and Khokhar had with Dorothy on November 22, 2005. The plaintiff points to Stonley's March 31, 2006 letter. As noted above, this letter was written by Stonley with the assistance of his son at the suggestion of Stonley's lawyer, three years before the within claim was commenced. In the letter, Stonley stated as follows:

> An understanding of the events leading up to February 27, 2006 is necessary in order to better recognize my unfortunate dismissal. On November 28th, 2005 I was informed by the co-owner of City Gas Bar, Dorothy Wemyss, of an offer for their tenant's lease. This consisted of a payment of $ 500,000 for a 10 year lease. The offer was restated by Dorothy Wemyss seven days later and received my interest. It was at that moment that I began a pursuit of the tenant's lease.

[147] The Plaintiff submits that Stonley spoke only of one conversation on November 22, 2005 and did not mention [*53]  in his March 31, 2006 letter that Selby was in the room when Dorothy made the offer. Therefore, Stonley's evidence on this matter should not be accepted. I disagree.

[148] By way of an undertaking given at examinations for discovery, Khokhar's cell phone records were produced from November 22, 2005, which confirm that the call as described by Stonley, Khokhar, and Nefsky was made on November 22, 2005. Stonley explained that the first conversation must have been on the 22nd given the cell phone records and the second one on the 29th of November.

[149] Stonley made an error regarding the dates in his March 31, 2006 letter. He does not strike me as a detail-oriented person. I would not expect him to remember specific dates unless they are written down for him. I accept the substance of his evidence however, as described in his March 31, 2006 letter, which was prepared long before the plaintiff's allegations of conspiracy. It is consistent with the evidence of Nefsky and Khokhar. Khokhar recalled and described Selby in the room on November 22, 2005 and the second conversation with Dorothy.

[150] Stonley's evidence is that when Dorothy was leaving for Florida in December 2005, her words [*54]  to Stonley were "if you hear anything from that eff'n lawyer, let me know". Stonley understood that Dorothy was asking him to let her know if Winch came back with anything about renewing the lease. Stonley thought it was odd she was asking him as she had previously told him and Khokhar that City Gas had a 10 year lease. Stonley did not tell Dorothy in response that he and Khokhar had had discussions with Nefsky and that Jet had no intention of negotiating with the Plaintiff and Jet was looking for a head lease.

[151] The circumstances leading up to the head lease between Jet and Little Zinger were described consistently in Stonley's March 31, 2006 letter, which states as follows:

> Owing to my inquiry about the tenant's lease I was informed by Neil Nefsky that he was not negotiating, with anyone, a tenant's lease in particularly with Selby Wemyss and City Gas Bar. This was

[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959, *54;
2014 ONSC 2510

due to Neil Nefsky's personal belief that Selby Wemyss had become ineffectual due to his illness and his co-owner Dorothy Wemyss, was unfamiliar with Jet Transportation's business. In addition, due to further personal reasons Neil Nefsky had decided that he was placing the full property (all tenants, not just [*55] City Gas Bar) on a head lease. Neil Nefsky had decided he wanted to acquire a limited relationship with the property. Therefore, what was negotiable was a head lease.

[152] It is admitted by the Defendants that none of the above noted negotiations or discussions were disclosed to the Plaintiff or authorized by the Plaintiff.

**Duties of a Fiduciary Employee**

[153] Employees with a fiduciary duty to their employer are subject to certain restrictions beyond that of a mere employee. As stated in *Canadian Aero*, at pp. 606-607:

> [A fiduciary employee] is precluded from obtaining for himself, either secretly or without the approval of the company ... any property or business advantage either belonging to the company or for which it has been negotiating; and especially is this so where the director or officer is a participant in the negotiations on behalf of the company.

[154] *GasTops Ltd. v. Forsyth*, 2009 CanLII 66153 (S.C.), at para. 86, aff'd on other grounds 2012 ONCA 134, 99 C.C.E.L. (3d) 62, identified three specific duties that extend from a fiduciary duty:

> 1.  avoid all conflict of interest;
>
> 2.  act only in the best interest of the beneficiary; and
>
> 3.   [*56] do not profit as a result of their position.

