# EXHIBIT B



4 of 5 DOCUMENTS

(c) Her Majesty the Queen in Right of Canada, 1974

Canadian Aero Service Limited (Plaintiff) Appellant and Thomas M. O'Malley, J. M. (George) Zarzycki, James E. Wells, Terra Surveys Limited (Defendants) Respondents

INDEXED AS: CAN. AERO v. O'MALLEY

SUPREME COURT OF CANADA

*[1974] S.C.R. 592; 1973 S.C.R. LEXIS 43*

**Heard:** May 11, 12, 15, 16, 24, 25, 1972

**Judgment:** June 29, 1973

**PANEL:**  Martland, Judson, Ritchie, Spence and Laskin JJ.

**PRIOR-HISTORY:** ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

**CATCHWORDS:**
Corporations -- Officers and directors -- Senior officers of appellant company resigning to form another company -- Benefit of corporate opportunity wrongfully taken -- Breach of fiduciary duty.

**HEADNOTE:**
The present appeal arose out of a claim by the plaintiff-appellant (C Ltd.) that the defendants had improperly taken the fruits of a corporate opportunity in which C Ltd. had a prior and continuing interest. The allegation against the defendants O and Z was that while directors or officers of C Ltd. they had devoted effort and planning in respect of the particular corporate opportunity as representatives of C Ltd., but had subsequently wrongfully taken the benefit thereof in breach of a fiduciary duty to C Ltd. The defendant W, who had been a director of C Ltd. but never an officer, was brought into the action as an associate of the other individual defendants in an alleged scheme to deprive C Ltd. of the corporate opportunity which it had been developing through O and Z; and the defendant T Ltd. was joined as the vehicle through which the individual defendants in fact obtained the benefit for which C Ltd. had been negotiating.

   C Ltd. failed before the trial judge, whose judgment was affirmed by the Court of Appeal.

   Held: The appeal should be allowed against all defendants save W. The appeal as against W should be dismissed.

   Although the defendants O and Z were subject to supervision of the officers of a company controlling C Ltd., their positions as senior officers of a subsidiary, which was a working organization, charged them with initiatives and with responsibilities far removed  from the obedient role of servants. It followed that O and Z stood in a fiduciary relationship to C Ltd., which in its generality betokens loyalty, good faith and avoidance of a conflict of duty and self-interest. A director or a senior officer like O or Z is precluded from obtaining for himself, either secretly or without

the approval of the company, any property or business advantage either belonging to the company or for which it has been negotiating; and especially is this so where the director or officer is a participant in the negotiations on behalf of the company.

A strict ethic in this area of the law disqualifies a director or senior officer from usurping for himself or diverting to another person or company with whom or with which he is associated a maturing business opportunity which his company is actively pursuing; he is also precluded from so acting even after his resignation where the resignation may fairly be said to have been prompted or influenced by a wish to acquire for himself the opportunity sought by the company, or where it was his position with the company rather than a fresh initiative that led him to the opportunity which he later acquired.

Unlike the case with O and Z, the findings of fact did not admit of a conclusion of law by which to fix the defendant W with liability.

**CASES-CITED:**
Peso Silver Mines Ltd. (N.P.L.) v. Cropper, [1966] S.C.R. 673, distinguished; Zwicker v. Stanbury, [1953] 2 S.C.R. 438; Regal (Hastings) Ltd. v. Gulliver, [1942] 1 All E.R. 378; Phipps v. Boardman, [1967] 2 A.C. 46; Industrial Development Consultants Ltd. v. Cooley, [1972] 2 All E.R. 162; Smith v. Harrison (1872), 27 L.T.R. 188; Furs Ltd. v. Tomkies (1936), 54 C.L.R. 583; G. E. Smith Ltd. v. Smith, [1952] N.Z.L.R. 470; Aberdeen Railway Co. v. Blakie Bros. (1854), 1 Macq. 461; Burg v. Horn (1967), 380 F. 2d 897; Ex p. James (1803), 8 Ves. 337; Pre-Cam. Exploration & Development Ltd. v. McTavish, [1966] S.C.R. 551; Raines v. Toney (1958), 313 S.W. 2d 802; Albert A. Volk Inc. v. Fleschner Bros. Inc. (1945), 60 N.Y.S. 2d 244; Mile-O-Mo Fishing Club Inc. v. Noble (1965), 210 N.E. 2d 12, referred to.

**INTRODUCTION:**
APPEAL from a judgment of the Court of Appeal for Ontario n1, dismissing an appeal from a judgment of Grant J. Appeal allowed against all defendants save one.

n1 *[1972] 1 O.R. 592,* 23 D.L.R. (3d) 632.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

**COUNSEL:** C. L. Dubin, Q.C., R. W. McKimm and R. A. Blair, for the plaintiff, appellant
C. H. Locke, Q.C., and Gordon Blair, for the defendant, respondent, Wells
John P. Nelligan, Q.C., and Denis Power, for the defendants, respondents, O'Malley, Zarzycki and Terra Surveys Ltd.

**JUDGMENT-1:**
The judgment of the Court was delivered by

LASKIN J.--This appeal arises out of a claim by the plaintiff-appellant (hereinafter referred to as Canaero) that the defendants had improperly taken the fruits of a corporate opportunity in which Canaero had a prior and continuing interest. The allegation against the defendants O'Malley and Zarzycki is that while directors or officers of Canaero they had devoted effort and planning in respect of the particular corporate opportunity as representatives of Canaero, but had subsequently wrongfully taken the benefit thereof in breach of a fiduciary duty to Canaero. The defendant Wells, who had been a director of Canaero but never an officer, was brought into the action as an associate of the other individual defendants in an alleged scheme to deprive Canaero of the corporate opportunity which it had been developing through O'Malley and Zarzycki; and the defendant Terra Surveys Limited was joined as the vehicle through which the individual defendants in fact obtained the benefit for which Canaero had been negotiating.

