**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| AGJUNCTION LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:14-CV-02069-DDC-KGS |
| | ) | |
| AGRIAN INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION
TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

This Court should reject Plaintiff's request for an injunction based solely on Mr. Heiniger's unfounded suspicions and assumptions of wrongdoing. In two days of live testimony, the Court heard no admissible evidence that Defendants actually took anything proprietary from Plaintiff. From the very first status conference in this case, Plaintiff has asserted that Defendants used its software code. *See* April 22, 2014 Hearing Tr. at 29:10-13 ("[I]t's not just verbatim using the code, but we think that these gentlemen have taken software code from AgJunction, and they're using it to build a new platform."). The objective evidence uniformly establishes that Defendants did not take AgJunction's software source code, did not take AgJunction's software structure, and, in fact, use very different technologies.

The things that Plaintiff contends were taken are not proprietary to Plaintiff, and are therefore not a proper basis for an injunction. For example, notwithstanding AgJunction's instructions to its expert witness to simply *assume* that the features and functions of AgJunction's software are "proprietary," AgJunction published those features and functions on the Internet, relinquishing that claim. The features and functions that Agrian implements in its current software are not proprietary to Plaintiff. The skill and experience that the Employee

Defendants developed before, during, and after their employment at AgJunction are also not proprietary to Plaintiff, or any other employer, for that matter. Such skill and experience belong to the Employee Defendants. Additionally, there is no injunctive relief the Court can fashion to remedy any alleged irreparable harm. As the Court noted, no relief can force third parties to return to negotiating a failed merger or force a departed customer back to Plaintiff.

In the end, there is no improper conduct to be stopped by the Court, just the consequences of honest business decisions. Defendant Agrian invited Plaintiff to jointly develop a new product to eliminate redundancies between their systems and better serve their joint customers. Plaintiff declined. Agrian decided to go it alone, investing millions in the new product. Agrian should not be enjoined from serving the needs of its customers through independent development of improved software services. Plaintiff's motion should be denied. Further, the Court's previous entry of a temporary injunction was based on Plaintiff's assertions that code was taken and used by Defendants. As those allegations have been proven false, the injunction should be lifted.

## STATEMENT OF FACTS

The facts underlying this dispute have been extensively briefed and presented to the Court at the recent hearing. Here, therefore, Defendants include only background facts as necessary. To the extent additional specific testimony or evidence is referenced elsewhere in this brief, specific record citations are included.

In Spring 2013, the principal of corporate defendant Agrian, Nishan Majarian, approached Plaintiff's principal, Rick Heiniger, and proposed the joint development of a revolutionary agricultural software product. Hearing Tr. at 483:10 – 486:8. Following deliberation, Heiniger declined the invitation. *Id.* at 486:9 – 487:13. Majarian informed

Heiniger that development would continue without Plaintiff. *Id.* at 493:25 – 494:20. There is, and was, no noncompetition agreement between Plaintiff and Agrian. *Id.* at 168:18 – 169:1. At all times, Agrian was free to develop competitive software products. Consequently, Agrian hired a team of software developers and spent millions of dollars on its new, next generation ("NextGen") product. *Id.* at 498:22 – 499:10.

In January 2014, a customer of both parties, Crop Production Services ("CPS"), informed Plaintiff that, beginning in 2015, Plaintiff's services no longer would be needed. Deposition of Neal Horrom (hereinafter "Horrom Depo."), at 22:12 – 23:13. CPS made this decision due to displeasure with Plaintiff's customer service, a new grower-focused business model, and the lack of investment in product development. *Id.* at 23:17-24; 24:6 – 25:12; 34:4-8; 122:8 – 123:10. CPS informed Plaintiff that all of its services would be provided by Agrian beginning in 2015. *Id.* at 22:12 – 23:13. Rather than responding to the customer complaints in a proactive way, Plaintiff filed this lawsuit in February 2014 alleging that Agrian, along with five former AgJunction employees (the "Employee Defendants"),[1] worked together to harm Plaintiff by using AgJunction's purportedly confidential information to develop a new product.

Plaintiff's suit alleges ten counts against various combinations of Defendants. Compl. (Doc. # 1) at 11-22. Plaintiff then moved for a preliminary injunction. (Doc. # 25). The motion has been fully briefed. (Doc. # 25, 77, 114). At an initial scheduling conference, this Court entered a limited temporary injunction to assure Plaintiff that its confidential information would not be used. Order of April 23, 2014 (Doc. # 44), at 1-2. The Court also established a limited discovery schedule. *Id.* at 2-3. A hearing on Plaintiff's motion occurred on June 24 and 25.

