Case 2:14-cv-02069-DDC-KGS Document 144-2 Filed 07/10/14 Page 1 of 24

**Lorna P. Elsley, Executrix of the Estate of Donald Champion Elsley** (*Defendant*) *Appellant*;

and

**J. G. Collins Insurance Agencies Limited** (*Plaintiff*) *Respondent.*

1977: October 31; 1978: March 7.

Present: Laskin C.J. and Martland, Ritchie, Pigeon, Dickson, Beetz and Pratte JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

*Contract — Restrictive covenant — Restraint of trade — Vendor of business subsequently purchaser's employee — Covenant against competition — Term of five years — Fixed sum — Stipulated as liquidated damages — Alternative remedies.*

On April 24, 1956, the respondent agreed to purchase the general insurance business of a competitor, D. C. Elsley Limited, owned by Elsley. The agreement contained a covenant on the part of the vendor that it would not for ten years carry on or be engaged in the business of a general insurance agency in the area in question, with liquidated damages stipulated at $1,000 "for each and every breach". By a second agreement Elsley was employed as manager of the respondent's operation subject to a covenant that Elsley not become engaged in the business of a general insurance agent while in the respondent's employ or during a five year period after cessation of his employment. Liquidated damages for the breach of this covenant were simply set at $1,000. After 17 years Elsley resigned and recommenced his own general insurance business. At trial Elsley was ordered restrained from carrying on the business of general insurance agent within the defined area and a reference was directed to assess damages with respect to the business taken, such damages being restricted to the loss of commissions on contracts of insurance with specified former clients for the period from resignation to the date of trial. The Court of Appeal affirmed the trial judgment with one variation, namely that Collins be compensated on the basis of *all* contracts of general insurance sold in the relevant period after taking into account expenses incurred in securing and servicing the contracts. Jessup J.A. dissented on the basis that the covenant was unreasonably wide in not being restricted to solicitation of the employer's particular clients and hence was unenforceable.

**Lorna P. Elsley, exécutrice de la succession de Donald Champion Elsley** (*Défenderesse*) *Appelante*;

et

**J. G. Collins Insurance Agencies Limited** (*Demanderesse*) *Intimée.*

1977: 31 octobre; 1978: 7 mars.

Présents: Le juge en chef Laskin et les juges Martland, Ritchie, Pigeon, Dickson, Beetz et Pratte.

EN APPEL DE LA COUR D'APPEL DE L'ONTARIO

*Contrat — Clause restrictive — Restriction à la liberté du commerce — Vendeur de l'entreprise employé subséquemment par l'acheteur — Clause restreignant la concurrence — Période de cinq ans — Somme déterminée — Montant stipulé à titre de dommages-intérêts liquidés — Il faut faire un choix quant au recours.*

Le 24 avril 1956, l'intimée a acheté l'entreprise d'assurance générale d'une société concurrente, D. C. Elsley Limited, propriété de Elsley. Aux termes du contrat, le vendeur s'engageait à ne pas exploiter d'entreprise d'assurance générale dans la région en cause et à payer $1,000 «pour chaque violation» à titre de dommages-intérêts liquidés. Par une seconde convention, Elsley a été engagé à titre de gérant des entreprises de l'intimée sous réserve de ne pas exploiter une entreprise d'agent d'assurance générale tant qu'il serait à l'emploi de l'intimée ou pendant les cinq ans qui suivront la cessation de son emploi. Les dommages-intérêts liquidés en cas de violation de cette clause étaient simplement fixés à $1,000. Après dix-sept ans, Elsley a démissionné et formé sa propre entreprise d'assurance générale. En première instance, on a ordonné à Elsley de s'abstenir d'exploiter l'entreprise d'agent d'assurance générale dans la zone définie; on a également ordonné un renvoi pour l'évaluation des dommages-intérêts dus en raison des affaires enlevées, à condition que ces dommages-intérêts fussent limités à la perte de commissions entre la démission et la date du procès relativement aux contrats d'assurance d'anciens clients énumérés. La Cour d'appel a confirmé le jugement de première instance, avec une modification, soit que Collins soit indemnisé pour la perte de commissions sur *tous* les contrats d'assurance générale conclus par Elsley au cours de la période pertinente, compte tenu des frais afférents à l'obtention des contrats et aux démarches subséquentes. Le juge Jessup était dissident au motif que la clause était trop large, puisqu'elle n'interdisait pas uniquement la sollicitation des propres clients de l'employeur, et ne pouvait donc pas être imposée.

EXHIBIT A-2

*Held*: The appeal should be dismissed.

The principles to be applied in considering restrictive covenants of employment are well established. The test of reasonableness as between the parties and with reference to the public interest, can be applied, however, only in the particular circumstances of the particular case. The distinction made between restrictive covenants in agreements for sale of a business and those in contracts of employment is well-conceived and responsive to practical considerations. In this case the covenant in the sale agreement was exhausted. The restrictive covenant in the employment contract cannot be regarded as fed by the sale agreement and to be enforceable has to stand up to the more rigorous tests applied in the employer/employee context. In an exceptional case such as this, the nature of the employment may justify a covenant prohibiting an employee not only from soliciting customers, but also from establishing his own business or working for others so as to be likely to appropriate the employer's trade connection through his acquaintance with the employer's customers.

With respect to damages, where a fixed sum is stipulated as and for liquidated damages upon a breach of the agreement, the covenantee must elect with respect to that breach between these liquidated damages and an injunction. If he elects to take an injunction and not the liquidated sum stipulated, he may recover damages in equity for the actual loss sustained up to the date of the injunction or, if tardy, up to the date upon which he should have sought the injunction, but in either case not exceeding the amount stipulated as payable upon a breach. Where the stipulated sum is less than the actual loss, the agreed sum represents the maximum amount recoverable whether the sum is a penalty or a valid liquidated damages clause. As a result, the respondent was entitled to an injunction and such damages as he could prove up to the date of the trial, to a maximum of $1,000.

*Herbert Morris Limited v. Saxelby*, [1916] 1 A.C. 688; *Stenhouse Australia Ltd. v. Phillips*, [1974] 1 All E.R. 117; *Robert W. Maguire v. Northland Drug Company Limited*, [1935] S.C.R. 412; *Nordenfelt v. Maxim Nordenfelt Guns and Ammunition Co. Ltd.* [1894] A.C. 535; *Mason v. Provident Clothing and Supply Co.*, [1913] A.C. 724; *Attwood v. Lamont*, [1920] 3 K.B. 571: *Scorer v. Seymour-John*, [1966] 3 All E.R. 347; *Gledhow Autoparts Ltd. v. Delaney*, [1965] 1 W.L.R. 1366; *Silverman v. Silverman* (1969), 113 Sol. J. 563:

*Arrêt*: Le pourvoi doit être rejeté.

Les principes applicables lorsqu'on examine les clauses restrictives en matière d'emploi sont bien établis. Le critère du caractère raisonnable vis-à-vis des parties et dans le sens de l'intérêt public ne peut toutefois s'appliquer que dans les circonstances spéciales d'un cas particulier. La distinction faite en jurisprudence entre une clause restrictive contenue dans un contrat de vente d'une entreprise et celle contenue dans un contrat de louage de services est bien conçue et répond à des considérations pratiques. En l'espèce, la clause du contrat de vente avait cessé d'avoir des effets. La clause restrictive du contrat de louage de services ne pouvait être alimentée par le contrat de vente et pour être exécutée, elle devait répondre aux critères plus rigoureux appliqués dans le contexte des relations employeur-employé. Dans des cas exceptionnels comme celui-ci, la nature de l'emploi peut justifier une clause interdisant à un employé, non seulement de solliciter des clients, mais également d'établir son propre commerce ou de travailler pour le compte de tiers de façon à s'approprier éventuellement la clientèle de l'employeur du fait qu'il la connaît.

Relativement aux dommages-intérêts, lorsqu'une somme déterminée est stipulée à titre de dommages-intérêts liquidés en cas de violation, le bénéficiaire doit choisir, à l'occasion de chaque violation, entre ces dommages-intérêts liquidés et une injonction. S'il opte pour l'injonction et non pour le montant liquidé stipulé, il peut obtenir des dommages-intérêts en *equity* pour la perte effectivement subie jusqu'à la date de l'injonction ou, s'il est en retard, jusqu'à la date à laquelle il aurait dû demander l'injonction, mais, dans les deux cas, ces dommages-intérêts ne doivent pas excéder le montant stipulé en cas de violation. Lorsque la somme stipulée est inférieure au préjudice réel, la somme fixée représente le montant maximum qui peut être recouvré, que le montant corresponde à une pénalité ou à une clause valide de dommages-intérêts liquidés. En conséquence, l'intimée a droit à une injonction et aux dommages-intérêts qu'elle peut justifier jusqu'à la date du procès, sans toutefois dépasser $1,000.

Jurisprudence: *Herbert Morris Limited v. Saxelby*, [1916] 1 A.C. 688; *Stenhouse Australia Ltd. v. Phillips*, [1974] 1 All E.R. 117; *Robert W. Maguire c. Northland Drug Company Limited*, [1935] R.C.S. 412; *Nordenfelt v. Maxim Nordenfelt Guns and Ammunition Co. Ltd.*, [1894] A.C. 535; *Mason v. Provident Clothing and Supply Co.*, [1913] A.C. 724; *Attwood v. Lamont*, [1920] 3 K.B. 571; *Scorer v. Seymour-John*, [1966] 3 All E.R. 347; *Gledhow Autoparts Ltd. v. Delaney*, [1965] 1 W.L.R. 1366; *Silverman v. Silverman* (1969),

Case 2:14-cv-02069-DDC-KGS Document 144-2 Filed 07/10/14 Page 3 of 24

*Fitch v. Dewes*, [1921] 2 A.C. 158; *Marion White v. Francis*, [1972] 1 W.L.R. 1423; *P.C.O. Services Ltd. v. Rumleski*, [1963] 2 O.R. 62; *Campbell, Imrie and Shankland v. Park*, [1954] 2 D.L.R. 170; *Putsman v. Taylor*, [1927] 1 K.B. 637; *Jones v. Heavens* (1877), 4 Ch.D. 636; *National Provincial Bank of England v. Marshall* (1888), 40 Ch.D. 112; *Snider v. McKelvey* (1900), 27 O.L.R. 339; *General Accident Assurance Corporation v. Noel*, [1902] 1 K.B. 377; *H. F. Clarke Limited v. Thermidaire Corporation Limited*, [1976] 1 S.C.R. 319; *Cellulose Acetate Silk Company Limited. v. Widnes Foundry (1925) Limited*, [1933] A.C. 20; *Wilbeam v. Ashton* (1807), 1 Camp. 78; *Imperial Tobacco v. Parslay*, [1936] 2 All E.R. 515 referred to.

APPEAL from a judgment of the Court of Appeal for Ontario[1] dismissing an appeal and allowing a cross-appeal from a judgment of Stark J.[2] in favour of the plaintiff in an action to enforce a restrictive covenant. Appeal dismissed, judgment below varied to provide for payment of such damages not to exceed $1,000 as can be established for the period to the date of trial.

*G. J. Smith, Q.C.*, for the appellant.

*R. A. O'Donnell* and *R. F. L. Rose*, for the respondent.

1978 CanLII (SCC)

The judgment of the Court was delivered by

DICKSON J.—The question for decision in this case is whether a restrictive covenant contained in a certain contract of employment, to which I will shortly refer, is valid.

The facts are, to all intents, undisputed. On April 24, 1956, an agreement was entered into for the purchase by the Collins Company of the general insurance business of a competitor, D. C. Elsley Limited. The price was $46,137. The life insurance business and the real estate business conducted by the Elsley Company were not included. The agreement contained a covenant on the part of the vendor that it would not, for a period of ten years, carry on or be engaged in the business of a general insurance agency within the City of Niagara Falls,

[1] (1976), 13 O.R. (2d) 177.
[2] (1974), 18 C.P.R. (2d) 1187.

