

Page 1

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499



1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

R. v. Northern Electric Co.

Regina v. Northern Electric Company, Limited et al.

Ontario Supreme Court

McRuer C.J.H.C.

Judgment: March 25, 1955

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *J.D. Arnup*, Q.C., and *P.A.H. Hess*, for the Crown

*Hazen Hansard*, Q.C., for Northern Electric Company, Limited and Cables, Conduits and Fittings, Limited.

*J.J. Robinette*, Q.C., *W.S. Walton*, Q.C., and *J.W. Brooke*, for Canada Wire and Cable Company Limited

*G.A. Martin*, Q.C., and *E.P. Hartt*, for Filcrest Company Limited and Automatic Electric Sales Limited

*C.F.H. Carson*, Q.C., *H.K. Thompson*, Q.C., *J.G. Middleton*, Q.C., *Allan Findlay*, Q.C., and *J.B.S. Southey*, for Canadian General Electric Company Limited

*C.P. McTague*, Q.C., and *A. Dunbar*, Q.C., for Federal Wire and Cable Company Limited

*A.S. Pattillo*, Q.C., and *P.M. Harvie*, for Triangle Conduit & Cable (Canada) Limited

*T.H. Simpson*, Q.C., for Boston Insulated Wire & Cable Company Limited

*J.H.C. Clarry*, for Industrial Wire & Cable Limited

Subject: Intellectual Property; Criminal; Property; Evidence; Corporate and Commercial

Criminal Law --- General principles involving criminal law — Crime and criminal law — Relation between crimes and civil wrongs — Criminal and civil law distinguished

Criminal Law --- Conspiracy offences — Conspiracy — Evidence — Co-conspirators — Declarations of co-conspirators in furtherance of conspiracy

Criminal Law --- Conspiracy offences — Conspiracy in restraint of trade

Conspiracy — Agreement to Prevent or Lessen Competition unduly — Intent to be Established by Crown — Monopolist-



EXHIBIT
A-4

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

ic Tendency not Essential — Whether Bare Agreement to Fix Prices Sufficient under The Criminal Code, R.S.C. 1927, c. 36, s. 498(1)(d).

Conspiracy — Special Rules of Evidence — Acts and Declarations of Co-conspirators — Internal Memoranda Passing between Employees of Same Accused Corporation — Whether Evidence against Other Corporations Charged.

Conspiracy — Admissibility of Evidence — Documents Seized in Possession of Accused Corporations or Agents — The Combines Investigation Act, R.S.C. 1927, c. 26, s. 41, as enacted by 1949, c. 12, s. 3, and amended and renumbered by 1952, c. 39, s. 6 — Application to Prosecution under s. 498(1)(d) of The Criminal Code before 1952 re-enactment.

Judgments and Orders — Stare decisis — Whether Judge Bound by Decision of Judge of Co-ordinate Jurisdiction — Distinction between Civil and Criminal Proceedings — The Judicature Act, R.S.O. 1950, c. 190, s. 31.

Evidence — Public Documents — What Documents Admissible under Established Exception to Hearsay Rule — Reports of Dominion Bureau of Statistics — The Statistics Act, R.S.C. 1952, c. 257, ss. 3(a), 4(1), (2), 5, 6, 7, 13, 15, 21, 24, 34, 35.

Evidence --- Documentary evidence — Public documents — Government documents — General

Combines — Conspiracy under s. 498(1) (d) of The Criminal Code — Unduly preventing or lessening competition in cable and copper wire — Onus on Crown to prove its case beyond reasonable doubt — Inferences drawn from conduct of the parties to the conspiracy — Accused corporations entering into an agreement in violation of the statute — Accused convicted.

Ten corporations were charged with conspiring to unduly prevent or lessen competition in the sale and supply of copper electrical wire and cable in violation of s. 498(1) (d) of The Criminal Code. It was submitted that the Crown had to show an agreement not only to prevent and lessen competition but also that the object of the agreement was to gain a monopoly in the trade. The argument of the defence was that an agreement cannot be considered as "undue in fact" unless its purpose is monopolistic to the extent of excluding others from manufacturing the article. The Crown submitted that such an interpretation should not be put upon s. 498(1) (d) so as to limit the effect of the section. The argument of the Crown was that the Court must examine the nature and scope of the agreement and the agreement must be looked at in each case as a question of fact to ascertain whether the agreement, if carried into effect, would impose improper, inordinate, excessive or oppressive restrictions upon the free competition the public was entitled to under the law. The articles or commodities mentioned in the indictment covered a wide range of different types of copper electrical wire and cable. The agreement was not set out in any formal way and the evidence was largely circumstantial.

*Held*, the accused conspired, combined, agreed and arranged together and with one another to unduly prevent or lessen competition in the production, manufacture, sale or supply of copper electrical wire and cable as charged in the indictment and they were guilty of violating s. 498(1) (d) of The Criminal Code.

1. The public is entitled to the benefit of free competition except in so far as it may be interfered with by valid legislation and any party to an arrangement, the direct object of which is to impose improper, inordinate, excessive or oppressive restrictions upon that competition is guilty of an offence.

2. It is not necessary for the Crown to establish that the object of the agreement was to gain a monopoly in the trade. It must be proved that the accused entered into an agreement which was in fact a violation of the statute. In considering whether the agreement or conspiracy comes within the statute one does not judge the unlawfulness by what was done

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

pursuant to the agreement (although this may be evidence of the agreement) but one examines the nature and scope of the agreement, as proved, and decides whether that agreement, if carried into effect, would prejudice the public interest in free competition to a degree that, in fact, would be undue. Persons or corporations might well enter into an unlawful agreement which, by reason of enforced circumstances, they could not carry out: it would nevertheless be an indictable offence.

3. A conspiracy to unduly prevent or lessen competition in the sale or supply of articles or commodities is "undue" within the meaning of the statute, if, when carried into effect, it will prejudice the public interest in free competition to a degree that the tribunal of fact finds to be "undue" and an agreement to prevent or lessen competition to such an extent is an offence against s. 498(1) (*d*). *Weidman v. Shragge* (1912), 46 S.C.R. 1, 2 W.W.R. 330, 20 C.C.C. 117, 2 D.L.R. 734, 10 Can. Abr. 1155; *Stinson-Reeb Builders Supply Co. v. The King*, [1929] S.C.R. 276, 52 C.C.C. 66, [1929] 3 D.L.R. 331, 10 Can. Abr. 1161; *Container Materials Limited et al. v. The King*, [1942] S.C.R. 147, 77 C.C.C. 129, [1942] 1 D.L.R. 529, Abr. Con. 985, applied.

**Practice Note:**

"Prosecutions under s. 498(1) (*d*) of The Criminal Code". It should be noted that the new Criminal Code, 1953-54 (Can.), c. 51, is now in effect having come into force on the 1st April 1955. The following provision appears in the new Code: "750. Wherever, in the Combines Investigation Act, c. 314 of the Revised Statutes of Canada, 1952, the expression 'section 498 or 498A of the Criminal Code' or 'section 498 or 498A of the Criminal Code, chapter 36 of the Revised Statutes of Canada 1927', appears, the expression 'section 411 or 412 of the Criminal Code' shall be substituted therefor, and wherever in the said Act the expression 'section 498 of the Criminal Code' appears, there shall be substituted therefor the expression 'section 411 of The Criminal Code'." The prosecution in the instant case was under s. 498(1) (*d*) of the old Criminal Code. There are several important points of practice to be noted in this case, including, as it does, such matters as: 1. The application of the rule of *stare decisis* in criminal cases; 2. The admissibility of reports of the Bureau of Statistics and of public inquiries; 3. The evidentiary value of internal communications amongst its own officials of corporations charged under s. 498 of The Criminal Code; and 4. The distinction between acts done in pursuance of *a common design* and individual acts neither related to the common design nor in furtherance of it. A useful summary on prosecutions under s. 498 of the Criminal Code will be found in an annotation on "Combines" in Canadian Criminal Procedure Annotations (1949), pp. 163-170 and a review of the *Stinson-Reeb* case will be found on p. 177 of the same book. Under the law as laid down in the *Stinson-Reeb* and other cases the public is entitled to the benefit of free competition *except in so far as it may be interfered with by valid legislation*. This is the governing "principle" and any violation of this principle which may be "undue" within the meaning of s. 498 may result in a prosecution. It is no defence to say that the steps taken were necessary in order to stabilize the industry or to enable it to exist if in fact there is injury to the public by the hindering or suppressing of free competition.

Trial of a charge of conspiracy.

***McRuer C.J.H.C.*** **(orally):**

1        The ten accused corporations are charged that they did, between the 1st November 1936 and the 31st October 1952, "unlawfully conspire, combine, agree or arrange together and with one another to unduly prevent or lessen competition in the production, manufacture, purchase, barter, sale, transportation or supply in the City of Montreal and the Town of St. Johns in the Province of Quebec, and in the City of Toronto in the County of York, the City of Hamilton in the County of Wentworth, the City of Guelph in the County of Wellington, the Town of Brockville in the County of Leeds, all in the Province of Ontario, and elsewhere in Canada where the articles or commodities hereinafter mentioned are

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

offered for sale, of articles or commodities which may be a subject of trade or commerce, to wit, electrical wire and cable, including uninsulated conductors, weatherproof wire, rubber-insulated and braided wire, cambric-insulated and braided wire, thermo-plastic wire and cable, rubber-insulated leaded power cable, cambric-insulated leaded power cable, paper-insulated leaded power cable, rubber-insulated telephone wire, paper-insulated telephone cable, flexible cords, flexible-armoured cable, signal and control cable (non-leaded), non-metallic sheath cable, magnet wire, asbestos-insulated wire, cord assemblies and all other types of electrical wire and cable, and did thereby commit an indictable offence contrary to the provisions of The Criminal Code, Section 498, subsection 1(*d*)".