[155] The Ontario Court of Appeal, in *Felker v. Cunningham* (2000), 191 D.L.R. (4th) 734 (Ont. C.A.), leave to appeal to S.C.C. refused, *[2000] S.C.C.A. No. 538,* summarizes the state of the law as follows, at para. 14:

> Since *Canadian Aero* it has been established law in Canada that high echelon managers and directors of an organization owe their employer a fiduciary obligation that transcends their implied duty of fidelity as a regular employee. Thus, an employee who stands in a fiduciary relationship to his or her employer has an equitable obligation of loyalty, good faith, honesty and avoidance of conflict of duty and self-interest ... This court has held that fiduciary employees cannot enter into engagements in which they have a personal interest that conflict with anything the employer does, or realistically may do, without first making full disclosure and obtaining the employer's consent: *Manley Inc. v. Fallis* (1977), 2 B.L.R. 277. Moreover, as the fiduciary duty is based on trust, loyalty and confidence, and not economic cost to the employer, fiduciary employees are not relieved of their  [*57] fiduciary duties if the business opportunity sought to further their own ends is one that the employer would have been unwilling or incapable of exploiting: *Berkey Photo (Canada) Ltd. v. Ohlig (1983), 43 O.R. (2d) 518* (H.C.J., at 530-31).

[156] I now turn to whether Stonley and Khokhar breached their duties to City Gas by improperly competing with City Gas, by usurping a corporate opportunity from City Gas, or otherwise.

[157] Stonley and Khokhar deny that they improperly competed with City Gas. The alleged acts of competition, they argue, are not regarding the conduct of the business or the use of confidential information to unfairly compete for business. The alleged acts of competition are merely that Stonley and Khokhar negotiated with Jet for a lease at a time when City Gas alleges it was also negotiating a lease.

[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959, *57;
2014 ONSC 2510

[158] Stonley and Khokhar further deny that they breached any duties to City Gas by seizing any corporate opportunities belonging to City Gas. City Gas was a monthly tenant. They had contractual rights, which they let lapse. Selby was offered the opportunity to negotiate a renewal based on a head lease with a substantial rent increase [*58] and he rejected it. The opportunity was captured by Stonley and Khokhar only after City Gas expressly advised it was not interested in it. It was not an opportunity that City Gas was competing for, nor was it something that Jet remained willing to continue to extend to City Gas once it learned of Selby's growing health concerns and the increased involvement of Silver.

[159] I agree with the defendants that Stonley and Khokhar did not use confidential information or trade secrets of the business to negotiate the head lease. Neither Stonley nor Khokhar read the prior leases between the plaintiff and Jet. Korman did not have a copy of the prior leases when he was retained to negotiate the head lease for Little Zinger.

[160] Stonley and Khokhar knew that Jet was the landlord and knew the Plaintiff's base monthly rent through their employment with the Plaintiff. This information, however, is known outside the business. The other tenants could have easily disclosed the identity of Jet as landlord and Jet in the normal course would have disclosed the monthly rents of the subtenants to a prospective tenant interested in entering into a head lease.

[161] I also agree with the Defendants [*59]  that the opportunity for the Plaintiff to enter into a head lease was not available to the Plaintiff to exploit. Selby expressed disinterest in a head lease and Nefsky expressed Jet's disinterest in continuing its relationship with the Plaintiff in the absence of Selby.

[162] I cannot agree, however, that in negotiating and entering into a head lease with Jet, Stonley and Khokhar acted without breach of their duties as fiduciaries. Their acts of competition are not regarding the conduct of the business, but they are indeed more egregious as they go to the very existence of the business.