Canaero failed before Grant J. whose judgment on October 8, 1969, was affirmed by the Ontario Court of Appeal, speaking through MacKay J. A., on June 18, 1971. The trial judge fixed the damages at $ 125,000 in the event of a successful appeal, and this determination was implicitly endorsed by the Ontario Court of Appeal. The appeal to this Court is taken in the light of concurrent findings of fact on all points touching the course of events, but the Ontario Court of Appeal did not agree with Grant J. that the relationship of O'Malley and Zarzycki to Canaero, by reason of their positions as senior managerial officers, was of a fiduciary character, like that existing between directors and a company; rather, it was of the view that the relationship was simply that of employees and employer, involving no corresponding fiduciary obligations and, apart from valid contractual restriction, no limitation upon post-employment competition save as to appropriation of trade secrets and enticement of customers, of which there was no proof in this case.

Canaero was incorporated in 1948 under the Companies Act of Canada as a wholly-owned subsidiary of Aero Service Corporation, a United States company whose main business, like that of Canaero and other subsidiaries, was topographical mapping and geophysical exploration. In 1961, the parent Aero and its subsidiaries came under the control of another United States corporation, Litton Industries Inc. O'Malley joined Aero Service Corporation in 1936 and, apart from army service, remained with it until 1950 when he became general manager and president of Canaero whose head office was in Ottawa. He returned to the parent Aero company in 1957, but rejoined Canaero in 1964 as president and chief executive officer, and remained as such until he resigned on August 19, 1966. Acknowledgement and acceptance of the resignation followed on August 26, 1966.

Zarzycki, who attained a widely-respected reputation in geodesy, joined Canaero in 1953, soon becoming chief engineer. He was named executive vice-president in 1964 and made a director in March 1965. He resigned these posts on August 22, 1966, and received the acknowledgment and acceptance of his resignation in a letter of August 29, 1966.

Wells, a solicitor in Ottawa, knowledgeable about external aid programmes and the opportunities open in that connection to aeroplane companies, became a director of Canaero on March 15, 1950, at the same time as O'Malley. He was never an officer and was, on the evidence, an inactive director. When Survair Limited was incorporated in 1960 at Canaero's instance to provide it with flying services (at first, exclusively, but not so after February 1, 1966), Wells became a shareholder by reason of his association with Canaero. He submitted his resignation as a director of Canaero at the request of Litton Industries Inc. when the latter took control, the resignation to be effective at its pleasure. No such pleasure was indicated, and Wells submitted a resignation on his own on February 5, 1965. There is an uncontested finding that he ceased to be a director after that date.

The defendant Terra Surveys Limited was incorporated on August 16, 1966, following a luncheon meeting of O'Malley, Zarzycki and Wells on August 6, 1966, at which the suggestion to form a company of their own was made by Wells to O'Malley and Zarzycki. To Wells' knowledge, the latter were discontented at Canaero by reason of the limitations upon their authority and the scope of independent action imposed by the Litton company, and they also feared loss of position if Canaero should fail to get contracts. Nominal directors and officers of the new company were appointed, but O'Malley and Zarzycki became major shareholders when common stock was issued on September 12, 1966. One share was issued to Wells at this time but he made a further investment in the new company on November 6, 1966. There is no doubt that Terra Surveys Limited was conceived as a company through which O'Malley and Zarzycki could pursue the same objects that animated Canaero. O'Malley became president of Terra Surveys Limited and Zarzycki became executive vice-president shortly after its incorporation.

The legal issues in this appeal concern what I shall call the Guyana project, the topographical mapping and aerial photographing of parts of Guyana (known as British Guiana until its independence on May 25, 1965) to be financed through an external aid grant or loan from the Government of Canada under its programme of aid to developing countries. Terra Surveys Limited, in association with Survair Limited and another company, succeeded in obtaining the contract for the Guyana project which Canaero had been pursuing through O'Malley and Zarzycki, among others, for a number of years. There is a coincidence of dates and events surrounding the maturing and realization of that project, and the departure of O'Malley and Zarzycki from Canaero, their involvement with Wells in the incorporation of Terra

Surveys Limited and its success, almost immediately thereafter, in obtaining the contract for the project. The significance of this coincidence is related, first, to the nature of the duty owed to Canaero by O'Malley and Zarzycki by reason of their positions with that company and, second, to the continuation of the duty, if any, upon a severance of relationship.

The coincidence aforementioned emerges from a review of the activities of Canaero in respect of the Guyana project. The business in which Canaero and other like companies were engaged involved technical, administrative and even diplomatic capabilities because, in the main, their dealings were with governments, both of countries seeking foreign aid for development and of countries, like United States and Canada, which had programmes for such aid. Companies like Canaero risked initiative and expenditure in preparatory work for projects without any assurance of return in the form of contracts; they saw their business as not only bidding on projects ripe for realization, but as also embracing suggestion and development of projects for which they would later seek approval and contracts to carry them out. In this latter aspect, the development of a project involved negotiation with officials of the country for whose benefit it was intended and the establishment of a receptive accord with a country offering aid for such matters. Of course, a suggested project was more likely to be viewed favourably if its technical and administrative aspects were well worked out in the course of its presentation for governmental approval.

Canaero's interest in promoting a project in Guyana for the development of its natural resources, and in particular electrical energy, began in 1961. It had done work in nearby Surinam (or Dutch Guiana) where conditions were similar. It envisaged extensive aerial photography and mapping of the country which, apart from the populated coastal area, was covered by dense jungle. Promotional work to persuade the local authorities that Canaero was best equipped to carry out the topographical mapping was done by O'Malley and by another associate of the parent Aero. A local agent, one Gavin B. Kennard, was engaged by Canaero. In May 1962, Zarzycki spent three days in Guyana in the interests of Canaero, obtaining information, examining existing geographical surveys and meeting government officials. He submitted a report on his visit to Canaero and to the parent Aero company.