---

[1] On July 9, 2014, this Court dismissed two of the Employee Defendants—Hunt and Dedmon—for a lack of personal jurisdiction. Order of July 9, 2014 (Doc. # 140).

As the Court recognized, this is a complex case where much of the testimony and evidence presented may be relevant to an eventual trial on the merits.  But, at the preliminary injunction stage, the parties were directed to focus on allegations that confidential information was taken by the Defendants and wrongfully used by Agrian.  To that end, each Employee Defendant testified that he did not take or use any confidential information from Plaintiff.  Hearing Tr. at 330:20 – 331:4; 385:18 – 386:6; 402:8-18; 410:1-4; 464:8-12.  Heiniger was unable to identify any specific confidential information that the Defendants allegedly took or used.  *Id.* at 170:3-15; 171:17 – 172:4; 173:21 – 174:12; 175:19 – 176:11.  Both expert witnesses agreed that the software systems are built on different platforms, and there is no evidence that any code was copied from Plaintiff's system to NextGen.  *Id.* at 244:3-14; 361:17 – 362:2.  Plaintiff did not present one tangible item (e.g., customer list; software code; algorithm) that it claims Agrian used.  Rather, Plaintiff relies on the theory that the Employee Defendants knew some of this (still unidentified) information in their brains, and that their know-how is protectable.

At the conclusion of the hearing, the Court ordered supplemental briefing on Plaintiff's motion.

## ARGUMENT AND AUTHORITIES

A preliminary injunction is an "extraordinary remedy," and as such, it is Plaintiff's burden to prove that its right to such relief is "clear and unequivocal."  *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 698 F.3d 1295, 1301 (10th Cir. 2012).  To obtain a preliminary injunction, Plaintiff must establish four elements:  "(1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing

party; and (4) the injunction, if issued, will not adversely affect the public interest." *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

In the Tenth Circuit, there are three types of disfavored injunctions: those that (1) alter the status quo; (2) are mandatory; or (3) afford the movant all the relief it could recover at trial. *Horne*, 698 F.3d at 1301. If the movant seeks a disfavored injunction, it must show that all four factors weigh "heavily and compellingly" in its favor before an injunction can issue. *Id.*[2]

Here, Plaintiff seeks a disfavored injunction. Specifically, Plaintiff's requested injunction would alter the status quo. Though the relief Plaintiff requests has morphed significantly throughout this case, in its Reply Brief and at the hearing, Plaintiff now seems to argue for an injunction that would halt entirely any development of NextGen. *See* Pl. Reply (Doc. # 114) at 13. True, the "status quo" for the disfavored-injunction inquiry is the last "peaceable uncontested status existing between the parties before the dispute developed." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070-71 (10th Cir. 2009). In this case, none of the conduct alleged in the Complaint occurred prior to the first employee—Hunt—joining Agrian. The undisputed testimony, however, established that NextGen was underway *before* Hunt left AgJunction. Indeed, Todd Rickets testified that the development platform and architecture were selected before Hunt even arrived at Agrian. Hearing Tr. at 383:20 – 384:4.

Thus, the status quo—as it existed before any of the complained-of conduct in this lawsuit—is Agrian developing NextGen. Plaintiff now seeks to alter that status quo, and as such, its requested injunction is disfavored and should be subjected to a heightened analysis.

---

[2] In addition to raising the burden of proof, disfavored injunctions also prevent Plaintiff from relying on the Tenth Circuit's relaxed likelihood-of-success-on-the-merits standard for which Plaintiff advocates. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004).

Moreover, even if this Court were to find that the heightened standard does not apply, the following discussion illustrates that the evidence here is insufficient to warrant a preliminary injunction under any Tenth Circuit standard.

## I.    PLAINTIFF HAS FAILED TO PROVE ANY IRREPARABLE HARM.

Though listed second in the elements for preliminary injunction, the Tenth Circuit has consistently explained that "a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008) (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)).  Because Plaintiff has failed to make this most important showing, the Court's analysis can begin and end with irreparable harm.

Plaintiff, throughout this proceeding, repeatedly made sweeping claims of irreparable harm.  Plaintiff appears to think that because it believes the alleged damages are difficult to quantify, it is therefore suffering irreparable harm for purposes of the preliminary injunction inquiry.  Not so.  If the alleged injuries are compensable by money damages, there is no irreparable harm.  *See, e.g.*, *Cent. Transp. Servs. v. Cole*, No. 13-1295, 2013 WL 5938102, at *6 (D. Kan. Nov. 6, 2013).  The only alleged "harm"—of any kind—that Plaintiff has identified in this case consists of  (1) the failed joint venture; (2) the loss of a customer, CPS; and (3) Agrian's expedited development of NextGen.  To the extent Plaintiff ever proves any of these claims, each is fully compensable by money damages.  Thus, there is no irreparable harm, so a preliminary injunction is inappropriate.