113 Sol. J. 563; *Fitch v. Dewes*, [1921] 2 A.C. 158; *Marion White v. Francis*, [1972] 1 W.L.R. 1423; *P.C.O. Services Ltd. v. Rumleski*, [1963] 2 O.R. 62; *Campbell, Imrie and Shankland v. Park*, [1954] 2 D.L.R. 170; *Putsman v. Taylor*, [1927] 1 K.B. 637; *Jones v. Heavens* (1877), 4 Ch.D. 636; *National Provincial Bank of England v. Marshall* (1888), 40 Ch.D. 112; *Snider v. McKelvey* (1900), 27 O.L.R. 339; *General Accident Assurance Corporation v. Noel*, [1902] 1 K.B. 377; *H. F. Clarke Limited v. Thermidaire Corporation Limited*, [1976] 1 R.C.S. 319; *Cellulose Acetate Silk Company Limited v. Widnes Foundry (1925) Limited*, [1933] A.C. 20; *Wilbeam v. Ashton* (1807), 1 Camp. 78; *Imperial Tobacco v. Parslay*, [1936] 2 All E.R. 515.

POURVOI à l'encontre d'un arrêt de la Cour d'appel de l'Ontario[1] qui a rejeté l'appel et accueilli le contre-appel d'une décision du juge Stark[2] en faveur du demandeur relativement à une action visant à faire valoir une clause restrictive. Pourvoi rejeté. Le jugement d'instance inférieure est modifié de façon à prévoir le versement de dommages-intérêts, d'au plus $1,000, qui pourront être établis pour la période allant jusqu'à la date du procès.

*G. J. Smith, c.r.*, pour l'appelante.

*R. A. O'Donnell* et *R. F. L. Rose*, pour l'intimée.

Le jugement de la Cour a été rendu par

LE JUGE DICKSON—La question à trancher en l'espèce est de savoir si une clause restrictive contenue dans un contrat de louage de services, auquel je me référerai brièvement, est valide.

A toutes fins pratiques, les faits ne sont pas contestés. Par contrat en date du 24 avril 1956, la compagnie Collins a acheté l'entreprise d'assurance générale d'une société concurrente, D. C. Elsley Limited, au prix de $46,137. L'assurance-vie et les activités immobilières exploitées par la compagnie Elsley n'étaient pas comprises dans la vente. Aux termes du contrat, le vendeur s'engageait à ne pas exploiter d'entreprise d'assurance générale à Niagara Falls, dans le canton de Stamford et dans le village de Chippawa, tous sis dans

[1] (1976), 13 O.R. (2d) 177.
[2] (1974), 18 C.P.R. (2d) 1187.

Case 2:14-cv-02069-DDC-KGS Document 144-2 Filed 07/10/14 Page 4 of 24

the Township of Stamford and the Village of Chippawa, all in the County of Welland, and that the vendor would pay the purchaser $1,000 for each and every breach. The parties entered into a further agreement on May 1, 1956, whereby Elsley was employed as interim manager of the combined general insurance businesses, now owned by Collins, upon terms which included a restrictive covenant almost identical with that contained in the purchase agreement of April 24, 1956.

The interim management agreement was short-lived. It was replaced by an agreement of May 30, 1956 by which Elsley undertook to serve as manager of the Collins Company's general insurance business in the greater Niagara Falls area, devoting all necessary time and attention to such employment, subject to the proviso that he might supervise the Elsley Company in its real estate and life insurance business. The agreement commenced June 1, 1956 and was stated to continue in force from year to year until terminated by either party upon three months' notice. As things developed, it continued until May, 1973.

Clause 3 of the management agreement contains the covenant which gave rise to the present proceedings. It reads:

3. Subject to the restrictive covenants contained in the Agreement made between the Parties dated May 1, 1956, in consideration of the employment, the Manager shall not, while in the employ of the Company or of its successors and assigns, whether in the capacity in which he is now or in any other capacity, or during the period of five years next after he shall, whether by reason of dismissal, retirement or otherwise, have ceased to be so employed, directly or indirectly, and whether as principal, agent, director of a company, traveller, servant or otherwise, carry on or be engaged or concerned or take part in the business of a general insurance agent within the corporate limits of the City of Niagara Falls, the Township of Stamford and the Village of Chippawa, all in the County of Welland; and in the event of his failing to observe or perform the said agreement, he shall pay to the said Company, its successors or assigns, or other the person or persons entitled for the time being to the benefit of the said agreement, the sum of One Thousand Dollars ($1,000.00) as and for liquidated damages, and

le comté de Welland, et le vendeur devait payer à l'acheteur $1,000 pour chaque violation. Par nouvelle convention des parties datée du 1[er] mai 1956, Elsley a été engagé à titre de gérant provisoire des entreprises combinées d'assurance générale dont Collins était maintenant propriétaire. Les conditions contenaient une clause restrictive presque identique à celle du contrat de vente du 24 avril 1956.

Le contrat de gérance provisoire a été de courte durée. Il a été remplacé par un contrat daté du 30 mai 1956 selon lequel Elsley s'engageait à travailler comme gérant des entreprises d'assurance générale de la compagnie Collins dans l'agglomération de Niagara Falls, à consacrer à cet emploi tout le temps et l'attention nécessaires, sous réserve qu'il puisse superviser les entreprises immobilières et d'assurance-vie de la compagnie Elsley. Le contrat est entré en vigueur le 1[er] juin 1956 et devait se poursuivre d'année en année jusqu'à ce que l'une des parties le résilie en donnant un préavis de trois mois. En fait, il est demeuré en vigueur jusqu'en mai 1973.

1978 CanLII 7 (SCC)

La clause 3 du contrat de gérance contient l'engagement qui a donné lieu à la présente procédure. Elle stipule:

[TRADUCTION] 3. Sous réserve des clauses restrictives contenues au contrat de louage de services intervenu entre parties le 1[er] mai 1956, le gérant ne doit pas, tant qu'il est à l'emploi de la compagnie ou de ses successeurs et ayants droit, soit en sa qualité actuelle soit en toute autre qualité, ou pendant les cinq ans qui suivront la cessation de son emploi, pour cause de renvoi, de retraite ou autre, directement ou indirectement, à titre de patron, mandataire, administrateur d'une compagnie, voyageur, préposé ou autre, exploiter une entreprise d'agent d'assurance générale, s'engager dans pareille entreprise, s'en occuper ou y participer, dans la municipalité de Niagara Falls, dans le canton de Stamford et le village de Chippawa, tous dans le comté de Welland; et dans le cas où il manquerait d'observer ou d'exécuter ladite convention, il devra payer à la compagnie, ses successeurs ou ayants droit, ou à toute autre personne qui en sera à ce moment titulaire, la somme de mille dollars ($1,000) à titre de dommages-intérêts liquidés et M[me] Elsley, épouse du gérant, en signant les présentes,

the said Mrs. Elsley, wife of the Manager, by her signature hereto, agrees to observe and be bound by the aforesaid covenant.

The clause differs substantially from the restrictive covenant contained in each of the two earlier agreements. It is for a five-year period after cessation of the employment. It is made subject to the covenant contained in the sale agreement of May 1, 1956, for the purpose, no doubt, of assuring a minimum restrictive period of ten years and a maximum restrictive period of the term of employment plus five years. The sum of $1,000 was to become payable for failure on the part of Elsley to observe or perform the agreement; each of the earlier agreements made provision for payment of $1,000 "for each and every breach."

At trial, Collins asked for rectification of the agreement by adding the words "for each and every breach." The evidence disclosed, however, that although both parties had agreed that there should be a restrictive clause the drafting and detail had been left to the solicitor of the parties. The solicitor had died prior to date of trial and neither party had any recollection of the discussion as to the terms of the clause. There was no memorandum or other written material. In the absence of evidence of mutual mistake leading to the conclusion that the true agreement of the parties was other than as recorded, the application for rectification was properly refused by the trial judge. Upon such refusal counsel for Collins abandoned any claim for liquidated damages.

To return to the narrative, Elsley managed the combined general insurance businesses for seventeen years, from June 1, 1956 until May 31, 1973, at which time he gave proper notice of termination of employment. During the seventeen-year period Elsley dealt with the customers of the agency to the almost total exclusion of Collins. To them Elsley was the business, Collins little more than a name. Elsley met the customers, telephoned them frequently, placed their insurance policies and answered their queries. Such were the findings of the trial judge. People became accustomed to doing business with him on a personal basis and he looked after their insurance needs. He served not

accepte l'engagement précité et est liée par lui.

La clause diffère substantiellement des clauses restrictives des deux conventions précédentes. Elle stipule une période de cinq ans après la cessation de l'emploi. Elle est assujettie à l'engagement contenu au contrat de vente du 1^er^ mai 1956, dans le but, sans aucun doute, d'assurer une période restrictive minimum de dix ans et une période restrictive maximum équivalant à la durée de l'emploi plus cinq ans. Elsley devait payer la somme de $1,000 à défaut de respecter ou d'exécuter la convention. Les conventions précédentes stipulaient le paiement de $1,000 [TRADUCTION] «pour chaque violation».

Pendant le procès, Collins a demandé que la convention soit rectifiée en y ajoutant les termes «pour chaque violation». La preuve révèle, toutefois, que bien que les deux parties eussent convenu qu'il y aurait une clause restrictive, elles en avaient laissé la rédaction et le détail à leur avocat. Ce dernier est mort avant la date du procès et aucune des parties ne se souvient de la discussion sur les termes de la clause. Il n'y a pas de note à ce sujet ni d'autres documents écrits. La demande de rectification a été à bon droit rejetée par le juge de première instance, en l'absence de preuve d'une erreur mutuelle permettant de conclure que l'accord réel des parties était autre que celui qui avait été mis par écrit. A la suite de ce refus, l'avocat de Collins a abandonné toute réclamation de dommages-intérêts liquidés.

Pour en revenir aux faits, Elsley a dirigé les entreprises combinées d'assurance générale pendant 17 ans, du 1^er^ juin 1956 au 31 mai 1973, date à laquelle il a donné le préavis de cessation d'emploi prévu. Pendant ces dix-sept ans, Elsley a traité avec les clients de l'agence presque sans aucune participation de Collins. Pour eux, Elsley, c'était l'entreprise, Collins, c'était à peine un peu plus qu'un nom. Elsley rencontrait les clients, leur téléphonait fréquemment, plaçait leurs polices d'assurance et répondait à leurs demandes. C'est ce que le juge de première instance a conclu. Les gens se sont habitués à traiter avec Elsley sur une base personnelle et il pourvoyait à leurs besoins en

Case 2:14-cv-02069-DDC-KGS Document 144-2 Filed 07/10/14 Page 6 of 24

only customers of the business he formerly owned, but also Collins' customers.

From 1956 to 1973 the business bore the name "Collins & Elsley Insurance Agencies." During that period, as a convenience, many policyholders paid their premiums at the office of D. C. Elsley Limited, the real estate office of Elsley, because a large part of the business purchased by Collins from Elsley came from the area in which this office was located. As general manager of the combined businesses, Elsley, of course, had access to all policyholder records; he was familiar with the nature and extent of coverage and the premium paid by each policyholder. He had knowledge of the insurable assets, financial credit, likes and dislikes and idiosyncrasies of each customer, in a recurring and confidential relationship not unlike that of lawyer/client or doctor/patient. It was only natural that policyholders would follow him if he made a change.