2      Mr. Arnup has confined the Crown's case to copper electrical wire and cable conductors of the type set out in the indictment.

3      As counsel have pointed out, I recognize that this is a criminal case and that the onus is on the Crown to prove beyond a reasonable doubt that the accused are guilty of the offence charged and I recognize the principles laid down in *Woolmington v. Director of Public Prosecutions*, [1935] A.C. 462, 25 Cr. App. R. 72.

4      It has also been pointed out that this is a case that depends upon circumstantial evidence and the proper inferences to be drawn from the evidence. I am likewise conscious of the law applicable to circumstantial evidence and that the circumstances must convince the tribunal of fact beyond a reasonable doubt that they are consistent with the guilt of the accused and that they are beyond a reasonable doubt inconsistent with any other rational conclusion.

5      A conspiracy at common law consists of an unlawful combination of two or more persons to do that which is contrary to law or to do that which is wrongful and harmful toward another person: *Quinn v. Leathem*, [1901] A.C. 495. In that case Lord Brampton, quoting Lord Mansfield in *Rex v. Eccles*, 1 Leach C.C. 274, 168 E.R. 240, said at p. 531: "... the offence does not consist in doing those acts, for they may be perfectly indifferent, but in conspiring with a view to effect the intended mischief by any means. The illegal combination is the *git* of the offence."

6      It is therefore unnecessary to consider whether it has been proved that the accused unduly prevented or lessened competition in the sale, etc., of copper electrical wire and cable; the question for me to decide is whether it has been proved beyond a reasonable doubt that they conspired to unduly prevent or lessen competition in these commodities, as charged.

7      A conspiracy may be proved by proof that the parties accused actually met together and entered into an alleged agreement or it may be inferred by proof of a course of conduct. In *Paradis v. The King*, [1934] S.C.R. 165 at 168, 61 C.C.C. 184, [1934] 2 D.L.R. 88, Rinfret J. (later C.J.C.) said:

> There was ample evidence for the jury to find that the telegrams had been actually exchanged between the parties. But the appellant sought to discount their evidentiary value on the ground — to quote the learned dissenting judge — that
>
>> The language of the telegrams conveys no hint of any concealed, sinister purpose; one has to read into them what is not there to give them any such import. And that is all the writing connected with the accused that there is of record. No one professes to have been present when the alleged plot was formed between Paradis and Pepin or to have overheard it or even to have seen them together in conference before the fire.
>
> We think the objection is untenable. Conspiracy, like all other crimes, may be established by inference from the conduct of the parties. No doubt the agreement between them is the gist of the offence, but only in very rare cases will it be possible to prove it by direct evidence. Ordinarily the evidence must proceed by steps. The actual agreement must

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

be gathered from 'several isolated doings', (Kenny — 'Outlines of Criminal Law', p. 294) having possibly little or no value taken by themselves, but the bearing of which one upon the other must be interpreted; and their cumulative effect, properly estimated in the light of all surrounding circumstances, may raise a presumption of concerted purpose entitling the jury to find the existence of the unlawful agreement.

8    This statement of the law has its foundation as far back as the judgment of Lord Mansfield in *Rex v. Parsons et al.* (1762), 1 Wm. Bl. 391, 96 E.R. 222.

9    The law applicable to this case has been comprehensively dealt with by my learned brother Spence in *Regina v. Howard Smith Paper Mills, Limited et al.*, [1954] O.R. 543, 109 C.C.C. 65, 19 C.R. 1, [1954] 4 D.L.R. 161, and anything I may say about it may be in some measure unnecessary and repetitive.

10    In considering the law in this case, as in all cases, the Court must be vigilant to distinguish language used in judgments which lays down principles, from language used in the application of the principles to the particular facts of the case. This has particular reference to some arguments presented on behalf of the defence, where it was contended that the accused could not be found guilty because of the absence of certain restrictive features that were present in other cases. The trilogy of decisions in the Supreme Court of Canada on the subject are: *Weidman et al. v. Shragge* (1912), 46 S.C.R. 1, 20 C.C.C. 117, 2 D.L.R. 734, 2 W.W.R. 330; *Stinson-Reeb Builders Supply Company et al. v. The King*, [1929] S.C.R. 276, 52 C.C.C. 66, [1929] 3 D.L.R. 331, and *Container Materials, Limited et al. v. The King*, [1942] S.C.R. 147, 77 C.C.C. 129, [1942] 1 D.L.R. 529, affirming 76 C.C.C. 18, [1941] 3 D.L.R. 145, which varied 74 C.C.C. 113, [1940] 4 D.L.R. 293. In the last case Duff C.J.C. states the purpose of the statute in these words at p. 152 (the italics are mine):

The enactment before us, I have no doubt, was passed for the protection of the specific public interest in free competition. That, in effect, I think, is the view expressed in *Weidman v. Shragge* in the judgments of the learned Chief Justice, of Mr. Justice Idington and Mr. Justice Anglin, as well as by myself. This protection is afforded by stamping with illegality agreements which, when carried into effect, prevent or lessen competition unduly and making such agreements punishable offences; *and, as the enactment is aimed at protecting the public interest in free competition, it is from that point of view that the question must be considered whether or not the prevention or lessening agreed upon will be undue*. Speaking broadly, the legislation is not aimed at protecting one party to the agreement against stipulations which may be oppresive and unfair as between him and the others; it is aimed at *protecting the public interest in free* competition. That is only another way of putting what was laid down in *Stinson-Reeb v. The King* which, it may be added, was intended to be in conformity with the decision in *Weidman v. Shragge*, as indicated in the passages quoted in the judgment.

*The lessening or prevention agreed upon will, in my opinion, be undue, within the meaning of the statute, if, when carried into effect, it will prejudice the public interest in free competition to a degree that the tribunal of fact finds to be undue, and an agreement to prevent or lessen competition to such an extent is, accordingly, an offence against sec.* 498(*d*).

11    This is a broad statement of the principles of law deduced from the decided cases which in the opinion of Duff C.J.C. are to be applied where an accused is charged with an offence under s. 498(1) (*d*). It was argued that the judgment of Duff C.J.C. was not the judgment of the Court and ought not to be followed. Whether this is true or not it is a statement of law by a great jurist who used words with care and precision and who was a member of the Court in both *Weidman et al. v. Shragge* and the *Stinson-Reeb* case.

12    Kerwin J., now C.J.C., wrote the majority judgment of the Court and dealt with many features of the agreement

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

there under consideration. I can find in his judgment no indication that he disagreed with the Chief Justice in his statement of the law. On the contrary, I think he agreed with it. At p. 159 he said (the italics are mine):

> Mr. Justice Mignault also quoted the following passage from the judgment of Mr. Justice Anglin (as he then was), at p. 42: —

>> The prime question certainly must be, does it (the agreement alleged to be obnoxious to section 498), however advantageous or even necessary for the protection of the business inter ests of the parties, impose improper, inordinate, excessive or oppressive restrictions *upon that competition the benefit of which is the right of every one?*

> Under the decision in the *Stinson-Reeb* case, *the public is entitled to the benefit of free competition except in so far as it may be interfered with by valid legislation, and any party to an arrangement, the direct object of which is to impose improper, inordinate, excessive or oppressive restrictions upon that competition, is guilty of an offence.* A comparison between section 498 of the Code and section 498A (which was enacted subsequent to the decision in the *Stinson-Reeb* case) indicates that there has not been any change in the rule. *Once an agreement is arrived at, whether anything be done to carry it out or not, the matter must be looked at in each case as a question of fact to be determined by the tribunal of fact upon a common sense view as to the direct object of the arrangement complained of.* The evidence in these cases of what was done is merely better evidence of that object that would exist where no act in furtherance of the common design had been committed. So viewing the matter, there can be no question that, not only was there some evidence upon which the trial judge could convict, but the evidence was overwhelming that all the appellants at one time or another conspired, combined, agreed or arranged to prevent or lessen competition ... and that they conspired to do so unduly.

13    Mr. Robinette stressed certain elements of competition which he stated were not excluded by the agreement. He argued that there was no agreement to restrict production, there was rivalry among the accused to sell as much of their products as they could sell, there was no allocation of business, and there were no restrictions on technological improvements in designs and techniques of existing products. However, he agreed that if an accused did develop a superior type of cable a fair conclusion from the evidence is that the price would be so controlled by the group that the public would get the technological improvement at the price that the group dictated and not at the price the individual company that produced the product dictated. I think this is a fair inference from the evidence. Mr. Robinette pointed out that there was no restriction on industrial "know-how" or quality. He argued that there was no agreement not to produce a different kind of conductor that would put all competitors off the market. I do not think that this argument goes to the root of the matter, nor do I think that the fact that a better or other article to serve the same purpose may be produced or invented is relevant to a consideration of free competition in the sale of an article now in production. Free competition is not considered in the abstract. It is related in the statute to articles or commodities in the sale of which there may be competition.

14    It is also pointed out that there was no agreement not to give engineering services. Some few sentences in Mr. White's evidence were stressed as indicating that the engineers of the Commission which he represented [the Toronto Hydro-Electric System] kept in touch with the engineers of the manufacturers as to developments. His words were: "We work along with the suppliers and the suppliers work along with us." No attempt was made to develop what Mr. White meant and there is no suggestion in the evidence that any of the accused competed with others in giving their customers real engineering services. What I think Mr. White referred to was little more than salesmanship.

15    It is argued that there was no restriction on stocking goods so that ready deliveries might be made. The evidence on this cuts both ways. It shows that there was objection to one company appointing an agent in Victoria on the ground

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

that all other companies supplied Vancouver Island from Vancouver. I use this only as an example. There is other evidence dealing with restriction or limitation of ready supplies in other parts of Canada. It is also emphasized by Mr. Robinette that there is no evidence of agreement to restrict the manufacturers from producing a better quality of goods, within the limits of the same specifications.