[163] Consider the following information that Stonley and Khokhar knew at the relevant time:

    i.  they knew from Dorothy that the Plaintiff wanted to sell its business to them for $ 500,000;

    ii.  they knew from Nefsky that the Plaintiff was a month to month tenant and could be evicted upon 30 days' notice;

    iii.  they knew from Silver that she was having difficulty contacting Jet regarding the lease;

    iv.  they knew from Dorothy that City Gas was waiting for a call from Winch regarding renewal of the lease;

    v. they knew from Nefsky that the Plaintiff's business could not be sold without a lease.  [*60]

[164] I have no difficulty concluding that Stonley and Khokhar permitted their own self-interest to conflict with their fiduciary duties to the Plaintiff. Nefsky presented them with an opportunity they could never have imagined. They blindly pursued their personal interests and ignored the best interests of their employer. There is no question that the personal interests of Stonley and Khokhar in negotiating and obtaining a head lease with Jet while employed with City Gas conflicted with the Plaintiff's expressed and continued efforts to secure a lease for the front street location and sell the business.

[165] I do not accept that Stonley and Khokhar always intended to permit the plaintiff to remain as a subtenant. This is not reflected in Little Zinger's irrevocable Offer to Lease and this is not consistent with the secrecy that permeated their negotiations with Jet.

[166] These two trusted employees failed to disclose to their employer the substance of their conversation with Nefsky on November 22, 2005. They had ample opportunity to do so on November 28, 2005 when Dorothy asked if

they wanted to buy the business and in December 2005 when Dorothy asked Stonley to let her know [*61] when he heard back from Winch. Stonley admitted he understood this to mean that Dorothy was waiting to hear back from Winch regarding renewal of the lease. No believable explanation was provided for not telling their employer about the opportunity presented to them by Nefsky; particularly if they were sincere in their intention to permit the Plaintiff to continue as a subtenant.

[167] It does not matter that the opportunity of a head lease was not available to the plaintiff. It matters only that the trusted employees knowingly ignored the best interests of their employer in favour of their personal interests failed to make full disclosure of a material fact critical to the plaintiff's survival and failed to obtain their employer's consent. Stonley and Khokhar pursued a business opportunity with Jet to further their own ends, fully aware that their employer was trying to negotiate a lease renewal with Jet and that their success would lead to their employer's demise. Their choosing to pursue the opportunity in secret, well aware of the consequences to their employer, breaches the very heart of fiduciary duties of trust, loyalty, and confidence.

### 4.   If Stonley and Khokhar breached [*62] their duties, whether fiduciary-based duties or employment-based duties, what damages flow?

[168] To assist the court in quantifying damages, the Plaintiff called Stephen Kertzman as an expert on business valuation and loss quantification. Mr. Kertzman analyzed the Plaintiff's damages under two distinct scenarios. First, a 10 year lease on the same terms as achieved by Little Zinger and second on a 10 year lease on the same terms as previously held by City Gas, except with a 25% increase in rent.

[169] I accept as fact that Jet had no intention of entering into a further 10 year lease with the Plaintiff if it meant that the Plaintiff would be operating the front street location for the term of the lease with no intention to sell the business. I also accept as a fact that the Plaintiff had no intention of entering into a head lease. This proves true notwithstanding the fiduciary breaches of Stonley and Khokhar. Neither scenario upon which Mr. Kertzman's analysis was based is accepted for quantification of damages in this case.

[170] Although the results of Mr. Kertzman's analysis were not challenged by a competing expert, I do not accept them as they are based on scenarios [*63] that have been demonstrated by the evidence to be highly unlikely and therefore unreasonable.

[171] The method for determining how compensation is to be awarded in cases of breach of fiduciary duty was dealt with by the court in *KJA Consultants Inc. v. Soberman* (2003), 36 B.L.R. (3d) 19 (Ont. S.C.), at paras. 51-52, aff'd on other grounds (2004), 50 B.L.R. (3d) 283 (Ont. C.A.):

> Compensation for breach of fiduciary duty has a restitutionary objective. In a case such as this there are two different approaches to compensation:

> (i) Disgorging the benefits wrongfully acquired by the defendant or

> (ii) Restoring the Plaintiff to the position it would have been in if the breach had not occurred.

> The first approach focuses on the defendant's gain; the second on the plaintiff's loss. The plaintiff may elect which approach to compensation they are seeking.

[172] The Plaintiff has elected to receive damages on the basis of what it would have earned but for the Defendants' breach of fiduciary duty.