Between 1962 and 1964 Canaero did magnetometer and electromagnetometer surveys in Guyana on behalf of the United Nations, and it envisaged either the United Nations or the United States as the funding agency to support the topographical mapping project that it was evolving as a result of its contacts in Guyana and Zarzycki's visit and report. Political conditions in Guyana after Zarzycki's visit in May 1962 did not conduce to furtherance of the project and activity thereon was suspended.

It was resumed in 1965 when it appeared that funds for it might be made available under Canada's external aid programme. The United States had adopted a policy in this area of awarding contracts to United States firms. The record in this case includes a letter of October 22, 1968, after the events which gave rise to this litigation, in which the Canadian Secretary of State for External Affairs wrote that Canada's external aid policy was to require contractors to be incorporated in Canada, managed and operated from Canada and to employ Canadian personnel; and although preference in awarding external aid contracts was given to Canadian controlled firms, this was not an absolute requirement of eligibility to obtain such contracts. Canaero would hence have been eligible at that time for an award of a contract and, inferentially, in 1966 as well.

Zarzycki returned to Guyana on July 14, 1965, and remained there until July 18, 1965. By July 26, 1965, he completed a proposal for topographical mapping of the country, a proposal that the Government thereof might use in seeking Canadian financial aid. Copies went to a Guyana cabinet minister, to the Canadian High Commissioner there and to the External Aid Office in Ottawa. Zarzycki in his evidence described the proposal as more sales-slanted than technical. The technical aspects were none the less covered; for example, the report recommended the use of an aerodist, a recently invented airborne electronic distance-measuring device. Zarzycki had previously urged that Canaero purchase one as a needed piece of equipment which other subsidiaries of Litton Industries Inc. could also use. Canaero placed an order for an aerodist, at a cost of $ 75,000, on or about July 15, 1966.

A few days earlier, on July 10, 1966, to be exact, an internal communication to the acting director-general of the

Canadian External Aid Office, one Peter Towe, informed him that the Governments of Guyana and Canada had agreed in principle on a loan to Guyana for a topographical survey and mapping. The Prime Minister of Guyana had come to Ottawa early in July, 1966, for discussion on that among other matters. O'Malley had felt that if the assistance from Canada was by way of a loan Guyana would have the major say in naming the contractor, and this would make Canaero's chances better than if the assistance was by way of grant because then the selection would be determined by Canada. Although a loan was authorized, its terms were very liberal, and it was decided that Canada would select the contractor with the concurrence of Guyana, after examining proposals from a number of designated companies which would be invited to bid. An official of the Department of Mines and Technical Surveys visited Guyana and prepared specifications for the project which was approved by the Cabinet on August 10, 1966. Towe was informed by departmental letter of August 18, 1966, of a recommendation that Canaero, Lockwood Survey Corporation, Spartan Air Services Limited and Survair Limited be invited to submit proposals for the project. There was a pencilled note on the side of the letter, apparently added later, of the following words: "general photogramy Terra Ltd.".

The Canadian External Aid Office by letter of August 23, 1966, invited five companies to bid on the Guyana project. Survair Limited was dropped from the originally recommended group of four companies, and Terra Surveys Limited and General Photogrammetric Services Limited were added. A briefing on the specifications for the project was held by the Department of Mines and Technical Surveys on August 29, 1966. Zarzycki and another represented Terra Surveys Limited at this briefing.

O'Malley and Zarzycki pursued the Guyana project on behalf of Canaero up to July 25, 1966, but did nothing thereon for Canaero thereafter. On July 9, 1966, they had met with the Prime Minister of Guyana during his visit to Ottawa, and on July 13, 1966, they had met with Towe (who had previously been informed of the inter-governmental agreement in principle on the Guyana project) and learned from him that the project was on foot. O'Malley had written to Kennard, Canaero's Guyana agent, on July 15, 1966, that he felt the job was a certainty for Canaero. By letter of the same date to Towe, O'Malley wrote that Zarzycki had spent about 20 days in Georgetown, Guyana, on two successive visits to inventory the data available and determine the use to which the control survey and mapping would be put, and that he had subsequently prepared a proposal for a geodetic network and topographical mapping which was submitted to the Honourable Robert Jordan (the appropriate Guyanese cabinet minister) on July 27, 1965. On July 22, 1966, O'Malley wrote to an officer of the parent company that the Prime Minister of Guyana had advised him that "the Canadian Government would honour the project". Finally, on July 25, 1966, O'Malley wrote to Kennard to ask if he could learn what position Guyana was taking on the selection of a contractor, that is whether it proposed to make the selection with Canada's concurrence or whether it would leave the selection to Canada subject to its concurrence.

Thereafter the record of events, subject to one exception, concerns the involvement of O'Malley and Zarzycki with Wells in the incorporation of Terra Surveys Limited, their resignations from their positions with Canaero and their successful intervention through Terra Surveys Limited into the Guyana project. As of the date of O'Malley's letter of resignation, August 19, 1966, Terra Surveys Limited had a post office box and a favourable bank reference. Zarzycki had then not yet formally resigned as had O'Malley but had made the decision to do so. O'Malley informed the Canadian External Aid Office on August 22, 1966, of the new company which he, Zarzycki and Wells had formed.

The exception in the record of events just recited concerns a visit of Zarzycki, his "regular trip to the External Aid Office" (to use his own words), to the man in charge of the Caribbean area. This was on or about August 13, 1966, after his return from holidays and after the luncheon meeting with O'Malley and Wells that led to the incorporation of Terra. The purpose of the visit related to two project possibilities in the Caribbean area for Canaero, that in Guyana and one in Ecuador. Zarzycki then received confirmation of what he had earlier learned from Towe, namely, that the Guyana project had been approved in principle.

Despite having lost O'Malley and Zarzycki and also a senior employee Turner (who joined the Terra venture and attended the briefing session on August 29, 1966, on its behalf with Zarzycki), Canaero associated itself with Spartan Air Services Limited in the latter's proposal on the Guyana project which was submitted under date of September 12, 1966. Prior to this submission, representatives of these two companies visited Guyana to assure officials there that

Canaero was involved in the preparation of the Spartan proposal and was supporting it.