*First*, Plaintiff's claim that its failed joint venture constitutes irreparable harm defies logic.  All parties to the potential joint venture testified that it is over and dead.  Deposition of Gregory Reisz, at 19:19 – 20:11 (hereinafter "Reisz Depo."); Deposition of James Walker, at

66:10-22 (hereinafter "Walker Depo.").  There is not an injunction that can put these pieces back together or force the parties back to the negotiating table.  To the extent Plaintiff believes it was damaged by the failed joint venture, it can attempt to prove those claims at trial, and money damages could redress any proven damage.

Further, self-inflicted harm is not irreparable.  *Salt Lake Tribune Pub. Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003).  Although Heiniger attempted to portray the failure of the joint venture as a "mutual decision" between the three parties, that is not accurate.  The independent testimony of the other joint venture partners directly established that the termination of the joint venture was entirely self-inflicted.    Both joint venture partners—without a dog in the fight in this case—testified it was Heiniger that pulled the plug.  Reisz Depo., at 19:19 – 20:11; Walker Depo., at 66:10-22; 85:1-8.  Whatever the motivation, Plaintiff unilaterally killed the deal.

*Second*, the loss of CPS as a customer is undoubtedly compensable by money damages.  *See, e.g.*, *Port City*, 518 F.3d at 1190 (rejecting a plaintiff's assertion of lost business as an irreparable harm because "loss of business can be compensated in money damages").  In fact, through the joint venture negotiations, the parties discussed the dollar value of the CPS contract.  *See, e.g.*, Walker Depo., at 96:8-20.  Further, Neal Horrom from CPS testified that CPS decided to leave AgJunction because of poor customer service and that the decision was entirely independent of the Employee Defendants having joined Agrian.  Horrom Depo., at 23:17-24; 24:6 – 25:12; 34:4-8; 122:8 – 123:10.  Further, an injunction could not remedy this alleged damage.  CPS cannot be forced through an injunction in this case to again become a customer of Plaintiff.

*Third* and finally, Agrian's alleged wrongful accelerated development of NextGen (to the extent it is ever proven) also is compensable by money damages. An expert witness could quantify the time value of the purported expedited development. And, from an injunction perspective, recall also that there is no noncompetition agreement between Agrian and Plaintiff. Agrian is allowed to develop a competing product. Agrian is allowed to market that product to customers of AgJunction. Those customers, in turn, are allowed to purchase products from Agrian. There is no justification for stopping Agrian's development of a product it is permitted to develop when there is no evidence—whatsoever—that it used Plaintiff's confidential information.

Plaintiff has not met its burden to establish it is suffering irreparable harm. Every injury Plaintiff alleges is compensable by money damages, and Plaintiff has articulated no justification for the irrational, wide-sweeping requested injunction halting the development of NextGen. This deficiency alone is sufficient to justify denial of Plaintiff's motion.

## II.    PLAINTIFF FAILED TO ESTABLISH A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

Plaintiff alleges ten separate counts against various combinations of Defendants. These allegations have been addressed in detail in prior briefing, and all of the allegations will not be rehashed here. Plaintiff makes two fundamental contentions, however, that underlie all counts: first, that the Defendants took and used Plaintiff's confidential and proprietary information; and second, that the Employee Defendants breached restrictive employment covenants in a coordinated effort to join Agrian and harm Plaintiff. As the hearing testimony established, there is no basis in fact for either allegation.

A.     **There Is No Evidence That Any Defendant Took Or Used Confidential Or Proprietary Information.**

Plaintiff has no evidence that any defendant took or used any of Plaintiff's confidential or proprietary information.  In fact, when Plaintiff's principal and CEO, Rick Heiniger, was asked to provide specific examples of what was taken, he was unable to do so.  Hearing Tr. at 170:3-15; 171:17 – 172:4; 173:21 – 174:12; 175:19 – 176:11.  Instead, he responded with extensive compliments about the Employee Defendants' abilities and skill, but could not identify one specific confidential item taken.  *Id.* at 170:3-11; 171:20 – 172:4; 173:2-20; 175:24 – 175:11.  Plaintiff relies on three vague formulations of the "confidential and proprietary" information Defendants allegedly "took" and "used":  (1) the "know-how" of the Employee Defendants; (2) the software code; and (3) the Modus standard.