I

Following termination of his employment with Collins, Elsley commenced his own general insurance business under D. C. Elsley Limited. He took with him two insurance salesmen and an insurance clerk formerly employed by the Collins and Elsley agency. A large number of former clients of the agency transferred their business. Exhibit 10 comprised a list of approximately two hundred former clients who had advised Collins they were transferring their insurance business to Elsley. The only factual dispute in the entire case is as to whether Elsley solicited the business of former clients. He denied having done so. Collins could not say that Elsley himself had solicited former clients, but said that Elsley's employees had done so. When asked as to how many former clients he had had dealings with after leaving the employ of Collins, Elsley replied that he had never "stopped to add them up." There is evidence he advertised for general insurance business and that some advertisements referred to him as being "formerly of Collins and

matière d'assurances. Il servait non seulement la clientèle de l'entreprise qui lui avait appartenu, mais également celle de Collins.

De 1956 à 1973, l'entreprise a fait affaire sous la raison sociale «Collins & Elsley Insurance Agencies». Pendant cette période, pour des raisons de commodité, un grand nombre de détenteurs de polices ont payé leurs primes dans les bureaux de D. C. Elsley Limited, l'entreprise immobilière de Elsley, parce qu'une grande partie des affaires achetées par Collins à Elsley provenait de la région dans laquelle ce bureau se trouvait. En tant que gérant général des entreprises combinées, Elsley avait évidemment accès aux dossiers de tous les détenteurs de polices; il était très au courant de la nature et de l'étendue de la couverture ainsi que de la prime payée par chacun. Vu ses relations continues et confidentielles avec sa clientèle, très semblables à celles d'un avocat avec son client ou d'un médecin avec son malade, il connaissait les biens assurables, la solidité financière, les goûts, les aversions et les petites manies de chacun de ses clients. Il n'était que naturel que les détenteurs de polices le suivent s'il changeait de situation.

1978 CanLII 7 (SCC)

I

A la suite de la cessation de son emploi auprès de la compagnie Collins, Elsley forma sa propre entreprise d'assurance générale sous la raison sociale D. C. Elsley Limited. Il prit avec lui deux courtiers en assurances et un employé précédemment au service de la compagnie Collins & Elsley. Un grand nombre d'anciens clients de la compagnie transférèrent leurs affaires auprès de Elsley. La pièce 10 comprend une liste d'à peu près 200 anciens clients qui avaient avisé Collins qu'ils transféraient leurs assurances auprès d'Elsley. Dans tout le litige, la seule contestation de fait est de savoir si Elsley a sollicité les anciens clients. Il le conteste. Collins ne pouvait pas dire qu'Elsley lui-même avait sollicité d'anciens clients, mais il a déclaré que les employés d'Elsley l'avaient fait. Quand on lui a demandé avec combien d'anciens clients il avait fait affaire après avoir quitté son emploi auprès de Collins, Elsley a répondu qu'il n'avait jamais [TRADUCTION] «pensé à les compter». Il est prouvé qu'une partie de la publicité qu'il

Case 2:14-cv-02069-DDC-KGS Document 144-2 Filed 07/10/14 Page 7 of 24

Elsley Insurance Agencies." In the Ontario Court of Appeal, Mr. Justice Evans (with whom Mr. Justice MacKinnon agreed) found that Elsley had actively solicited former clients. Mr. Justice Jessup took a contrary view. Both courts below considered Collins and Elsley to be successful businessmen, competent and experienced.

At trial, Mr. Justice Stark ordered Elsley restrained until September 1, 1978 from carrying on the business of general insurance agent within the defined area. He also directed a reference to the Local Master to assess the damages of Collins with respect to the business taken from him by Elsley from June 1, 1973 until the date of trial, subject to such damages being restricted to the loss of the agent's share of the premiums from contracts of insurance detailed in Exhibit 10, to which I have referred.

The majority of the Court of Appeal affirmed the judgment at trial, with one variation. The Court directed that Collins be compensated for the loss of commission on *all* contracts of general insurance sold by Elsley from June 1, 1973 to the date of the injunction (not limited to the policies set out in Exhibit 10), after taking into account the expenses incurred in securing and servicing the contracts. Mr. Justice Jessup dissented.

The point taken by Mr. Justice Jessup is central to the case. It is this. The restrictive covenant, it is contended, does not merely restrain the solicitation by Elsley of clients of the Collins & Elsley agency, it prevents Elsley engaging at all in the general insurance business in a large area and operates, therefore, to eliminate competition *per se* without regard for the public interest and beyond necessary protection of Collins' interest. The argument, in short, is that the covenant would have been valid if it had precluded Elsley from soliciting clients of his former employer but, drawn in more sweeping terms, it is unenforceable as being in restraint of trade and an interference with individual liberty of action. Among the authorities cited in support of

a faite au sujet de son entreprise d'assurance générale parle de lui comme étant [TRADUCTION] «précédemment de Collins & Elsley Insurance Agencies». En Cour d'appel de l'Ontario, le juge Evans (avec lequel le juge MacKinnon était d'accord) a conclu qu'Elsley avait activement sollicité d'anciens clients. Le juge Jessup était d'avis contraire. Les deux tribunaux d'instance inférieure ont considéré que Collins et Elsley étaient des hommes d'affaires compétents et expérimentés et qui avaient réussi.

En première instance, le juge Stark a ordonné à Elsley de s'abstenir, jusqu'au 1[er] septembre 1978, d'exploiter l'entreprise d'agent d'assurance générale dans la zone définie. Il a également ordonné un renvoi au *Master* local pour l'évaluation des dommages-intérêts dus à Collins en raison des affaires que lui avait enlevées Elsley du 1[er] juin 1973 jusqu'à la date du procès, à condition que ces dommages-intérêts fussent limités à la perte de la part des primes de l'agent relativement aux contrats d'assurance énumérés à la pièce 10 précitée.

La majorité de la Cour d'appel a confirmé le jugement de première instance, avec une modification. La Cour a ordonné que Collins soit indemnisé pour la perte de commissions sur *tous* les contrats d'assurance générale conclus par Elsley du 1[er] juin 1973 jusqu'à la date de l'injonction (pas seulement sur les polices énumérées à la pièce 10), compte tenu des frais afférents à l'obtention des contrats et aux démarches subséquentes. Le juge Jessup était dissident.

La question soulevée par le juge Jessup est cruciale en l'espèce. La voici. On soutient que la clause restrictive n'empêche pas simplement Elsley de solliciter des clients de la compagnie Collins & Elsley; elle interdirait à ce dernier de se livrer d'une façon quelconque à des activités d'assurance générale dans une zone étendue et aurait pour effet, en conséquence, d'éliminer la concurrence en soi, sans égard à l'intérêt public et par-delà la protection nécessaire des intérêts de Collins. En résumé, l'argument est que la clause aurait été valide si elle avait interdit à Elsley de solliciter les clients de son ancien employeur mais, rédigée en termes trop généraux, elle ne peut être imposée car elle constitue une restriction à la liberté du com-

this are *Herbert Morris Limited v. Saxelby*[3]; *Stenhouse Australia Ltd. v. Phillips*[4] and *Robert W. Maguire v. Northland Drug Company Limited*[5].

II

The principles to be applied in considering restrictive covenants of employment are well-established. They are found in the cases above-mentioned and in such familiar authorities as the *Nordenfelt* case[6], *Mason v. Provident Clothing and Supply Co.*[7] and *Attwood v. Lamont*[8]. Of more recent vintage: *Scorer v. Seymour-John*[9] and *Gledhow Autoparts Ltd. v. Delaney*[10]. A covenant in restraint of trade is enforceable only if it is reasonable between the parties and with reference to the public interest. As in many of the cases which come before the courts, competing demands must be weighed. There is an important public interest in discouraging restraints on trade, and maintaining free and open competition unencumbered by the fetters of restrictive covenants. On the other hand, the courts have been disinclined to restrict the right to contract, particularly when that right has been exercised by knowledgeable persons of equal bargaining power. In assessing the opposing interests the word one finds repeated throughout the cases is the word "reasonable." The test of reasonableness can be applied, however, only in the peculiar circumstances of the particular case. Circumstances are of infinite variety. Other cases may help in enunciating broad general principles but are otherwise of little assistance.

It is important, I think, to resist the inclination to lift a restrictive covenant out of an employment agreement and examine it in a disembodied

[3] [1916] 1 A.C. 688.
[4] [1974] 1 All E.R. 117.
[5] [1935] S.C.R. 412.
[6] [1894] A.C. 535.
[7] [1913] A.C. 724.
[8] [1920] 3 K.B. 571.
[9] [1966] 3 All E.R. 347.
[10] [1965] 1 W.L.R. 1366.

merce et une immixtion dans la liberté d'action individuelle. Parmi les arrêts cités à l'appui de cette théorie, on trouve *Herbert Morris Limited v. Saxelby*[3]; *Stenhouse Australia Ltd. v. Phillips*[4] et *Robert W. Maguire c. Northland Drug Company Limited*[5].

II

Les principes applicables lorsqu'on examine les clauses restrictives en matière d'emploi sont bien établis. On les trouve dans les décisions susmentionnées et dans d'autres arrêts connus comme *Nordenfelt*[6], *Mason v. Provident Clothing and Supply Co.*[7] et *Attwood v. Lamont*[8]. Et plus récemment: *Scorer v. Seymour-John*[9] et *Gledhow Autoparts Ltd. v. Delaney*[10]. Une clause restreignant le commerce ne peut être exécutoire que si elle est raisonnable vis-à-vis des parties et de l'intérêt public. Comme dans beaucoup d'affaires dont les tribunaux ont à connaître, on doit peser des exigences contradictoires. Dans l'intérêt public, il est important de décourager les restrictions à la liberté du commerce et de maintenir une concurrence exempte des entraves que constituent les clauses restrictives. En revanche, les tribunaux n'ont pas été enclins à restreindre le droit de contracter, particulièrement quand ce droit a été exercé par des personnes expérimentées ayant un pouvoir de négociation égal. En évaluant les intérêts opposés, on constate qu'on retrouve dans toutes les affaires le mot «raisonnable». Le critère du caractère raisonnable ne peut toutefois s'appliquer que dans les circonstances spéciales d'un cas particulier. Les circonstances varient à l'infini. Si d'autres affaires peuvent aider à énoncer des principes généraux, elles sont, par ailleurs, de peu d'utilité.

Il est important, je crois, de résister au désir de sortir une clause restrictive d'un contrat de louage de services et de l'examiner hors de son contexte,

[3] [1916] 1 A.C. 688.
[4] [1974] 1 All E.R. 117.
[5] [1935] R.C.S. 412.
[6] [1894] A.C. 535.
[7] [1913] A.C. 724.
[8] [1920] 3 K.B. 571.
[9] [1966] 3 All E.R. 347.
[10] [1965] 1 W.L.R. 1366.

Case 2:14-cv-02069-DDC-KGS Document 144-2 Filed 07/10/14 Page 9 of 24

manner, as if it were some strange scientific specimen under microscopic scrutiny. The validity, or otherwise, of a restrictive covenant can be determined only upon an overall assessment, of the clause, the agreement within which it is found, and all of the surrounding circumstances.

The distinction made in the cases between a restrictive covenant contained in an agreement for the sale of a business and one contained in a contract of employment is well-conceived and responsive to practical considerations. A person seeking to sell his business might find himself with an unsaleable commodity if denied the right to assure the purchaser that he, the vendor, would not later enter into competition. Difficulty lies in definition of the time during which, and the area within which, the non-competitive covenant is to operate, but if these are reasonable, the courts will normally give effect to the covenant.

A different situation, at least in theory, obtains in the negotiation of a contract of employment where an imbalance of bargaining power may lead to oppression and a denial of the right of the employee to exploit, following termination of employment, in the public interest and in his own interest, knowledge and skills obtained during employment. Again, a distinction is made. Although blanket restraints on freedom to compete are generally held unenforceable, the courts have recognized and afforded reasonable protection to trade secrets, confidential information, and trade connections of the employer.