16      On the other hand, Mr. Hansard argued that, because the product was one to which safety standards of the Canadian Standards Association applied, there would naturally be uniformity. He said: "I think I am also entitled to make this proposition: That all of the products with which we are concerned here are completely utilitarian; that is to say, there is nothing in them which appeals to the eye or to the buyer except the utility to which the thing may be put." And referring to the Canadian Standards Association he said: "It is an independent body entirely, and they set these standards. The point I am trying to make is that where you are dealing with a utilitarian product it has to get a seal of approval before it can be sold, then the tendency obviously must be to build to that standard, and there is no inducement to the manufacturer to go beyond the standard because all the man who is buying it wants is something which meets the job, as specified by the Canadian Standards Association. On the other hand, there is no desire on the part of the buyer to get something more than that. In other words, while my friend may say it is a minimum standard, it is a safety standard. I would sooner use that expression. The tendency and the result of that in my submission is that you get, over the great mass of these products, uniformity of product. In other words, whether a piece of BX cable is made by Mr. Wagman's concern, industrial, or whether it is made by Northern Electric, or whether it is made by Cables, Conduits & Fittings, no matter who makes it so far as the purchasing public is concerned what they are interested in is seeing that it has the C.S.A. standard label on it and that it meets that requirement. That is all they are interested in. That has a very important effect on the whole atmosphere of this industry. They are dealing continuously with articles of trade and commerce, it is true, but with articles that are built to that kind of standard and which tend to be uniform no matter who makes them. Now I go the further step and say that therefore it is not surprising to find the price of standard articles made in that way the same."

17      There is nothing in the evidence to indicate that there was any competition as to quality. In fact, the specifications adopted were designed in detail to restrain this. There is evidence that there was no agreement on uniformity of dates of delivery. This is a feature that I take into consideration. Mr. Robinette emphasized that it was open to one manufacturer to manufacture a wider range of products than another and by so doing to give discounts on products not covered by the agreement. I also take this into consideration.

18      It is also pointed out that some companies could compete with others by making more generous financial arrangements than their competitors could make. The discounts and terms of payment were defined and fixed but there was nothing to prevent the extension of credit. This power may well emphasize the hardship of an agreement on price. If Company "A" can extend better credit terms than Company "B", Company "B" has had taken from it the most effective means of competing if it cannot appeal to the purchaser on a better price-basis.

19      It was argued that not only must the Crown show an agreement to prevent or lessen competition, etc., but before it can be considered to be an agreement to unduly prevent or lessen competition it must be shown that the object of the agreement was to gain a monopoly in the trade. Mr. Robinette put it this way: "... that the agreement cannot be considered as undue in fact unless its purpose or object is monopolistic; or, to put it in other words, unless the purpose or object of the agreement is to exclude others from manufacturing wire cable. In other words, if other persons or companies are free to come into the manufacturing of wire cable, and nothing is being done to keep others out, the agreement cannot be considered as one which is undue in its effect because its object or purpose is not monopolistic." He relies on passages in the judgments in the *Container Materials* case where the monopolistic features of the agreement were emphasized. I can find in no case warrant for Mr. Robinette's contention as he put it. An agreement to gain a monopoly in the trade of any commodity is an agreement to extinguish competition in it and it could hardly be argued that such an agreement did

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

not come within the ban of the statute. If Parliament and the Supreme Court of Canada considered that the section was to be construed with such a limitation it would have been very simple to have said so. I do not think the Courts have ever attempted to limit the effect of the section as contended by Mr. Robinette. The Court examines the nature and scope of the agreement as proved, and the agreement must be looked at, as Kerwin J. said in that case, "in each case as a question of fact to be determined by the tribunal of fact upon a common sense view as to the direct object of the arrangement complained of", in the light of all the circumstances revealed in the evidence. It is considered, as I have said, not in the abstract but as related to the commodities in question. If in those circumstances the Court is convinced beyond a reasonable doubt that the accused agreed to do that which would, if carried into effect as agreed, impose improper, inordinate, excessive or oppressive restrictions upon the free competition, the benefit of which Parliament has sought to preserve to the public, the accused should be found guilty.

20      I may interpose that "inordinate, excessive or oppressive" are words used to define "undue" in the New Oxford Dictionary.

21      It is argued that proof of the agreement to lessen competition by fixing common prices is not sufficient to bring it within the section and reliance is placed upon a statement of my learned brother Spence in the *Howard Smith Paper Mills, Limited* case, where he says at p. 572: "It has been said that an agreement to fix prices is in itself a violation of s. 498(1) (*d*) ..." He refers to *Rex v. Clarke* (1908), 1 Alta. L.R. 358, 14 C.C.C. 57; *Rex v. Canadian Import Co. et al.* (1933), 61 C.C.C. 114, affirmed 62 C.C.C. 342, [1935] 3 D.L.R. 330, and *Rex v. McGavin Bakeries Limited et al.* (*No. 6*) (1951), 3 W.W.R. (N.S.) 289, 101 C.C.C. 22, 13 C.R. 63, [1952] 1 D.L.R. 201, and goes on to say: "But in fact in each of these cases the fixation of prices had been accompanied by lessening of competition in many other ways and I believe that the statements quoted must be read in the light of that circumstance. It is, in fact, difficult to understand why Parliament should have found it necessary to enact in s. 498(1) (*c*) that it was an offence to enhance prices unduly if in s. 498(1) (*d*) it had made it an offence merely to fix prices, without more. I am of the opinion that the dicta quoted do not give enough scope and meaning to the word 'unduly' and that before the Court may find that a breach of s. 498(1) (*d*) has been committed the Court must find more than a *bare* agreement to fix prices." This statement is *obiter dictum*.

22      If my brother Spence meant that in no circumstances could an agreement to fix a common price for a common article be an offence under s. 498(1) (*d*) I respectfully disagree with him. From the language he used it was argued by Mr. Hansard that one cannot take into account an agreement on price in considering whether there has been an agreement which violates s. 498(1) (*d*), since s. 498(1) (*c*) makes it an offence to agree to unreasonably enhance the price of articles or commodities. I first point out that the words used in clause *c* with respect to price are "unreasonably enhance" while the words used with reference to manufacture are "unduly prevent, limit or lessen" and the *obiter dictum* of my learned brother Spence deals with clause *c* as if the word "unduly" modified "enhance". With great respect I do not think one can relate the construction of clause *d* to clause *c*. The consideration of an agreement to unreasonably enhance the price of a commodity may lead one into a wide field of economics with boundless limitations. I think it is quite clear that an agreement to unduly prevent or lessen manufacture or production of an article, which might be an offence under clause *c*, may be taken into consideration in considering whether there has been an agreement to unduly prevent or lessen *competition* in production, coming within clause *d*. In fact, as I have pointed out, counsel have argued that I should not find the accused guilty because an agreement to lessen production has not been shown, notwithstanding that this is a subject-matter dealt with under clause *c*. I do not think that effect should be given to Mr. Hansard's argument that an agreement to fix a common price cannot be taken into consideration in deciding whether an offence has been committed against clause *d*. An agreement to unreasonably enhance the price of an article is one thing, and an agreement to fix a common price which unduly prevents or limits that free competition to which Duff C.J.C. and Kerwin J. refer in the *Container Materials* case is quite another thing. There might well be an agreement to enhance prices to an unreasonable degree without agreeing to limit competition in price, by simply agreeing to limit the supply of raw material. After all, in essence, the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

object of most restrictive trade agreements is to maintain a common price for the same article by those who are in a position to compete with one another and the means adopted is only procedural.

23      In this view I am supported by the judgment of Robertson C.J.O. in the *Container Materials* case in 76 C.C.C. 18 at 46, [1941] 3 D.L.R. 145 at 170, where he said:

> There remains under the fourth count the question of conspiracy to unreasonably enhance prices. There is an abundance of evidence, in my opinion, of a conspiracy to control prices and to fix them throughout Canada, and to unduly prevent and lessen competition in that respect. The evidence establishes that Container Materials Ltd. was given a large measure of control over prices, and that it exercised such control over a period of years, and that competition in prices ceased to exist. I doubt whether the direct evidence on the fixing of prices goes any further than that. There is evidence, no doubt, of the prices that were fixed, but there is no direct evidence, so far as I am aware, that any of the prices were unreasonably high. In that connection it is important to note that here the word 'unreasonably' is used and not 'unduly' before the word 'enhance'. The result may be that it is necessary to consider the reasonable necessities of the producer as well as the interest of the customer or consumer, in determining whether prices are enhanced in a way that is forbidden. See *Weidman v. Shragge*, 2 D.L.R. at p. 760, 20 C.C.C. at pp. 151-2.

> Doubtless there is grave danger that the prices demanded for goods will be unreasonably enhanced if the manufacturers of the goods have the control of prices in their own hands. There may be much truth in Edmund Burke's epigram, 'There never was a man who thought he had no law but his own will who did not soon discover that he had no end but his own profit.' That danger, however, is one that arises from preventing or lessening competition, against which cl. (*d*) of s. 498 is designed to provide. It is not enough to support a charge under cl. (*c*) to show that unreasonable enhancing of prices was made possible. It must be shown that it was designed.

24      Mr. Robinette argued that one considered the matter of competition as a circle and the inquiry must be directed to determine what segment of the circle was occupied by price competition. I think there is much force in Mr. Arnup's argument that such an approach involves a degree of economic speculation and psychological inquiry that is not contemplated by the statute. To put on the Crown the proof of what influences buyers to buy is a burden that has not yet been imposed by jurisprudence.

25      The agreement must be looked at in all its aspects and consideration may be given to the character of the article which is the subject of the agreement and the evidence may indicate, as it does here, that price looms as a very large element in the restriction affecting the "specific public interest in free competition" or the "benefit of free competition". It may well be that in commodities of certain types price-competition is the only real competition that is in any way beneficial to the public, while in commodities of other types the competitive price may be a minor factor. It is one thing to agree on a common price for women's dresses or hats sold according to size, texture and quality of material, where style has an infinite appeal, and another thing to agree on the price of copper wire sold by the ton according to standard specifications.