[173] In *GasTops*, the Plaintiff elected to receive damages on the basis of what it would have earned but for the Defendants' breach of fiduciary duty. The court stated the following [*64] regarding the amount owed, at paras. 1478-1479:

*Canaero* stands for the proposition that since the former employer can compel the faithless fiduciary to answer for his or her default according to that individual's gain, the former employer does not have to establish precisely what its profit would have been or what it has lost by failing to realize the corporate opportunity in question. Thus, the court may assess the likelihood that an employer did indeed lose a particular business opportunity because of the defendant's breach, even if the defendant did not acquire that opportunity.

A precise calculation, therefore, is not required. Rather an estimate of what may have been lost by the plaintiff due to the defendant's breach, subject to a reduction for contingencies, is the proper approach in considering such lost opportunities.

[174] At the time Stonley and Khokhar began negotiating with Jet, they were under the reasonable expectation that City Gas did not intend to carry on business, but rather sell it at most for $ 500,000 with a 10 year lease. The effective result of the employees' breach was to secure the lease themselves and resume the Plaintiff's business without [*65] paying the sale price as offered.

[175] In my view, in losing the opportunity to obtain a lease for the front street location, the Plaintiff lost the opportunity to sell the business. Restoring the Plaintiff to the position it would have been but for the breach, therefore, means awarding the Plaintiff damages consistent with the proceeds it would have received from the sale of the business.

[176] Silver testified that she sold the Plaintiff's smaller gas station, Martin Grove, in August 2006 for $ 250,000 as a going concern with a lease and all of its equipment, including the pumps she had moved there from the front street location. Considering this, and Dorothy's opening offer of $ 500,000 it is reasonable, in my view, to conclude that $ 450,000 is a reasonable estimate of what the Plaintiff may have lost due to the defendants' breach. This amount should be reduced by the costs that would have been incurred by the Plaintiff to facilitate the sale, including legal costs and disbursements. Although not a precise calculation, for reasons set out above, I conclude that damages for breach of fiduciary duty are fixed at $ 400,000 in favour of the Plaintiff.

### 5.   Did Jet induce Stonley [*66]  and Khokhar to breach their employment contract with City Gas?

#### (a)   Was Jet aware that Stonley and Khokhar were employees of City Gas?

[177] The defendants concede that Jet was aware of this fact.

#### (b)   Did Jet's actions cause Stonley and Khokhar to breach their employment contract?

[178] Inducing requires that any interference be deliberate and intentional, although not necessarily out of malice: see *Posluns v. Toronto Stock Exchange and Gardiner, [1964] 2 O.R. 547* (H.C.J.), at p. 598, aff'd on other grounds *[1966] 1 O.R. 285* (C.A.), aff'd on other grounds *[1968] S.C.R. 330.*

[179] In *WP (33 Sheppard) Gourmet Express Restaurant Corp. v. WP Canada Bistro & Express Co. Inc.*, 2010 ONSC 2644, the court stated the following, at para. 86:

To satisfy the intention element, the defendant need not know the precise terms of the contract or that his objective could be accomplished solely through a breach. It is enough if, turning a blind eye, the defendant went about his conduct regardless of whether it would involve a breach. In these circumstances, the defendant will be treated [*67]  as though he procured a contractual breach. Fleming, *The Law of Torts*, at 761-2.

[180] On November 22, 2005, Nefsky invited Stonely and Khokhar to make Jet an offer to lease the premises. The Defendants submit that Nefksy's invitation should be excused as he was only contacted by Stonley and Khokhar after

Dorothy offered to sell them the business. It was Nefsky's invitation, however, on November 22, 2005 that was the first step of a dance that ultimately ended in the Plaintiff's eviction.

[181] Having said that, I am unable to conclude that Jet's interference was deliberate and intentional. In inviting the trusted employees to make an offer for a head lease, Nefsky was pursuing the interests of Jet. Jet wanted a head lease on the premises and Nefsky exploited an opportunity presented to him to secure it. He could not have known, at the time he invited the offer, however, that Stonley and Khokhar would choose to pursue the opportunity without disclosing it to their employer or without receiving their employer's consent. The evidence does not demonstrate that at the time of the invitation, Nefsky was or could be certain that a head lease of the sort he proposed would inevitably [*68] result in the Plaintiff's eviction. It cannot be said therefore that Jet intended the breach.