Terra Surveys Limited submitted its proposal on September 12, 1966, through Zarzycki, having sent a letter on that date to the External Aid Office setting out its qualifications. A report on the various proposals submitted was issued on September 16, 1966, by the Canadian government officer who had visited Guyana and had prepared the specifications for the project. He recommended that Terra Surveys Limited be the contractor, and included in his report the following observations upon its capabilities:

"This project is one of the most demanding that has been undertaken in the Canadian technical assistance program. The parts of the operation most seriously affected by the difficult conditions are the establishment of survey control and the procurement of the aerial photography, and the success of the project will depend greatly on the ability of the company selected to complete these two phases satisfactorily. The subsequent operations are somewhat less complex and are dependent on the successful completion of the initial phases. Furthermore, should the project lag in these phases, further resources are readily available in other companies in Canada.

In my discussions with senior survey officials in Guyana, I was informed that an accurate framework of survey control was required to form the base for the topographical mapping now urgently required and in addition to permit the orderly completion of the national coverage in the future. Our experience is that the Aerodist system can provide the precision and density of control required more economically than any other method developed to date. Operational experience with this equipment by Canadian commercial companies has been extremely limited and has only been gained on projects where they acted in a support role to Surveys and Mapping Branch engineers. This has been kept in mind in the examination of the proposals in evaluating the plans of approach presented for this phase...

The proposals for the control surveys and topographical mapping project in Guyana submitted to the Director General on September 12, 1966 by Lockwood Survey Corporation, Spartan Air Services Limited and Terra Surveys Limited have been carefully reviewed.

Representatives of General Photogrammetric Services Limited and Canadian Aero Services Limited submitted no proposals. However, Spartan Air Services Limited has indicated that they intend to make use of equipment and services of Canadian Aero Service Limited while Terra Surveys Limited has stated that they intend to subcontract compilation and draughting work to General Photogrammetric Services Limited...

Terra Surveys Limited has submitted a detailed proposal outlining their assessment of the major points to be considered in undertaking the proposed project in Guyana and their solution. It concludes with their proposed plan of operations and associated time schedule and is accompanied by a summary of what the Government of Guyana may expect to receive as well as the support it will be expected to provide...

Although Terra, like other Canadian companies, has had no practical experience in planning and executing a similar type of Aerodist project, the proposal indicates that its authors have studied the subject very thoroughly and in preparing their plan of operation have also taken conditions peculiar to Guyana into account...

Dr. J. M. Zarzycki is named as the project manager. He is known internationally as an outstanding photogrammetric engineer and has developed and successfully used an aerial triangulation procedure utilizing superwide angle photography, the Wild B. 8 and auxiliary data. Like most photogrammetric operations it requires good work by technicians but its success or failure hinges on the professional judgment and supervision of the engineer. Dr. Zarzycki has demonstrated this ability most clearly in past years.

Mr. M. H. Turner is to assist Dr. Zarzycki. He gained extensive experience in different field operations in Africa and has shown his ability to establish excellent working relationships with the senior survey officials as well as carrying out very difficult survey tasks. The Aerodist project will call for a high degree of theoretical knowledge in geodesy as well as practical management ability. This can be provided by Messrs. Turner and Zarzycki...

The proposal submitted by Terra Surveys Limited covered the operation in much greater detail than might normally be expected. However, the suggestions put forward indicate that all aspects of the operation have been most carefully reviewed and the plan of operation well thought out. The sections of the Terra proposal dealing with Aerodist indicate a more complete understanding of the problems in the field and subsequent operations than the other two proposals.

The treatment of many aspects of the project varies very little in the three proposals. However, appreciable differences do appear in the key phases of aerial photography and Aerodist control as explained in the preceding paragraphs. My assessment is that Terra Surveys Limited, in combination with Survair Limited and General Photogrammetric Services Limited, is best fitted to undertake this very difficult operation."

In the result, Terra Surveys Limited negotiated a contract with the External Aid Office, and on November 26, 1966, entered into an agreement with the Government of Guyana to carry out the project for the sum of $ 2,300,000. This was the amount indicated in the proposal of July 26, 1965, prepared by Zarzycki on behalf of Canaero.

There is no evidence that either Zarzycki or any other representative of Terra visited Guyana between August 23, 1966, the date when the invitations to submit proposals went out, and September 12, 1966, the date of the Terra proposal. The reference in the report of September 16, 1966, to the fact that the Terra proposal "covered the operation in much greater detail than might normally be expected" is a tribute to Zarzycki that owed much to his long involvement in the Guyana project on behalf of Canaero. From the time of his contact with certain Guyana officials in Canada in July 1966. Zarzycki had no relationship with them or any others until he went to Guyana to sign the contract which had been awarded to Terra.

There are four issues that arise for consideration on the facts so far recited. There is, first, the determination of the relationship of O'Malley and Zarzycki to Canaero. Second, there is the duty or duties, if any, owed by them to Canaero by reason of the ascertained relationship. Third, there is the question whether there has been any breach of duty, if any is owing, by reason of the conduct of O'Malley and Zarzycki in acting through Terra to secure the contract for the Guyana project; and, fourth, there is the question of liability for breach of duty if established.

Like Grant J., the trial judge, I do not think it matters whether O'Malley and Zarzycki were properly appointed as directors of Canaero or whether they did or did not act as directors. What is not in doubt is that they acted respectively as president and executive vice-president of Canaero for about two years prior to their resignations. To paraphrase the findings of the trial judge in this respect, they acted in those positions and their remuneration and responsibilities verified their status as senior officers of Canaero. They were "top management" and not mere employees whose duty to their employer, unless enlarged by contract, consisted only of respect for trade secrets and for confidentiality of customer lists. Theirs was a larger, more exacting duty which, unless modified by statute or by contract (and there is nothing of this sort here), was similar to that owed to a corporate employer by its directors. I adopt what is said on this point by Gower, Principles of Modern Company Law, 3rd ed., 1969, at p. 518 as follows:

"... these duties, except in so far as they depend on statutory provisions expressly limited to directors, are not so restricted but apply equally to any officials of the company who are authorized to act on its behalf, and in particular to those acting in a managerial capacity."