*First*, despite Heiniger's insistence to the contrary, the Employee Defendants' "know-how" is not protectable under the law.  "Skill and knowledge acquired or information obtained cannot be left behind so long as those things exist within the mind of the employee."  *Allen, Gibbs & Houlik, L.C. v. Ristow*, 94 P.3d 724, 728 (Kan. App. 2004) (quoting *Garst v. Scott*, 220 P. 277, 278 (Kan. 1923)).  This is also true under Canadian law.  *See Maguire v. Northland Drug Co.*, [1935] S.C.R. 412, 416-17 (Can.) (attached hereto as "Exhibit A-1").  Further, Plaintiff identifies no specific information that was purportedly taken.  Heiniger testified that the Employee Defendants had information about "customers," but customers themselves are not protectable.  *See Dodson Int'l Parts, Inc. v. Altendorf*, 347 F. Supp. 2d 997, 1010 (D. Kan. 2004).  There is no evidence, or even an allegation, that an actual customer list was taken.  *See id.*  Simply put, Plaintiff seeks to protect information the law defines as not protectable—the information contained in a person's head.

Furthermore, even if Plaintiff could prove that the Employee Defendants had protectable information in their minds, there is no evidence that the information was *used* in any way to benefit Agrian or damage Plaintiff.  As discussed, *infra*, Agrian's NextGen software is unique and was not built using any of Plaintiff's confidential information.  Plaintiff's allegation that Defendants used confidential "know-how" was based on pure speculation and conjecture that has now turned out to be entirely incorrect.

*Second*, Plaintiff's theory that their software was "copied" or "translated" to create NextGen has been debunked by the evidence.  Plaintiff's and Defendants' experts both agree that there is *no* evidence of actual code copying.  Hearing Tr. at 244:3-8; 361:17-22.  Similarly, the two pieces of software are built on different platforms, use different languages, and have different structures.  *Id.* at 244:9-14; 361:17 – 362:2.  Faced with this reality, Plaintiff once again altered its theory to allege that the "features and functions" of the software are proprietary and protected.  Not so.  Despite numerous requests throughout this litigation, Plaintiff has never identified the specific features it believes are AgJunction's proprietary trade secrets.  But to be entitled to injunctive relief, Plaintiff is required to describe—in detail—the subject matter of alleged trade secrets.  *See Dodson*, 347 F. Supp. 2d at 1010.

Instead of attempting to meet its burden to specifically identify any alleged trade secrets, Plaintiff relies on the vague and generic assertion that the "features and functionalities" of the software are proprietary.  This assertion is demonstrably false.  Plaintiff maintains a "Wiki" that describes the features and functions of the AgJunction software.  *See* Def. Hearing Ex. 509.  On its website, Plaintiff includes a product manual that also describes the features and functionalities of the software.  *See* Def. Hearing Ex. 510.  And remember, Plaintiff is asserting that these "features and functionalities" *themselves* are the trade secrets.  This cannot be so when Plaintiff

makes publically available detailed descriptions of the alleged trade secrets.  Further, when asked about a long series of his software's features, Heiniger readily admitted that several other providers in the industry provide the exact same functionality.  Hearing Tr. at 194:23 – 196:11.  Critically, this fact was confirmed in detail by CPS's Director of Precision Agricultural Services, Neal Horrom.  Horrom Depo., at 131:23 – 137:17.  Thus, independent testimony confirms that the generic "features and functions" over which Plaintiff asserts trade secret protection are not even unique to Plaintiff.

The impropriety of Plaintiff's position is well articulated by *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581 (7th Cir. 2002).  There, the plaintiff, IDX, asserted that features of its software were trade secrets.  The court refused to grant trade secret protection, explaining that—just as Plaintiff has done here—IDX "has been both too vague and too inclusive, effectively asserting that all information in or about its software is a trade secret."  *IDX*, 285 F.3d at 583.  "That's not plausible—and, more to the point, such a broad assertion does not match up to the statutory definition."[3]  *Id.*  Describing its reasons for denying trade secret protection, the *IDX* court specifically addressed the same arguments Plaintiff makes in this case.  Specifically, IDX provided the court with a 43-page description of the features of the software.  The Court had a direct answer to IDX's assertion that the document was specific enough:  "No it isn't."  *IDX*, 285 F.3d at 583.  Although the document described the software, it failed to "separate the trade secrets from the other information that goes into any software package":

> Which aspects are known to the trade, and which are not?  That's vital under the statutory definition.  Likewise, IDX's tender of the complete documentation for the software leaves mysterious exactly which pieces of information are the trade secrets.  As we remarked in *Composite Marine Propellers, Inc. v. Van Der*

---

[3] Though the *IDX* court was applying Wisconsin's version of the Uniform Trade Secrets Act, it is identical to the Kansas Statute.  *Compare* K.S.A. 60-3320(4), *with* Wis. Stat. § 134.90(1)(c).