The majority of the Court of Appeal considered the present case to be one which did not fit neatly into the category of either sale or employment, being inextricably bound together as in *Silverman v. Silverman*[11]. In a sense that is true, but I do not think the restrictive covenant of the employment agreement can be fed by the sale agreement. The covenant contained in the sale agreement expired, and its force exhausted, seven years before the

[11] (1969), 113 Sol. J. 563.

comme s'il s'agissait de l'examen microscopique d'un spécimen scientifique rare. La validité ou tout autre aspect d'une clause restrictive ne peut être déterminé que par une évaluation générale de cette clause, du contrat où elle est insérée et de toutes les circonstances qui l'entourent.

La distinction faite en jurisprudence entre une clause restrictive contenue dans un contrat de vente d'une entreprise et celle contenue dans un contrat de louage de services est bien conçue et répond à des considérations pratiques. Celui qui cherche à vendre son entreprise peut se retrouver avec une chose invendable si on lui conteste le droit d'assurer l'acheteur que lui, le vendeur, ne lui fera pas concurrence plus tard. La difficulté réside dans la définition de la période au cours de laquelle la clause de non-concurrence doit jouer et la région visée; mais si ces deux éléments sont raisonnables, les tribunaux donneront normalement effet à la clause.

Une situation différente, du moins en théorie, surgit dans la négociation d'un contrat de louage de services où un déséquilibre dans le pouvoir de négociation peut conduire à de l'oppression et à nier à l'employé son droit, à la suite de la cessation de son emploi, d'exploiter dans l'intérêt public et dans son propre intérêt, les connaissances et la compétence qu'il a acquises au cours de son emploi. De nouveau, on fait une distinction. Bien que les tribunaux jugent le plus souvent que les restrictions générales à la liberté de la concurrence ne sont pas exécutoires, ils reconnaissent et accordent une protection raisonnable aux secrets commerciaux, aux renseignements confidentiels et à la clientèle de l'employeur.

La majorité de la Cour d'appel a considéré que la présente affaire n'entre nettement ni dans la catégorie de la vente d'entreprise ni dans celle du louage de services, les deux étant liées d'une façon inextricable comme dans l'affaire *Silverman v. Silverman*[11]. Dans un sens, cela est vrai, mais je ne crois pas que la clause restrictive du contrat de louage de services puisse être alimentée par le contrat de vente. La clause du contrat de vente est

[11] (1969), 113 Sol. J. 563.

restrictive covenant contained in the employment agreement came into operation. The employment agreement was negotiated subsequent to and independent of the sale agreement. The agreement sued upon is the employment agreement. It would be wrong, in my opinion, to test that agreement by the criteria applicable in the case of a vendor/purchaser agreement, or by some hybrid test. The restrictive covenant, if enforceable, must stand up to the more rigorous tests applied in an employer/employee context.

III

The critical question, as I have indicated, is whether the employer, in seeking to protect his trade connection, overreached in the formulation of clause 3 of the agreement of May 30, 1956.

In assessing the reasonableness of the clause with reference to the interests of the parties, several questions must be asked. First, did Collins have a proprietary interest entitled to protection? The answer to this question must surely be in the affirmative. Shortly before the agreement for the employment of Elsley, Collins had paid Elsley some $46,000 for the general insurance trade connection of Elsley. By the agreement Elsley was placed in control, not only of that trade connection, but also the trade connection which Collins enjoyed prior to that time. Second, were the temporal or spatial features of the clause too broad? Some argument was directed to the Court as to those aspects, but I am in entire agreement with the courts below that they are not open to successful challenge. The next and crucial question is whether the covenant is unenforceable as being against competition generally, and not limited to proscribing solicitation of clients of the former employer. In a conventional employer/employee situation the clause might well be held invalid for that reason. The fact that it could have been drafted in narrower terms would not have saved it, for as Viscount Haldane said in *Mason v. Provident Clothing and Supply Co., supra*, p. 732, "... the question is not whether they could have made a valid agreement but whether the agreement actu-

expirée et a cessé d'avoir des effets sept ans avant que la clause restrictive du contrat de louage de services n'entre en vigueur. Le contrat de louage de services a été négocié subséquemment à l'acte de vente et indépendamment de ce dernier. La présente action est introduite en vertu du contrat de louage de services. A mon avis, il serait erroné d'utiliser à l'égard de ce contrat les critères applicables à un contrat entre un vendeur et un acheteur ou un critère hybride. Pour être exécutoire, la clause restrictive doit répondre aux critères plus rigoureux appliqués dans le contexte des relations employeur-employé.

III

Comme je l'ai indiqué, la question cruciale est de savoir si l'employeur, en cherchant à protéger sa clientèle, est allé trop loin dans la formulation de la clause 3 du contrat du 30 mai 1956.

On doit peser plusieurs questions quand on évalue le caractère raisonnable de la clause relativement à l'intérêt des parties. Premièrement, est-ce que Collins a un droit de propriété qu'il peut protéger? La réponse à cette question doit certainement être affirmative. Peu de temps avant qu'Elsley ne signe son contrat d'engagement, il avait vendu à Collins sa clientèle dans le domaine de l'assurance générale pour quelque $46,000. Ce contrat donnait à Elsley le contrôle non seulement de cette clientèle, mais également celui de la clientèle dont Collins bénéficiait antérieurement. Deuxièmement, est-ce que les stipulations temporelles et territoriales de la clause sont trop larges? On a plaidé sur ces questions devant la Cour, mais je souscris complètement à l'avis des cours d'instance inférieure selon lequel ces stipulations ne peuvent être attaquées avec succès. La question essentielle qui suit est de savoir si la clause n'est pas inexécutoire parce qu'elle vise la concurrence d'une façon générale et ne se limite pas à interdire la sollicitation des clients de l'ancien employeur. Dans une situation employeur-employé classique, la clause pourrait être jugée invalide pour ce motif. Le fait qu'elle aurait pu être rédigée en termes plus étroits ne l'aurait pas sauvée, car, comme l'a dit le vicomte Haldane dans l'arrêt *Mason v. Provident Clothing and Supply Co.*, précité, à la p.

Case 2:14-cv-02069-DDC-KGS Document 144-2 Filed 07/10/14 Page 11 of 24

ally made was valid." Whether a restriction is reasonably required for the protection of the covenantee can only be decided by considering the nature of the covenantee's business and the nature and character of the employment. Admittedly, an employer could not have a proprietary interest in people who were not actual or potential customers. Nevertheless, in exceptional cases, of which I think this is one, the nature of the employment may justify a covenant prohibiting an employee not only from soliciting customers, but also from establishing his own business or working for others so as to be likely to appropriate the employer's trade connection through his acquaintance with the employer's customers. This may indeed be the only effective covenant to protect the proprietary interest of the employer. A simple non-solicitation clause would not suffice.

732, [TRADUCTION] «. . . la question n'est pas de savoir s'ils auraient pu conclure un contrat valide, mais si le contrat effectivement conclu était valide». La seule façon de déterminer s'il est raisonnable d'insérer une clause restrictive pour la protection du stipulant est d'examiner la nature de son entreprise, ainsi que la nature et les attributs de l'emploi. Il est admis qu'un employeur ne peut pas avoir de droit à l'égard de personnes qui n'étaient pas ses clients actuels ou potentiels. Néanmoins, dans des cas exceptionnels, et je crois que celui-ci en est un, la nature de l'emploi peut justifier une clause interdisant à un employé, non seulement de solliciter des clients, mais également d'établir son propre commerce ou de travailler pour le compte de tiers de façon à s'approprier éventuellement la clientèle de l'employeur du fait qu'il la connaît. En vérité, c'est peut-être là la seule clause restrictive efficace pour protéger le droit de propriété de l'employeur. Une simple clause de non-sollicitation ne suffirait pas.

There are cases which uphold the validity of a covenant prohibiting an employee from engaging in a particular type of work within a specified area, and for an acceptable period of time after the termination of his employment: see e.g. *Fitch v. Dewes*[12]; *Marion White v. Francis*[13]; *P.C.O. Services Ltd. v. Rumleski*[14]; *Campbell, Imrie and Shankland v. Park*[15]. In each of these cases the employee was in a position where he acquired a close personal acquaintance with the clients or customers of the business. Such a restrictive covenant was reasonable, in the words of Lord Birkenhead in *Fitch v. Dewes* at p. 165, in order that the employee "should not be in a position to use the intimacies and knowledge which he had acquired in the course of his employment in order to create a practice of his own in that same place and by doing so undermine the business and the connection of the [employer]." In the present case, when the clause was drafted it was known that Elsley had, or would acquire, a special and intimate knowledge of the customers of his prospective employer and the means of influence over them.

Des arrêts ont confirmé la validité d'une clause interdisant à un employé de prendre part à un genre de travail particulier dans une zone déterminée et ce, pendant une période de temps acceptable après la cessation de son emploi: voir par exemple les arrêts *Fitch v. Dewes*[12]; *Marion White v. Francis*[13]; *P.C.O. Services Ltd. v. Rumleski*[14]; *Campbell, Imrie and Shankland v. Park*[15]. Dans chacune de ces affaires, l'employé occupait un poste qui lui avait fait connaître personnellement les clients de l'entreprise. Pour reprendre les termes de lord Birkenhead dans l'arrêt *Fitch v. Dewes*, à la p. 165, pareille clause restrictive était raisonnable pour que l'employé [TRADUCTION] «ne fût pas en mesure d'utiliser les relations étroites et l'expérience qu'il avait acquises au cours de son emploi pour créer sa propre affaire au même endroit et, ce faisant, saper l'entreprise et la clientèle de l'employeur». En l'espèce, lorsque la clause a été rédigée, on savait qu'Elsley avait, ou aurait, une connaissance spéciale et intime de la clientèle de son employeur éventuel et les moyens de l'influencer.

[12] [1921] 2 A.C. 158.
[13] [1972] 1 W.L.R. 1423.
[14] [1963] 2 O.R. 62.
[15] [1954] 2 D.L.R. 170.

[12] [1921] 2 A.C. 158.
[13] [1972] 1 W.L.R. 1423.
[14] [1963] 2 O.R. 62.
[15] [1954] 2 D.L.R. 170.

In the leading case of *Morris v. Saxelby, supra*, Lord Parker enunciated with clarity the circumstances in which a covenant taken by an employer from an employee or apprentice will be enforceable. He said, at p. 709:

> Wherever such covenants have been upheld it has been on the ground, not that the servant or apprentice would, by reason of his employment or training, obtain the skill and knowledge necessary to equip him as a possible competitor in the trade, but that he might obtain such personal knowledge of and influence over the customers of his employer, or such an acquaintance with his employer's trade secrets as would enable him, if competition were allowed, to take advantage of his employer's trade connection or utilize information confidentially obtained.

It is difficult to envisage a factual situation in which an employee would be in a better position than that of Elsley in the present case, to obtain "personal knowledge of and influence over the customers of his employer." Later in his speech, Lord Parker made the point that it is of importance: whether "the defendant ever came into personal contact with the plaintiff's customers." The same point is made in the following passage from Cheshire & Fifoot, *The Law of Contract* (8th ed.), at p. 369:

> A restraint is not valid unless the nature of employment is such that customers will either learn to rely upon the skill or judgment of the servant or will deal with him directly and personally to the virtual exclusion of the master, with the result that he will probably gain their custom if he sets up business on his own account.