26      Robertson C.J.O. emphasized this in the *Container Materials* case at p. 43 (76 C.C.C.) where he said: "Competition from which everything that makes for success is eliminated except salesmanship is not the free competition that s. 498 is mainly designed to protect." And, with respect, I think the learned Chief Justice was there referring to the facts shown in the *Container Materials* case, but he goes on to say: "It brings to the customer no opportunity to buy at a lower price or on better terms, or to buy better or more attractive goods for the same money, and this is one of the principal benefits to be had from free competition."

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

27      However, for reasons that I shall state, the agreement proved in this case went far beyond a *bare* agreement to fix common prices for the commodities which were sold according to specifications, including gauge and weight.

28      That brings me to the law dealing with proof of the conspiracy. It is argued with much force that s. 41 of The Combines Investigation Act, R.S.C. 1927, c. 26, as it was amended and consolidated by 1952, c. 39, s. 6, cannot be resorted to by the Crown to make documents filed admissible in evidence which would not be evidence in the case at common law. It is argued that the fact that the Act of 1952 repealed the former s. 498 of The Criminal Code and re-enacted it with what was no more than a grammatical correction of the wording in the old section had the effect of limiting the application of s. 41 to offences committed since the date of the repeal and re-enactment of s. 498 correcting the grammatical error. Section 41 had previously been s. 39A, enacted by s. 3 of 1949, 2nd sess., c. 12, which revised and consolidated The Combines Investigation Act, and applied to s. 498 before the amendment. It is argued that the amendment of 1952 has destroyed all application of it to a charge laid under the former section.

29      In the *Howard Smith Paper Mills* case my learned brother Spence considered all the arguments that were submitted to me and decided that s. 41 of The Combines Investigation Act was applicable to a charge laid under s. 498 of The Criminal Code as it was prior to 1952. It is argued that I am not bound by this decision as it is a decision of a judge of co-ordinate jurisdiction. Mr. Robinette contends that there is a slightly different rule between civil and criminal cases with respect to the application of the rule of *stare decisis*.

30      From 1895 to 1931 there was a section in The Judicature Act, the last revision of which appeared in R.S.O. 1927, c. 88, s. 31(2), which provided: "It shall not be competent for any Judge of the High Court Division in any case before him to disregard or depart from a prior known decision of any other judge of co-ordinate authority on any question of law or practice without his concurrence." Subsection 3 of the same section provided: "If a judge deems a decision previously given to be wrong and of sufficient importance to be considered in a higher court, he may refer the case before him to a Divisional Court." In 1931 subs. 2 was dropped. This left the matter to be governed by the common law, and while the rule may be more flexible in criminal cases than it is in civil cases, the principles of common law would appear to be essentially similar in both civil and criminal cases.

31      In 19 Halsbury, 2nd ed. 1935, pp. 256-7, it is stated: "There is no statute or common law rule by which one Court is bound to abide by the decision of another Court of co-ordinate jurisdiction; a Court of law does so on the ground of judicial comity. It is on the ground of judicial comity that an appellate Court consisting of more than one judge bows to its own decisions; for the same reason, although the *ratio decidendi* of a decision by a judge of first instance is not absolutely binding upon another judge of first instance of co-ordinate jurisdiction, it is the practice in the Courts of the King's Bench Division for a judge to follow the decision of another judge of that division on a question of law without saying what his own view would have been in the matter, leaving it to the Court of Appeal to say whether or not that decision was wrong, and when a judge of first instance, after consideration, has come to a definite decision on the construction of a complicated and difficult enactment, a second judge of first instance of co-ordinate jurisdiction should follow that decision; on the other hand, on the matter of the construction of a will a judge of first instance should not regard himself as bound by the decision of another judge of first instance, and practice notes, being directions given without argument, have very little judicial force."

32      In *Gelmini v. Moriggia et al.*, [1913] 2 K.B. 549 at 552, Channell J. used this language: "Although that decision was one at nisi prius, and therefore *probably* not binding on me, I think it was right."

33      There appears to be a distinction made between decisions at *nisi prius* and decisions of judges sitting at the Royal Courts of Justice, or, formerly, at Westminster Hall. In *Gelmini v. Moriggia et al.* the decision referred to was by "Mr.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955]
O.W.N. 499

Commissioner Wills" and the language may have its foundation in the fact that in England commissions may be issued to
others than judges to sit at *nisi prius*.

34    In *Forster v. Baker*, [1910] 2 K.B. 636 at 638 Bray J. said: "I have always understood that one judge is not bound
by the decision of another judge on a point of law at nisi prius and, therefore, I think I am bound to consider the case and
to decide it according to my own opinion, at the same time, of course, giving great weight to the decision of Darling J."

35    In *The Vera Cruz (No. 2)* (1884), 9 P.D. 96 at 98, Brett M.R. said: "This raises the question whether any Court is
bound by a decision of its own, which decision was grounded on the fact that the members of the Court present were
equally divided. It was the custom for each of the Courts in Westminster Hall to hold itself bound by a previous decision
of itself or of a Court of co-ordinate jurisdiction. But there is no statute or common law rule by which one Court is bound
to abide by the decision of another of equal rank, it does so simply from what may be called the comity among judges. In
the same way there is no common law or statutory rule to oblige a Court to bow to its own decisions, it does so again on
the grounds of judicial comity."

36    See also *Young v. Bristol Aeroplane Company, Limited*, [1944] K.B. 718, [1944] 2 All E.R. 293; *Sweney v. The
Department of Highways*, [1933] O.W.N. 783.

37    In *Hill et al. v. Aldershot Corporation*, [1933] 1 K.B. 259 at 263, Scrutton L.J. said: "If I had a free hand to con-
strue the statutes without reference to the decisions I should probably have arrived at a different conclusion from that
which I have with some difficulty reached. Such a decision would no doubt be welcomed by various non-judicial writers
who have protested against too careful adherence to the principle known as stare decisis, following decisions of co-
ordinate and superior courts, though you do not agree with them. But, in my view, liberty to decide each case as you
think right without any regard to principles laid down in previous similar cases would only result in a completely uncer-
tain law in which no citizen would know his rights or liabilities until he knew before what judge his case would come
and could guess what view that judge would take on a consideration of the matter without any regard to previous de-
cisions."

38    But criminal cases must be dealt with on a different basis. The Judicature Act does not apply to them and even if
it did s. 31 would be impractical. A decision on a point of law in a criminal case must be decided between the com-
mencement and the conclusion of the trial and the matter cannot be referred to the Court of Appeal. In *Regina v. Ham-
mond* (1898), 29 O.R. 211 at 224, 1 C.C.C. 373, Robertson J. indicated that the law was different between civil and crim-
inal cases.

39    Mr. Robinette referred to the useful judgment in *Read et al. v. The Bishop of Lincoln*, [1892] A.C. 644, particu-
larly at p. 655, and a more recent judgment in *Rex v. Taylor*, [1950] 2 K.B. 368, [1950] 2 All E.R. 170, 34 Cr. App. R.
138, where Lord Goddard C.J. said at p. 371:

I desire to say a word about the re-consideration of a case by this court. The Court of Appeal in civil matters usually
considers itself bound by its own decisions or by decisions of a court of co-ordinate jurisdiction. For instance, it con-
siders itself bound by its own decisions and by those of the Exchequer Chamber, and, as is well known, the House of
Lords also always considers itself bound by its own decisions. In civil matters this is essential in order to preserve
the rule of stare decisis.

This court, however, has to deal with questions involving the liberty of the subject and if it finds, on re-
consideration, that in the opinion of a full court assembled for that purpose, the law has been either misapplied or

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

misunderstood in a decision which it has previously given, and that, on the strength of that decision an accused person has been sentenced and imprisoned it is the bounden duty of the court to reconsider the earlier decision with a view to seeing whether that person has been properly convicted. The exceptions which apply in civil cases ought not to be the only ones applied in such a case ...

40      In *Rex v. Eakins*, [1943] O.R. 199, 79 C.C.C. 256, [1943] 2 D.L.R. 543, the Court of Appeal refused to follow a prior decision, but it was on the ground that it did not appear that a section of The Criminal Code had been brought to the attention of the Court in the earlier case. I think there is a clear distinction between a judge of first instance and the judges of a Court of Appeal with respect to prior decisions. It is of great importance that there should be a stability in the administration of the law, both civil and criminal, and that the uncertainty of criminal trials should not be increased by a diversity of views among trial judges as to what the law is. If one man is condemned because one judge has one view of the law and the next man is set at liberty because another judge differs from his brother judge as to the law, the administration of the criminal law will tend to become chaotic and the criminal law, which should be certain, will lose much of its certainty. The wide rights of appeal that exist in all civil and criminal cases are ample to protect the liberty of the subject in case a prior decision should be wrong.

41      Having regard to all the rights of appeal that now exist in Ontario, I think Hogg J. stated the right common law principle to be applied in his judgment in *Rex ex rel. McWilliam v. Morris*, [1942] O.W.N. 447 at 448-9, where he said: "The doctrine of *stare decisis* is one long recognized as a principle of our law. Sir Frederick Pollock says, in his First Book of Jurisprudence, 6th ed., p. 321: 'The decisions of an ordinary superior court are binding on all courts of inferior rank within the same jurisdiction, and, though not absolutely binding on courts of coordinate authority nor on that court itself, will be followed in the absence of strong reason to the contrary ...'"