[182] For these reasons I conclude that Jet did not induce Stonley and Khokhar to breach their fiduciary duties to City Gas.

(c) **If so, did this cause City Gas to suffer damages and to what extent?**

[183] If the cause of action was established, damages would be $ 400,000 for reasons set out earlier.

(d) **Is Jet jointly and severally liable for Stonley and Khokhar's breaches?**

[184] It is agreed that if the cause of action was established, it would have resulted in joint and several liability.

**6 Did the Defendants Conspire to Injure City Gas?**

[185] As set out in *Agribrands Purina Canada Inc. v. Kasamekas*, 2011 ONCA 460, *106 O.R. (3d) 427, at para. 26,* the tort of conspiracy is committed when the following elements are present:

i. The defendants act in combination, in concert, by agreement, or with a common design;

ii. The defendants' conduct is unlawful;

iii. The defendants' conduct is directed towards the plaintiff;

iv. The defendants should know that, in the circumstances, injury to the plaintiff is likely to result; [*69] and v. The defendants' conduct causes injury to the plaintiff.

(a) **Did the Defendants act in concert by agreement or common design when they negotiated and executed the lease?**

[186] While the negotiations between Jet and Little Zinger were not disclosed to the Plaintiff, there is no evidence that the Defendants conspired to injure City Gas. The testimony of Korman and Winch, as reflected in their respective file documents, demonstrate that the Defendants' negotiations were arms-length where each party attempted through counsel to secure a commercial contract in their own best interest. The negotiations continued from the time the offer was invited on November 22, 2005 through to the acceptance of the offer by Jet on February 28, 2006. The Plaintiff was sent a Notice to Vacate by Jet on February 24, 2006, only after the two parties had completed their negotiations.

(b) **Did the Defendants commit a tort, breach of a duty, or breach of contract by negotiating and executing the lease?**

[187] Stonley and Khokhar breached their fiduciary duties owed to City Gas. This is sufficient to constitute unlawful conduct for the purposes of the tort of unlawful conduct conspiracy: [*70] see *Berry v. Pulle*y, 2012 ONSC 1790, at para. 379. While the jurisprudence does not require that the parties commit the same unlawful act as each other, it does require that each party commit an unlawful act: see *Agribrands*, at para. 28. Jet committed no tort, breach of

contract, or breach of legislation. It cannot be said therefore that the Defendants committed an unlawful concerted action.

### (c)    Was the conduct directed towards City Gas?

[188] The negotiations between the Jet and Little Zinger were not directed toward the Plaintiff. Rather, the Defendants were pursuing their own respective self-interests without considering the interests of City Gas.

### (d)    Was the Defendants' predominant purpose to injure City Gas or did the Defendants know or ought to have known that injury was likely to result to City Gas?

[189] Where the concerted action is lawful, the Plaintiff must prove the Defendants' predominant objective was to injure the Plaintiff. : see *Canada Cement LaFarge Ltd. v. British Columbia Lightweight Aggregate Ltd., [1983] 1 S.C.R. 452, at pp. 471-472; Knoch Estate v. Jon Picken Ltd. (1991), 4 O.R. (3d) 385* [*71]  (C.A.), at pp. 402-403; and *Robinson v. Medtronic Inc.* (2009), 80 C.P.C. (6th) 87 (S.C.), at paras. 91-94 and 103, aff'd on other grounds 2010 ONSC 3777, 79 C.C.L.T. (3d) 26.

[190] The evidence demonstrates that the Defendants' predominant objective was their own respective self-interest. Moreover, the Plaintiff has failed to plead and identify damages specifically caused by the alleged conspiracy. Rather, City Gas had treated all causes of actions as leading to the same damages: see *Robinson*, at paras. 111-113.