The distinction taken between agents and servants of an employer is apt here, and I am unable to appreciate the basis upon which the Ontario Court of Appeal concluded that O'Malley and Zarzycki were mere employees, that is servants of Canaero rather than agents. Although they were subject to supervision of the officers of the controlling company, their positions as senior officers of a subsidiary, which was a working organization, charged them with initiatives and with responsibilities far removed from the obedient role of servants.

It follows that O'Malley and Zarzycki stood in a fiduciary relationship to Canaero, which in its generality betokens loyalty, good faith and avoidance of a conflict of duty and self-interest. Descending from the generality, the fiduciary relationship goes at least this far: a director or a senior officer like O'Malley or Zarzycki is precluded from obtaining for

himself, either secretly or without the approval of the company (which would have to be properly manifested upon full disclosure of the facts), any property or business advantage either belonging to the company or for which it has been negotiating; and especially is this so where the director or officer is a participant in the negotiations on behalf of the company.

An examination of the case law in this Court and in the Courts of other like jurisdictions on the fiduciary duties of directors and senior officers shows the pervasiveness of a strict ethic in this area of the law. In my opinion, this ethic disqualifies a director or senior officer from usurping for himself or diverting to another person or company with whom or with which he is associated a maturing business opportunity which his company is actively pursuing; he is also precluded from so acting even after his resignation where the resignation may fairly be said to have been prompted or influenced by a wish to acquire for himself the opportunity sought by the company, or where it was his position with the company rather than a fresh initiative that led him to the opportunity which he later acquired.

It is this fiduciary duty which is invoked by the appellant in this case and which is resisted by the respondents on the grounds that the duty as formulated is not nor should be part of our law and that, in any event, the facts of the present case do not fall within its scope.

This Court considered the issue of fiduciary duty of directors in Zwicker v. Stanbury n2, where it found apt for the purposes of that case certain general statements of law by Viscount Sankey and by Lord Russell of Killowen in Regal (Hastings) Ltd. v. Gulliver n3, at pp.381 and 389. These statements, reflecting basic principle which is not challenged in the present case, are represented in the following passages:

Per Viscount Sankey:

"In my view, the respondents were in a fiduciary position and their liability to account does not depend upon proof of mala fides. The general rule of equity is that no one who has duties of a fiduciary nature to perform is allowed to enter into engagements in which he has or can have a personal interest conflicting with the interests of those whom he is bound to protect. If he holds any property so acquired as trustee, he is bound to account for it to his cestui que trust. The earlier cases are concerned with trusts of specific property: Keech v. Sandford ((1726), Sel.Cas. Ch.61) per Lord King, L.C. The rule, however, applies to agents, as, for example, solicitors and directors, when acting in a fiduciary capacity."

Per Lord Russell of Killowen:

"In the result, I am of opinion that the directors standing in a fiduciary relationship to Regal in regard to the exercise of their powers as directors, and having obtained these shares by reason and only by reason of the fact that they were directors of Regal and in the course of the execution of that office, are accountable for the profits which they have made out of them. The equitable rule laid down in Keech v. Sandford [supra] and *Ex p. James ((1803), 8 Ves. 337),* and similar authorities applies ... in full force. It was contended that these cases were distinguishable by reason of the fact that it was impossible for Regal to get the shares owing to lack of funds, and that the directors in taking the shares were really acting as members of the public. I cannot accept this argument. It was impossible for the cestui que trust in Keech v. Sandford to obtain the lease, nevertheless the trustee was accountable. The suggestion that the directors were applying simply as members of the public is a travesty of the facts. They could, had they wished, have protected themselves by a resolution (either antecedent or subsequent) of the Regal shareholders in general meeting. In default of such approval, the liability to account must remain."

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 *[1953] 2 S.C.R. 438.*

n3 *[1942] 1 All E.R. 378.*

[1974] S.C.R. 592; 1973 S.C.R. LEXIS 43

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

    I need not pause to consider whether on the facts in Regal (Hastings) Ltd. v. Gulliver the equitable principle was overzealously applied; see, for example, Gower, op. cit., at pp.535-537. What I would observe is that the principle, or, indeed, principles, as stated, grew out of older cases concerned with fiduciaries other than directors or managing officers of a modern corporation, and I do not therefore regard them as providing a rigid measure whose literal terms must be met in assessing succeeding cases. In my opinion, neither the conflict test, referred to by Viscount Sankey, nor the test of accountability for profits acquired by reason only of being directors and in the course of execution of the office, reflected in the passage quoted from Lord Russell of Killowen, should be considered as the exclusive touchstones of liability. In this, as in other branches of the law, new fact situations may require a reformulation of existing principle to maintain its vigour in the new setting.

    The reaping of a profit by a person at a company's expense while a director thereof is, of course, an adequate ground upon which to hold the director accountable. Yet there may be situations where a profit must be disgorged, although not gained at the expense of the company, on the ground that a director must not be allowed to use his position as such to make a profit even if it was not open to the company, as for example, by reason of legal disability, to participate in the transaction. An analogous situation, albeit not involving a director, existed for all practical purposes in the case of Phipps v. Boardman n4, which also supports the view that liability to account does not depend on proof of an actual conflict of duty and self-interest. Another, quite recent, illustration of a liability to account where the company itself had failed to obtain a business contract and hence could not be regarded as having been deprived of a business opportunity is Industrial Development Consultants Ltd. v. Cooley n5, a judgment of a Court of first instance. There, the managing director, who was allowed to resign his position on a false assertion of ill health, subsequently got the contract for himself. That case is thus also illustrative of the situation where a director's resignation is prompted by a decision to obtain for himself the business contract denied to his company and where he does obtain it without disclosing his intention.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

       n4 [1967] 2 A.C. 46.

       n5 *[1972] 2 All E.R. 162.*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

    What these decisions indicate is an updating of the equitable principle whose roots lie in the general standards that I have already mentioned, namely, loyalty, good faith and avoidance of a conflict of duty and self-interest. Strict application against directors and senior management officials is simply recognition of the degree of control which their positions give them in corporate operations, a control which rises above day-to-day accountability to owning shareholders and which comes under some scrutiny only at annual general or at special meetings. It is a necessary supplement, in the public interest, of statutory regulation and accountability which themselves are, at one and the same time, an acknowledgment of the importance of the corporation in the life of the community and of the need to compel obedience by it and by its promoters, directors and managers to norms of exemplary behaviour.