> *Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992), a plaintiff must do more than just
> identify a kind of technology and then invite the court to hunt through the details
> in search of items meeting the statutory definition.  *See also AMP Inc. v.*
> *Fleischhacker*, 823 F.2d 1199, 1203 (7th Cir. 1987).

*IDX*, 285 F.3d at 583-84.[4]

This lack of specificity is precisely what is at issue here.  Plaintiff asserts that its "software" is a trade secret.  Then, when pressed for specific trade secrets, Plaintiff cannot provide them.  Plaintiff leaves Defendants, and the Court, to guess about which features could constitute trade secrets.  Generic, vague, and unsubstantiated assertions are simply not enough to warrant protection under the law.

Even worse, Plaintiff instructed its expert to *assume* that all of the components of the software were protectable trade secrets.  Hearing Tr. at 245:21 – 246:11.  Not only is Plaintiff's legal argument doomed by its failure to identify a specific trade secret, its own expert's report and testimony is tainted by the same fallacy.  Plaintiff's expert did not look at any specific aspects of the software that were allegedly trade secrets; rather, he improperly looked at the software as a whole, searching for any similarities whatsoever.  But recall, *there is no non-competition agreement between Plaintiff and Agrian*.  Thus, Agrian was, and is, free to build a competing product.

To the extent Plaintiff's expert did find any overlapping "functionality," his analysis is entirely unhelpful to the inquiry in this case for two reasons.  First, Heiniger could not provide

---

[4] *See also L-3 Commc'ns Corp. v. Jaxon Eng'g & Maintenance, Inc.*, No. 10-cv-02868, 2011 WL 10858409, at *2 (D. Colo. Oct. 12, 2011) ("[W]hat is clear is that general allegations and generic references to products or information are insufficient to satisfy the reasonable particularity standard."); *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, ___ F. Supp. 2d ___, 2014 WL 812820 (S.D.N.Y. Feb. 10, 2014) (requiring specific description of trade secrets and collecting cases illustrating that "each Circuit Court of Appeals to have opined on this issue has required a comparable degree of specificity, as have numerous district courts across the country").

one "function" that was exclusive to AgJunction, much less provide evidence—through expert testimony or otherwise—that any such protectable function overlapped with anything in Agrian's code. The functionalities are common in the industry. Second, to the extent any overlap exists, the law permits—and the marketplace encourages—reverse engineering, and there is no evidence that the Employee Defendants provided *any* confidential information to Agrian. *See Evolution, Inc. v. SunTrust Bank*, 342 F. Supp. 2d 943, 962-63 (D. Kan. 2004). The *only way* that Agrian's development of a competing product is wrongful is if it used Plaintiff's confidential information to do so. There is no evidence to this effect.

Indeed, the two employees that have any development role whatsoever—Hunt and Dedmon—are only two of the nearly 30 developers working on NextGen. Hearing Tr. 498:22 – 499:1. Further, of the 147,540 lines of code in Agrian's NextGen product, Hunt and Dedmon's name appeared on only 651 of them—approximately 0.4% of the code. *See* Hearing Tr. at 371:21 – 372:11. As much as Plaintiff wishes to assume that NextGen "had to" be developed using Plaintiff's confidential information, there is simply no evidence to support this theory. *See* Deposition of Rick Heiniger, at 118:13-22.

*Third*, Plaintiff asserts a protectable interest in the Modus standard project. The hearing testimony on Modus demonstrates the irrationality of this argument. Since its inception, Modus's purpose was to create one, uniform XML format to be used in connection with lab data outputs across many different software platforms. *See, e.g.*, Hearing Tr. at 414:6 – 415:1; Def. Hearing Ex. 467. This would allow soil sample testing data to be uniform as well as easy to use and share. *Id.* Importantly, AgJunction was a founding member of Modus. *See* Def. Hearing Ex. 508. It is entirely disingenuous for Plaintiff to now argue that a project it helped create that was designed to be open to, and accessed by, anyone, is suddenly a proprietary project. And

Plaintiff remains actively involved in the Modus project.  Both Devron VonGunden (AgJunction Director of Operations) and Bob Owens (an AgJunction lead developer) are on the Modus committee.  *See* Def. Hearing Ex. 534; Hearing Tr. at 417:1-3.  Yet not once to date has Plaintiff raised any concern to the Modus group.  Hearing Tr. at 188:20 – 189:3.