In the view which I take of this case a covenant against solicitation would not have been adequate to protect the proprietary interest entitled to protection. Exhibit 10 is telling support of that view. Elsley testified that he did not solicit former clients; notwithstanding, two hundred clients switched their custom to him. That is a vivid illustration of what Lord Parker had in mind in speaking of the influence of an employee over the customers of his employer. And it is not suggested that Exhibit 10 was a complete list of all those who took action. It was filed as representative only. Collins estimated that Elsley had taken close to

Dans l'affaire faisant autorité, *Morris v. Saxelby*, précitée, lord Parker a clairement énoncé les conditions dans lesquelles une clause restrictive imposée par un employeur à son employé ou à son apprenti serait exécutoire. Il a dit à la p. 709:

> [TRADUCTION] Chaque fois que l'on a confirmé pareilles clauses, ce n'était pas pour le motif que le préposé ou l'apprenti, vu son emploi ou son apprentissage, obtiendrait la compétence et la connaissance nécessaires pour devenir un concurrent éventuel dans le commerce, mais parce qu'il pourrait obtenir une connaissance personnelle des clients de son employeur et une influence sur eux, ou une connaissance des secrets commerciaux de son employeur, qui lui permettrait, si la concurrence était autorisée, de tirer profit de la clientèle de son employeur ou d'utiliser les renseignements confidentiels ainsi obtenus.

Il est difficile d'imaginer une situation de fait dans laquelle un employé serait dans une meilleure position que celle d'Elsley en l'espèce, pour acquérir [TRADUCTION] «une connaissance personnelle des clients de son employeur et une influence sur eux». Plus loin dans son exposé, lord Parker a relevé qu'il était important de savoir si [TRADUCTION] «le défendeur est jamais entré en contact personnel avec les clients du demandeur». On retrouve le même point dans le passage suivant de Cheshire & Fifoot, *The Law of Contract* (8e éd.) à la p. 369:

> [TRADUCTION] Une clause restrictive n'est valide que si la nature de l'emploi est telle que les clients apprendront soit à s'en remettre à l'expérience ou au jugement du préposé ou traiteront avec lui directement et personnellement en excluant virtuellement le patron, de sorte que si le préposé s'établit à son compte, il acquerra probablement leur clientèle.

Vu mon optique en l'espèce, une clause interdisant la sollicitation n'aurait pas été appropriée pour protéger le droit de propriété comme il se doit. La pièce 10 appuie ce point de vue. Elsley a témoigné qu'il n'avait pas sollicité d'anciens clients; malgré cela, deux cents clients lui ont transféré leur clientèle. C'est un exemple vivant de ce que lord Parker avait en vue en parlant de l'influence d'un employé sur les clients de son employeur. Personne n'a prétendu que la pièce 10 est une liste complète de tous ceux qui ont changé d'assureur. On l'a déposée à titre d'exemple seulement. Collins a estimé qu'Elsley a pris près de la

one-half of the business on the books when Elsley left. As Salter J. said in the case of *Putsman v. Taylor*[16] at p. 642, a covenant against solicitation "is difficult to enforce; it is difficult to show breach and difficult to frame an injunction." The difficulty is demonstrated in this case. Does an advertisement which comes to the attention of former clients amount to solicitation? Was there solicitation by Elsley? I need not attempt to answer those questions. The point is that a non-solicitation covenant, in the circumstances here found, would have been meaningless.

Mr. Justice Jessup suggested in his reasons that a simple provision in a non-solicitation agreement would have enabled the plaintiff to examine the defendant's books and records from time to time so that solicitation of clients acquired by the plaintiff could be detected. I do not think any experienced businessman would consent to examination of his books by a competitor, whether a former employer or not. I doubt that clients of the defendant would welcome such intrusion upon their confidential affairs, or permit it if it came to their attention. If the defendant were hired by someone rather than being self-employed, by what right could he open the books of his employer to examination by a former employer? In short, I cannot accept the efficacy of the simple provision Mr. Justice Jessup envisages.

For the foregoing reasons, in my view the impugned covenant is no wider than reasonably required in order to afford adequate protection to Collins.

After the party relying on a restrictive covenant has established its reasonableness as between the parties, the onus of proving that it is contrary to the public interest lies on the party attacking it: *Morris v. Saxelby*, (*supra*). Since in my opinion the respondent has established what is required of him, the matter of the public interest must now be considered.

Unless it can be said that any and every restraint upon competition is bad, I do not think that enforcement of the clause could be considered

[16] [1927] 1 K.B. 637.

moitié du portefeuille quand il est parti. Comme l'a dit le juge Salter dans l'arrêt *Putsman v. Taylor*[16] à la p. 642, une clause de non-sollicitation [TRADUCTION] «est difficile à faire exécuter; il est difficile de prouver la violation et difficile de formuler une injonction». La difficulté est démontrée en l'espèce. Est-ce qu'une annonce qui attire l'attention d'anciens clients équivaut à une sollicitation? Elsley a-t-il sollicité? Je n'ai pas besoin d'essayer de répondre à ces questions. Le fait est qu'une clause de non-sollicitation, dans les circonstances de l'espèce, aurait été dénuée de sens.

Le juge Jessup a suggéré dans ses motifs qu'une simple stipulation dans une convention de non-sollicitation aurait permis au demandeur d'examiner de temps à autre les livres et registres du défendeur de façon à lui permettre de détecter la sollicitation de ses clients acquis. Je ne crois pas qu'un homme d'affaires expérimenté consentirait à faire examiner ses livres par un concurrent, qu'il s'agisse d'un ex-employeur ou non. Je doute que les clients du défendeur verraient d'un bon œil cette intrusion dans leurs affaires confidentielles ou l'autoriseraient s'ils l'apprenaient. Si le défendeur avait été engagé par un tiers au lieu de travailler pour son compte, de quel droit pourrait-il ouvrir les livres de son employeur pour qu'ils puissent être examinés par un ancien employeur? En résumé, je ne puis accepter l'efficacité de la simple stipulation envisagée par le juge Jessup.

Pour les motifs qui précèdent, la clause attaquée n'est pas plus large qu'il est raisonnablement requis pour protéger Collins de façon appropriée.

Après que la partie qui s'appuie sur une clause restrictive a établi son caractère raisonnable entre parties, il incombe à celle qui l'attaque de prouver qu'elle est contraire à l'intérêt public: *Morris v. Saxelby*, précité. Vu qu'à mon avis, l'intimée a établi ce qu'on lui demande, il faut maintenant examiner la question de l'intérêt public.

A moins que l'on puisse dire que toute restriction à la concurrence est néfaste, je ne crois pas que l'on puisse considérer que la mise en vigueur

[16] [1927] 1 K.B. 637.

1978 CanLII 7 (SCC)

inimical to the public interest. There were twenty to twenty-two general agents in Niagara Falls according to the evidence as of the date of trial, employing eighty to ninety employees. There was nothing to suggest that the people of Niagara Falls would suffer through the loss, for a limited period, of the services of Elsley in the general insurance business.

I am of opinion that the clause in contention is valid, and enforceable in accordance with its terms.

IV

The only other question is as to damages. The injunction granted at trial and continued by the Court of Appeal ceased to have effect with the death of Elsley, after the judgment of the Court of Appeal. Proceedings in this Court were continued by his widow as executrix of his estate.

The damage issue is one of some importance and difficulty. It subsumes two questions: (i) the right of a plaintiff enforcing a restrictive covenant to claim both an injunction and damages; (ii) whether the quantum is, or is limited to, the amount stipulated as liquidated damages in the covenant. In other words, can Collins claim *any* damages; and if so, is the amount limited to $1,000? I would answer both of these questions in the affirmative.

The Court was referred to a number of authorities. The first, in time, was *Jones v. Heavens*[17]. In that case, the covenant precluded the carrying on of the business of a saddler under penalty of £100 to be paid by way of liquidated damages for each such offence. A motion was made for an injunction. It was argued that the plaintiff's remedy was by action for recovery of the sum named as liquidated damages. An injunction was granted. Thus, even where there is provision for liquidated damages, the plaintiff may elect instead to ask for an

[17] (1877), 4 Ch.D. 636.

de la clause soit contraire à l'intérêt public. Selon la preuve, il y avait à Niagara Falls, à la date du procès, de vingt à vingt-deux agents généraux employant quatre-vingts à quatre-vingt-dix personnes. Rien ne permet de penser que les habitants de Niagara Falls souffriraient de la perte, pendant une période limitée, des services d'Elsley dans l'assurance générale.

Je suis d'avis que la clause litigieuse est valide et exécutoire conformément à ses conditions.

IV

La seule autre question est celle des dommages-intérêts. L'injonction accordée en première instance et confirmée en Cour d'appel a cessé de faire effet avec le décès d'Elsley, après l'arrêt de la Cour d'appel. La procédure devant cette Cour a été reprise par sa veuve, en sa qualité d'exécutrice de la succession.

La question des dommages-intérêts est importante et présente des difficultés. Elle se subdivise en deux points: (i) le droit d'un demandeur qui fait appliquer une clause restrictive de réclamer à la fois une injonction et des dommages-intérêts; (ii) la question de savoir si le quantum des dommages est ou doit être limité au montant stipulé à titre de dommages-intérêts liquidés dans la clause restrictive. En d'autres termes, Collins peut-il demander des dommages-intérêts *quels qu'ils soient*? S'il le peut, le montant en est-il limité à $1,000? Je suis d'avis que la réponse à ces deux questions doit être affirmative.

On a renvoyé la Cour à de nombreux arrêts. Le premier et le plus ancien est l'arrêt *Jones v. Heavens*[17]. La clause interdisait l'exploitation d'une sellerie sous peine d'une somme de £100 due à titre de dommages-intérêts liquidés pour chaque infraction. En défense à la demande d'injonction, le défendeur a plaidé que le demandeur devait recourir à une action en recouvrement de la somme indiquée à titre de dommages-intérêts liquidés. Une injonction a été accordée. Ainsi, même s'il existe une stipulation de dommages-inté-

[17] (1877), 4 Ch.D. 636.

Case 2:14-cv-02069-DDC-KGS Document 144-2 Filed 07/10/14 Page 15 of 24

injunction to prevent breach.

In the later case of *National Provincial Bank of England v. Marshall*[18], the defendant, on entering the service of the plaintiffs, a banking company, had executed a bond in the penal sum of £1,000 a condition of which was that he should pay this sum to the plaintiffs as liquidated damages if he should within a limited period after leaving the service of the plaintiffs accept employment in any other bank. The defendant accepted other employment in breach of the bond and the plaintiffs brought an action claiming an injunction. In response to the claim the defendant offered to pay the penal sum of £1,000. The Court held that he could not purchase his liberty to do the proscribed act. Lord Justice Cotton said that if the obligee brings an action at law he can recover damages, but (p. 116) ". . . if he comes into a Court of Equity the agreement will be enforced, if no action for damages has been brought, and an injunction will be granted." This case illustrates the principle that if the plaintiff is entitled to an injunction, the defendant cannot deprive him of this remedy by paying damages. The plaintiff may pursue whatever remedy is his due, even though it clearly affords him wider relief than another remedy open to him. Cotton L.J. added that if the Bank had brought an action they were not obliged to prove the damage they had suffered, but would be entitled without proof of damage to recover £1,000 as liquidated damages. Lindley L.J. in the same case spoke of the plaintiffs having an alternative remedy by way of injunction to enforce the agreement if they do not bring an action.

An early Canadian case, *Snider v. McKelvey*[19] dealt also with the matter. The defendant, who had sold his medical practice, acted in defiance of the sale agreement by which he had bound himself

[18] (1888), 40 Ch.D. 112.
[19] (1900), 27 O.L.R. 339.

rêts liquidés, le demandeur peut choisir de demander une injonction pour empêcher la violation du contrat.