42      I think that "strong reason to the contrary" does not mean a strong argumentative reason appealing to the particular judge, but something that may indicate that the prior decision was given without consideration of a statute or some authority that ought to have been followed. I do not think "strong reason to the contrary" is to be construed according to the flexibility of the mind of the particular judge. If a Judge of the High Court, sitting in a civil case, is of the opinion that a prior decision in law of a judge of co-ordinate jurisdiction is not right, he ought to refer the matter to the Court of Appeal under the power given in The Judicature Act rather than permit a multiplicity of views of the law to develop as envisaged by Scrutton L.J. In a criminal case he is permitted greater latitude, and if after giving great weight to the decision of a brother judge he still feels that on full consideration of the relevant authorities he is fully convinced that the former decision is wrong, he should follow his own opinion.

43      I have discussed this matter at some length as it vitally affects the administration of justice and it was argued with admirable clarity and frankness by Mr. Robinette, who brought to my attention all the most useful of the relevant authorities. However, I have come to the conclusion that my learned brother Spence was right in his decision as to the application of s. 41 of The Combines Investigation Act to the case before him and I think it applies to the case before me. The reasons of my brother Spence are both forceful and convincing.

44      Notwithstanding all that, I have decided to deal with this case as if s. 41 did not apply and the verdict must depend upon the application of the common law.

45      The accused are all corporations which must necessarily act through employees or agents. By reason of the admissions of fact, made on behalf of the accused, I am relieved of considering any question of the authority of those who purported to act on behalf of the corporations with respect to the agreement in question, such as arose in *Rex v. Ash-Temple Company Limited et al.*, [1949] O.R. 315, 93 C.C.C. 267, 8 C.R. 66.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

46    In the application of the common law one must be careful to distinguish acts done or declarations made in pursuance of a common design from acts which are not related to the common design and declarations which are mere narrative or statements made with reference to the common design but not in furtherance of it. Such declarations are evidence against the accused making the statement to show its participation in the conspiracy but are not evidence against the co-conspirators: *Regina v. Blake and Tye* (1844), 6 Q.B. 126, 115 E.R. 49 — while acts done or declarations made in furtherance of the common design are evidence against all implicated in the conspiracy: *Regina v. Connolly and McGreevy* (1894), 25 O.R. 151, 1 C.C.C. 468; *Rex v. Lebreque et al.*, [1941] O.R. 10, 75 C.C.C. 117.

47    In this case I have some difficulty with the internal acts of a corporation and statements made by one employee of the corporation to another in order that corporate effect might be given to the conspiracy, as distinct from external acts of the employees to further the common design. My inclination is to the view that a communication from an employee of an accused corporation to another employee of the same corporation for the purpose of enabling the corporation to act on the common design is not evidence against other corporations charged unless the individuals doing those acts are charged as and shown to be co-conspirators. I think it would be an extension of the application of the common law rule applicable to evidence in conspiracy cases to hold corporations charged as co-conspirators responsible for the language used by one employee of a corporation in communication with another employee of the same corporation with respect to the common design. It may well be evidence that the corporation adopted the conspiracy but on the evidence before me I am not prepared to hold that internal communications within any particular corporation are evidence against the alleged co-conspirators and I consider the case on that basis.

48    Counsel have made admissions of fact which have contributed much to the administration of justice in this case. Not only have they tended to reduce to a minimum the confusion of detail but the length of the trial has been reduced to a minimum. I complimented all counsel at the close of the trial and I do so now more formally. I say with respect that this case has been conducted by counsel for the Crown and for the defence in the most admirable manner. The admissions made have greatly eliminated tedious days of formal proof and in no sense should they be taken as admissions of any impropriety being attached to that which has been admitted. They are admissions of fact only.

49    I do not propose to deal in comprehensive detail with the evidence. It has been discussed at great length in the argument and I have had the benefit of a transcript of the evidence and the argument. I shall discuss in some detail the system that was established and followed over a long period of years.

50    The indictment covers the period from 1936 to 1952. It is not argued that the evidence does not establish that over this period there was in effect an agreement to lessen competition in the sale of copper electrical wire and cable as described in the indictment. The basic framework of the agreement was evidently in effect in 1936 and continued to be in effect in 1952. Counsel for the Crown did not rely on or adduce much evidence of the operation of the agreement during the effective period of price-controls set up during the war.

51    The articles or commodities mentioned in the indictment covered a very wide range of different types of copper electrical wire and cable. The Northern Electric company and Phillips Electrical Works Limited (now known as Filcrest Company Limited) are the only producers in Canada of telephone wire, while Canada Wire & Cable Company Limited, Northern Electric Company, Limited, Canadian General Electric Company Limited, Cables, Conduits and Fittings Limited, and Phillips Electrical Works Limited are the only producers of copper power cable in Canada. Of the ten companies charged, nine are engaged in manufacturing and Automatic Electric Sales (Canada) Limited (formerly Automatic Electric (Canada) Limited) has been for many years a selling-agent for Phillips Electrical Works Limited (now Filcrest Company Limited).

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

52      Exhibit 6068 shows the dollar-value of the electrical wire and cable products produced by the nine accused manufacturing corporations from 1937 to 1952 inclusive. In 1937 the total production was $14,205,053, including aluminum wire. In 1952 it was $104,903,081, exclusive of aluminum wire.

53      The agreement arrived at was not set out in any formal way. In fact, great care was taken to conceal all evidence of any agreement. The evidence amply justifies the restrained statement of Crown counsel that there were studied efforts at concealment of what was going on, but I say now that the accused are not to be found guilty by reason of their efforts to conceal and camouflage their activities with reference to the agreement. That, in my view, must be excluded when considering whether the agreement has been shown by the evidence to be unlawful. It may well be that the accused intended to enter into an unlawful agreement and were advised that the agreement was unlawful, and hence took steps to conceal their activities, but all that is irrelevant in deciding whether an unlawful agreement has been proved.

54      An intention to agree must be proved but that alone is not sufficient. It must be proved that the accused entered into an agreement which was in fact a violation of the statute. The question whether a state of *mens rea* was required, in the sense that there must be proof of an intention that the agreement should unduly prevent or lessen competition, was fully argued in the *Container Materials* case and set at rest by the judgment of the Supreme Court of Canada. No such onus rests on the Crown. Although it is admitted that the Crown has proved an agreement to prevent or lessen competition in the sale of the articles named in the indictment, it is argued with great force that it has not been proved that the agreement is one which, if carried into effect, would unduly prevent or lessen competition.

55      In considering whether the agreement or conspiracy comes within the statute, one does not judge the unlawfulness by what was done pursuant to the agreement (although this may be evidence of the agreement) but, as I have said, one examines the nature and scope of the agreement as proved and decides whether that agreement, if carried into effect, would prejudice the public interest in free competition to a degree that in fact would be undue. To paraphrase what was said by Duff C.J.C. in the *Container Materials* case, and to adapt the language of Kerwin J., one examines the agreement arrived at, no matter whether anything was done under it or not, and determines as a question of fact upon a common sense view the direct object of the arrangement complained of and determines whether that object, if put into effect, would result in an undue prevention or lessening of competition. Persons or corporations might well enter into an unlawful agreement which by reason of enforced circumstances they could not carry out; it would nevertheless be an indictable offence.

56      I now proceed to deal with the agreement proved and the system and method of operation. Notwithstanding that there was no formal type of association, the evidence demonstrates quite clearly that each one of the accused expected the others to adhere rigidly to the agreement with respect to all matters decided, and they all agreed that they would do so. The method of secrecy followed was designed to leave as little written record as possible. The late Mr. MacPherson of the Northern Electric company for many years acted as a sort of director or coordinator of the alleged conspiracy and in later years Mr. Gass of the Canada Wire and Cable company performed similar duties. The method of communication was principally by what can be most appropriately referred to as "circulating memoranda". A particular form of memorandum and code of letters were adopted and used. The code letter was usually the first letter of the surname of the person in the particular corporation whose duty it was to act for the corporation with respect to the matter. The memoranda were on plain onion-skin paper with no letterhead, signed by an initial which was a code letter adopted to designate the person in the company having authority to act for the company in the matter. The method of designating those to whom the memorandum was directed was to put the initials of the addressees in the lower left-hand corner in the manner that the initials of one who has dictated a letter, and the secretary who has transcribed it, are placed on letters in ordinary commercial practice. The initials were sometimes divided by an oblique stroke or a colon. The memorandum was then placed in a plain envelope, stamped with postage-stamps and with the Northern Electric company they were not put through the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

letter-meter. In all cases they were marked "Personal" and addressed to each of the persons whose code letter appeared in the lower left-hand corner. For example, copies of a memorandum signed by "M" (for MacPherson) with the initials TGL/SAL in the lower left-hand corner would be put in plain envelopes and mailed to Mr. Timmons of the Phillips company, Mr. Gass of the Canada Wire and Cable Company, Mr. Leary of the Canadian General Electric Company, Mr. Smith of Federal Wire and Cable Company, Mr. Arnold of Boston Insulated Wire and Cable Company, and Mr. Lindsay of Automatic Electric Sales Company. Likewise, replies to such a memorandum were circulated in a similar manner, as, for example, a reply from Mr. Timmons to the memorandum I have used as an illustration would be on plain onion-skin paper signed "T", and designated in the lower left-hand corner MGL/SAL and addressed in plain envelopes marked "Personal" to the others whose code letters appeared on the memorandum, and it would refer to "M's memorandum". After the commencement of the investigation under The Combines Investigation Act in 1950, the initials in the lower left-hand corner were dropped. The circulation of memoranda in this way conveyed information to all members of the group and was used not only to fix common prices but to arrive at other agreements affecting the sale of the commodities mentioned in the indictment. It was also used to police the agreements arrived at and to arrange for and call meetings. Meetings were held from time to time and many matters affecting competition were dealt with at these meetings. No minutes were kept but each representative attending apparently made his own memorandum of the decisions arrived at. Mr. Gass's evidence in regard to these meetings is as follows:

Q. Mr. Gass, with regard to these meetings that were held, were any minutes kept? A. Perhaps I should say, my Lord — I stated that Mr. MacPherson had been chairman and I had been chairman but generally speaking I would say they were so informal there wasn't any chairman most of the time. To my knowledge there were no minutes kept. I have kept some notes for my own information.