[191] For these reasons I conclude that the defendants did not conspire to injure City Gas.

### 7.    Did Stonley and Khokhar intentionally interfere with City Gas's economic relations with Jet?

[192] As set out in *Reach M.D. Inc. v. Pharmaceutical Manufacturers Association of Canada (2003), 65 O.R. (3d) 30* (C.A.), at para. 44, the tort of intentional interference with economic relations is committed when the following elements are present:

>    i. The defendant intended to injure the plaintiff;

>    ii. The defendant interfered with the plaintiff's business by illegal or unlawful means; and iii. As a result of the interference, the [*72]  plaintiff suffered economic loss.

### (a) Were City Gas and Jet engaged in economic relations?

[193] The tort of intentional interference of economic relations is an intentional tort that is directed at redressing deliberate commercial wrongdoing: see *Correia v. Canac Kitchens*, 2008 ONCA 506, at para. 98. In my view, commercial conduct would include two sophisticated parties negotiating a contract.

[194] Jet and Little Zinger engaged in negotiations for a head lease from the time of the invitation by Jet on November 22, 2005 until the time of the irrevocable offer to lease on February 22, 2006. It cannot be said that during this time, Jet and City Gas were not engaged in economic relations. On behalf of the Plaintiff, Silver was attempting to negotiate a lease for the front street location through Winch. As late as December 2005, the Plaintiff was waiting to hear back from Winch. Although Jet expressed its intention not to enter into a fixed term lease with the Plaintiff, this was not relayed to the Plaintiff.

[195] I conclude that City Gas and Jet were engaged in economic relations at the material time.

### (b) Were Stonley and Khokhar aware that City Gas and Jet were  [*73]   engaged in economic relations?

[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959, *73;
2014 ONSC 2510

[196] As noted above, Stonley and Khokhar were aware that at least City Gas believed it was engaged in economic relations. Nefsky advised Stonley and Khokhar on November 22, 2005 that it had no intention to enter into a fixed lease with the Plaintiff at the front street location. Afterwards, however, it was known that Silver was having difficulties contacting Jet's lawyer and that the Plaintiff was waiting to hear back from Jet's lawyer regarding the lease for the front street location.

(c) **Did Stonley and Khokhar breach any of their duties to City Gas by negotiating and crystallizing a deal with Jet?**

[197] For reasons set out above, Stonley and Khokhar breached their fiduciary duties to City Gas by negotiating and crystallizing a deal with Jet.

(d) **Did Stonley's and Khokhar's acts cause Jet and City Gas' economic relations to terminate?**

[198] Stonley and Khokhar's acts did not cause Jet and City Gas' economic relations to terminate. It is uncontested that Jet did not intend to enter into a fixed term lease for the front street location with City Gas before it commenced negotiations with Stonley and Khokhar to lease the [*74] premises. Moreover, the Plaintiff through Selby rejected the opportunity to enter into a head lease with Jet long before the offer was extended to Stonley and Khokhar. The economic relations between Jet and City Gas terminated because City Gas failed to renew the 1998 fixed term lease as provided for in the terms and failed to accept a head lease for the premises when offered in 2005, not because of Stonley and Khokhar's acts.

(e) **Did Stonley and Khokhar intend to cause loss to City Gas, either as an end in itself or as a means for something else?**

[199] Intent is defined in *Alleslev-Krofchak v. Valcom Ltd.*, 2010 ONCA 557, 322 D.L.R. (4th) 193, at para. 50, leave to appeal to S.C.C. refused, *[2010] S.C.C.A. No. 403,* as follows:

> Apart from the debate about the scope of "unlawful means", the Lords agreed that the intentional interference with economic relations requires that the defendant intend to cause loss to the plaintiff, either as an end in itself or as a means of, for example, enriching himself. If the loss suffered by the plaintiff is merely a foreseeable consequence of the defendant's actions, that is not enough. Moreover, there [*75] must be a causal connection between the unlawful means and the loss suffered by the plaintiff. Neither of these components is new to the jurisprudence in Ontario.