    A particular application of the equitable principle against a director is found in an early Australian case, appealed unsuccessfully to the Privy Council, where there was a refusal to permit a director to carry out a scheme for acquiring a mining claim of the company, through unopposed enforcement of a forfeiture, on his undertaking to give all shareholders save a pledgee bank the benefit of his purchase according to their shareholdings see Smith v. Harrison n6. The High Court of Australia applied the equitable principle on a conflict of duty and self-interest basis in a case where a director, who was empowered to sell a branch of his company's business with which he was particularly associated (which would result in loss of his position), arranged with the purchaser to enter its employ, doing so with the approval of the chairman of the board of the seller company, he having consulted with his fellow directors: see Furs Ltd. v.

Tomkies n7. As was there pointed out, there was failure to make full disclosure to the shareholders of the financial arrangements made by the director, and it was no answer to the breach of fiduciary duty that no loss was caused to the company or that any profit made was of a kind which the company could not have obtained.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n6 (1872), *27 L.T.R. 188.*

n7 (1936), *54 C.L.R. 583.*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

In the same vein is the New Zealand case of G. E. Smith Ltd. v. Smith n8, which founded itself not only on Regal (Hastings) Ltd. v. Gulliver, supra, but as well on the proposition stated by Lord Cranworth in Aberdeen Railway Co. v. Blakie Bros. n9 that a possible conflict of personal interest and duty will establish a basis for relief. The case concerned acquisition by a company director in his own right of an import licence (which had been refused to the company) for goods in which the company dealt, this being done at a time when liquidation of the company was contemplated by him and the other principal shareholder but before an agreement was concluded by which the defendant sold his interest in the company to that other shareholder.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n8 [1952] N.Z.L.R. 470.

n9 (1854), *1 Macq. 461.*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Cases in the United States show that early enunciations of principle, resting on particular fact situations, have been broadened to cover succeeding cases, but one cannot pretend that there is any one consistent line of approach among the different state jurisdictions: see James C. Slaughter, "The Corporate Opportunity Doctrine", *18 Southwestern L.J. 96 (1964).* What emerges from a review of the American case law is an imprecise ethical standard "which prohibits an executive--here defined to include either a director or an officer--from appropriating to himself a business opportunity which in fairness should belong to the corporation": see Note, "Corporate Opportunity", *74 Harv. L. Rev. 765 (1961).*

A useful examination of the approach to corporate opportunity in American decisions is that found in Burg v. Horn n10, a majority decision of the Second Circuit Court of Appeals applying New York law in a diversity suit. What was involved in that case was not the usurpation of an opportunity which the particular company was pursuing, but the more far-reaching question whether a director was obliged to offer to the company, before taking them for himself, opportunities in its line of business of which he rather than the company became aware and which he pursued. The facts, briefly, were that directors of a company, operating low rental housing, who were known to their co-director plaintiff to have unrelated interests and also interests, acquired earlier, in other like companies, acquired a number of low rental properties which they did not offer to the company of which they and the plaintiff were co-directors. These properties had not been sought by the company nor did the defendants learn of them through the company. In denying liability, the majority expressed New York law to require a determination in each case, by considering the relationship between director and company, whether a duty to offer the company all opportunities within its line of business was fairly to be implied. The dissenting judge saw the case as one where, in the absence of a contrary understanding between the parties, the defendants were under a fiduciary obligation to offer the properties to the company before buying them for themselves.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n10 (1967), *380 F. 2d 897.*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

That the rigorous standard of behaviour enforced against directors and executives may survive their tenure of such offices was indicated as early as Ex p. James n11 where Lord Eldon, speaking of the fiduciary in that case who was a solicitor purchasing at a sale, said (at p.390 E.R.):

"With respect to the question now put whether I will permit Jones to give up the office of solicitor and to bid, I cannot give that permission. If the principle is right that the solicitor cannot buy, it would lead to all the mischief of acting up to the point of the sale, getting all the information that may be useful to him, then discharging himself from the character of solicitor and buying the property... On the other hand I do not deny that those interested in the question may give the permission."

The same principle, although applied in a master-servant case in respect of the use to his own advantage of confidential information acquired by the respondent while employed by the appellant, was recognized by this Court in Pre-Cam Exploration & Development Ltd. v. McTavish n12.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n11 (1803), *8 Ves. 337, 32 E.R. 385.*

n12 *[1966] S.C.R. 551.*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

The trial judge appeared to treat this question differently in quoting a passage from Raines v. Toney n13, a judgment of the Supreme Court of Arkansas, at p.809. The passage is in the following words:

"It is, however, a common occurrence for corporate fiduciaries to resign and form a competing enterprise. Unless restricted by contract, this may be done with complete immunity because freedom of employment and encouragement of competition generally dictate that such persons can leave their corporation at any time and go into a competing business. They cannot while still corporate fiduciaries set up a competitive enterprise ... or resign and take with them the key personnel of their corporations for the purposes of operating their own competitive enterprises ... but they can, while still employed, notify their corporation's customers of their intention to resign and subsequently go into business for themselves, and accept business from them and offer it to them ... but they can use in their own enterprise the experience and knowledge they gained while working for their corporation ... They can solicit the customers of their former corporation for business unless the customer list is itself confidential."