Once again, the impropriety of Plaintiff's legal argument extends to its expert as well.  Plaintiff simply instructed its expert to assume that all Modus information was a protectable trade secret, which is demonstrably false.  *See* Hearing Tr. at 248:14-20; 415:15 – 416:8; Def. Hearing Ex. 466, 467.  But, for the sake of argument, set aside the fact that everything related to Modus is entirely open-source and not protectable.  Plaintiff next gave Stillerman a file titled "modus_result_eample.xml" and told him that it contained Agrian's code.  Report of Robert Stillerman (Pl. Hearing Ex.132), at 7 & n.7; Ex. 3 to Stillerman Report; Deposition of Robert Stillerman, at 236:3-7.  On this basis, Stillerman compared the file to Plaintiff's code.  Notably, this is the *only* place in Stillerman's entire report or testimony where he was able to point to specific examples of similar language appearing in two different files.  *See* Report of Robert Stillerman at 7-8.  But testimony and evidence at the hearing established that this file was not— in any way whatsoever—connected to Agrian NextGen development.  Hearing Tr. at 422:6-8.  Rather, it was a file that Hunt created *for Plaintiff* as a favor, purportedly to assist Plaintiff in integrating the Modus platform into its software.  Def. Hearing Ex. 544; Hearing Tr. 418:1 – 422:10.  Plaintiff then took this file and passed it off to its expert as an Agrian file.  This misinformation undermines Stillerman's conclusions, and leaves no basis for the assertion that NextGen is based on Plaintiff's proprietary information.[5]

---

[5] Stillerman also admitted that his opinion was based in part on two documents (Def. Hearing Ex. 465 and 469) that he did not—in any way—independently verify.  He does not know who

Modus is an open-source and collaborative project that Plaintiff has participated in since its inception.  There is no basis for Plaintiff to claim any proprietary ownership over it, and no basis to condemn the use of the XML code in *any* software—for that is the precise purpose and goal of the Modus project.

### B.     The Employee Defendants' Restrictive Covenants Are Unenforceable.

Plaintiff's other allegation underlying several counts is that the Employee Defendants breached restrictive covenants contained in a "Confidentiality and Intellectual Property Agreement" incorporated into their employment agreements.  *See* Ex. B, C, D, E to Pl. Compl.[6] Two of the three remaining Employee Defendants signed the Confidentiality and Intellectual Property Agreement.  Plaintiff admits that Defendant Anderson never signed this agreement, yet has taken no steps to dismiss the corresponding allegations.  Hearing Tr. at 171:5-16.  These claims against Anderson should be dismissed in their entirety.  As to the other two Employee Defendants, the restrictive covenants are unenforceable.

The parties agree that the law of Alberta, Canada, governs the restrictive covenants.  Pl. Memo. in Support (Doc. # 25) at 11; Def. Memo. in Opposition (Doc. # 77) at 35.  The selection of Alberta law was a selection made by Plaintiff when it drafted the employment agreements.  As discussed below, these breathtakingly broad restrictive covenants would not be enforced under Alberta law.  Plaintiff's defenses—that the restrictive covenants were "very important" to its board of directors and that a Canadian law firm advised on the drafting of the provisions—are

---

authored these documents or their degree of reliability.  He was simply told to rely on them and did so.  *See* Hearing Tr. 252:14 – 255:12.

[6] The restrictive covenants can be found on Page 4 of each agreement under the heading "Non-Competition and Non-Solicitation."  The language of each employee's restrictive covenants are nearly identical, the only variation being the length of the restrictions.

unavailing.  *See* Hearing Tr. at 38:19-25; 50:8-22.  In fact, it is telling that the firm that advised Plaintiff on drafting these provisions is not present in these proceedings.

The most straightforward ground on which this Court should deem the covenants unenforceable is the lack of any geographic limitation whatsoever.  This omission alone renders the provisions unenforceable.  *See, e.g.*, *Elsley Estate v. J.G. Collins Insurance Agencies Ltd.*, [1978] 2 S.C.R. 916, 926 (Can.) (attached hereto as "Exhibit A-2"); *H.L. Staebler Co. v. Allan* (2008), 92 O.R. 3d 107, ¶¶ 50-51, 53 (Can. Ont. C.A.) (attached hereto as "Exhibit A-3").[7] Recall, these restrictive covenants not only prevent solicitation with Plaintiff's customers; not only prevent performance of the same type of work; not only prevent servicing of the same territories the Employee Defendants serviced for Plaintiff.  *See* Confidentiality and Intellectual Property Agreement, at 4, ¶¶ 1-2.  Rather, these covenants prevent employment *in any capacity* for *any company* that competes *in any way* with Plaintiff, and prevent the Employee Defendants from accepting work or doing business with any client of Plaintiff.  Importantly, Kansas also requires reasonable geographic limits on restrictive covenants.  *See, e.g.*, *H&R Block v. Lovelace*, 493 P.2d 205, 210 (Kan. 1972).  It cannot possibly be said that these restrictions are "no greater than necessary to protect [Plaintiff's] interests."  *Weber v. Tillman*, 913 P.2d 84, 91 (Kan. 1996). Plaintiff has not cited, and Defendants are unaware of, any decision in which a Canadian court has upheld a worldwide restrictive covenant.  There is no need for a U.S. federal court to extend Canadian law beyond its current reach when the restrictive covenants at issue are so vastly broad as to be unenforceable under Canadian or Kansas law.