Dans une affaire subséquente, *National Provincial Bank of England v. Marshall*[18], le défendeur, en entrant au service de la demanderesse, une banque, avait signé une garantie contenant une clause pénale de £1,000, montant qu'il devait payer à la demanderesse à titre de dommages-intérêts liquidés, si, après avoir quitté son service, il acceptait, dans un délai déterminé, un emploi auprès d'une autre banque. Le défendeur a accepté un autre emploi, en violation de la garantie, et la demanderesse a présenté une demande d'injonction. En réponse à l'action, le défendeur a offert de payer la somme de £1,000 faisant l'objet de la clause pénale. La Cour a jugé qu'il ne pouvait pas acheter la liberté de faire l'acte interdit. Le lord juge Cotton a dit que si le créancier intente une action en *common law*, il peut obtenir des dommages-intérêts, mais (p. 116) [TRADUCTION] «. . . s'il se présente devant une cour d'*equity* et qu'aucune action en dommages-intérêts n'a été intentée, la convention sera appliquée et une injonction accordée». Cette affaire illustre le principe que si le demandeur a droit à une injonction, le défendeur ne peut pas le priver de ce recours en payant des dommages-intérêts. Le demandeur peut utiliser le recours auquel il a droit quel qu'il soit, même s'il lui accorde clairement un redressement plus étendu qu'un autre recours qui lui est ouvert. Le lord juge Cotton a ajouté que si la banque avait intenté une action, elle n'aurait pas été obligée de prouver le préjudice qu'elle avait subi et aurait eu droit, sans preuve de préjudice, à £1,000 à titre de dommages-intérêts liquidés. Le lord juge Lindley, dans la même affaire, a parlé du recours subsidiaire ouvert à la demanderesse sous forme d'injonction pour faire exécuter la convention si elle n'intentait pas une action.

Une ancienne affaire canadienne, *Snider v. McKelvey*[19] a également traité de cette question. Le défendeur, qui avait vendu son cabinet de médecin, avait contrevenu aux conditions de l'acte

[18] (1888), 40 Ch.D. 112.
[19] (1900), 27 O.L.R. 339.

in the sum of $400 to be paid if he set up in practice within a defined time and area. Robertson J. granted an injunction and awarded damages of $100. On appeal, the Court held that the plaintiff must elect whether to take judgment for the $400 or for the injunction. The plaintiff insisted that the $400 was a penalty and, if such, he could have damages assessed for the breach of the condition as well as the injunction to restrain further breaches. Osler J.A., in the leading judgment, rejected this argument. He declined to recognize any distinction between the case of bond with a penalty and an agreement to pay liquidated damages, because the plaintiff would, if the equitable remedy by injunction were enforced, be obtaining performance of the agreement *in specie* and also what he was only entitled to recover in the case of its non-performance. He was of opinion that the $400 was intended to be payable as liquidated damages. After referring to the passage of *Lord Cairns' Act*, 21-22 Vict. c. 27, the learned judge of appeal had this to say, at p. 344:

> It is clear that the Act did not enable the Court to give the plaintiff a double remedy where before the Act his right was in the alternative—either at law or in equity, but not in both: *Sainter v. Ferguson* (1849), 7 C.B. 716; 1 Mac. & G. 286.

The following passage from the judgment of Osler J.A. is of particular interest because of the distinction made in respect of those cases concerning the sale of goodwill where there was no valid covenant or bond for the breach of which the plaintiff could have sued at law, and therefore no choice available between a suit at law and injunction in equity (at pp. 344-5):

> The learned trial Judge relied upon the case of *Mossop v. Mason* (1869), 16 Gr. 302, (1870), 18 Gr. 360, (1871), 18 Gr. 453 (in appeal), where damages were awarded as well as an injunction. But that case is quite distinguishable. There the defendant had sold to the plaintiff *inter alia* the goodwill of the business of an innkeeper carried on by him, and the bill was filed to restrain him from resuming the business he had sold and for damages sustained in consequence of his having done so. There was, as the Court held, no valid covenant or bond for the breach of which the plaintiff could have sued at law. The plaintiff had, therefore, no alternative

de vente en vertu duquel il s'était engagé à payer la somme de $400 s'il pratiquait pendant une période et dans une zone déterminées. Le juge Robertson a accordé une injonction et des dommages-intérêts de $100. En appel, la Cour a statué que le demandeur devait choisir entre obtenir un jugement pour les $400 et l'injonction. Le demandeur a soutenu que les $400 constituaient une peine et que, cela étant, il pouvait obtenir des dommages-intérêts pour la violation de la condition aussi bien qu'une injonction pour en empêcher d'autres. Le juge d'appel Osler, dans le jugement principal, a rejeté cet argument. Il a refusé de faire une distinction entre une garantie accompagnée d'une peine et un accord de payer des dommages-intérêts liquidés, parce que si l'on avait recours à l'injonction en *equity*, le demandeur obtiendrait l'exécution intégrale du contrat ainsi que ce à quoi il a droit seulement en cas de non-exécution. A son avis, les $400 étaient dus à titre de dommages-intérêts liquidés. Après avoir cité le passage de la *Lord Cairns' Act*, 21-22 Vict. c. 27, le savant juge a dit, à la p. 344:

> [TRADUCTION] Il est clair que la Loi n'a pas permis à la Cour de donner au demandeur un double recours là où, avant la Loi, il devait faire un choix—recours en *common law* ou en *equity*, mais pas les deux: *Sainter v. Ferguson* (1849), 7 C.B. 716; 1 Mac. & G. 286.

Le passage suivant du jugement du juge Osler présente un intérêt particulier parce qu'il distingue les affaires relatives à la vente d'un achalandage lorsqu'il n'y a pas de clause ou de garantie valide dont la violation aurait permis au demandeur d'introduire une action en *common law* et où il n'y avait donc aucun choix possible entre une poursuite en *common law* et une injonction en *equity* (aux pp. 344 et 345):

> [TRADUCTION] Le savant juge de première instance s'est appuyé sur l'arrêt *Mossop v. Mason* (1869), 16 Gr. 302, (1870) 18 Gr. 360, (1871), 18 Gr. 453 (en appel), qui a accordé des dommages-intérêts et une injonction. Toutefois, cette affaire est clairement différente. En l'espèce, le défendeur a notamment vendu au demandeur l'achalandage d'une auberge qu'il exploitait. La déclaration a été déposée pour l'empêcher de poursuivre le commerce qu'il avait vendu et pour le préjudice subi du fait qu'il l'avait poursuivi. Comme la Cour l'a décidé, il n'y avait aucune clause de garantie valide dont la violation aurait permis au demandeur d'introduire une action

remedy, and his right to recover rested solely upon the defendant's equitable obligation, implied in the sale of the goodwill, not to hold out in any way that he was carrying on business in continuation of, or in succession to, the business formerly carried on by him, the goodwill of which he had sold. See *Labouchere v. Dawson* (1872), L.R. 13 Eq. 322; approved in *Trego v. Hunt*, [1896] A.C. 7.

There was, therefore, nothing to prevent the Court from directing a reference to ascertain what damages the plaintiff had sustained consequent upon the breach of the equitable obligation.

We are, of course, not dealing here with a sale of goodwill but with an agreement for employment. McLennan J.A. shared the opinion of Osler J.A. that the $400 was clearly liquidated damages and he regarded it as clearly settled that in the case of liquidated damages the plaintiff must elect between the damages and an injunction. This case emphasizes that the basic principle being applied is the prohibition against double recovery. The agreed liquidated damages sum is to be a complete remedy for the entire breach specified. Once this sum has been awarded, to grant an injunction for even part of the breach would be to have overlapping remedies.

1978 CanLII 7 (SCC)

A year later, Wright J. in *General Accident Assurance Corporation v. Noel*[20], concluded that the current of authority in England was such that if the plaintiffs elected to take an injunction they could not have judgment as well for the liquidated damages for which the employment agreement in the case provided.

The British Columbia case of *Campbell, Imrie and Shankland v. Park, supra*, was cited in argument. In that case a restrictive covenant had been given by a chartered accountant engaged to serve as branch manager by a firm of accountants. The agreement was silent as to the payment of a stated amount for breach. The plaintiffs sought both injunction and damages. The defendant, relying on *General Accident Assurance Corporation v. Noel*,

[20] [1902] 1 K.B. 377.

en *common law*. Le demandeur n'avait, en conséquence, aucun autre recours possible et son droit à un redressement s'appuyait uniquement sur l'obligation du défendeur en *equity*, découlant implicitement de la vente de l'achalandage, de ne montrer en aucune façon qu'il exploitait une entreprise en continuation ou à titre de successeur de l'entreprise qu'il exploitait antérieurement et dont il avait vendu l'achalandage. Voir l'arrêt *Labouchere v. Dawson* (1872), L.R. 13 Eq. 322; approuvé dans l'arrêt *Trego v. Hunt*, [1896] A.C. 7.

Par conséquent, il n'y avait rien qui empêchait la Cour d'ordonner un renvoi pour fixer le préjudice que le demandeur avait subi à la suite de la non-exécution de l'obligation en *equity*.

Évidemment, nous ne traitons pas ici de la vente d'un achalandage, mais d'un contrat de louage de services. Le juge d'appel McLennan partageait l'avis du juge d'appel Osler selon lequel les $400 constituaient nettement des dommages-intérêts liquidés et il considérait comme clairement établi qu'en ce cas, le demandeur devait choisir entre dommages-intérêts et injonction. Cette affaire souligne que le principe fondamental appliqué est l'interdiction d'une double indemnisation. Le montant fixé à titre de dommages-intérêts liquidés est le redressement complet si la violation stipulée se réalise. Une fois ce montant alloué, accorder une injonction, même pour une partie de la violation, équivaudrait à utiliser des recours qui chevauchent.

Un an plus tard, le juge Wright dans l'arrêt *General Accident Assurance Corporation v. Noel*[20] a conclu que la tendance de la jurisprudence en Angleterre était telle que, si le demandeur choisissait de recourir à l'injonction, il ne pourrait pas en même temps obtenir un jugement pour les dommages-intérêts liquidés stipulés au contrat de travail.

Au cours des plaidoiries, on a cité une affaire de la Colombie-Britannique, *Campbell, Imrie and Shankland v. Park*, précitée. Dans cette affaire, un comptable agréé engagé à titre de directeur de succursale par une firme de comptables avait consenti à une clause restrictive. Le contrat était muet quant au paiement d'un montant déterminé en cas de violation. Les demandeurs ont requis à la fois une injonction et des dommages-intérêts. Le défen-

[20] [1902] 1 K.B. 377.

Case 2:14-cv-02069-DDC-KGS Document 144-2 Filed 07/10/14 Page 18 of 24

*supra*, said they could not have both. Wilson J., as he then was, had this to say in respect of that contention, at p. 183:

The plaintiffs have asked for an injunction and for damages. The defendant, relying on *Gen'l Accident Ass'ce Corp. v. Noel*, 1902 1 K.B. 377, says they cannot have both, but must elect. The case referred to is one in which the restrictive agreement contained a clause requiring the covenantor, in case of breach, to pay £100 as liquidated damages. Very reasonably, the covenantee was required to elect. The sum of £100 had been agreed to by the parties as being the total amount of damage which the covenantee would suffer by a breach. It he were paid this sum, he could not reasonably ask for an injunction to prohibit the doing of something in respect of which he had already collected full damages. But here the plaintiffs cannot say what their full damage may be i.e. the defendant is allowed to continue to attract their clients, they can only tell me what damage they have suffered to date, and ask me to prevent the defendant from inflicting on them further damage. I have no doubt that it is my right and duty so to do. I refer to *Garbutt Business College Ltd. v. Henderson*, [1939] 4 D.L.R. 151, as a case in which both forms of relief were granted.

The judge fixed damages at $1,000 and granted an injunction.