Q. You were meeting for a purpose, were you not? A. We were all good friends.

Q. I realize that, but the correspondence would indicate it was not a purely friendly get-together. You would agree with that? A. Quite.

Q. You did decide things? A. Certain decisions would be arrived at, yes. No minutes were made of that. I presumed everybody made their own notation that a decision had been reached.

Q. Was there any reason why you did not keep minutes? A. As I say, they were not formal meetings.

Q. Whether they were formal or informal, they were called for a purpose. A. No official record was made.

Q. They were called for the purpose of reaching decisions. That is fair? A. That is fair. I believe there is a letter in evidence to the effect that on an occasion when one member was not there, one of the other members took it on himself to advise the other member what had been decided on. I would not call that an official minute. To my knowledge there were no official minutes ever kept.

Q. It seems rather strange to call meetings for a particular purpose, have an agenda, and have no minutes. A. It is finished and done with and thrown away.

Q. You intended what was done at the meeting to be effective, did you not? A. Yes, and tried to do it. To my knowledge I have not seen a minute of any meeting that I ever attended.

57      Up until January 1950 the prices arrived at were determined by the group as a whole. Following a meeting held at that time "the pricing set-up" was "taken care of" in the following manner:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

```
AC and ACL            --  Canadian Triangle.
Rubber Covered Wire
Type 'T' Wire
Flexible Cords        --  Northern Electric.
etc.
Paper Power Cable
Weatherproof Wire     --  Phillips Electrical
Annunciator Wire          Works.


All magnet Wire
Bare Wire             --  Canada Wire and Cable
Automotive Replace-       Company.
ment Cable
Varnished Cambric,
Asbestos and Lead-    --  Canadian General
covered Wire              Electric Company.
Cord Sets             --  Federal Wire and
                          Cable Company.
```

58      The fixed prices were contained in loose-leaf price-books which were the price-books of the respective compan-ies. When prices were changed a mimeographed price-sheet was circulated for insertion in the price-book stating the reason for the change. I think it unnecessary to go into the method of arriving at common prices. Some commodities were priced on a tonnage-basis, some on a footage-basis. The gauge and covering were always taken into consideration and even the stranding and colouring of the covering were the subject of agreement, but there is not much evidence with re-spect to the last and I give it no consideration.

59      In order that there should be no concessions on carrying-charges, Canada was divided into zones and the accused were provided with mimeographed alphabetical lists of towns and cities, perforated for insertion in the price-books, so that laid-down prices would be equally adjusted according to freight or water carriage-rates.

60      The price-books of those manufacturing power cable did not show identical prices throughout the whole period but they had price-adjustment sheets on articles of power cable. These sheets provided for different percentages to be ad-ded to the list-price, and when these percentages were applied the prices were identical. The scale was:

```
Northern Electric             nil
Canada Wire and Cable         25%
Cables, Conduits and Fittings 40%
Phillips                      50%
Canadian General Electric     60%
```

61      This system was followed until about 1948. The effective operation of it is demonstrated by ex. 6056. There is no doubt that this system was adopted to camouflage the agreement on identical prices.

62      In order that there should be no opportunity for price concessions on containers, the agreement extended to allow-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

ances for spools and lags used for shipping wire.

63     It was argued by defence counsel that the agreement went no further than fixing a bare common price, as referred to by my brother Spence. But the agreement went further than the fixing of a common price for like articles or commodities. The accused agreed on those persons or firms who would be recognized as jobbers or wholesalers and entitled to get jobbers' discounts, and the discounts were rigidly fixed by agreement. It is argued that the fixing of a common jobbers' discount is nothing more than the bare fixing of a common price as referred to by my brother Spence. I do not think my brother Spence intended to include in his reference to "a bare agreement to fix prices" an agreement that went further and fixed common jobbers' discounts and those jobbers that would be permitted to act as jobbers of a particular commodity. Such an agreement eliminates the benefits of quantity buying. But the agreement I have to consider goes further than an agreement to fix a common jobbers' discount; it was agreed that the individual accused could not recognize a wholesaler or jobber as such and give him the benefit of jobbers' discounts without the approval of all other members of the group. The real effect of this agreement was that the accused set themselves up as a private licensing body preventing anyone from doing business as a jobber or wholesaler of the articles mentioned in the indictment produced by the accused without being licensed by the whole group. The evidence shows that firms were acceptable to certain members of the group as jobbers or wholesalers and if left to themselves they would have been glad to have given them jobbers' discounts and recognized them as wholesalers, but that right was denied because of the disapproval of others within the group.

64     The accused agreed among themselves that they would not appoint agents for their respective companies in particular territories without the consent or approval of the members of the group. The agreement covered discounts to manufacturers who used products of the group in manufacturing (*e.g.*, manufacturing electric ranges or radios). Large contractors were excluded from getting quantity discounts by the arrangement and when it was suggested that a wholesaler be put on the wholesalers' list the question whether he was in the contracting business as well was the subject of discussion and if he was in the contracting business he was not eligible to be put on the wholesalers' list.

65     I now deal with the effective operation of the agreement. As I have stated, there are only two of the accused companies that produce telephone wire in Canada — the Northern Electric company and the Phillips company; and the only manufacturers in Canada of power cable are Canada Wire and Cable, Northern Electric Company, Canadian General Electric, Cables, Conduits and Fittings, and Phillips (with Automatic Electric as selling agent for Phillips). These companies did not all manufacture power cable throughout the whole period covered by the indictment and the agreement, but they all did at some time during that period and they became parties to the agreement in all respects.

66     With respect to the other producing companies named in the indictment, there is some argument as to whether the Crown has proved by evidence properly admissible what proportion of the production in Canada of the articles referred to in the indictment is shared by the accused companies. There is no evidence as to what the importations of copper wire and cable were but in the view I take of the case that evidence is not essential to the Crown's case.

67     The evidence of Mr. Hallwood, supply manager of the Manitoba Power Commission, who was in charge of purchasing all wire and cable and electrical materials for the Commission, showed that the Commission in practice called for sealed tenders where substantial quantities were to be purchased. In each case tenders were invited from all the companies producing power cable except the Boston company, which did not maintain an office in Winnipeg. Canadian Fairbanks-Morse Company Limited supplied some service entrance cable but their cable was shipped directly from Canada Wire and Cable Company. On one occasion at least their tender was lower than the others. In all other cases the tenders were precisely the same for the same product. Mr. Hallwood said that during the whole of the period from 1936 to 1952 he could not remember any difference in price in the tenders submitted by the accused companies. He produced a number

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

of tenders submitted. In certain of these there was a variation in delivery-dates but the governing price was the price on the date of delivery and the evidence shows that this was worked out in agreement on the basis of the price of copper prevailing on delivery-date so that all prices would be identical for deliveries on the same date.

68      Mr. Vigeant, director of the purchasing department of the Quebec Hydro-Electric Commission, gave evidence to show that tenders submitted in answer to requests for quotations from accused corporations were identical. He said that in his experience he did not recollect any difference in prices quoted on wire.

69       Mr. Charles Plante, accountant and supervisor of purchasing for the Ottawa Hydro-Electric Commission, gave evidence which showed that when tenders were called from four different accused companies the prices were always the same for the same article.

70      Mr. Turner, office manager of the purchasing department of the Hydro-Electric Power Commission of Ontario, explained how tenders were called for by the Commission. They required sealed tenders to be received and opened by the Commission only. The procedure was to call for tenders from all companies in a position to supply the articles required in the quantity required.

71       Mr. White, who is director of supply for the Toronto Hydro-Electric System, said the Commission called for sealed tenders which were opened by the board and referred to him. Requests to tender were sent to suppliers who were able to supply the material required. With respect to identical items all companies tendering tendered at the same price but there were variations in the dates of delivery.

72      A considerable number of tenders for various types of electrical cable were submitted in evidence which showed identical prices for articles of the same specifications. Exhibits of this class merely demonstrated the operation of the conspiracy.

73      The evidence clearly showed that where quotations were asked for copper wire and cable by any public or private bodies the accused had agreed that the quotations should be at the same price.

74      All accused formed themselves into a sort of "vigilante" force and where anyone learned of a sale or quotation below the agreed price it was the subject of circulating memoranda in order to call the offender to account. Sometimes the memorandum was insufficient to determine who the offender was. When the name of the offender was revealed the usual explanation was that the quotation was the result of some clerical error. It is not surprising that these memoranda in many cases are incomplete, since the files of most of the companies seem to be very incomplete with respect to the circulating memoranda and other matters affecting the agreement. Strangely, much of the documentary material came from the files of the Boston company, whose interest in the conspiracy was not in proportion to the records found in its files.

75      The evidence shows that all aspects of effective competition were the subject of discussion in the memoranda and at meetings. There is little evidence that prices were arrived at based on costs or that the costs of the respective companies were taken into consideration. Stress is placed on the fact that there is no evidence of what the importations from abroad were. I do not think this is an essential feature of the Crown's case. As Hope J. pointed out in the *Container Materials* case, 74 C.C.C. 113 at 120, [1940] 4 D.L.R. 293 at 300, referring to s. 498 of The Criminal Code:

This codification was a corollary to the adoption by this country of the economic policy of tariff protection for industry. Quoting from Lord Atkin in the *P.A.T.A.* case *[Proprietary Articles Trade Ass'n v. A.-G. Can.],* [1931] 2 D.L.R. 1, 55 C.C.C. 241 [[1931] A.C. 310, [1931] 1 W.W.R. 552], and referring to s. 498 and the *Combines Act*:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

It is unfortunately beyond dispute that in a country where a general tariff exists persons may be found to take advantage of the protection, and within its walls form combinations that may work to the public disadvantage. It is an elementary point of self-preservation that the Legislature which creates the protection should arm the executive with powers of withdrawing or relaxing the protection if abused. (p. 11 D.L.R., p. 251 Can. C.C.)