[200] There is no evidence that Stonley and Khokhar intended to cause loss to City Gas. The evidence is overwhelming that they blindly pursued their own monetary interests. Their motive was devoid of any thought or regards to the Plaintiff, including loss caused to the Plaintiff.

(f) **Did City Gas suffer damages?**

[201] For reasons set out above, I have concluded that Stonley and Khokhar did not intentionally interfere with City Gas' economic relations with Jet.

[202] If the cause of action was established, damages would be $ 400,000 for reasons set out above.

8. **Did Jet intentionally interfere with City Gas's economic relations with Stonley and Khokhar?**

(a) **Was Jet aware that City Gas had economic relations with Stonley and Khokhar?**

[203] Jet was aware that Stonley and Khokhar were employed by the Plaintiff as its trusted managers.

**(b)    Did Jet induce Stonley and Khokhar to breach their duties to City Gas or did Jet otherwise act unlawfully?**

[204] For reasons set out above,  [*76]  while Jet invited the offer to lease the premises, it could not have known that Stonley and Khokhar would have entertained it without the Plaintiff's knowledge or consent. It cannot be said therefore that Jet intended the breach.

**(c)    Did any acts of Jet cause Stonley and Khokhar's economic relations with City Gas to terminate?**

[205] The evidence does not demonstrate that Jet was or could have been certain that a head lease of the sort Nefsky proposed would inevitably result in the Plaintiff's eviction or Stonley and Khokhar's termination. It cannot be said therefore that Jet caused the cessation of economic relations between Stonley and Khokhar and City Gas that ultimately occurred.

**(d)    Did Jet intend to cause loss to City Gas, either as an end in itself or as a means for something else?**

[206] There is no evidence that Jet intended to cause loss to City Gas. Further, there is no finding that Jet engaged in an unlawful means to cause loss to the Plaintiff.

**(e)    Did City Gas suffer damages?**

[207] For reasons set out above I conclude that Jet did not intentionally interfere with City Gas's economic relations with Stonley and Khokhar.

[208] If the [*77]  cause of action was established, damages would be $ 400,000 for reasons set out above.

**9.    Based on a finding of liability on any of the torts pleaded, is City Gas entitled to be put back into the position it otherwise would have been in but for the breach(es)?**

**(a)    If so, what is the appropriate quantum of damages?**

[209] For reasons set out above, damages are assessed at $ 400,000.

**(b)    Did City Gas have a duty to mitigate its damages?**

[210] The Defendants argue that at the time City Gas vacated the front street location in April 2006 it was under a duty to mitigate. It is trite law that a Plaintiff is under a duty to mitigate after becoming aware of wrongful conduct against them. The Plaintiff argues that it only became aware of the wrongful conduct after the within litigation was commenced.

[211] For reasons set out above, the court has found as a fact that the Plaintiff knew of wrongful conduct at the time of the trusted employees' termination on February 27, 2006. Further the court has found as a fact that the Plaintiff ought to have known of the wrongful conduct as of March 6, 2006.

[212] I conclude therefore that the Plaintiff had a duty to mitigate [*78]  its damages.

**(c)    If so, did City Gas make reasonable efforts to mitigate its damages?**

[213] As part of the duty to mitigate, City Gas was required to act reasonably: see *Hearn Vehicle Leasing Ltd. v. Torres, [2000] O.J. No. 336, at para. 53.*

[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959, *78;
2014 ONSC 2510

[214] By vacating the property early, the Plaintiff did not have to pay one month's rent. The Plaintiff sold its fuel tanks for $ 50,000 and moved the fuel pumps from the front street location to the Martin Grove location.

[215] In my view, however, the Plaintiff failed to take reasonable steps to mitigate its damages. I make this conclusion in part by considering the Plaintiff's conduct between the time it received the Notice to Vacate on February 24, 2006 and the time it vacated the front street location on April 7, 2006. This conduct is detailed as follows:

    i.  The Plaintiff vacated the front street location 30 days earlier than required under the Notice to Vacate, thereby forfeiting 30 days of revenue. The evidence is such that the monthly revenue exceeded the base monthly rent of the front street location;

    ii.  The Plaintiff failed to respond to Korman's e-mail of March 6, 2006 where Little [*79]  Zinger offered to purchase the Plaintiff's equipment or to negotiate a sublease. As set out above, the court does not accept the reasons offered for this failure to respond;

    iii.  As documented in Korman's file, Little Zinger was prepared to start negotiations for the front street location equipment at $ 100,000 and was willing to go up to $ 250,000;

    iv.  Silver's evidence is that she also ignored the offers from "many others" that called her and attempted to purchase the equipment.