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n13 (1958), *313 S.W. 2d 802.*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Prior to quoting from Raines v. Toney, Grant J. had referred to and rejected a submission of the appellant that "as long as the defendants came upon the profit making possibility inherent in the Guyana contract in the course of and by reason of occupying their positions as directors and senior officers of Canaero ... the strict equitable rule must be applied against them". Albert A. Volk Inc. v. Fleschner Bros. Inc. n14 had been cited in support of the submission. The trial judge's position on this point was put by him as follows:

"I do not interpret the decision above quoted as indicating that the mere fact of learning of the contract or even doing extensive work and preparation in attempts to secure the same for the plaintiff while they were still in their offices for it, of itself prevents them, after severing relations with their employer, from seeking to acquire it for themselves. It is not the coming upon or learning of the proposed contract while directors that establishes liability, but rather obtaining the same because of such fiduciary position and in the course of their duties as such. I would think that when directors or senior officers leave the employ of the company they must not use confidential information which they have acquired in such employment for the purpose of assisting them in getting such a contract for themselves. Such information so acquired by them would remain an asset of their principal even after they had left their employment."

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n14 (1945), *60 N Y.S. 2d 244.*

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

In so far as the trial judge, founding himself upon what Lord Russell of Killowen said in Regal (Hastings) Ltd. v. Gulliver, would limit the liability of directors or senior officers to the case where they obtained a contract "in the course of their duties as such", I regard his position as too narrowly conceived. Raines v. Toney does not support the trial judge's view, as is evident from the assertion of the Supreme Court of Arkansas that the fiduciary duty of a director or officer does not terminate upon resignation and that it cannot be renounced at will by the termination of employment: see also Mile-O-Mo Fishing Club Inc. v. Noble n15. The passage quoted by Grant J. from Raines v. Toney was directed to a different point, namely, that of a right to compete with one's former employer unless restricted by contract.

- - - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n15 (1965), 210 N.F. 2d 12.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

The view taken by the trial judge, and affirmed by the Court of Appeal (which quoted the same passage from the reasons of Lord Russell of Killowen in Regal (Hastings) Ltd. v. Gulliver), tended to obscure the difference between the survival of fiduciary duty after resignation and the right to use non-confidential information acquired in the course of employment and as a result of experience. I do not see that either the question of the confidentiality of the information acquired by O'Malley and Zarzycki in the course of their work for Canaero on the Guyana project or the question of copyright is relevant to the enforcement against them of a fiduciary duty. The fact that breach of confidence or violation of copyright may itself afford a ground of relief does not make either one a necessary ingredient of a successful claim for breach of fiduciary duty.

Submissions and argument were addressed to this Court on the question whether or how far Zarzycki copied Canaero's documents in preparing the Terra proposal. The appellant's position is that Zarzycki was not entitled to use for Terra what he compiled for Canaero; and the respondents contended that, although Zarzycki was not entitled to use for Terra the 1965 report or proposal as such that he prepared for Canaero, he was entitled to use the information therein which came to him in the normal course and by reason of his own capacity. It was the respondents' further submission that Zarcycki did not respond in 1966 on behalf of Terra on the basis of his 1965 report as an officer of and for Canaero; and they went so far as to say that it did not matter that O'Malley and Zarzycki worked on the same contract for Terra as they had for Canaero, especially when the project was not exactly the same.

In my opinion, the fiduciary duty upon O'Malley and Zarzycki, if it survived their departure from Canaero, would be reduced to an absurdity if it could be evaded merely because the Guyana project had been varied in some details when it became the subject of invited proposals, or merely because Zarzycki met the variations by appropriate changes

in what he prepared for Canaero in 1965 and what he proposed for Terra in 1966. I do not regard it as necessary to look for substantial resemblances. Their presence would be a factor to be considered on the issue of breach of fiduciary duty but they are not a sine qua non. The cardinal fact is that the one project, the same project which Zarzycki had pursued for Canaero, was the subject of his Terra proposal. It was that business opportunity, in line with its general pursuits, which Canaero sought through O'Malley and Zarzycki. There is no suggestion that there had been such a change of objective as to make the project for which proposals were invited from Canaero, Terra and others a different one from that which Canaero had been developing with a view to obtaining the contract for itself.

Again, whether or not Terra was incorporated for the purpose of intercepting the contract for the Guyana project is not central to the issue of breach of fiduciary duty. Honesty of purpose is no more a defence in that respect than it would be in respect of personal interception of the contract by O'Malley and Zarzycki. This is fundamental in the enforcement of fiduciary duty where the fiduciaries are acting against the interests of their principal. Then it is urged that Canaero could not in any event have obtained the contract, and that O'Malley and Zarzycki left Canaero as an ultimate response to their dissatisfaction with that company and with the restrictions that they were under in managing it. There was, however, no certain knowledge at the time O'Malley and Zarzycki resigned that the Guyana project was beyond Canaero's grasp. Canaero had not abandoned its hope of capturing it, even if Wells was of opinion, impressed during his luncheon with O'Malley and Zarzycki on August 6, 1966, that it would not get a foreign aid contract from the Canadian Government. Although it was contended that O'Malley and Zarzycki did not know of the imminence of the approval of the Guyana project, their ready run for it, when it was approved at about the time of their resignations and at a time when they knew of Canaero's continuing interest, are factors to be considered in deciding whether they were still under a fiduciary duty not to seek to procure for themselves or for their newly-formed company the business opportunity which they had nurtured for Canaero.