---

[7] All Canadian courts are bound to follow a precedent of the Supreme Court of Canada and any pre-1949 decision of the Privy Council which has not been overruled by the Supreme Court of Canada.  Decisions of co-ordinate courts are highly persuasive, and will be followed in the absence of "a strong reason to the contrary."  *See, e.g.*, *R. v. N. Elec. Co.*, [1955] O.R. 431, ¶¶ 41-42 (Can. Ont. Sup. Ct.) (attached hereto as "Exhibit A-4").

The lack of a geographic limit alone can end this Court's analysis on the enforceability of these restrictive covenants.  But even turning to the text of the individual covenants, there are several additional grounds supporting their invalidity.  Paragraph 1 is a pure non-competition provision.  Canadian courts will almost *never* enforce this type of clause, because it unnecessarily restricts employees' ability to gain employment.  *See Lyons v. Multari* (2000), 50 O.R. (3d) 526, ¶ 31 (Can. Ont. C.A.) (attached hereto as "Exhibit A-5"); *HL Staebler*, 92 O.R. 3d 107, ¶¶ 40-41.  These decisions hold that non-solicitation provisions—*e.g.*, a clause restricting the employee's ability solicit the former employer's customers with whom that employee worked—are typically sufficient to protect the former employer's interests.  Paragraph 1 is unenforceable as a matter of Canadian law.

At first blush, Paragraph 2 appears to be just that—a non-solicitation provision.  On closer examination, however, Paragraph 2 not only prohibits solicitation, but also prohibits doing any business with *any* customer of Plaintiff or anyone who Plaintiff targeted and competed for business.  This Paragraph, then, is a so-called "hybrid" provision that restricts solicitation as well as doing business.  The *HL Staebler* decision addresses precisely this type of provision.  The court held that the clause's prohibition of doing any business (and not merely solicitation) tainted the entire restrictive covenant and rendered it unenforceable.  *HL Staebler*, 92 O.R. 3d 107, ¶¶ 48, 51.  So too here.  Plaintiff's restriction of the Employee Defendants' ability to do any business with customers is overly broad and invalidates Paragraph 2.

When Canadian courts encounter unenforceable restrictive covenants, they will not reform or strike the offending provisions in an effort to save the clause as a whole.  Rather, the entire provision is invalidated as unenforceable.  *See Shafron v. KRG Ins. Brokers (Western) Inc.*, 2009 SCC 6, [2009] 1 S.C.R. 157, 172-74 (Can.) (attached hereto as "Exhibit A-6").  The

courts will not step in to do the work that the employer should have done in the first place. Doing so would encourage employers to draft the broadest agreements possible (similar to the one at issue here), and then simply rely on the courts to limit the agreement to something "reasonable." These restrictive covenants should be invalidated in their entirety.

Further, any concept of the employees having longer "fiduciary duties" is also belied by case law. Indeed, the Alberta Court of Appeal permitted fiduciary duties to extend for only 12 months for an employee described as a senior officer, director, and shareholder with approximately 9 years tenure. *Anderson, Smyth & Kelly Customs Brokers Ltd. v. World Wide Customs Brokers Ltd.*, 1996 ABCA 169, ¶ 34 (Can. Alta. C.A.) (attached hereto as "Exhibit A-7"). Here, the Employee Defendants were being demoted and moved out of key decision-making roles at AgJunction. *See, e.g.*, Hearing Tr. at 435:9 – 436:17.

Finally, Heiniger testified that he believes that the broad definition of "confidential information" applies to all of the Employee Defendants "in perpetuity," and not for the length of the agreement. Hearing Tr. at 174:13-16. Importantly, the definition includes items such as "know-how." As discussed above, know how is not protectable under Kansas or Canadian law. And, as a matter of logic, if this provision really did apply in perpetuity, it would effectively become a lifetime ban on any of these individuals taking a position with any company, worldwide, in the same industry. This type of prohibition is unenforceable under Canadian and Kansas law.