In the recent case in this Court, *H. F. Clarke Limited v. Thermidaire Corporation Limited*[21], the claim was for damages for breach of a restrictive covenant contained in a distributorship agreement. The question of injunction was not in issue. The agreement provided that the defaulting party would be required to pay as liquidated damages the gross profit realized from the sale of competitive products. The issue was whether the plaintiff could recover this amount or only provable damages. A majority of the Court held in favour of the latter disposition. In the majority judgment the Chief Justice in *obiter dicta* had this to say, at p. 335:

[21] [1976] 1 S.C.R. 319.

deur, se fondant sur l'arrêt *General Accident Assurance Corporation v. Noel*, précité, a dit qu'ils ne pouvaient avoir les deux. Voici ce que le juge Wilson, tel était alors son titre, a dit au sujet de cette prétention, à la p. 183:

[TRADUCTION] La demanderesse a requis une injonction et des dommages-intérêts. Le défendeur s'appuie sur l'arrêt *Gen'l Accident Ass'ce Corp. v. Noel*, 1902 1 K.B. 377, pour dire qu'elle ne peut avoir les deux et doit donc choisir. Dans l'affaire citée, la convention restrictive contenait une clause qui obligeait le débiteur, en cas de violation, à payer £100 à titre de dommages-intérêts liquidés. On a très raisonnablement demandé au stipulant de choisir. Les parties avaient convenu que la somme de £100 était le montant total du préjudice que subirait le stipulant s'il y avait violation. Si on lui paye cette somme, il ne peut raisonnablement pas demander une injonction pour interdire qu'on fasse une chose pour laquelle il a déjà touché des dommages-intérêts complets. Mais, en l'espèce, la demanderesse ne peut pas dire quel peut être son préjudice total, c'est-à-dire que si le défendeur est autorisé à continuer d'attirer les clients de la demanderesse, elle peut seulement me dire quel préjudice elle a subi à ce jour et me demander d'interdire à ce dernier de lui en faire subir davantage. Je ne doute pas que j'ai le droit et le devoir de le faire. Je me reporte à l'arrêt *Garbutt Business College Ltd. v. Henderson*, [1939] 4 D.L.R. 151, une affaire où l'on a accordé les deux formes de redressement.

Le juge a fixé les dommages-intérêts à $1,000 et a accordé une injonction.

Dans l'affaire récemment tranchée par cette Cour, *H. F. Clarke Limited c. Thermidaire Corporation Limited*[21], il s'agissait d'une demande en dommages-intérêts pour violation d'une clause restrictive contenue dans un contrat de distribution. La question de l'injonction n'était pas en litige. Le contrat stipulait que la partie en défaut devrait payer à titre de dommages-intérêts liquidés le profit brut réalisé par la vente des produits concurrents. La question était de savoir si le demandeur pouvait obtenir ce montant ou seulement la réparation du préjudice susceptible d'être prouvé. La majorité de la Cour s'est prononcée en faveur de cette dernière solution. Dans le jugement de la majorité, le Juge en chef a dit en *obiter*, à la p. 335:

[21] [1976] 1 R.C.S. 319.

1978 CanLII (SCC)

There is no doubt that a covenantee cannot have both an injunction during the covenant period and damages based on a breach of covenant for the entire period where they are based on a formula. There is case law holding that where a fixed sum is stipulated as the liquidated damages upon a breach, the covenantee cannot have both the damages and an injunction but must elect between the two remedies: see *General Accident Assurance Corp. v. Noel*, [1902] 1 K.B. 377; *Wirth and Hamid Booking Inc. v. Wirth* (1934), 192 N.E. 297. I do not however read these cases as excluding damages for past loss by reason of the breach, but only as precluding recovery of the liquidated amount referable to breach in the future which that amount was designed to cover and against which an injunction has been granted.

The *Campbell, Imrie and Shankland* case, as well as the passages quoted above from *Snider* and *H. F. Clarke*, in my opinion, point up the fact that a plaintiff may have a right to damages in equity in addition to an injunction if he can establish his entitlement under the appropriate equitable considerations. In Ontario, the Court's power to award damages in equity is founded on what is now s. 21 of *The Judicature Act*, R.S.O. 1970, c. 228, which is derived from *Lord Cairns' Act* of 1858. Section 21 provides as follows:

21. Where the court has jurisdiction to entertain an application for an injunction against a breach of a covenant, contract or agreement, or against the commission or continuance of a wrongful act, or for the specific performance of a covenant, contract or agreement, the court may award damages to the party injured either in addition to or in substitution for the injunction or specific performance, and the damages may be ascertained in such manner as the court directs, or the court may grant such other relief as is considered just.

It should be remembered that if a plaintiff is entitled to an injunction to restrain breach of a restrictive covenant, he is entitled to prevent the entire breach, not just part of it. Thus, for any part not restrained, he may be entitled to unliquidated damages in equity. There would be no double recovery provided the damages were not referable to any period during which breach was restrained

Il ne fait pas de doute qu'un créancier ne peut obtenir à la fois une injonction durant la période de la clause et des dommages-intérêts fondés sur une violation toute la période durant lorsque ceux-ci sont basés sur une formule. Il est des arrêts qui ont décidé que lorsqu'une somme fixe est stipulée pour valoir comme montant de dommages liquidés lors d'une violation, le créancier ne peut avoir à la fois les dommages-intérêts et une injonction mais doit choisir entre les deux recours: voir *General Accident Assurance Corp. v. Noel*, [1902] 1 K.B. 377; *Wirth and Hamid Booking Inc. v. Wirth* (1934), 192 N.E. 297. Je n'interprète pas toutefois ces arrêts comme excluant des dommages-intérêts pour une perte passée qui est due à la violation, mais seulement comme empêchant le recouvrement du montant liquidé se rapportant à la violation ultérieure que ce montant était destiné à couvrir et contre laquelle une injonction a été accordée.

L'arrêt *Campbell, Imrie and Shankland* ainsi que les passages précités des arrêts *Snider* et *H. F. Clarke* soulignent, à mon avis, le fait qu'un demandeur peut avoir droit à des dommages-intérêts en *equity* en plus d'une injonction, s'il peut établir son droit en vertu de considérations d'*equity* pertinentes. En Ontario, le pouvoir des tribunaux d'allouer des dommages-intérêts en *equity* est fondé sur ce qui est maintenant l'art. 21 de *The Judicature Act*, R.S.O. 1970, c. 228, qui dérive de la *Lord Cairns' Act* de 1858. L'article 21 dispose:

[TRADUCTION] 21. Lorsqu'un tribunal est compétent pour connaître d'une demande d'injonction visant la violation d'un engagement, d'un contrat ou d'une convention, ou un acte illicite ou sa continuation, ou l'exécution intégrale d'un engagement, d'un contrat ou d'une convention, le tribunal peut accorder des dommages-intérêts à la partie lésée soit en sus soit à la place de l'injonction ou de l'exécution intégrale et le préjudice peut être constaté de la manière que le tribunal ordonnera, ou le tribunal peut accorder tout autre redressement qu'il considère juste.

Il faut se souvenir que si un demandeur a droit à une injonction pour faire interdire la violation d'une clause restrictive, il a le droit d'empêcher la violation totale et pas seulement une partie de cette dernière. Ainsi, pour toute partie non interdite par l'injonction, il peut avoir droit, en *equity*, à des dommages-intérêts non liquidés. Il n'y aura pas double indemnisation, pourvu que les domma-

1978 CanLII 7 (SCC)

Case 2:14-cv-02069-DDC-KGS Document 144-2 Filed 07/10/14 Page 20 of 24

by the injunction. This right to damages would not be based on the liquidated damages clause, but on the right under s. 21 to damages in equity in substitution for an injunction in respect of the period of breach prior to the granting of the injunction. A plaintiff, of course, cannot delay seeking an injunction in order to inflate his damages. He would not be entitled to damages past the time when he should have sought the injunction.

How then should the measure of such damages be determined? It will generally be appropriate to adopt in equity rules similar to those applicable at law: Spry, *Equitable Remedies* (1971), at pp. 552-4. This is so not because the Court is obliged to apply analogous legal criteria, but because the amount of compensation which would satisfy the loss suffered, and which the Court considers it just and equitable be paid, usually happens to be equivalent to the amount of legal damages which would be appropriate. The award is still governed, however, by general equitable considerations which would not apply if the plaintiff were seeking damages at law rather than in equity. These considerations might serve, for example, to reduce the amount, due to such factors as delay or acquiescence. In addition, if the parties have agreed on a set amount of damages at law, or a maximum amount, it would be unconscionable, in my opinion, to allow recovery of a greater amount of damages in equity.

In the case of a gross underestimate of damages as, presumably, in the present case, the plaintiff may receive an amount equivalent to the liquidated damages sum, plus an injunction, and therefore appear to have double relief. But such is not the case. The injunction relates to the latter part of the period in respect of which the restrictive covenant imposes restraint, the damages (not exceeding the stipulated liquidated damages) relate to the period prior to the granting of the injunction and are in substitution for injunctive relief during that period.

ges-intérêts ne visent pas une période durant laquelle la violation était interdite par l'injonction. Ce droit à des dommages-intérêts ne serait pas fondé sur la clause accordant des dommages-intérêts liquidés, mais sur le droit que donne l'art. 21 à des dommages-intérêts en *equity* à la place d'une injonction pour la période de violation antérieure à celle-ci. Évidemment, un demandeur ne peut pas retarder la demande d'injonction pour gonfler les dommages-intérêts. Il n'y aurait pas droit pour la période suivant le moment où il aurait dû demander l'injonction.

Comment donc déterminer l'importance de ces dommages-intérêts? Il sera généralement approprié d'adopter en *equity* des règles semblables à celles qui sont appliquées en *common law*: Spry, *Equitable Remedies* (1971), aux pp. 552-554. Il en est ainsi non pas parce que la Cour est tenue d'appliquer des critères juridiques similaires, mais parce que le montant de l'indemnité qui répare le préjudice subi, et que la Cour considère approprié en *equity*, est habituellement équivalent aux dommages-intérêts qui seraient appropriés en *common law*. Toutefois l'indemnité est toujours soumise à des considérations générales d'équité qui ne seraient pas applicables si le demandeur actionnait en dommages-intérêts en *common law* plutôt que de le faire en *equity*. Ces considérations peuvent servir, par exemple, à réduire le montant, en raison de facteurs tels que le retard ou l'acquiescement. De plus, si les parties ont convenu d'un montant déterminé de dommages-intérêts en *common law*, ou d'un montant maximum, il serait déraisonnable, à mon avis, d'accorder un montant plus important de dommages-intérêts en *equity*.

Dans le cas d'une sous-évaluation flagrante des dommages-intérêts, comme c'est probablement le cas en l'espèce, le demandeur peut recevoir un montant équivalent aux dommages-intérêts liquidés, ainsi qu'une injonction. Il semble donc ainsi bénéficier d'un redressement double. Mais tel n'est pas le cas. L'injonction se rapporte à la dernière partie de la période d'interdiction visée par la clause restrictive alors que les dommages-intérêts (qui n'excèdent pas les dommages-intérêts liquidés) se rapportent à la période antérieure à l'injonction et remplacent le redressement par injonction pendant cette période.

Case 2:14-cv-02069-DDC-KGS Document 144-2 Filed 07/10/14 Page 21 of 24

V

The matter of the right of a plaintiff to recover legal damages for actual loss sustained where a lesser stipulated amount is mentioned was considered in the House of Lords decision in *Cellulose Acetate Silk Company Limited v. Widnes Foundry (1925) Limited*[22]. The amount stipulated was £20 for each week of delay in the erection of an acetone recovery plant. The contractors were thirty weeks late. The actual loss suffered was £5,850. The case is of interest in two respects. First, the recovery was limited to £600, the agreed damages. Second, Lord Atkin, delivering judgment, said that he found it unnecessary to consider what would be the position if the stipulated £20 per week were a penalty, adding, at p. 26:

> It was argued by the appellants that if this were a penalty they would have an option either to sue for the penalty or for damages for breach of the promise as to time of delivery. I desire to leave open the question whether, where a penalty is plainly less in amount than the prospective damages, there is any legal objection to suing on it, or in a suitable case ignoring it and suing for damages.