Similarly it is noted by Clute J. in *Wampole & Co. v. Karn Co.* (1906), 11 O.L.R. 619 at p. 628: 'The history of the law shows that it was passed at a time when the law relating to the protection of native industries was being introduced. As an objection to the protective tariff it was argued that combinations might be formed which would destroy competition and so enhance the price: ... To meet that objection the law against restraint of trade was passed.'

Possessed as I am therefore of the view that the policy of the law as existent prior to 1935 was then endorsed by Parliament, let me turn to an examination of the law in relation to restraint of trade in Canada.

76      However, a careful eye was kept on imports from abroad. Up until 1950 the protective tariff applicable to importations from the United States of America of the products of the industry was 27 $1/2$ per cent. Following the Geneva agreements this was reduced to 20 per cent. There is an abundance of evidence that in fixing the common price the accused put the prices just as high as possible having regard to the protection enjoyed. If imports were making themselves felt to the degree that competition from that source would be considerable, the price was reduced sufficiently to meet that competition, not always as low as the import price, but to a level which the accused considered would be sufficient to control the situation. On the other hand, if the prices went up abroad the domestic prices were advanced by agreement without any apparent consideration of the position or needs of the individual accused or the welfare of the consumer.

77      It is argued, however, that I cannot find the accused guilty unless it is proved affirmatively that there was no other source of competition in Canada in the articles in question or that other sources were inconsequential. This proof has been established with respect to copper power cable.

78      To meet this argument with respect to other products Mr. Arnup tendered in evidence the reports of the Dominion Bureau of Statistics which show the total production of electrical wire and cable in Canada from 1937 to 1952, so that by relating the total production of the accused companies to the total production in Canada the relative percentage produced by the accused companies might be known. Mr. Robinette objected to the reception of this evidence. I allowed the evidence to be given and the exhibits to be filed so that they might in any case be available for consideration by another Court, reserving my decision on Mr. Robinette's objection until I should have further opportunity to consider the arguments of counsel and the authorities submitted. This met with the approval of counsel.

79      Mr. Arnup contends that the report of the Dominion Bureau of Statistics is a public document and admissible at common law. In considering the authorities discussed one must first start with the statute under which the reports are prepared. The relevant provisions of The Statistics Act, R.S.C. 1952, c. 257, are as follows:

3. There shall be a Bureau under the Minister, to be called the Dominion Bureau of Statistics, the duties of which are

(*a*) to collect, compile, analyse, abstract, and publish statistical information relative to the commercial, industrial, financial, social, economic and general activities and condition of the people ...

4. (1) The Governor in Council may appoint an officer called the Dominion Statistician to hold office during pleasure, whose duties are, under the direction of the Minister, ...

(*b*) to organize and maintain a scheme of co-operation in the collection, classification and publication of statistics as

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

between the several departments of government;

(*c*) to supervise generally the administration of this Act and to control the operations and staff of the Bureau; and

(*d*) to report annually to the Minister with regard to the work of the Bureau during the preceding year.

(2) Such other officers, clerks and employees as are necessary for the proper conduct of the business of the Bureau may be appointed in the manner authorized by law.

5. The Minister may employ from time to time, in the manner authorized by law, such commissioners, enumerators, agents or persons as are necessary to collect for the Bureau such statistics and information as he deems useful and in the public interest, relating to such commercial, industrial, ... and other activities as he may determine, and the duties of such commissioners, enumerators, agents or persons are such as the Minister prescribes.

80      Section 6 provides for an oath of office to be taken by those employed in the execution of any duty under the act whereby the person so employed swears to fulfil his duties faithfully and honestly.

81      Section 7 provides that the Minister may make rules and regulations and prescribe forms requisite for the conducting of the work and business of the Bureau.

82      Section 13 provides that the forms supplied by the proper authority are *prima facie* evidence of all instructions therein set forth.

83      Section 15 provides that individual returns, with the exception of annual returns of carriers and public utilities under ss. 25 and 26, are secret.

84      Section 21 imposes on the Dominion Statistician a statutory duty to prepare forms for the collection of such data as may be, in his judgment, desirable for the proper presentation of industrial statistics, and the form shall embody inquiries as to the

(*a*) name under which business is carried on;

(*b*) kind of goods manufactured or business done; ...

(*e*) gross quantity and value of articles manufactured; ...

85      Section 21(2) provides: "The Minister may employ agents or other persons for the collection of the statistics referred to in subsection (1) or a form may be sent to the person from whom information is desired and such person shall answer the inquiries thereon and return the same to the Bureau, properly certified as accurate, ..."

86      Section 24: "The Dominion Statistician shall prepare and make a report annually containing the results of any information collected during the preceding year upon the domestic trade of Canada."

87      Section 34 provides for penalties where any person employed in the execution of any duty under the Act, having taken the prescribed oath, wilfully makes any false declaration, statement or return touching any matter.

88      Section 35 provides for a penalty where any person, without lawful excuse, refuses or neglects to answer or wilfully answers falsely any question requisite for obtaining any information sought in respect of the objects of the Act.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

89      Mr. McLeod, who is director of the Industrial and Merchandising Division of the Bureau of Statistics, was called as a witness. He stated he was required to obtain from each manufacturer in Canada a complete statistical report covering operations in the preceding year and to compile that information and publish official reports thereof. In order to obtain as complete information as possible and ascertain who are members of an industry, the Bureau keeps a continuing and elaborate check as to new firms coming into the business. It checks through the Unemployment Insurance Commission, trade directories, financial papers, trade magazines and any way in which it can trace or get information about any new company in the business. It has a staff working on that continually. I mention this at length because it has some bearing on Mr. Robinette's argument.

90      Forms are sent to those whose names may be known to the Division to be manufacturers of a particular material, to obtain the information as to production required by s. 21 of the Act. It is from the information so obtained that the report required by s. 24 is prepared.

91      I now consider the case law.

92      The judgment of Lord Blackburn in *Sturla et al. v. Freccia et al.* (1880), 5 App. Cas. 623, commencing at p. 639, is the classic authority on the subject of what principles are to be applied in considering the admissibility of documents tendered as public documents. At p. 643, after referring to the decision in the case of *The Irish Society v. The Bishop of Derry et al.* (1846), 12 Cl. & F. 641, 8 E.R. 1561, the learned law lord said: "Then he goes on to say, 'In public documents made for the information of the Crown, or all the King's subjects who may require the information they contain, the entry by a public officer is presumed to be true when it is made, and is for that reason receivable in all cases, whether the officer or his successor may be concerned in such cases or not.'"

93      And he proceeds to state the principle upon which that case was decided, thus: "Now, my Lords, taking that decision, the principle upon which it goes is, that it should be a public inquiry, a public document, and made by a public officer. I do not think that 'public' there is to be taken in the sense of meaning the whole world. I think an entry in the books of a manor is public in the sense that it concerns all the people interested in the manor ... But it must be a public document, and it must be made by a public officer. I understand a public document there to mean a document that is made for the purpose of the public making use of it, and being able to refer to it. It is meant to be where there is a judicial, or *quasi*-judicial, duty to inquire, as might be said to be the case with the bishop acting under the writs issued by the Crown. That may be said to be *quasi*-judicial."

94      The authorities were again reviewed by the Judicial Committee in *Thrasyvoulos Ioannou et al. v. Papa Christoforos Demetriou et al.*, [1952] A.C. 84, [1952] 1 All E.R. 179. At p. 92 Lord Tucker said: "Public documents in this connexion may be classified under different heads, but the class with which the Board is now concerned is that class which comprises documents which are brought into existence as a result of a survey, inquiry or inquisition carried out or held under lawful authority, and it is to this class of document that the observations which follow are confined."

95      And after quoting from the judgment of Lord Blackburn in *Sturla et al. v. Freccia et al., supra,* and *Arnold et al. v. The Bishop of Bath and Wells et al.* (1829), 5 Bing. 316, 130 E.R. 1083, Lord Tucker went on to say: "These passages stress the dual requirements that the document should *not only in fact be available for public inspection, but that it should have been brought into existence for this very purpose*, and Lord Blackburn was explaining his interpretation of the judgment in *Irish Society v. Bishop of Derry* where Parke B. in the year 1846 had said: 'In public documents, made for the information of the Crown, or all the King's subjects who may require the information they contain, the entry by a public officer is presumed to be true when it is made, and is for that reason receivable in all cases, whether the officer or his successor may be concerned in such cases or not.'" (The italics are mine.)

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

96      Lord Tucker referred to the judgment of Lord Goddard in *Lilley v. Pettit*, [1946] K.B. 401 at 407, *(*sub nom. *Pettit v. Lilley)* [1946] 1 All E.R. 593. The headnote summarizes the principles to be drawn from that judgment: "A document to be receivable in evidence as a public document at common law must be one prepared for the purpose of the public making use of it and with the object that all persons concerned in it may have access thereto."

97      The reports of the Dominion Statistician meet the tests in the following respects:

1. There is a statutory duty to compile, analyze, abstract and publish statistical information relative to the industry here in question.

2. Those performing this duty are bound by an oath of office to perform their duties faithfully and honestly.

3. The Dominion Statistician is required to prepare forms embodying inquiries as to the gross quantity of the articles in question manufactured in Canada.

4. Where a form is sent to a person from whom the information is desired, accurate returns must be made. A penalty is attached for wilfully making a false declaration.

5. The result of the information must be compiled in an annual report for the use of the public, but the individual reports are not open to the public.

98      But it appears to me there is still another test.

99      The English text-books do not indicate an extension of the exception to the hearsay rule to reports of the nature of the one here in question made by government officials.