[216] Instead of pursuing opportunities to make money or remain at the front street location, however, the Plaintiff engaged in unreasonable conduct; conduct that lost further opportunities to earn money and conduct that cost money, including removing the tanks and remediating the soil at an approximate cost of $ 150,000.

[217] The Plaintiff submits that Little Zinger never intended and was never truly in a position to have City Gas take over the fuel station as a subtenant. Rather, their alleged offer to lease was simply a false representation.

[218] The evidence of Stonley and Khokhar was that they had every intention of running the fuel station themselves. Their head lease with Jet did not permit [*80]  them to sublet the fuel station to a third party. While the Plaintiff's failure in responding to the e-mail of March 6, 2006 is not excused, I agree with the Plaintiff that the opportunity of a sub-lease was remote.

[219] However, it was unreasonable that the Plaintiff did not pursue the opportunity to sell the equipment of the front street location to Little Zinger. At the time of the e-mail, decommissioning had only just begun and the Plaintiff had full opportunity to negotiate a price and sell the equipment. Instead, the Plaintiff ignored the opportunity, and incurred the cost of removing the tanks, moving the pumps, removing the canopy and signage, and remediating the soil.

[220] The Plaintiff submits that its conduct should be excused because it was never presented with a dollar figure by the Defendants and it was under no obligation to seek out the best possible offer to sell the equipment. In my view, the failure to even respond to the e-mail and inquire about the offer amounts to an unreasonable attempt to mitigate. Clearly it was in the financial interests of the Plaintiff to sell the tanks in the ground and forego the decommissioning and remediation work.

[221] I therefore [*81]  conclude that the Plaintiff has failed to mitigate its damages. It acted unreasonably in failing to respond to Little Zinger's offer to purchase its equipment. The evidence is such that Little Zinger would have paid up to $ 250,000 for the equipment. The Plaintiff's damages are therefore discounted by $ 250,000 for its failure to mitigate.

**Conclusion**

[222] The evidence of Selby is absent in this case. It is unfortunate that the man who hired and trusted Stonley and Khokhar and contracted with Nefsky's dad for many years was not available to give testimony in court. Selby's trusted

[2014] O.J. No. 2664; 2014 ON.C. LEXIS 2959, *81;
2014 ONSC 2510

employees saw opportunity they could never have imagined and pursued it with blind ambition. They had no intention to hurt the man that had been so good to them for so many years. Their own interests took over and they purposively ignored their knowledge of the Plaintiff's efforts to secure a fixed lease. They had a duty to tell the Plaintiff about their opportunity and receive its consent. Their failure to do so resulted in their termination by City Gas and the cessation of the business Selby created and trusted them to run.

**Disposition**

[223] For reasons set out above, the Plaintiff's claim is [*82]  dismissed as against all defendants as it is statute barred.

[224] In the event that I am wrong, the Plaintiff would have proven its cause of action against Stonley and Khokhar for breach of fiduciary duties on the merits. The damages I would have awarded on this cause of action only, in favour of the Plaintiff, as against the Defendants Khokhar and Stonley, would have been the amount of $ 150,000. The Plaintiff's other claims against the Defendants would have been dismissed.

**Costs**

[225] The appropriate costs award for the February 26, 2009, Little Zinger action and the within March 27, 2009 counterclaim remain outstanding. The parties are encouraged to agree to a mutually acceptable costs award. If unable to agree I will receive written submission in this regard from the parties, of not more than five pages; first from the Plaintiff within 30 days of this award, followed by the Defendants within 30 days thereafter.

V.R. CHIAPPETTA J.