Counsel for O'Malley and Zarzycki relied upon the judgment of this Court in Peso Silver Mines Ltd. (N.P.L.) v. Cropper n16, as representing an affirmation of what was said in Regal (Hastings) Ltd. v. Gulliver respecting the circumscription of liability to circumstances where the directors or senior officers had obtained the challenged benefit by reason only of the fact that they held those positions and in the course of execution of those offices. In urging this, he did not deny that leaving to capitalize on their positions would not necessarily immunize them, but he submitted that in the present case there was no special knowledge or information obtained from Canaero during their service with that company upon which O'Malley and Zarzycki had relied in reaching for the Guyana project on behalf of Terra.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n16 *[1966] S.C.R. 673.*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

There is a considerable gulf between the Peso case and the present one on the facts as found in each and on the issues that they respectively raise. In Peso, there was a finding of good faith in the rejection by its directors of an offer of mining claims because of its strained finances. The subsequent acquisition of those claims by the managing director and his associates, albeit without seeking shareholder approval, was held to be proper because the company's interest in them ceased. There is some analogy to Burg v. Horn because there was evidence that Peso had received many offers of mining properties and, as in Burg v. Horn, the acquisition of the particular claims out of which the litigation arose could not be said to be essential to the success of the company. Whether evidence was overlooked in Peso which would have led to the result reached in Regal (Hastings) Ltd. v. Gulliver (see the examination by Beck, "The Saga of Peso Silver Mines: Corporate Opportunity Reconsidered", (1971), *49 Can. Bar. Rev. 80, at p. 101)* has no bearing on the proper disposition of the present case. What is before this Court is not a situation where various opportunities were offered to a company which was open to all of them, but rather a case where it had devoted itself to originating and bringing to fruition a particular business deal which was ultimately captured by former senior officers who had been in charge of the matter for the company. Since Canaero had been invited to make a proposal on the Guyana project, there is no basis

for contending that it could not, in any event, have obtained the contract or that there was any unwillingness to deal with it.

It is a mistake, in my opinion, to seek to encase the principle stated and applied in Peso, by adoption from Regal (Hastings) Ltd. v. Gulliver, in the straight-jacket of special knowledge acquired while acting as directors or senior officers, let alone limiting it to benefits acquired by reason of and during the holding of those offices. As in other cases in this developing branch of the law, the particular facts may determine the shape of the principle of decision without setting fixed limits to it. So it is in the present case. Accepting the facts found by the trial judge, I find no obstructing considerations to the conclusion that O'Malley and Zarzycki continued, after their resignations, to be under a fiduciary duty to respect Canaero's priority, as against them and their instrument Terra, in seeking to capture the contract for the Guyana project. They entered the lists in the heat of the maturation of the project, known to them to be under active Government consideration when they resigned from Canaero and when they proposed to bid on behalf of Terra.

In holding that on the facts found by the trial judge, there was a breach of fiduciary duty by O'Malley and Zarzycki which survived their resignations I am not to be taken as laying down any rule of liability to be read as if it were a statute. The general standards of loyalty, good faith and avoidance of a conflict of duty and self-interest to which the conduct of a director or senior officer must conform, must be tested in each case by many factors which it would be reckless to attempt to enumerate exhaustively. Among them are the factor of position or office held, the nature of the corporate opportunity, its ripeness, its specificness and the director's or managerial officer's relation to it, the amount of knowledge possessed, the circumstances in which it was obtained and whether it was special or, indeed, even private, the factor of time in the continuation of fiduciary duty where the alleged breach occurs after termination of the relationship with the company, and the circumstances under which the relationship was terminated, that is whether by retirement or resignation or discharge.

Wells stands on a different footing from O'Malley and Zarzycki. The case put against Wells in the submissions to this Court is not that he personally owed a fiduciary duty to Canaero in respect of the Guyana project from the time it took shape but rather that he was a party to a conspiracy with O'Malley and Zarzycki to convert Canaero's business opportunity in respect of the Guyana project to personal benefit in breach of fiduciary obligation. Although Wells was associated with his co-defendants beyond the role of their solicitor, and was a director and substantial shareholder of Survair Limited, which was among the original intended invitees to submit proposals for the Guyana project but was dropped when the formal invitations were issued, there is no reason to interfere with the concurrent findings of fact upon which the action against Wells was dismissed and the dismissal affirmed on appeal. Unlike the case with O'Malley and Zarzycki, the findings of fact do not admit of a conclusion of law by which to fix Wells with liability.

There remains the question of the appropriate relief against O'Malley and Zarzycki, and against Terra through which they acted in breach of fiduciary duty. In fixing the damages at $ 125,000, the trial judge based himself on a claim for damages related only to the loss of the contract for the Guyana project, this being the extent of Canaero's claim as he understood it. No claim for a different amount or for relief on a different basis, as, for example, to hold Terra as constructive trustee for Canaero in respect of the execution of the Guyana contract, was made in this Court. Counsel for the respondents, although conceding that there was evidence of Terra's likely profit from the Guyana contract, emphasized the trial judge's finding that Canaero could not have obtained the contract itself in view of its association with Spartan Air Services Limited in the submission of a proposal. It was his submission that there was no evidence that that proposal would have been accepted if Terra's had been rejected and, in any event, there was no evidence of Canaero's likely share of the profit.

Liability of O'Malley and Zarzycki for breach of fiduciary duty does not depend upon proof by Canaero that, but for their intervention, it would have obtained the Guyana contract; nor is it a condition of recovery of damages that Canaero establish what its profit would have been or what it has lost by failing to realize the corporate opportunity in question. It is entitled to compel the faithless fiduciaries to answer for their default according to their gain. Whether the damages awarded here be viewed as an accounting of profits or, what amounts to the same thing, as based on unjust enrichment, I would not interfere with the quantum. The appeal is, accordingly, allowed against all defendants save

Wells, and judgment should be entered against them for $ 125,000. The appellant should have its costs against them throughout. I would dismiss the appeal as against Wells with costs.

Appeal allowed against all defendants save Wells.

**SOLICITORS:** Solicitors for the plaintiff, appellant: Soloway, Wright, Houston, McKimm, Killeen & Greenberg, Ottawa
Solicitors for the defendant, respondent, Wells: Herridge, Tolmie, Gray, Coyne & Blair, Ottawa
Solicitors for the defendants, respondents, O'Malley, Zarzycki and Terra Surveys Ltd.: Nelligan/Power, Ottawa