Plaintiff selected Alberta law to govern these agreements. It then drafted restrictive covenants that are patently contrary to Canadian law. Additionally, because this analysis occurs in the context of a preliminary injunction motion, it is important to consider that *all* of the

restrictive covenants at issue have now expired.  Thus, just as all of the other claims in this case, the alleged breaches of contract are fully compensable by money damages.

## III.     THE HARM TO AGRIAN IF THE INJUNCTION IS ISSUED GREATLY OUTWEIGHS THE RISK OF POTENTIAL HARM TO PLAINTIFF.

For the reasons described in Defendants' opening brief, the harm to Agrian if this Court were to issue an injunction would greatly outweigh the threatened injury Plaintiff has described. *See* Memo. in Opposition at 40-41.  Additionally, now that limited discovery has occurred, the testimony confirms that the "injury" Plaintiff alleges is nothing more than lost business in fair competition.  Plaintiff's theory that Agrian used Plaintiff's confidential information to create NextGen began as pure speculation and supposition.  That has not changed.  There is no evidence of any of Plaintiff's confidential information being used on the NextGen product.

Despite that glaring lack of evidence, Plaintiff still requests one of the most extreme remedies in the Court's arsenal.  And it does not do so in a limited or targeted way tailored to specific conduct.  Rather, it requests that the Court halt *all development* of NextGen—a product that Agrian developed entirely within its rights.  Agrian has invested tremendous resources toward this project, including of millions of dollars and the employment of nearly 30 developers (only two of which were defendants in this lawsuit, and have now been dismissed).  Hearing Tr. at 498:22 – 499:10.  Stopping development of this product would be a gross overreach with resulting harm to Agrian due to product delay.

## IV.     PLAINTIFF'S REQUESTED INJUNCTION IS CONTRARY TO PUBLIC POLICY.

This injunction would adversely impact the public interest.  As Plaintiff has now adjusted its requested relief to completely ban the development of NextGen, this case clearly presents a public policy question of the extent to which a Court will restrain competition based on nothing

more than speculation of a competitor.  This Court should not indulge Plaintiff's request to smother competition in this manner.  Further, invalidating Plaintiff's overly broad restrictive covenants also serves the public interest.  Employees should have the ability to freely move about the workforce, burdened only by reasonable restrictions.  Employees also should be able to rely on the application of a contract's governing law to the agreement in issue.  As the case law establishes, the restrictions Plaintiff is attempting to impose are overly burdensome and unenforceable.

## CONCLUSION

Plaintiff falls woefully short of meeting the high burden necessary to justify imposition of a preliminary injunction.  There is no irreparable harm, which in and of itself, is sufficient to defeat Plaintiff's motion.  Additionally, Plaintiff is not substantially likely to succeed on the merits.  There is no evidence that *any* of Plaintiff's confidential information was used by any of the defendants at any time, and the restrictive covenants that Plaintiff is attempting to impose are unenforceable.

Finally, the temporary injunction originally imposed in this case should be lifted in its entirety.  *See* Order of April 23, 2014 (Doc. # 44).  The Employee Defendants had specific temporal limits on their restrictive covenants.  All of those terms have now expired.  That expiration coupled with the lack of any evidence that the Defendants took or used any of Plaintiff's confidential information illustrates why no further restrictions should be placed on any of the Defendants.

Plaintiff's motion for preliminary injunction should be denied, and the temporary preliminary injunction should be lifted in its entirety.

Respectfully submitted,

/S/ JOAN K. ARCHER

JOAN K. ARCHER      KS BAR NO. 15543
MICHAEL T. RAUPP    KS BAR NO. 25831
KYLE A. KITSON      KS BAR NO. 26277
LAURA E. PETERSON   KS BAR NO. 26293
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Tel:  816.983.8000
Fax:  816.983.8080
joan.archer@huschblackwell.com
michael.raupp@huschblackwell.com
kyle.kitson@huschblackwell.com
laura.peterson@huschblackwell.com

WALTER J. KAWULA, JR. (PRO HAC VICE ADMISSION)
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL  60606
Tel:  312.655.1500
Fax:  312.655.1501
walter.kawula@huschblackwell.com

Of Counsel *Pro Hac Vice*:

MARK JOSSELYN
CANADA23470L
GOWLING LAFLEUR HENDERSON LLP
160 Elgin Street, Suite 2600
Ottawa Ontario
K1P 1C3 Canada
Tel:  613-786-0148
Fax: 613-788-3441
mark.josselyn@gowlings.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was served on this 10th day of July 2014, via the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/S/ JOAN K. ARCHER
JOAN K. ARCHER