There is authority indicating that a penalty clause is ineffective even where it is less than the actual loss suffered (see Hals. 4th vol. 12, para. 118, p. 422 and the authorities cited therein). The result would be that actual damages could be recovered which exceeded the amount stipulated as a penalty. To that extent, the proposition appears to me to be contrary to principle and productive of injustice. The foundation of relief in equity against penalties is expressed in Story, *Equity Jurisprudence* (14th ed.) at s. 1728, as follows:

> Where a penalty or forfeiture is designed merely as a security to enforce the principal obligation, it is as much against conscience to allow any party to pervert it to a different and oppressive purpose as it would be to allow him to substitute another for the principal obligation.

[22] [1933] A.C. 20.

V

La question du droit du demandeur d'obtenir des dommages-intérêts pour un préjudice effectivement subi lorsqu'un montant inférieur est stipulé a été examinée dans la décision de la Chambre des lords dans l'affaire *Cellulose Acetate Silk Company Limited v. Widnes Foundry (1925) Limited*[22]. Le montant stipulé était de £20 par semaine de retard dans la construction d'une fabrique de récupération d'acétone. Les entrepreneurs avaient trente semaines de retard. Le préjudice effectivement subi se montait à £5,850. L'affaire est intéressante à deux égards. Premièrement, l'indemnité a été limitée à £600, dommages-intérêts convenus. Deuxièmement, lord Atkin, rendant le jugement, a dit qu'il avait jugé inutile d'examiner quelle serait la situation si les £20 par semaine stipulés constituaient une peine; il ajoute à la p. 26:

> [TRADUCTION] L'appelante a soutenu que, s'il s'agissait d'une peine, elle aurait eu la possibilité d'actionner soit en recouvrement de la peine soit en dommages-intérêts pour violation de l'engagement relatif à la date de livraison. Je ne veux pas me prononcer sur la question de savoir s'il y a une objection juridique à intenter une action en se fondant sur la peine ou, dans un cas pertinent, à y passer outre et à poursuivre en dommages-intérêts, quand la peine est clairement inférieure au montant des dommages-intérêts éventuels.

Selon un courant de jurisprudence, une clause pénale est inefficace même lorsqu'elle est inférieure au préjudice effectivement subi (voir Hals. 4e vol. 12, par. 118, à la p. 422 et la jurisprudence qui y est citée). Il en résulterait que l'on pourrait effectivement obtenir des dommages-intérêts excédant le montant fixé par la clause pénale. Dans cette mesure, cette thèse me paraît contraire aux principes et être injuste. Le fondement du redressement en *equity* par opposition aux clauses pénales est exposé par Story dans *Equity Jurisprudence* (14e éd.), art. 1728, comme suit:

> [TRADUCTION] Lorsqu'une peine ou une déchéance est conçue uniquement à titre de garantie d'exécution de l'obligation principale, il serait tout aussi contraire à la conscience de permettre à une partie de l'utiliser dans un but différent et oppressif que de lui permettre de changer l'obligation principale.

[22] [1933] A.C. 20.

1978 CanLII 7 (SCC)

The operation of this relief in the face of contrary agreement by the party is also explained in this section:

If it be said that it is his own folly to have made such a stipulation, it may equally well be said that the folly of one man cannot authorize gross oppression on the other side.

It is now evident that the power to strike down a penalty clause is a blatant interference with freedom of contract and is designed for the sole purpose of providing relief against oppression for the party having to pay the stipulated sum. It has no place where there is no oppression. If the actual loss turns out to exceed the penalty, the normal rules of enforcement of contract should apply to allow recovery of only the agreed sum. The party imposing the penalty should not be able to obtain the benefit of whatever intimidating force the penalty clause may have in inducing performance, and then ignore the clause when it turns out to be to his advantage to do so. A penalty clause should function as a limitation on the damages recoverable, while still being ineffective to increase damages above the actual loss sustained when such loss is less than the stipulated amount. As expressed by Lord Ellenborough in *Wilbeam v. Ashton*[23]: "Beyond the penalty you shall not go; within it, you are to give the party any compensation which he can prove himself entitled to." Of course, if an agreed sum is a valid liquidated damages clause, the plaintiff is entitled at law to recover this sum regardless of the actual loss sustained.

In the context of the present discussion of the measure of damages, the result is that an agreed sum payable on breach represents the maximum amount recoverable whether the sum is a penalty or a valid liquidated damages clause.

It should be noted that the above principles concern only the situation where there is a single sum specified for breach of the agreement, or a single breach. Where there are different breaches and the agreement provides for a particular sum of

[23] (1807), 1 Camp. 78.

Cet article explique également l'effet du redressement en présence d'une entente en sens contraire entre les parties:

[TRADUCTION] Si l'on dit que cette stipulation est le fruit de sa propre sottise, on peut tout aussi bien dire que la sottise de l'un ne peut autoriser l'oppression flagrante de l'autre.

Il est maintenant évident que le pouvoir d'annuler une clause pénale constitue une ingérence criante dans la liberté contractuelle et qu'il vise seulement à fournir un redressement contre l'oppression de la partie qui doit payer la somme convenue. Ce pouvoir n'existe pas s'il n'y a pas oppression. S'il s'avère que le préjudice réel excède la peine, les règles normales d'exécution des contrats doivent s'appliquer pour permettre le recouvrement de la somme convenue seulement. La partie qui impose la peine ne doit pas être en mesure de profiter de la force d'intimidation que peut avoir la clause pénale pour forcer l'exécution et ensuite la laisser de côté quand il s'avère avantageux de le faire. Une clause pénale doit servir à limiter les dommages-intérêts recouvrables, tout en restant sans effet pour augmenter les dommages-intérêts au-delà de la perte réelle subie quand cette dernière est inférieure au montant convenu. Comme l'a dit lord Ellenborough dans l'arrêt *Wilbeam v. Ashton*[23]: [TRADUCTION] «N'allez pas au-delà de la peine; dans les limites de cette dernière, accordez à la partie toute l'indemnité qu'elle peut justifier». Évidemment, si une somme fixée est une clause valide de dommages-intérêts liquidés, le demandeur a droit, en *common law*, de recouvrer cette somme indépendamment de la perte effectivement subie.

Dans le contexte de cette discussion sur l'étendue des dommages-intérêts, il ressort qu'une somme fixée, due en cas d'inexécution, représente le montant maximum qu'on peut obtenir qu'il s'agisse d'une clause pénale ou d'une clause valide de dommages-intérêts liquidés.

Il faut souligner que les principes précités s'appliquent uniquement dans les cas où il n'y a qu'une seule somme fixée en cas d'inexécution du contrat, ou d'une seule violation. Lorsqu'il y a plusieurs violations et que le contrat stipule un montant

[23] (1807), 1 Camp. 78.

Case 2:14-cv-02069-DDC-KGS Document 144-2 Filed 07/10/14 Page 23 of 24

liquidated damages to be payable for each and every breach, there is no bar to awarding the liquidated damages amount for each breach which has occurred to date of trial, and also awarding an injunction to restrain future breaches. In *Imperial Tobacco v. Parslay*[24] the Court of Appeal held that an agreed sum payable on every breach of a covenant was a recoverable amount of liquidated damages for past breaches, even though an injunction had also been granted to prevent future breaches. In principle, this result is correct. There is no double recovery because the liquidated damages award and the injunction are referable to different breaches.

To summarize:

1. Where a fixed sum is stipulated as and for liquidated damages upon a breach, the covenantee must elect with respect to that breach between these liquidated damages and an injunction.
2. If he elects to take the liquidated damages stipulated he may recover that sum irrespective of his actual loss.
3. Where the stipulated sum is a penalty he may only recover such damages as he can prove, but the amount recoverable may not exceed the sum stipulated.
4. If he elects to take an injunction and not the liquidated sum stipulated, he may recover damages in equity for the actual loss sustained up to the date of the injunction or, if tardy, up to the date upon which he should have sought the injunction, but in either case, not exceeding the amount stipulated as payable upon a breach.
5. Where a liquidated damages sum is stipulated as payable for each and every breach, the covenantee may recover this sum in respect of distinct breaches which have occurred and he may also be granted an injunction to restrain future breaches.

Applying these propositions to the present case, in my view the plaintiff was entitled to an injunc-

[24] [1936] 2 All E. R. 515.

déterminé de dommages-intérêts liquidés pour chacune, rien ne s'oppose à ce qu'on accorde des dommages-intérêts liquidés pour chaque violation jusqu'à la date du procès ainsi qu'une injonction pour prévenir des violations futures. Dans l'arrêt *Imperial Tobacco v. Parslay*[24], la Cour d'appel a jugé qu'un montant fixé, dû à chaque violation d'un engagement, constituait un montant de dommages-intérêts liquidés recouvrable pour des violations passées, quoiqu'une injonction eût également été accordée pour prévenir des violations futures. En principe, ce résultat est approprié. Il n'y a pas double redressement, parce que le versement des dommages-intérêts liquidés et l'injonction se rapportent à des violations différentes.

En résumé:

1. Lorsqu'une somme déterminée est stipulée à titre de dommages-intérêts liquidés en cas de violation, le bénéficiaire doit choisir, à l'occasion de chaque violation, entre ces dommages-intérêts liquidés et une injonction.
2. S'il opte en faveur des dommages-intérêts liquidés convenus, il peut les obtenir indépendamment de la perte réelle qu'il a subie.
3. Quand la somme stipulée est une peine, il peut seulement recouvrer les dommages qu'il peut justifier, mais le montant attribué ne peut pas dépasser la somme stipulée.
4. S'il opte pour l'injonction et non pour le montant liquidé stipulé, il peut obtenir des dommages-intérêts en *equity* pour la perte effectivement subie jusqu'à la date de l'injonction ou, s'il est en retard, jusqu'à la date à laquelle il aurait dû demander l'injonction, mais, dans les deux cas, ces dommages-intérêts ne doivent pas excéder le montant stipulé en cas de violation.
5. Lorsqu'un montant de dommages-intérêts liquidés est stipulé pour chaque violation, le stipulant peut obtenir cette somme relativement à chacune et il peut également obtenir une injonction pour empêcher des violations futures.

Si j'applique ces principes en l'espèce, le demandeur a droit à une injonction et aux dommages-

[24] [1936] 2 All E.R. 515.

1978 CanLII (SCC)

tion and such damages as he could prove to date of trial but not to exceed the sum of $1,000.

I would accordingly dismiss the appeal and direct the payment of such damages, not to exceed $1,000, as the respondent can establish in respect of the period from June 1, 1973 to date of trial, for the loss of commission on all contracts of general insurance sold by Elsley during that period, after taking into account expenses incurred in securing and servicing the contracts.

Success has been divided. The respondent sustained the validity of the covenant; the appellant succeeded in limiting damages to the stipulated amount. I would not award costs to either party.

*Judgment accordingly.*

*Solicitors for the appellant: Weir & Faulds, Toronto.*

*Solicitors for the respondent: Fitzpatrick, O'Donnell & Poss, Toronto.*

intérêts qu'il peut justifier jusqu'à la date du procès, sans toutefois dépasser $1,000.

En conséquence, je suis d'avis de rejeter le pourvoi et d'ordonner le paiement des dommages-intérêts que l'intimée pourra établir, mais ne dépassant pas $1,000, pour la période du 1er juin 1973 à la date du procès, au titre des commissions perdues sur tous les contrats d'assurance générale conclus par Elsley au cours de cette période, compte tenu des frais afférents à l'obtention des contrats et aux démarches subséquentes.

Les deux parties ont partiellement gain de cause en l'espèce. L'intimée a fait reconnaître la validité de la clause; l'appelante a réussi à faire limiter les dommages-intérêts au montant stipulé. Je n'adjuge donc les dépens à aucune des parties.

*Jugement en conséquence.*

*Procureurs de l'appelante: Weir & Faulds, Toronto.*

*Procureurs de l'intimée: Fitzpatrick, O'Donnell & Poss, Toronto.*

1978 CanLII 7 (SCC)