100      Phipson on Evidence, 9th ed. 1952, at p. 368, says: "Inquisitions, surveys, assessments, reports, and returns are admissible, but generally not conclusive, in proof of their contents when made under public authority, and in relation to matters of public concern." The authorities referred to are *Sturla et al. v. Freccia et al. supra*, and the judgment of Farwell J. in *Mercer v. Denne*, [1904] 2 Ch. 534 at 541 (affirmed [1905] 2 Ch. 538), where he said: "The test of publicity as put by Lord Blackburn is *that the public are interested in it, and entitled to go and see it, so that if there is anything wrong in it they would be entitled to protest. In that sense it becomes a statement that would be open to the public to challenge or dispute and therefore it has a certain amount of authority."* (The italics are mine.)

101      Taylor on Evidence, 12th ed. 1931, p. 1113 (vol. 2), says: "To render inquisitions, reports, surveys, and other similar documents admissible in evidence as public documents, it must appear that they were made that the public might make use of them and be able to refer to them, *for the fact that the public are interested in the documents, and are in a position to challenge or dispute them if inaccurate, invests them with a certain amount of authority."* (The italics are mine.) And the cases referred to are the *Sturla* case and the *Mercer* case.

102      The principles are discussed and a broader view is taken in Wigmore on Evidence, 3rd ed. 1940, vol. 5, commencing at p. 512. At p. 517 the learned author states: "Where the nature of the office fairly requires or renders appropriate the making and recording of a specific statement, that statement is to be regarded as made under official duty." And at p. 518 *Evanston v. Gunn* (1878), 99 U.S. 660, where it was held that meteorological reports were admissible, is referred to. At p. 519 the learned author states: "The statement — whether by register, certificate, report or the like — is admissible only so far as a duty exists to make statements on the *specific subject-matter*. Hence a statement as to matters not covered by the duty is inadmissible; this is conceded."

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

103     At p. 672, s. 1670, the learned author deals with reports and inquisitions in general and quotes from Starkie on Evidence, 1824, p. 260, as follows: "Inquisitions, which are of a public nature, and taken under competent authority, to ascertain a matter of public interest, are, upon principles already announced, admissible in evidence against all the world ... It is not essential to the reception of evidence of this nature that the inquiry should have been made by virtue of some judicial authority and by means of witnesses examined upon oath; it is sufficient if it was made by virtue of competent authority on behalf of the public, and on a subject-matter of public interest ... It is, however, of the very essence of evidence of this nature that the inquiry should have been made under proper authority; in general, therefore, unless the authority be in its nature notorious, it must be proved by the production of the commission; as in the case of an inquisition 'post mortem' and such private offices."

104     At p. 677, s. 1671, the subject of population is dealt with and particularly at pp. 685-6, para. 7: "The *census* is an *inquisition* of *population*, manufactures, agriculture, wealth, and many other classes of sociological data, and is made under an express legislative warrant and authority; it is therefore admissible under the general principle already considered. But the authority given is to report *general classes of facts*; the details as to individual persons, factories, farms, and the like, are noted only as a necessary basis for the general and anonymous summaries. Hence the census reports are usually not receivable to show the age of a *particular person*, or the product of a particular factory, or the area of a particular farm. Nevertheless, if by special authority a local census — as of an Indian tribe — is taken for the express purpose of registering individuals, it would become admissible; for in such case they virtually become registers of specific individuals and fall within the principle of s. 1644, *ante* (register of birth, marriage and death)." The only authority referred to in the footnote in British law for this statement is the statute of 1910, 10 Edw. VII and I Geo. V, c. 11, s. 8, which is an act dealing with the census of Ireland and provides for admission of a certificate of the General Register Office purporting to be signed by the Registrar-General of Births, Deaths and Marriages as evidence of population.

105     The subject of the admissibility of the result of inquisitions is dealt with in 7 C.E.D. (Ont.), 2nd ed. 1952 at p. 217, as follows:

> The findings of competent public officers, Courts, or persons having legal jurisdiction to inquire, under public authority, into matters within that jurisdiction, are admissible. Having a special duty under the law to make particular kinds of inquiries, credit is *prima facie* given to their inquests as recorded proceedings. [The authority for this again is *Sturla et al. v. Freccia et al., supra*.] An inquisition of mental incompetency has been held admissible to prove the person's mental competency at the time. *Sergeson v. Sealey* (1742), 2 Atk. 412, 26 E.R. 648; *Hall v. Warren* (1804), 9 Ves. 605, 32 E.R. 738; *Fauldner v. Silk* (1811), 3 Camp. 126, 170 E.R. 1328.

106     In *Bird v. Keep*, [1918] 2 K.B. 692, the Court of Appeal in England held that the record of a coroner's inquisition and the certificate of death were not admissible as evidence of the cause of death. At p. 700 Swinfen Eady M.R. said: "The respondent relied on an American case of *Stokes v. Dawes*, 4 Mason 268, before Story J. That, however, was not a case of a coroner's inquest, but of an inquest of office, by the Attorney-General, for lands escheating to the Government by reason of alienage. So also inquisitions of lunacy may be read, as has been held repeatedly: *Sergeson v. Sealey [supra]; Faulder v. Silk [supra]; Prinsep v. Dyce Sombre*, 10 Moo. P.C. 232 [14 E.R. 480]. But there is a clear distinction between these inquisitions which determine status and coroners' inquests which purport to find facts." That case was followed in *Barnett v. Cohen et al.*, [1921] 2 K.B. 461.

107     In *Regina v. Kaipiainen*, [1954] O.R. 43, 107 C.C.C. 377, 17 C.R. 388, the Court of Appeal held that the records of an enlisted man were not admissible as public documents.

108     Mr. Robinette argues that in any case the reports ought not to be received on the ground that the statute does not

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

state from whom inquiry is to be made and by consulting the Unemployment Insurance Commission, trade journals and directories, etc., those making the inquiries went beyond their legal authority. The cases I have discussed make it clear that anything dealt with in an authorized report which is not the proper subject-matter of inquiry cannot be considered part of the public document. Counsel seeks to apply this to the method of making the inquiry in so far as the Dominion Statistician consulted directories, trade journals, etc., and inquired from the Unemployment Insurance Commission to ascertain who were the manufacturers of electrical wire and cable in Canada. I do not think this is a valid argument in considering the admissibility of the reports.  It may have relevancy to the weight to be given them. The admissibility of the records must rest on the authority given under the statute and the report means only that it shows the total production of electrical wire and cable in Canada of those from whom inquiry was made pursuant to the system followed. By reason of the method used in compiling the information the Court may give little weight to it if it does not appear that the inquiry was an exhaustive one. I accept Mr. Robinette's argument to the extent that the reports cannot be evidence of the total production of electrical wire and cable in Canada; but if admitted they would be evidence of the domestic production of copper electrical wire and cable of those reporting to the Dominion Bureau of Statistics under the system followed. The evidence if received would have great weight if I accepted the argument advanced by Mr. Robinette that the agreement must show a monopolistic object or resulted in a monopoly before the accused can be convicted.

109      In view of all the authorities, it is difficult to decide whether Parliament, in leaving the admissibility of the reports of the Dominion Bureau of Statistics to the common law, assumed that they are admissible at common law, as contended by Wigmore, or whether the failure of Parliament to pass specific legislation either in England or in Canada indicates that it is contrary to the public interest that they should be admitted as *prima facie* evidence. They stand on a very different footing from a record of the registration of events or facts, whether they be births, marriages, deaths or climatic conditions. They are a summation of the results of inquiries made pursuant to public duty. Although they are made for the use of the public they can gain little or no authority by reason of the public or any member of the public being in a position to challenge or dispute them, because the constituent material that goes to make up the reports is secret. If they constituted a catalogue of production by the individual firms manufacturing these products the matter would be different. My decision, after the fullest consideration, is that the reports are not admissible.

110      However, I do not think it is essential to the Crown's case to show a monopoly or virtual monopoly but even if it were, without the assistance of the reports from the Bureau of Statistics it has been proved that those accused I have already mentioned are the only manufacturers in Canada of copper telephone wire and power cable.

111      It is perfectly clear that all the accused agreed to defeat any effective purpose to be gained by calling for tenders or quotations by either public bodies or private bodies. Tenders were called for by specification and quotations were made according to specification. If such a large body of suppliers as the accused combine together to deny the public all benefit of honest competitive tender or quotation where purchases have to be made that run into millions of dollars, one can hardly say it is something that does not deprive the public of the benefit of that free competition which jurisprudence has declared s. 498(1) (*d*) is designed to protect.

112      That is only one thing. I have examined the agreement not only in this aspect but in all its aspects and the irresistible conclusion, from the evidence properly admissible against all accused, is that whenever there was a suggestion of competition raising its head the combined action of all accused was brought to bear for the purpose of not only unduly preventing or lessening it but extinguishing it, and that any effective competition among them should be extinguished as far as possible.

113      I emphasize the *combined action*. It is one thing for one person or company to take action to suppress competition. It is another thing for large corporations of the character involved in this case to agree together to suppress competi-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1955 CarswellOnt 16, 21 C.R. 45, [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 24 C.P.R. 1, [1955] O.W.N. 499

tion. The evidence clearly justifies the conclusion that the combined action to unduly prevent or lessen competition in effective form was exercised pursuant to the agreement. As I have said, whether the accused were successful in all their efforts is not the test.

114      In arriving at this conclusion I have considered the evidence as a whole, considering acts done or declarations made in furtherance of the common design to be evidence against all accused and restricting internal communications in their evidentiary value to be evidence against the corporations from whose possession they came and no further. I have given no effect to that evidence which I have considered to be inadmissible. In doing this I am doing as the Court of Appeal and the Supreme Court of Canada did in the *Container Materials* case.

115      Thus viewing the evidence and considering the arguments of counsel, many of which I have not dealt with in detail (and I trust no disrespect will be felt because I have not done so), I am convinced beyond reasonable doubt that the accused conspired, combined, agreed and arranged together and with one another to unduly prevent or lessen competition in the production, manufacture, sale or supply of copper electrical wire and cable as charged in the indictment, and I find them guilty.

*Accused convicted.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works