**Morley Shafron**   *Appellant*

*v.*

**KRG Insurance Brokers (Western)
Inc.**   *Respondent*

**Indexed as: Shafron v. KRG Insurance
Brokers (Western) Inc.**

**Neutral citation: 2009 SCC 6.**

File No.: 31981.

2008: October 16; 2009: January 23.

Present: McLachlin C.J. and Binnie, LeBel, Deschamps,
Abella, Charron and Rothstein JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR
BRITISH COLUMBIA

*Contracts — Employment contracts — Restrictive
covenants — Geographic scope of restrictive covenant
ambiguous — Whether notional severance or rectifica-
tion may be invoked to resolve ambiguity or to render
unreasonable restriction reasonable.*

*Employment law — Fiduciary and equitable obli-
gations — Employee leaving his employment in insur-
ance agency to work for another agency as insurance
salesman — Former employer alleging that employee
breached fiduciary duty not to use confidential infor-
mation and solicit its clients — Whether employee owed
former employer fiduciary and equitable obligations.*

In 1987, S sold his insurance agency to KRG. KRG
renamed the agency KRG Western and in 1991, sold
the agency to another party. S was employed by KRG
Western from 1987 to 2001 pursuant to a series of
employment contracts. Each employment contract con-
tained a similarly worded restrictive covenant in which S
agreed that for three years after leaving his employment
for any reason other than termination without cause, he
will not be employed in the business of insurance bro-
kerage within the "Metropolitan City of Vancouver".
In January 2001, S began working as an insurance
salesman for another agency in Richmond, B.C. KRG
Western commenced an action to enforce the restrictive
covenant. It also claimed that S had breached fiduci-
ary and equitable obligations. The trial judge dismissed

**Morley Shafron**   *Appelant*

*c.*

**KRG Insurance Brokers (Western)
Inc.**   *Intimée*

**Répertorié : Shafron *c.* KRG Insurance
Brokers (Western) Inc.**

**Référence neutre : 2009 CSC 6.**

Nᵒ du greffe : 31981.

2008 : 16 octobre; 2009 : 23 janvier.

Présents : La juge en chef McLachlin et les juges Binnie,
LeBel, Deschamps, Abella, Charron et Rothstein.

EN APPEL DE LA COUR D'APPEL DE LA
COLOMBIE-BRITANNIQUE

*Contrats — Contrats de travail — Clauses restric-
tives — Portée géographique d'une clause restrictive
ambiguë — Peut-on utiliser les théories de la divisibilité
fictive ou de la rectification pour dissiper l'ambiguïté
ou pour faire en sorte qu'une restriction déraisonnable
devienne raisonnable?*

*Droit de l'emploi — Obligations fiduciales et en
equity — Employé quittant son emploi dans une agence
d'assurances pour travailler comme vendeur d'assu-
rance dans une autre agence — Allégation par l'ancien
employeur d'un manquement par l'employé à son obli-
gation fiduciale de ne pas utiliser de renseignements
confidentiels ni solliciter ses clients — L'employé avait-il
des obligations fiduciales et en equity envers son ancien
employeur?*

En 1987, S a vendu son agence d'assurances à KRG.
KRG a rebaptisé l'agence KRG Western et l'a vendue
à un tiers en 1991. S a travaillé pour KRG Western de
1987 à 2001 en vertu d'une série de contrats de travail.
Chaque contrat de travail contenait une clause restric-
tive formulée en des termes similaires dans laquelle S
s'engageait à ne pas travailler dans une entreprise de
courtage d'assurance dans « l'agglomération de la ville
de Vancouver » pendant les trois années suivant son
départ pour quelque raison que ce soit, sauf un congé-
diement non motivé. En janvier 2001, S a commencé à
travailler comme vendeur d'assurance dans une autre
agence à Richmond, C.-B. KRG Western a intenté une
action pour réclamer l'application de la clause res-
trictive. Elle soutenait aussi que S avait manqué à ses

EXHIBIT
A-6

the action, finding that the term "Metropolitan City of Vancouver" in the restrictive covenant is neither clear, certain nor reasonable. He also found that S owed no fiduciary duty to KRG Western. The Court of Appeal set aside the decision. While the court found that there was no fiduciary duty, it held that the restrictive covenant was enforceable. The court agreed that the term "Metropolitan City of Vancouver" is ambiguous; however, it applied the doctrine of notional severance and held that the term means the "City of Vancouver, the University of British Columbia Endowment Lands, Richmond and Burnaby".

*Held*: The appeal should be allowed.

The Court of Appeal erred when it substituted the phrase "City of Vancouver, the University of British Columbia Endowment Lands, Richmond and Burnaby" for the "Metropolitan City of Vancouver". The term "Metropolitan City of Vancouver" was uncertain and ambiguous. Nothing demonstrates a mutual understanding of the parties at the time they entered into the contract as to what geographic area the restrictive covenant covered and it was inappropriate for the Court of Appeal to re-write the covenant. In this case, neither blue-pencil severance nor rectification can be applied to re-write the restrictive covenant. Notional severance cannot be applied to a restrictive covenant. Also, the findings that S was not a fiduciary and did not abuse confidential information belonging to KRG Western are not pure questions of law. These findings were based on evidence at trial and must stand in the absence of any palpable and overriding error by the trial judge. [2] [13] [58]

Restrictive covenants generally are restraints of trade and contrary to public policy. Freedom to contract, however, requires an exception for reasonable restrictive covenants. Normally, the reasonableness of a covenant will be determined by its geographic and temporal scope as well as the extent of the activity sought to be prohibited. Reasonableness cannot be determined if a covenant is ambiguous in the sense that what is prohibited is not clear as to activity, time, or geography. An ambiguous restrictive covenant is by definition, *prima facie* unreasonable and unenforceable. The onus is on the party seeking to enforce the restrictive covenant to show that it is reasonable and a party seeking to enforce an ambiguous covenant will be unable

obligations fiduciales et en equity. Le juge de première instance a rejeté l'action, ayant conclu que l'expression « l'agglomération de la ville de Vancouver » employée dans la clause restrictive n'était ni claire, ni précise, ni raisonnable. Il a aussi conclu que S n'avait aucune obligation fiduciale envers KRG Western. La Cour d'appel a infirmé cette décision. Elle a conclu qu'il n'existait pas d'obligation fiduciale, mais que la clause restrictive était applicable. La cour estimait que l'expression « l'agglomération de la ville de Vancouver » était ambiguë; elle a toutefois appliqué la théorie de la divisibilité fictive pour l'interpréter comme englobant « la ville de Vancouver, la dotation foncière universitaire de l'Université de la Colombie-Britannique, Richmond et Burnaby ».

*Arrêt* : Le pourvoi est accueilli.

La Cour d'appel a eu tort de remplacer « l'agglomération de la ville de Vancouver » par « la ville de Vancouver, la dotation foncière universitaire de l'Université de la Colombie-Britannique, Richmond et Burnaby ». L'expression « l'agglomération de la ville de Vancouver » était imprécise et déraisonnable. Rien ne révèle que les parties s'étaient entendues sur la portée géographique de la clause restrictive lors de la conclusion du contrat et la Cour d'appel ne pouvait pas récrire la clause. En l'espèce, ni la technique du trait de crayon bleu, ni la théorie de la rectification ne peuvent être appliquées pour récrire la clause restrictive. La théorie de la divisibilité fictive ne peut pas être appliquée à une clause restrictive. En outre, les conclusions que S n'avait pas d'obligations fiduciales et n'a pas utilisé de renseignements confidentiels appartenant à la société KRG Western de façon irrégulière ne constituaient pas de pures questions de droit. Ces conclusions s'appuyaient sur la preuve présentée au procès et doivent être confirmées en l'absence d'une erreur manifeste et dominante de la part du juge de première instance. [2] [13] [58]

En général, les clauses restrictives constituent des restrictions au commerce et sont contraires à l'intérêt public. La liberté contractuelle exige toutefois que les clauses restrictives raisonnables fassent exception. Normalement, le caractère raisonnable d'une clause restrictive est apprécié en regard de sa portée géographique et de sa durée, ainsi que de l'ampleur des activités interdites. Lorsqu'une clause est ambiguë, en ce sens que l'interdiction n'est pas clairement définie quant à sa durée, à sa portée géographique ou à l'activité interdite, il est impossible d'en apprécier le caractère raisonnable. Une clause restrictive ambiguë est par définition déraisonnable et inapplicable à première vue. C'est à la partie qui réclame l'application d'une clause

to demonstrate reasonableness. Restrictive covenants in employment contracts are scrutinized more rigorously than restrictive covenants in a sale of a business because there is often an imbalance in power between employees and employers and because a sale of a business often involves a payment for goodwill whereas no similar payment is made to an employee leaving his or her employment. In this case, the restrictive covenant arises in an employment contract and attracts the higher standard of scrutiny. [15-17] [21-23] [25-27] [43]

Notional severance, reading down a contractual provision so as to make it legal and enforceable, is not an appropriate mechanism to cure a defective restrictive covenant. Notional severance may be available where an objective bright line test exists to distinguish what is legal from what is not. There is no objective bright-line test for reasonableness and applying notional severance simply amounts to a court rewriting a covenant in a manner that it subjectively considers reasonable. Employers should not be invited to draft overly broad restrictive covenants with the prospect that the court will sever the unreasonable parts or read down the covenant to what the courts consider reasonable. This would change the risks assumed by the parties and inappropriately increase the risk that an employee will be forced to abide by an unreasonable covenant. The Court of Appeal should not have attempted to resolve the ambiguity in this case by reading down the restrictive covenant according to its own notion of reasonableness and what it thought that the parties might have intended. [2] [31] [33] [39] [41] [47]

Blue-pencil severance, removing part of a contractual provision, may be resorted to sparingly and only in cases where the part being removed is clearly severable, trivial and not part of the main purport of the restrictive covenant. Blue-pencil severance cannot be applied to remove the word "Metropolitan" from the restrictive covenant in this case because it is not merely a trivial part of the covenant agreed to by the parties. There is no evidence that the parties unquestioningly would have agreed to remove the word "Metropolitan" without varying any other terms of the contract or otherwise changing the bargain. [2] [36] [50]

restrictive qu'il incombe de démontrer qu'elle est raisonnable, ce que la partie qui invoque une clause ambiguë est dans l'impossibilité de démontrer. Les clauses restrictives contenues dans les contrats de travail font l'objet d'un examen plus minutieux que celles qui figurent dans les contrats de vente d'une entreprise parce qu'il y a souvent inégalité de pouvoir entre employeur et employé et parce que la vente d'une entreprise comporte souvent un paiement pour l'achalandage, alors que l'employé qui quitte son emploi ne reçoit aucun paiement à ce titre. En l'espèce, la clause restrictive figure dans un contrat de travail et doit être examinée selon le critère plus rigoureux. [15-17] [21-23] [25-27] [43]

Il n'est pas possible de recourir à la divisibilité fictive, d'attribuer une interprétation atténuée à une disposition contractuelle de façon à la rendre légale et applicable, pour remédier aux lacunes d'une clause restrictive. La divisibilité fictive peut entrer en jeu lorsqu'il existe un critère de démarcation nette entre la légalité et l'illégalité. Il n'existe pas de critère de démarcation nette pour l'appréciation du caractère raisonnable et appliquer la théorie de la divisibilité fictive équivaut à récrire la clause selon ce que le tribunal estime raisonnable d'un point de vue subjectif. Les employeurs ne doivent pas être incités à rédiger des clauses restrictives d'une portée démesurée en s'attendant à ce que les tribunaux en retranchent les éléments déraisonnables ou en donnent une interprétation atténuée selon ce qu'ils jugent raisonnable. Cela modifierait les risques assumés par les parties et accroîtrait indûment le risque que l'employé soit contraint de consentir à une clause déraisonnable. La Cour d'appel n'aurait pas dû tenter de dissiper l'ambiguïté en donnant une interprétation atténuée de la clause restrictive selon ce qu'elle jugeait raisonnable et sa perception de l'intention possible des parties. [2] [31] [33] [39] [41] [47]

La technique du trait de crayon bleu, la suppression d'une partie d'une disposition contractuelle, devrait être appliquée avec parcimonie et uniquement dans les cas où la partie retranchée peut clairement être séparée du reste de la clause, est dénuée d'importance et ne fait pas partie de l'objet principal de la clause restrictive. On ne peut avoir recours à cette technique en l'espèce pour retrancher les mots « l'agglomération de » dans la clause restrictive parce que cette partie de la clause dont les parties ont convenu n'est pas dénuée d'importance. Rien ne démontre que les parties se seraient incontestablement entendues pour les supprimer sans changer quoi que ce soit aux autres clauses du contrat ni modifier autrement le marché. [2] [36] [50]

Rectification cannot be invoked to resolve the ambiguity in this case. Rectification is used to restore what the parties' agreement actually was, were it not for the error in the written agreement. Here, there is no indication that the parties agreed on something and then mistakenly included something else in the written contract. Rather, they used an ambiguous term in the contract. KRG Western can point to no prior agreement, written or oral, that explains the term "Metropolitan City of Vancouver". [3] [57]

**Cases Cited**

**Explained:** *Transport North American Express Inc. v. New Solutions Financial Corp.*, 2004 SCC 7, [2004] 1 S.C.R. 249; **applied:** *Performance Industries Ltd. v. Sylvan Lake Golf & Tennis Club Ltd.*, 2002 SCC 19, [2002] 1 S.C.R. 678; **not followed:** *T. S. Taylor Machinery Co. v. Biggar* (1968), 2 D.L.R. (3d) 281; *Putsman v. Taylor*, [1927] 1 K.B. 637; *T. Lucas & Co. v. Mitchell*, [1974] Ch. 129; **referred to:** *Nordenfelt v. Maxim Nordenfelt Guns and Ammunition Co.*, [1894] A.C. 535; *Herbert Morris, Ltd. v. Saxelby*, [1916] 1 A.C. 688; *Leather Cloth Co. v. Lorsont* (1869), L.R. 9 Eq. 345; *Elsley v. J. G. Collins Insurance Agencies Ltd.*, [1978] 2 S.C.R. 916; *Burgess v. Industrial Frictions & Supply Co.* (1987), 12 B.C.L.R. (2d) 85; *Mason v. Provident Clothing and Supply Co.*, [1913] A.C. 724; *Attwood v. Lamont*, [1920] 3 K.B. 571; *Globex Foreign Exchange Corp. v. Kelcher*, 2005 ABCA 419, 262 D.L.R. (4th) 752; *Canadian American Financial Corp. (Canada) Ltd. v. King* (1989), 60 D.L.R. (4th) 293; *Frederick E. Rose (London) Ld. v. William H. Pim Jnr. & Co.*, [1953] 2 Q.B. 450.

APPEAL from a judgment of the British Columbia Court of Appeal (Huddart, Thackray and Chiasson JJ.A.), 2007 BCCA 79, 236 B.C.A.C. 116, 390 W.A.C. 116, 64 B.C.L.R. (4th) 125, 25 B.L.R. (4th) 193, 45 C.C.L.I. (4th) 163, [2007] B.C.J. No. 261 (QL), 2007 CarswellBC 276, reversing a decision of Parrett J., 2005 BCSC 1611, 12 B.L.R. (4th) 90, 30 C.C.L.I. (4th) 187, [2005] B.C.J. No. 2506 (QL), 2005 CarswellBC 2758. Appeal allowed.

*Neo J. Tuytel* and *Valerie S. Dixon*, for the appellant.

*Frank G. Potts* and *Timothy J. Delaney*, for the respondent.

Il n'est pas possible d'invoquer la rectification pour dissiper l'ambiguïté en l'espèce. La rectification sert à rétablir l'entente véritablement conclue par les parties, n'eût été l'erreur commise dans l'entente écrite. Ici, rien ne permet de croire que les parties auraient convenu d'une chose, puis inscrit par erreur quelque chose d'autre dans le contrat. Elles ont plutôt utilisé une expression ambiguë dans le contrat écrit. KRG Western ne peut faire valoir aucune entente préalable, écrite ou verbale, qui expliquerait l'expression « l'agglomération de la ville de Vancouver ». [3] [57]

**Jurisprudence**

**Arrêt expliqué :** *Transport North American Express Inc. c. New Solutions Financial Corp.*, 2004 CSC 7, [2004] 1 R.C.S. 249; **arrêt appliqué :** *Performance Industries Ltd. c. Sylvan Lake Golf & Tennis Club Ltd.*, 2002 CSC 19, [2002] 1 R.C.S. 678; **arrêts non suivis :** *T. S. Taylor Machinery Co. c. Biggar* (1968), 2 D.L.R. (3d) 281; *Putsman c. Taylor*, [1927] 1 K.B. 637; *T. Lucas & Co. c. Mitchell*, [1974] Ch. 129; **arrêts mentionnés :** *Nordenfelt c. Maxim Nordenfelt Guns and Ammunition Co.*, [1894] A.C. 535; *Herbert Morris, Ltd. c. Saxelby*, [1916] 1 A.C. 688; *Leather Cloth Co. c. Lorsont* (1869), L.R. 9 Eq. 345; *Elsley c. J. G. Collins Insurance Agencies Ltd.*, [1978] 2 R.C.S. 916; *Burgess c. Industrial Frictions & Supply Co.* (1987), 12 B.C.L.R. (2d) 85; *Mason c. Provident Clothing and Supply Co.*, [1913] A.C. 724; *Attwood c. Lamont*, [1920] 3 K.B. 571; *Globex Foreign Exchange Corp. c. Kelcher*, 2005 ABCA 419, 262 D.L.R. (4th) 752; *Canadian American Financial Corp. (Canada) Ltd. c. King* (1989), 60 D.L.R. (4th) 293; *Frederick E. Rose (London) Ld. c. William H. Pim Jnr. & Co.*, [1953] 2 Q.B. 450.

POURVOI contre un arrêt de la Cour d'appel de la Colombie-Britannique (les juges Huddart, Thackray et Chiasson), 2007 BCCA 79, 236 B.C.A.C. 116, 390 W.A.C. 116, 64 B.C.L.R. (4th) 125, 25 B.L.R. (4th) 193, 45 C.C.L.I. (4th) 163, [2007] B.C.J. No. 261 (QL), 2007 CarswellBC 276, qui a infirmé une décision du juge Parrett, 2005 BCSC 1611, 12 B.L.R. (4th) 90, 30 C.C.L.I. (4th) 187, [2005] B.C.J. No. 2506 (QL), 2005 CarswellBC 2758. Pourvoi accueilli.

*Neo J. Tuytel* et *Valerie S. Dixon*, pour l'appelant.

*Frank G. Potts* et *Timothy J. Delaney*, pour l'intimée.

The judgment of the Court was delivered by

Version française du jugement de la Cour rendu par

ROTHSTEIN J. —

LE JUGE ROTHSTEIN —

I. Introduction

I. Introduction

[1] The central issue in this appeal is whether, in an employment contract, the doctrine of severance may be invoked to resolve an ambiguous term in a restrictive covenant or render an unreasonable restriction in the covenant reasonable. The issue arises because the term "Metropolitan City of Vancouver" in the restrictive covenant contained in the contract between the parties has no legally defined meaning and is therefore ambiguous.

[1] La question qui est au cœur du présent pourvoi est celle de savoir si, dans le contexte d'un contrat de travail, il est possible d'invoquer la théorie de la divisibilité pour dissiper l'ambiguïté d'une terme dans une clause restrictive ou pour faire en sorte qu'une restriction déraisonnable y figurant devienne raisonnable. Cette question se pose en raison de l'ambiguïté de l'expression « Metropolitan City of Vancouver » (« l'agglomération de la ville de Vancouver ») utilisée dans la clause restrictive du contrat signé par les parties, mais dont le sens n'est pas défini en droit.

[2] Severance, when permitted, appears to take two forms. "Notional" severance involves reading down a contractual provision so as to make it legal and enforceable. "Blue-pencil" severance consists of removing part of a contractual provision. For reasons I set out below, notional severance is not an appropriate mechanism to cure a defective restrictive covenant. As for blue-pencil severance, it may only be resorted to in rare cases where the part being removed is trivial, and not part of the main purport of the restrictive covenant. These circumstances are not present in this case and hence the ambiguity cannot be cured by severing the word "Metropolitan".

[2] Le recours à la divisibilité, lorsqu'il est permis, peut prendre deux formes. La « divisibilité fictive » permet d'attribuer une interprétation atténuée à une disposition contractuelle de façon à la rendre légale et applicable. La divisibilité pure et simple — ou « technique du trait de crayon bleu » — permet de supprimer une partie d'une disposition contractuelle. Pour les motifs exposés ci-après, il n'est pas possible de recourir à la divisibilité fictive pour remédier aux lacunes d'une clause restrictive. Quant à la divisibilité pure et simple, on ne peut y avoir recours que dans les rares cas où la partie supprimée est dénuée d'importance et ne fait pas partie de l'objet principal de la disposition. Ces conditions ne sont pas réunies en l'espèce. Par conséquent, il n'est pas possible de dissiper l'ambiguïté en supprimant les mots « l'agglomération de » (« Metropolitan »).

[3] A secondary issue is whether rectification may be invoked to resolve the ambiguity. In my opinion, it cannot. There is no indication that the parties agreed on something and then mistakenly included something else in the written contract. The doctrine of rectification cannot be invoked to rewrite the bargain between the parties.

[3] La question secondaire de savoir s'il est possible d'invoquer la rectification pour dissiper l'ambiguïté a aussi été soulevée. À mon avis, cela n'est pas possible. Rien n'indique que les parties auraient convenu d'une stipulation, puis auraient par erreur consigné une stipulation différente dans le contrat écrit. La théorie de la rectification ne peut pas être utilisée pour récrire le marché conclu par les parties.

## II.  Facts

[4]   On December 31, 1987, Morley Shafron sold the shares he owned in his own insurance agency business, Morley Shafron Agencies Ltd. ("MSA"), to KRG Insurance Brokers Inc. for a total consideration of $700,000. The name of his business was changed from MSA to KRG Insurance Brokers (Western) Inc. ("KRG Western") following the sale. Shafron continued to be employed in the business.

[5]   While there were a number of agreements between various parties over a period of some 12 years, it is not necessary to refer to all of them. I refer only to those relevant to the issues in this appeal. In early 1988, Shafron entered into a contract containing a non-competition clause with KRG Insurance Brokers Inc. and KRG Management Inc. (the owner of KRG Insurance Brokers Inc.). That contract contained the following terms, among others:

#### Employment of Shafron

3.  The Corporation [KRG Management Inc.] agrees that it shall cause KRG Insurance [KRG Insurance Brokers Inc.] or MSA to engage and to continue to engage Shafron for the term of this agreement [until January 1, 1991] to provide to the Corporation in the Province of British Columbia such managerial and insurance brokerage services as may be required or reasonably requested by KRG Insurance including, but without limiting the generality of the foregoing;

.   .   .

#### Non-Competition

12.  Shafron agrees that, upon his leaving the employment of MSA or KRG Insurance for any reason save and except for termination by KRG Insurance without cause, he shall not for a period of three (3) years thereafter, directly or indirectly, carry on, be employed in, or be interested in or permit his name to be used in connection with the business of insurance brokerage which is carried on within the metropolitan City of Vancouver. [Emphasis added.]

[6]   On February 28, 1991, Shafron entered into a further employment contract with KRG Western,

## II.  Les faits

[4]   Le 31 décembre 1987, Morley Shafron a vendu ses actions dans l'agence d'assurance dont il était propriétaire, Morley Shafron Agencies Ltd. (« MSA »), à KRG Insurance Brokers Inc. moyennant une contrepartie totale de 700 000 $. Après la vente, son entreprise est devenue la KRG Insurance Brokers (Western) Inc. (« KRG Western »). M. Shafron a continué de travailler au sein de l'entreprise.

[5]   Sur une période d'une douzaine d'années, plusieurs ententes ont été conclues entre diverses parties, mais il n'est pas nécessaire de faire état de chacune. Je mentionnerai uniquement les ententes qui ont un lien avec les questions en litige dans le pourvoi. Au début de 1988, M. Shafron a conclu avec KRG Insurance Brokers Inc. et KRG Management Inc. (propriétaire de KRG Insurance Brokers Inc.) un contrat qui contenait une clause de non-concurrence. Ce contrat comportait notamment les stipulations suivantes :

[TRADUCTION]

#### Emploi de M. Shafron

3.  La Société [KRG Management Inc.] s'engage à veiller à ce que KRG Insurance [KRG Insurance Brokers Inc.] ou MSA embauche M. Shafron et le maintienne en fonction pour la durée de la présente entente [jusqu'au 1ᵉʳ janvier 1991], afin que ce dernier fournisse à la Société, en Colombie-Britannique, les services de gestion et de courtage d'assurance qui sont requis ou qui peuvent raisonnablement lui être demandés par KRG Insurance, et notamment les services suivants;

.   .   .

#### Non-concurrence

12.  Pendant une période de trois (3) ans suivant son départ de MSA ou de KRG Insurance pour quelque raison que ce soit, sauf un congédiement non motivé par KRG Insurance, M. Shafron s'engage à ne pas, même indirectement, exploiter une entreprise de courtage d'assurance, travailler pour une telle entreprise, y avoir des intérêts ni permettre l'utilisation de son nom en rapport avec une telle entreprise dans l'agglomération de la ville de Vancouver. [Je souligne.]

[6]   Le 28 février 1991, M. Shafron a conclu avec KRG Western, l'intimée, un autre contrat de travail

the respondent, which was to expire on January 1, 1994, containing a non-competition clause in substantially the same form as in the 1988 agreement. This covenant provided:

### 13. Non-Competition

Shafron shall not, upon his leaving the employment of the Corporation [KRG Western] for any reason, save and except for termination by the Corporation or KRG Management without cause, for a period of three (3) years thereafter, directly or indirectly, carry on, be employed in, or be interested in or permit his name to be used in connection with the business of insurance brokerage which is carried on within the <u>Metropolitan City of Vancouver</u>. [Emphasis added.]

[7] On July 31, 1991, Intercity Investment Corporation ("Intercity") acquired the shares of KRG Western. The February 28, 1991 employment contract provided that upon the sale of 50 percent or more of the shares of KRG Western, Shafron's employment would terminate. In order to continue working for KRG Western, on August 1, 1991, Shafron entered into yet another employment contract with KRG Western, which was to expire on January 1, 1994, containing a restrictive covenant essentially identical to the language of the February 28, 1991 covenant. The only difference was the deletion of the words "or KRG Management" from the covenant. There were two additional renewals of this employment agreement in 1993 and 1998. The 1993 agreement expired on December 31, 1998 and the 1998 agreement expired on December 31, 2000. Each renewal included the same restrictive covenant as contained in the August 1, 1991 agreement.

[8] In December 2000, as the 1998 employment contract was about to expire, Shafron left KRG Western's employment and in January 2001 began working as an insurance salesman for another agency, Shaw Insurance Agency Ltd. ("Shaw"), in Richmond.

[9] KRG Western commenced an action in the Supreme Court of British Columbia claiming that Shafron was wrongly competing with it in breach of the restrictive covenant. It also made additional

devant prendre fin le 1er janvier 1994, qui contenait une clause de non-concurrence essentiellement identique à celle figurant dans le contrat de 1988. En voici le libellé :

[TRADUCTION]

### 13. Non-concurrence

Pendant une période de trois (3) ans suivant son départ de la Société [KRG Western] pour quelque raison que ce soit, sauf un congédiement non motivé par la Société ou KRG Management, M. Shafron s'engage à ne pas, même indirectement, exploiter une entreprise de courtage d'assurance, travailler pour une telle entreprise, y avoir des intérêts ni permettre l'utilisation de son nom en rapport avec une telle entreprise dans <u>l'agglomération de la ville de Vancouver</u>. [Je souligne.]

[7] Le 31 juillet 1991, Intercity Investment Corporation (« Intercity ») a acheté les actions de KRG Western. Aux termes du contrat de travail signé le 28 février 1991, l'emploi de M. Shafron devait prendre fin si KRG Western vendait au moins 50 p. 100 de ses actions. Afin de continuer de travailler pour KRG Western, M. Shafron a donc conclu avec la société, le 1er août 1991, un autre contrat devant prendre fin le 1er janvier 1994, qui contenait une clause restrictive dont le libellé était essentiellement identique à celui de la clause du 28 février 1991. Seule différence, les termes « ou KRG Management » n'y figuraient pas. Ce contrat de travail a été reconduit à deux reprises, soit en 1993 et en 1998. Les contrats signés en 1993 et en 1998 ont expiré respectivement le 31 décembre 1998 et le 31 décembre 2000. La clause restrictive contenue dans le contrat du 1er août 1991 figurait dans chacun des renouvellements.

[8] En décembre 2000, à l'approche de la date d'expiration du contrat de travail de 1998, M. Shafron a quitté son emploi chez KRG Western. En janvier 2001, il a commencé à travailler comme vendeur d'assurance dans une autre agence, Shaw Insurance Agency Ltd. (« Shaw »), à Richmond.

[9] La société KRG Western a intenté en Cour suprême de la Colombie-Britannique une action dans laquelle elle faisait valoir que M. Shafron lui livrait une concurrence déloyale en violation de la

claims, one of which was that when he began work-ing for Shaw, Shafron breached the fiduciary and equitable obligations he owed to KRG Western not to use confidential information and solicit KRG Western's clients.

[10] The trial judge, Parrett J., dismissed KRG Western's action (2005 BCSC 1611, 12 B.L.R. (4th) 90). He found, among other things, that the term "Metropolitan City of Vancouver" was neither clear nor certain and, in any event, was unreason-able. He also found that Shafron owed no fiduciary duty to KRG Western and that he had not breached any duty relating to confidential information.

[11] The British Columbia Court of Appeal reversed the decision of the trial judge (2007 BCCA 79, 236 B.C.A.C. 116). While that court found Shafron owed no fiduciary duty to KRG Western, it held that the restrictive covenant was enforceable. In the view of the Court of Appeal, while the term "Metropolitan City of Vancouver" was ambiguous, it was possible to apply the doctrine of "notional" severance to construe it as applying to the City of Vancouver and municipalities contiguous to it. According to the Court of Appeal, the covenant would cover the City of Vancouver, the University of British Columbia Endowment Lands, Richmond and Burnaby.

[12] Having regard to this spatial area and the non-competition term of three years, the Court of Appeal found the covenant reasonable and there-fore enforceable.

III. Issues

[13] The issues before this Court are:

(1) whether the doctrine of severance or rectifica-tion may be applied to resolve an ambiguity in

clause restrictive. Elle soutenait aussi notamment que M. Shafron, lorsqu'il avait commencé à tra-vailler chez Shaw, avait manqué à ses obligations fiduciales et à ses obligations en equity envers KRG Western, qui lui interdisaient d'utiliser des rensei-gnements confidentiels et de solliciter les clients de KRG Western.

[10] En première instance, le juge Parrett a rejeté l'action de KRG Western (2005 BCSC 1611, 12 B.L.R. (4th) 90). Il a notamment conclu que l'ex-pression [TRADUCTION] « l'agglomération de la ville de Vancouver » n'était ni claire ni précise et qu'elle était de toute façon déraisonnable. Il a également conclu que M. Shafron n'avait aucune obligation fiduciale envers la société KRG Western et n'avait commis aucun manquement à une obligation rela-tive à l'utilisation de renseignements confidentiels.

[11] La Cour d'appel de la Colombie-Britannique a infirmé la décision du juge de première instance (2007 BCCA 79, 236 B.C.A.C. 116). Elle a conclu que M. Shafron n'avait aucune obligation fiduciale envers la société KRG Western, mais que la clause restrictive était applicable. Même si elle estimait que l'expression [TRADUCTION] « l'agglomération de la ville de Vancouver » était ambiguë, la Cour d'appel a jugé possible de recourir à la théorie de la divisibilité « fictive » pour l'interpréter comme désignant la ville de Vancouver et les municipali-tés limitrophes. La Cour d'appel a conclu que la clause englobait la ville de Vancouver, la dota-tion foncière universitaire (University Endowment Lands) de l'Université de la Colombie-Britannique, Richmond et Burnaby.

[12] Compte tenu du secteur géographique ainsi visé et de la période de non-concurrence de trois ans, la Cour d'appel a conclu que la clause était rai-sonnable et, partant, applicable.

III. Les questions en litige

[13] Notre Cour est appelée à se prononcer sur les questions suivantes :

(1) Peut-on utiliser les théories de la divisibilité ou de la rectification pour dissiper l'ambiguïté

a restrictive covenant in an employment contract or render an unreasonable restriction in a covenant reasonable;

(2) whether Shafron owed fiduciary and equitable obligations to KRG Western and, if so, whether they were breached.

The second issue may be disposed of quickly. The findings of the trial judge with respect to fiduciary obligations and the improper use of confidential information were based on evidence at trial. These are not pure questions of law. The Court of Appeal correctly did not interfere with the trial judge's conclusions on these issues. In the absence of palpable and overriding error by the trial judge, which KRG Western did not plead or demonstrate, the trial judge's conclusions — that Shafron was not a fiduciary and that he did not abuse confidential information belonging to KRG Western — must stand.

IV. Analysis

[14] Before dealing with the doctrine of severance, I will summarize the law on restrictive covenants.

A. *Reconciling Freedom of Contract and Public Policy Considerations Against Restraint of Trade*

[15] A restrictive covenant in a contract is what the common law refers to as a restraint of trade. Restrictive covenants are frequently found in agreements for the purchase and sale of a business and in employment contracts. A restrictive covenant precludes the vendor in the sale of a business from competing with the purchaser and, in an employment contract, the restrictive covenant precludes the employee, upon leaving employment, from competing with the former employer.

d'une clause restrictive contenue dans un contrat de travail ou pour faire en sorte qu'une restriction déraisonnable y figurant devienne raisonnable?

(2) M. Shafron avait-il des obligations fiduciales et des obligations en equity envers KRG Western et, dans l'affirmative, a-t-il manqué à ces obligations?

La deuxième question en litige peut être réglée rapidement. Le juge de première instance a fondé ses conclusions relatives aux obligations fiduciales et à l'utilisation irrégulière de renseignements confidentiels sur la preuve présentée au procès. Il ne s'agit pas de pures questions de droit. C'est à juste titre que la Cour d'appel n'a pas modifié les conclusions du juge de première instance à ces égards. En l'absence d'une erreur manifeste et dominante de la part du juge de première instance, erreur que la société KRG Western n'a ni plaidée ni prouvée, il convient de confirmer les conclusions du juge de première instance selon lesquelles M. Shafron n'avait pas d'obligation fiduciale et n'a pas utilisé de renseignements confidentiels appartenant à la société KRG Western de façon irrégulière.

IV. Analyse

[14] Avant de traiter de la théorie de la divisibilité, je résumerai les règles de droit régissant les clauses restrictives.

A. *Conciliation de la liberté de contracter et des considérations d'intérêt public défavorables à la restriction du commerce*

[15] Une clause restrictive figurant dans un contrat constitue ce que la common law désigne comme une restriction au commerce. Les conventions d'achat-vente d'une entreprise et les contrats de travail contiennent souvent une clause restrictive. Dans le premier cas, elle empêche le vendeur de l'entreprise de faire concurrence à l'acquéreur. Dans le second, elle empêche l'employé qui quitte son emploi de faire concurrence à son ancien employeur.

[16]  Restrictive covenants give rise to a tension in the common law between the concept of freedom to contract and public policy considerations against restraint of trade. In the seminal decision of the House of Lords in *Nordenfelt v. Maxim Nordenfelt Guns and Ammunition Co.*, [1894] A.C. 535, this tension was explained. At common law, restraints of trade are contrary to public policy because they interfere with individual liberty of action and because the exercise of trade should be encouraged and should be free. Lord Macnaghten stated, at p. 565:

The public have an interest in every person's carrying on his trade freely: so has the individual. All interference with individual liberty of action in trading, and all restraints of trade of themselves, if there is nothing more, are contrary to public policy, and therefore void. That is the general rule.

[17]  However, recognition of the freedom of the parties to contract requires that there be exceptions to the general rule against restraints of trade. The exception is where the restraint of trade is found to be reasonable. At p. 565, Lord Macnaghten continued:

But there are exceptions: restraints of trade and interference with individual liberty of action may be justified by the special circumstances of a particular case. It is a sufficient justification, and indeed it is the only justification, if the restriction is reasonable — reasonable, that is, in reference to the interests of the parties concerned and reasonable in reference to the interests of the public, so framed and so guarded as to afford adequate protection to the party in whose favour it is imposed, while at the same time it is in no way injurious to the public. That, I think, is the fair result of all the authorities. [Emphasis added.]

Therefore, despite the presumption that restrictive covenants are *prima facie* unenforceable, a reasonable restrictive covenant will be upheld.

[18]  It is important at this juncture to differentiate between a contract for the sale of a business and an employment contract.

[19]  In *Nordenfelt*, Lord Macnaghten pointed out that there is greater freedom to contract between

[16]  Les clauses restrictives créent en common law une tension entre la liberté de contracter et les considérations d'intérêt public défavorables à une restriction au commerce. Cette tension a été expliquée dans l'arrêt clé de la Chambre des lords, *Nordenfelt c. Maxim Nordenfelt Guns and Ammunition Co.*, [1894] A.C. 535. En common law, les restrictions au commerce sont contraires à l'intérêt public parce qu'elles portent atteinte à la liberté d'action individuelle et parce que les activités commerciales doivent être favorisées et exercées en toute liberté. Lord Macnaghten s'est exprimé ainsi à la p. 565 :

[TRADUCTION] Il est de l'intérêt du public et aussi de l'individu que chaque personne exploite librement son commerce. Toute atteinte à la liberté individuelle en matière commerciale et toute pratique restrictive du commerce sont, à défaut d'autres circonstances, en elles-mêmes contraires à l'intérêt public et, partant, nulles. Voilà la règle générale.

[17]  Toutefois, la reconnaissance de la liberté contractuelle des parties exige que la règle générale interdisant les restrictions au commerce souffre certaines exceptions. Il y a exception à la règle lorsqu'une restriction est jugée raisonnable. À la p. 565, lord Macnaghten a ajouté :

[TRADUCTION] Mais il existe des exceptions : les circonstances particulières d'un cas donné peuvent justifier certaines restrictions au commerce et atteintes à la liberté individuelle. Le fait qu'une restriction est raisonnable constitue une justification suffisante et, à vrai dire, la seule justification possible — raisonnable au regard des intérêts des parties concernées et au regard des intérêts du public, et formulée avec la circonspection nécessaire pour bien protéger la partie devant en bénéficier, sans toutefois causer un préjudice quelconque au public. C'est ce qui se dégage à mon avis de l'ensemble de la jurisprudence. [Je souligne.]

Bien qu'elle soit présumée inapplicable à première vue, une clause restrictive sera donc jugée valide si elle est raisonnable.

[18]  Il importe ici de faire la différence entre un contrat de vente d'une entreprise et un contrat de travail.

[19]  Dans *Nordenfelt*, lord Macnaghten a souligné qu'il existe une plus grande liberté de contracter

buyer and seller than between employer and employee. At p. 566, he wrote:

> To a certain extent, <u>different considerations must apply in cases of apprenticeship and cases of that sort, on the one hand, and cases of the sale of a business or dissolution of partnership on the other</u>. A man is bound an apprentice because he wishes to learn a trade and to practise it. A man may sell because he is getting too old for the strain and worry of business, or because he wishes for some other reason to retire from business altogether. <u>Then there is obviously more freedom of contract between buyer and seller than between master and servant or between an employer and a person seeking employment.</u> [Emphasis added.]

Although the comments of Lord Macnaghten focus on apprenticeship, the same concept has been extended and applied to contracts between employers and employees.

[20]   In the House of Lords' decision of *Herbert Morris, Ltd. v. Saxelby*, [1916] 1 A.C. 688, Lord Atkinson made some observations on the difference between contracts of employment and those for sale of a business. He cited with approval *Leather Cloth Co. v. Lorsont* (1869), L.R. 9 Eq. 345, at p. 354, quoting James V.-C. in that case:

> The principle is this: Public policy requires that every man shall be at liberty to work for himself, and shall not be at liberty to deprive himself or the State of his labour, skill, or talent, by any contract that he enters into. On the other hand, public policy requires that when a man has by skill or by any other means obtained something which he wants to sell, he should be at liberty to sell it in the most advantageous way in the market; and in order to enable him to sell it advantageously in the market it is necessary that he should be able to preclude himself from entering into competition with the purchaser.

Lord Atkinson then stated that "[t]hese considerations in themselves differentiate, in my opinion, the case of the sale of goodwill from the case of master and servant or employer and employee" (p. 701).

[21]   The sale of a business often involves a payment to the vendor for goodwill. In consideration of

entre l'acquéreur et le vendeur qu'entre l'employeur et l'employé. Il a écrit, à la p. 566 :

> [TRADUCTION] Dans une certaine mesure, <u>des considérations différentes doivent intervenir dans les cas de formation en apprentissage et autres cas du même genre, d'une part, et dans les cas de vente d'une entreprise ou de dissolution d'une société, d'autre part</u>. On se met en apprentissage parce qu'on souhaite apprendre un métier et l'exercer. On peut vendre son entreprise parce qu'on se sent trop vieux pour supporter la tension et les tracas qu'elle engendre, ou parce qu'on souhaite se retirer des affaires pour une autre raison. <u>De toute évidence, il existe donc entre l'acquéreur et le vendeur une plus grande liberté de contracter qu'entre le maître et le serviteur ou entre l'employeur et la personne qui cherche un emploi.</u> [Je souligne.]

Les propos de lord Macnaghten concernaient surtout la formation en apprentissage, mais la même notion a été élargie et appliquée aux contrats conclus entre employeurs et employés.

[20]   Dans un arrêt de la Chambre des lords, *Herbert Morris, Ltd. c. Saxelby*, [1916] 1 A.C. 688, lord Atkinson a traité de la différence entre les contrats de travail et les contrats de vente d'une entreprise. Il a cité en les approuvant ces observations faites par le vice-chancelier James dans *Leather Cloth Co. c. Lorsont* (1869), L.R. 9 Eq. 345, p. 354 :

> [TRADUCTION] Le principe est le suivant : L'intérêt public exige que chacun soit libre de travailler à son compte, mais ne soit pas libre de conclure un contrat qui le priverait ou priverait l'État de son travail, de ses compétences ou de son talent. En revanche, l'intérêt public exige que celui qui, grâce à ses compétences ou par tout autre moyen, a acquis une chose qu'il souhaite vendre, soit libre de la vendre de la façon la plus avantageuse sur le marché; et pour qu'il puisse la vendre de façon avantageuse sur le marché, il doit pouvoir s'engager à ne pas faire concurrence à l'acquéreur.

Lord Atkinson a ajouté que [TRADUCTION] « [c]es considérations permettent en elles-mêmes, selon moi, de distinguer la vente d'un achalandage de la relation entre maître et serviteur ou entre employeur et employé » (p. 701).

[21]   Il est fréquent que le vendeur d'une entreprise reçoive une somme d'argent pour l'achalandage. En

the goodwill payment, the custom of the business being sold is intended to remain and reside with the purchaser. As Lord Ashbourne observed at p. 555 of *Nordenfelt*:

I think it is quite clear that the covenant must be taken as entered into in connection with the sale of the goodwill of the appellant's business, and that it was entered into with the plain and bona fide object of protecting that business.

And as stated by Dickson J. (as he then was) in *Elsley v. J. G. Collins Insurance Agencies Ltd.*, [1978] 2 S.C.R. 916, at p. 924:

A person seeking to sell his business might find himself with an unsaleable commodity if denied the right to assure the purchaser that he, the vendor, would not later enter into competition.

See also *Burgess v. Industrial Frictions & Supply Co.* (1987), 12 B.C.L.R. (2d) 85 (C.A.), *per* McLachlin J.A. (as she then was), at p. 95.

[22] The same considerations will not apply in the employer/employee context. No doubt an employee may build up a relationship with customers of the employer, but there is normally no payment for goodwill upon the employee leaving the employment of the employer. It is also accepted that there is generally an imbalance in power between employee and employer. For example, an employee may be at an economic disadvantage when litigating the reasonableness of a restrictive covenant because the employer may have access to greater resources (see, for example, *Elsley*, at p. 924, and *Mason v. Provident Clothing and Supply Co.*, [1913] A.C. 724 (H.L.), *per* Lord Moulton, at p. 745, quoted below at para. 33).

[23] The absence of payment for goodwill as well as the generally accepted imbalance in power between employee and employer justifies more rigorous scrutiny of restrictive covenants in employment contracts compared to those in contracts for the sale of a business.

contrepartie de la somme versée à ce titre, l'acheteur s'attend à ce que la clientèle de l'entreprise lui soit acquise et lui demeure fidèle. Dans *Nordenfelt*, lord Ashbourne a dit, à la p. 555 :

[TRADUCTION] Il me paraît très clair que la clause doit être considérée comme reliée à la vente de l'achalandage de l'entreprise de l'appelant et qu'elle visait manifestement et véritablement à protéger l'entreprise.

Je citerai aussi le juge Dickson (plus tard Juge en chef), qui a écrit ceci dans *Elsley c. J. G. Collins Insurance Agencies Ltd.*, [1978] 2 R.C.S. 916, p. 924 :

Celui qui cherche à vendre son entreprise peut se retrouver avec une chose invendable si on lui conteste le droit d'assurer l'acheteur que lui, le vendeur, ne lui fera pas concurrence plus tard.

Voir également *Burgess c. Industrial Frictions & Supply Co.* (1987), 12 B.C.L.R. (2d) 85 (C.A.), la juge McLachlin (plus tard Juge en chef du Canada), p. 95.

[22] Les mêmes considérations ne s'appliquent pas dans le contexte de la relation entre employeur et employé. Même si l'employé peut certainement nouer des liens avec les clients de son employeur, il ne reçoit généralement aucun paiement pour l'achalandage lorsqu'il quitte son emploi. Il est aussi reconnu qu'il y a généralement inégalité de pouvoir entre employeur et employé. Par exemple, l'employé qui conteste le caractère raisonnable d'une clause restrictive peut être désavantagé sur le plan financier parce qu'il ne dispose pas de ressources aussi considérables que celles auxquelles l'employeur peut avoir accès (voir, par exemple, *Elsley*, p. 924, et *Mason c. Provident Clothing and Supply Co.*, [1913] A.C. 724 (H.L.), lord Moulton, p. 745, cité plus loin au par. 33).

[23] L'absence de paiement pour l'achalandage, ainsi que l'inégalité de pouvoir généralement reconnue entre employeur et employé justifie un examen plus minutieux des clauses restrictives contenues dans les contrats de travail, par rapport à celles qui figurent dans les contrats de vente d'une entreprise.

[24]   An initial question in the present case is whether the restrictive covenant at issue is properly characterized as being contained in an employment contract or a contract for the sale of a business. The December 31, 1987 agreement covering the sale of Shafron's business did not contain a restrictive covenant. However, the agreement he entered into in early 1988 did. Whether the restrictive covenant in the 1988 agreement should be construed as being in relation to the sale of the business and the $700,000 goodwill payment is not the issue before the Court.

[25]   After Shafron sold his business, KRG Western was sold again in 1991 to Intercity. Shafron received no payment on account of goodwill when the shares of KRG Western were sold to Intercity. The contract in which the restrictive covenant at issue in this case was contained was entered into in 1998, some 11 years after Shafron sold his business and after it was sold a second time. The 1998 employment contract was entirely independent of the 1987 sale agreement and 1988 agreement. The fact that the restrictive covenant in the 1998 employment contract originated in the 1988 agreement has no bearing on the interpretation of the 1998 employment contract. The 1998 agreement is an employment contract and, as found by the trial judge, the reasonableness of the restrictive covenant must stand up to the more rigorous test applicable to employment contracts.

B.   *Determining Reasonableness*

[26]   As a general rule, according to Dickson J. in *Elsley*, at p. 925, the geographic coverage of the covenant and the period of time in which it is effective have been used to determine whether a restrictive covenant is reasonable. The extent of the activity sought to be prohibited is also relevant.

[27]   However, for a determination of reasonableness to be made, the terms of the restrictive covenant must be unambiguous. The reasonableness of a covenant cannot be determined without first

[24]   La première question soulevée dans le pourvoi est de savoir si la clause restrictive en litige est à juste titre qualifiée de stipulation incluse dans un contrat de travail ou si elle fait partie du contrat de vente d'une entreprise. L'entente conclue le 31 décembre 1987 concernant la vente de l'entreprise de M. Shafron ne comportait pas de clause restrictive. Par contre, le contrat signé au début de l'année 1988 en contenait une. La Cour n'est pas appelée ici à déterminer si la clause restrictive figurant dans le contrat passé en 1988 devrait être interprétée comme liée à la vente de l'entreprise et à la somme de 700 000 $ versée au titre de l'achalandage.

[25]   Après la vente de son entreprise par M. Shafron, KRG Western a été revendue à Intercity en 1991. M. Shafron n'a reçu aucun paiement pour l'achalandage lors de la vente des actions de KRG Western à Intercity. Le contrat contenant la clause restrictive en litige dans le pourvoi a été conclu en 1998, soit après la revente de l'entreprise, quelque 11 ans après sa vente initiale par M. Shafron. Le contrat de travail conclu en 1998 était complètement indépendant de la convention de vente de 1987 et du contrat de 1988. Le fait que la clause restrictive incluse dans le contrat d'emploi de 1998 tire son origine du contrat conclu en 1988 n'a aucune incidence sur l'interprétation du contrat de travail de 1998. Le contrat passé en 1998 est un contrat de travail et, comme l'a conclu le juge de première instance, le caractère raisonnable de la clause restrictive doit être apprécié selon le critère plus rigoureux applicable à ce type de contrat.

B.   *L'appréciation du caractère raisonnable*

[26]   Règle générale, le caractère raisonnable d'une clause restrictive est apprécié en regard de sa portée géographique et de sa durée, conformément aux motifs exposés par le juge Dickson dans *Elsley*, à la p. 925. L'ampleur des activités interdites est également pertinente.

[27]   Néanmoins, la question du caractère raisonnable ne pourra être tranchée que si les termes de la clause restrictive sont exempts d'ambiguïté. Il n'est pas possible de déterminer si une clause restrictive

establishing the meaning of the covenant. The onus is on the party seeking to enforce the restrictive covenant to show the reasonableness of its terms. An ambiguous restrictive covenant will be *prima facie* unenforceable because the party seeking enforcement will be unable to demonstrate reasonableness in the face of an ambiguity. As stated at the outset, the main difficulty that arises in this case is the ambiguity of the geographical restriction contained in the covenant. However, before turning to the case at hand, I will discuss the doctrine of severance as it applies to restrictive covenants in employment contracts.

[28]   As we see in this case, the limits on geographic scope often give rise to questions of severance. Can a restrictive covenant that is unreasonably wide in its geographic scope be severed in some manner so as to leave in place what the court regards as reasonable?

C.  *Severance*

[29]   Where severance is permitted, there appears to be two types: "blue-pencil" severance and "notional" severance. Both types of severance have been applied in limited circumstances to remove illegal features of a contract so as to render the contract in conformity with the law. Blue-pencil severance was described in *Attwood v. Lamont*, [1920] 3 K.B. 571 (C.A.), by Lord Sterndale as "effected when the part severed can be removed by running a blue pencil through it" (p. 578). In *Transport North American Express Inc. v. New Solutions Financial Corp.*, 2004 SCC 7, [2004] 1 S.C.R. 249, Bastarache J., in dissent, described this form of severance at para. 57:

Under the blue-pencil test, severance is only possible if the judge can strike out, by drawing a line through, the portion of the contract they want to remove, leaving the portions that are not tainted by illegality, without affecting the meaning of the part remaining.

est raisonnable sans que sa signification ait d'abord été établie. C'est à la partie qui réclame l'application d'une clause restrictive qu'il incombe de démontrer que sa teneur est raisonnable. Une clause restrictive ambiguë est à première vue inapplicable parce que son ambiguïté place la partie qui l'invoque dans l'impossibilité d'en démontrer le caractère raisonnable. Comme je l'ai expliqué dès le départ, le principal problème en l'espèce tient à l'ambiguïté de la portée géographique de la clause restrictive. Toutefois, avant d'examiner l'affaire qui nous est soumise, je traiterai de l'application de la théorie de la divisibilité aux clauses restrictives stipulées dans les contrats de travail.

[28]   Comme on le constate en l'espèce, les limites à la portée géographique soulèvent souvent la question de la divisibilité. Lorsque la portée géographique d'une clause restrictive est déraisonnable, est-il possible de lui appliquer la théorie de la divisibilité pour n'en conserver que ce que le tribunal juge raisonnable?

C.  *La divisibilité*

[29]   Lorsqu'il est permis de recourir à la divisibilité, celle-ci peut prendre deux formes : la divisibilité pure et simple, ou « technique du trait de crayon bleu », et la « divisibilité fictive ». Ces deux types de divisibilité ont été appliqués dans des circonstances limitées pour retrancher les éléments illégaux d'un contrat de manière à le rendre conforme au droit. Selon la description donnée par lord Sterndale dans *Attwood c. Lamont*, [1920] 3 K.B. 571 (C.A.), le recours à la divisibilité pure et simple est possible [TRADUCTION] « lorsqu'on peut supprimer la partie retranchée en la rayant d'un trait de crayon bleu » (p. 578). Dans *Transport North American Express Inc. c. New Solutions Financial Corp.*, 2004 CSC 7, [2004] 1 R.C.S. 249, le juge Bastarache, dissident, a décrit ce type de divisibilité dans les termes suivants, au par. 57 :

D'après le test du trait de crayon bleu, la divisibilité peut être appliquée uniquement lorsque le juge peut retrancher, en la raturant, la partie du contrat qu'on entend supprimer, tout en conservant les parties non viciées par l'illégalité, et ce sans que ne soit affecté le sens du reste du document.

[30]   Notional severance involves reading down an illegal provision in a contract that would be unenforceable in order to make it legal and enforceable (see *Transport*, at para. 2). In *Transport*, the contract provided that interest was to be charged at a rate exceeding 60 percent contrary to s. 347 of the *Criminal Code*. There was no evidence of an intention to contravene this provision, and this was not a case of loan sharking. Arbour J. applied the doctrine of notional severance to effectively read down the interest rate to the legal statutory maximum of 60 percent.

[31]   In *Transport*, a condition for application of the doctrine of notional severance appears to have been that what was illegal was easily determined by a bright-line provision in the *Criminal Code*. At para. 34, Arbour J. stated:

This legislatively mandated bright line [of 60 percent] distinguishes s. 347 cases from those involving provisions, for example, in restraint of trade, where there is no bright line.

It is apparent that Arbour J. would not have applied the doctrine of notional severance where there was no bright-line test for illegality. (See also *Globex Foreign Exchange Corp. v. Kelcher*, 2005 ABCA 419, 262 D.L.R. (4th) 752, at para. 46.)

[32]   It must be recognized, however, that the court is altering the terms of the original contract between the parties by applying the doctrine of severance, whether blue-pencil or notional. In *Transport*, Arbour J. observed at para. 30, that "[i]ndeed, all forms of severance alter the terms of the original agreement". Where severance is applied, whether blue-pencil or notional, the purpose is to give effect to the intention of the parties when they entered into the contract. However, courts will be restrained in their application of severance because of the right of parties to freely contract and to choose the words that determine their obligations and rights.

[30]   La divisibilité fictive consiste à donner une interprétation atténuée d'une clause contractuelle illégale, qui serait inapplicable, de façon à la rendre légale et applicable (voir *Transport*, par. 2). Dans *Transport*, le contrat prévoyait un taux d'intérêt supérieur à 60 p. 100, ce qui était contraire à l'art. 347 du *Code criminel*. Rien n'indiquait que les parties aient eu l'intention de contrevenir à cette disposition et il ne s'agissait pas d'une affaire de prêt usuraire. La juge Arbour a eu recours à la théorie de la divisibilité fictive pour ramener le taux d'intérêt au taux maximum de 60 p. 100 autorisé par la loi.

[31]   Dans *Transport*, l'existence dans le *Code criminel* d'une ligne de démarcation nette permettant de déterminer facilement ce qui était illégal semble avoir été considérée comme une condition d'application de la théorie de la divisibilité fictive. Au paragraphe 34, la juge Arbour s'est exprimée ainsi :

Cette démarcation prescrite par la loi [60 p. 100] distingue les affaires fondées sur l'art. 347 de celles concernant les clauses — restreignant la liberté de commerce par exemple — à l'égard desquelles il n'existe pas de telle ligne de démarcation nette.

La juge Arbour n'aurait apparemment pas appliqué la théorie de la divisibilité fictive s'il n'avait pas existé de critère de démarcation nette entre la légalité et l'illégalité. (Voir aussi *Globex Foreign Exchange Corp. c. Kelcher*, 2005 ABCA 419, 262 D.L.R. (4th) 752, par. 46.)

[32]   Il faut toutefois reconnaître que le tribunal modifie les stipulations du contrat original conclu entre les parties lorsqu'il applique la théorie de la divisibilité, qu'il s'agisse de la technique du trait de crayon bleu ou de la divisibilité fictive. Dans *Transport*, la juge Arbour a souligné, au par. 30, que « [d]e fait, toutes les techniques d'application de la divisibilité modifient les conditions de la convention originale ». L'application de la théorie de la divisibilité, pure et simple ou fictive, a pour objectif de donner effet à l'intention qu'avaient les parties au moment de la conclusion du contrat. Toutefois, les tribunaux disposeront d'une marge de manœuvre restreinte dans leur application de la théorie de la divisibilité en raison du droit des parties de contracter librement et de définir leurs droits et obligations dans les termes de leur choix.

Case 2:14-cv-02069-DDC-KGS   Document 144-6   Filed 07/10/14   Page 16 of 24

172          SHAFRON *v.* KRG INSURANCE BROKERS   *Rothstein J.*          [2009] 1 S.C.R.

D.  *Blue-Pencil and Notional Severance Applied to Restrictive Covenants*

[33]  Where the provision in question is a restrictive covenant in an employment contract, severance poses an additional concern. While the courts wish to uphold contractual rights and obligations between the parties, applying severance to an unreasonably wide restrictive covenant invites employers to draft overly broad restrictive covenants with the prospect that the courts will only sever the unreasonable parts or read down the covenant to what the courts consider reasonable. In *Mason*, Lord Moulton made the well-known statement to this effect at p. 745:

It would in my opinion be pessimi exempli if, when an employer had exacted a covenant deliberately framed in unreasonably wide terms, the Courts were to come to his assistance and, by applying their ingenuity and knowledge of the law, carve out of this void covenant the maximum of what he might validly have required. It must be remembered that the real sanction at the back of these covenants is the terror and expense of litigation, in which the servant is usually at a great disadvantage, in view of the longer purse of his master.

[34]  Lord Moulton did not foreclose severance entirely. However, he considered it exceptional and applicable only where there could be a clear severance and, even then, only where the excess was of a trivial or technical nature. He stated at p. 745:

My Lords, I do not doubt that the Court may, and in some cases will, enforce a part of a covenant in restraint of trade, even though the covenant as a whole the covenant exceeds what is reasonable. But, in my opinion, that ought only to be done in cases where the part so enforceable is <u>clearly severable, and even so only in cases where the excess is of trivial importance, or merely technical, and not a part of the main purport and substance of the clause</u>. [Emphasis added.]

D.  *L'application de la technique du trait de crayon bleu et de la divisibilité fictive aux clauses restrictives*

[33]  Lorsque la stipulation en litige est une clause restrictive figurant dans un contrat de travail, l'application de la théorie de la divisibilité pose une difficulté supplémentaire. Bien que le souhait des tribunaux soit de donner effet aux droits et obligations stipulés par les parties, l'application de la théorie de la divisibilité à une clause restrictive d'une portée excessive incite en fait les employeurs à rédiger des clauses restrictives d'une portée démesurée en s'attendant à ce que les tribunaux en retranchent les éléments déraisonnables ou en donnent une interprétation atténuée selon ce qu'ils jugent raisonnable. Citons à ce propos, les célèbres observations faites par lord Moulton dans *Mason*, à la p. 745 :

[TRADUCTION] À mon avis, il serait absolument déplorable que les tribunaux viennent en aide à l'employeur qui a imposé une clause délibérément formulée dans des termes déraisonnablement larges et mettent à profit leur ingéniosité et leur connaissance du droit pour récupérer de cette clause nulle le maximum de ce que l'employeur aurait pu exiger en toute légitimité. Il ne faut pas oublier que la véritable sanction inscrite en filigrane dans ces clauses réside dans la terreur et les coûts d'une poursuite judiciaire, lors de laquelle l'employé se trouve habituellement désavantagé étant donné la bourse mieux garnie de son employeur.

[34]  Lord Moulton n'a pas complètement exclu le recours à la divisibilité. Toutefois, il s'agissait pour lui d'une solution exceptionnelle, applicable uniquement aux stipulations clairement divisibles et, encore, à la condition qu'elles soient dénuées d'importance ou qu'elles soient de pure forme. Il s'est exprimé ainsi à la p. 745 :

[TRADUCTION] Vos seigneuries, je ne doute pas qu'il est possible, et qu'il arrivera dans certains cas, que la Cour applique une partie d'une clause restreignant la liberté de commerce, même si cette clause, prise globalement, va au-delà de ce qui est raisonnable. Mais à mon sens, cette solution ne devrait être retenue que dans les cas où la partie applicable <u>est clairement divisible, et seulement lorsque les stipulations excessives sont dénuées d'importance ou sont de pure forme, et ne font partie ni de l'objet principal ni de la substance de la clause</u>. [Je souligne.]

[35]   Other cases have accepted that severance might be applied if the severed parts are independent of one another or can be severed without the severance affecting the meaning of the part remaining. See, for example, *T. S. Taylor Machinery Co. v. Biggar* (1968), 2 D.L.R. (3d) 281 (Man. C.A.), at p. 290, *Putsman v. Taylor*, [1927] 1 K.B. 637 (Div. Ct.), at pp. 639-40, and *T. Lucas & Co. v. Mitchell*, [1974] Ch. 129 (C.A.), at p. 135.

[36]   I think the approach of Lord Moulton in *Mason* is the appropriate view of the law rather than the approach taken in the cases cited in para. 35 above. I am of the opinion that blue-pencil severance may be resorted to sparingly and only in cases where the part being removed is clearly severable, trivial and not part of the main purport of the restrictive covenant. However, the general rule must be that a restrictive covenant in an employment contract found to be ambiguous or unreasonable in its terms will be void and unenforceable.

[37]   However, I am also of the view that notional severance has no place in the construction of restrictive covenants in employment contracts. In my opinion, there are at least two reasons why it would be inappropriate to extend the doctrine of notional severance to the case of restrictive covenants in employment contracts.

[38]   First, there is no bright-line test for reasonableness. In the case of a contract that provides for an illegal rate of interest, for example, notional severance has been used to bring the rate down to the legal rate of 60 percent. In *Transport*, the evidence was that the parties did not intend to enter into an illegal contract, and what must be done to make the contract legal was quite clear. The Court inferred that the parties' original common intention was to charge and pay the highest legal interest rate and notional severance was applied to read down the rate to the highest legal rate.

[35]   Dans d'autres causes, on a estimé possible de recourir à la divisibilité si les parties retranchées sont indépendantes des autres ou peuvent être retranchées sans que le sens du reste du document ne soit affecté. Voir, par exemple, *T. S. Taylor Machinery Co. c. Biggar* (1968), 2 D.L.R. (3d) 281 (C.A. Man.), p. 290, *Putsman c. Taylor*, [1927] 1 K.B. 637 (C. div.), p. 639-640, et *T. Lucas & Co. c. Mitchell*, [1974] Ch. 129 (C.A.), p. 135.

[36]   J'estime que la vision du droit qu'il faut retenir est celle qui se dégage du raisonnement de Lord Moulton dans *Mason*, et non celle exprimée dans la jurisprudence citée au par. 35 ci-dessus. Selon moi, la technique du trait de crayon bleu devrait être appliquée avec parcimonie, et uniquement dans les cas où la partie retranchée peut clairement être séparée du reste de la clause, est dénuée d'importance et ne fait pas partie de l'objet principal de la clause restrictive. Néanmoins, la règle générale doit être la suivante : une clause restrictive ambiguë ou déraisonnable figurant dans un contrat de travail est nulle et inapplicable.

[37]   Je suis également d'avis que la théorie de la divisibilité fictive ne doit pas être appliquée pour interpréter les clauses restrictives d'un contrat de travail. À mon avis, il y a au moins deux raisons pour lesquelles il serait inopportun d'étendre la théorie de la divisibilité fictive aux clauses restrictives d'un contrat de travail.

[38]   Premièrement, il n'existe pas de critère de démarcation nette pour l'appréciation du caractère raisonnable. Dans le cas d'un contrat qui prévoit un taux d'intérêt illégal, par exemple, la théorie de la divisibilité fictive a été appliquée pour ramener le taux au maximum de 60 p. 100 autorisé par la loi. Dans *Transport*, il ressortait de la preuve que les parties n'avaient pas l'intention de conclure un contrat illégal et il était très facile de déterminer ce qu'il fallait faire pour rendre le contrat conforme à la loi. La Cour a conclu que les parties avaient initialement l'intention commune d'exiger et de payer le taux d'intérêt légal le plus élevé et elle a appliqué la théorie de la divisibilité fictive pour ramener le taux au maximum prévu par la loi.

[39]   In the case of an unreasonable restrictive covenant, while the parties may not have had the common intention that the covenant be unreasonable, there is no objective bright-line rule that can be applied in all cases to render the covenant reasonable. Applying notional severance in these circumstances simply amounts to the court rewriting the covenant in a manner that it subjectively considers reasonable in each individual case. Such an approach creates uncertainty as to what may be found to be reasonable in any specific case.

[40]   Second, applying the doctrine of notional severance runs into the problem identified by Lord Moulton in *Mason*. It invites the employer to impose an unreasonable restrictive covenant on the employee with the only sanction being that if the covenant is found to be unreasonable, the court will still enforce it to the extent of what might validly have been agreed to.

[41]   Not only would the use of notional severance change the terms of the covenant from the parties' initial agreement to what the court thinks they should have agreed to, it would also change the risks assumed by the parties. The restrictive covenant is sought by the employer. The obligation is on the employee. Having regard to the generally accepted imbalance of power between employers and employees, to introduce the doctrine of notional severance to read down an unreasonable restrictive covenant to what is reasonable provides no inducement to an employer to ensure the reasonableness of the covenant and inappropriately increases the risk that the employee will be forced to abide by an unreasonable covenant.

[42]   For these reasons, the doctrine of notional severance does not apply in respect of restrictive covenants in employment contracts.

V.   Application to This Case

[43]   Normally, the reasonableness of a restrictive covenant is determined by considering the extent of the activity sought to be prohibited and the extent of the temporal and spatial scope of the prohibition.

[39]   Dans le cas d'une clause restrictive déraisonnable, bien que les parties n'aient peut-être pas eu l'intention commune de stipuler une clause déraisonnable, il n'existe pas de règle objective de démarcation nette qui puisse être appliquée dans tous les cas pour obtenir une clause raisonnable. Appliquer la théorie de la divisibilité fictive dans ces circonstances équivaut à récrire la clause en lui attribuant le contenu que le tribunal estime raisonnable, d'un point de vue subjectif, dans chaque cas particulier. Cette façon de procéder engendre l'incertitude quant à ce qui peut être jugé raisonnable dans un cas donné.

[40]   Deuxièmement, l'application de la théorie de la divisibilité fictive pose le problème décrit par lord Moulton dans *Mason*. Elle incite l'employeur à imposer une clause restrictive déraisonnable à l'employé en risquant, pour unique sanction, que le tribunal, s'il juge la clause déraisonnable, lui donne néanmoins effet dans la mesure de ce qui aurait pu être valablement stipulé par les parties.

[41]   Non seulement le recours à la théorie de la divisibilité fictive modifierait la clause stipulée à l'origine par les parties en lui substituant celle dont le tribunal estime que les parties auraient dû convenir, mais encore elle modifierait les risques assumés par les parties. C'est l'employeur qui stipule la clause restrictive et c'est à l'employé qu'incombe l'obligation. Compte tenu de l'inégalité de pouvoir généralement reconnue entre employeur et employé, le recours à la théorie de la divisibilité fictive pour attribuer une interprétation atténuée raisonnable à une clause restrictive déraisonnable n'incite pas l'employeur à stipuler une clause raisonnable et accroît indûment le risque que l'employé soit contraint de consentir à une clause déraisonnable.

[42]   Pour ces motifs, la théorie de la divisibilité fictive ne s'applique pas aux clauses restrictives d'un contrat de travail.

V.   Application aux faits de l'espèce

[43]   Le caractère raisonnable d'une clause restrictive s'apprécie habituellement au regard de l'ampleur des activités interdites ainsi que de la portée géographique et de la durée de l'interdiction. Le

This case is different because of the added issue of ambiguity. As indicated, a restrictive covenant is *prima facie* unenforceable unless it is shown to be reasonable. However, if the covenant is ambiguous, in the sense that what is prohibited is not clear as to activity, time, or geography, it is not possible to demonstrate that it is reasonable. Thus, an ambiguous restrictive covenant is, by definition, *prima facie* unreasonable and unenforceable. Only if the ambiguity can be resolved is it then possible to determine whether the unambiguous restrictive covenant is reasonable.

[44]  The trial judge found that there was no legal or judicial definition of the term "Metropolitan City of Vancouver". In finding that the spatial area covered by the restrictive covenant was not clear and certain, the trial judge referred to the evidence of the principal of KRG Western. At para. 56 of his reasons, he wrote:

Mr. Meier's [principal of KRG Western] cross-examination at this trial was revealing as to what the parties had in mind when the phrase was used. At one point he testified that the phrase "means different things to different people". As his evidence progressed he thought that what was intended was the Greater Vancouver Regional District but "not Lion's Bay". At another point he indicated that it meant "Vancouver and suburbs" and finally he defined it on a population base indicating he thought it included "1.4 million people". During the course of his evidence he clearly indicated his belief that it was not limited to the City of Vancouver.

On the basis of this and other evidence, the trial judge found that the language of the restrictive covenant was neither clear nor certain and for this and other reasons dismissed the claim of KRG Western against Shafron.

[45]  The Court of Appeal agreed that the term "Metropolitan City of Vancouver" was ambiguous. At para. 59, Chiasson J.A. wrote:

présent pourvoi se distingue en ce qu'il soulève en outre la question de l'ambiguïté de la clause. Comme nous l'avons vu, une clause restrictive est à première vue inapplicable, à moins qu'il ne soit démontré qu'elle est raisonnable. Mais si la clause est ambiguë, en ce sens que l'interdiction n'est pas clairement définie quant à sa durée, à sa portée géographique ou à l'activité interdite, il est impossible d'en démontrer le caractère raisonnable. Une clause restrictive ambiguë est donc par définition déraisonnable et inapplicable à première vue. C'est uniquement si l'ambiguïté peut être dissipée qu'il devient possible de déterminer si la clause restrictive non ambiguë est raisonnable.

[44]  Le juge de première instance a constaté l'absence de définition législative ou jurisprudentielle de l'expression [TRADUCTION] « l'agglomération de la ville de Vancouver ». Il s'est reporté au témoignage du directeur de KRG Western pour conclure que le secteur géographique visé par la clause restrictive n'était ni clair ni précis. Voici ce qu'il a écrit au par. 56 de ses motifs :

[TRADUCTION] Le contre-interrogatoire de M. Meier [le directeur de KRG Western] pendant le procès est révélateur de ce que les parties avaient à l'esprit en utilisant cette expression. Il a déclaré à un moment que cette expression « a une signification différente pour des personnes différentes ». Plus loin dans son témoignage, il a dit croire qu'on voulait parler du District régional de Vancouver, mais « pas de Lion's Bay ». À un autre moment, il a indiqué que cette expression désignait « Vancouver et sa banlieue », puis il a finalement défini l'expression en fonction de la population, précisant qu'elle incluait selon lui « 1,4 million de personnes ». Au cours de son témoignage, il a clairement indiqué que, dans son esprit, l'expression ne visait pas uniquement la ville de Vancouver.

Ce témoignage et d'autres éléments de preuve ont amené le juge de première instance à conclure que la clause restrictive n'était ni claire ni précise. Pour cette raison, et pour d'autres motifs, il a rejeté l'action intentée par KRG Western contre M. Shafron.

[45]  La Cour d'appel a elle aussi jugé ambiguë l'expression [TRADUCTION] « l'agglomération de la ville de Vancouver ». Au paragraphe 59, le juge Chiasson a déclaré ce qui suit :

There is no fixed, recognized meaning for the phrase "Metropolitan City of Vancouver". Various suggested meanings were provided at trial and in this Court. They served merely to reinforce the ambiguity of the phrase.

[46] However, the Court of Appeal was satisfied that "there is no doubt that the parties intended to prevent Mr. Shafron from competing in the City of Vancouver and an area beyond the City" (para. 80). It then determined that what "likely was in the reasonable contemplation of the parties when they made their agreement" (para. 63) was "the City of Vancouver, the University of British Columbia Endowment Lands, Richmond and Burnaby" (para. 61). In construing the ambiguous term "Metropolitan City of Vancouver" in the way it did, the Court of Appeal said that it relied on the doctrine of notional severance to resolve the ambiguity.

## A. *Severance Cannot Be Invoked to Resolve the Ambiguity*

[47] With respect, I do not think that what the Court of Appeal did constituted notional severance. As explained above, in *Transport*, notional severance was used to read down an illegal provision in a contract to render it legal. That is not what the Court of Appeal purported to do in this case. It was in fact trying to resolve the ambiguity in the term "Metropolitan City of Vancouver" by reading down covenant according to its notion of reasonableness and what it thought the parties might have intended (paras. 59 and 63). As stated earlier, notional severance does not permit a court to rewrite a restrictive covenant in an employment contract in order to reflect its own view of what the parties' consensus *ad idem* might have been or what the court thinks is reasonable in the circumstances.

[48] In the alternative, KRG Western submitted (at para. 116 of its factum) that, if this Court is unwilling to uphold the decision of the Court of Appeal which held that "Metropolitan City of Vancouver"

[TRADUCTION] Il n'existe aucune définition établie et reconnue de l'expression « l'agglomération de la ville de Vancouver ». Diverses significations ont été proposées pendant le procès et devant notre Cour. Elles n'ont servi qu'à accentuer l'ambiguïté de cette expression.

[46] Toutefois, la Cour d'appel était convaincue que [TRADUCTION] « les parties avaient sans l'ombre d'un doute l'intention d'empêcher M. Shafron de faire concurrence à l'entreprise dans la ville de Vancouver et dans les environs » (par. 80). Elle a ensuite conclu que le secteur [TRADUCTION] « sans doute raisonnablement envisagé par les parties lorsqu'elles ont conclu l'entente » (par. 63) était composé de « la ville de Vancouver, la dotation foncière universitaire de l'Université de la Colombie-Britannique, Richmond et Burnaby » (par. 61). La Cour d'appel a dit s'être appuyée sur la théorie de la divisibilité fictive pour interpréter ainsi l'expression ambiguë [TRADUCTION] « l'agglomération de la ville de Vancouver ».

## A. *La divisibilité ne peut être invoquée pour dissiper l'ambiguïté*

[47] En toute déférence, je ne crois pas que la Cour d'appel ait effectivement appliqué la théorie de la divisibilité fictive. Comme je l'ai expliqué précédemment, la Cour a appliqué la théorie de la divisibilité fictive dans *Transport* pour donner une interprétation atténuée d'une clause illégale afin de la rendre légale. Ce n'est pas ce que la Cour d'appel voulait faire en l'espèce. Elle essayait en fait de dissiper l'ambiguïté de l'expression [TRADUCTION] « l'agglomération de la ville de Vancouver » en donnant une interprétation atténuée de la clause selon ce qu'elle jugeait raisonnable et sa perception de l'intention possible des parties (par. 59 et 63). Comme je l'ai déjà indiqué, la théorie de la divisibilité fictive ne permet pas à un tribunal de récrire une clause restrictive d'un contrat de travail en accord avec sa propre perception du consensus auquel ont pu arriver les parties ou avec ce qu'il juge raisonnable dans les circonstances.

[48] KRG Western a fait valoir à titre subsidiaire (par. 116 de son mémoire) que, dans le cas où notre Cour ne serait pas disposée à confirmer la décision de la Cour d'appel interprétant

should be read to include "the City of Vancouver, the University of British Columbia Endowment Lands, Richmond and Burnaby", this Court should apply blue-pencil severance and remove the word "Metropolitan". In my view, blue-pencil severance does not apply here.

[49] As I have stated, blue-pencil severance is to be applied narrowly, and only in particular circumstances. In *Canadian American Financial Corp. (Canada) Ltd. v. King* (1989), 60 D.L.R. (4th) 293 (B.C.C.A.), Lambert J.A. stated, at pp. 305-6, that

the courts will only [apply blue pencil severance to] sever the covenant and expunge a part of it if the obligation that remains can fairly be said to be a sensible and reasonable obligation in itself and such that the parties would unquestionably have agreed to it without varying any other terms of the contract or otherwise changing the bargain. . . . It is in that context that reference is made in the cases severing and expunging merely trivial or technical parts of an invalid covenant, which are not part of the main purport of the clause, in order to make it valid . . . .

[50] Removal of the word "Metropolitan" would leave behind only "City of Vancouver". KRG Western, in its factum, stated that the "context makes it clear the parties intended the restricted area to cover not only the City of Vancouver, but also the suburbs immediately surrounding Vancouver" (para. 82). The Court of Appeal stated that the parties "clearly intended a geographic reach that included the City of Vancouver and something more" (para. 57 (emphasis added)). However, there is no evidence that the parties would have "unquestionably" agreed to remove the word "Metropolitan" "without varying any other terms of the contract or otherwise changing the bargain". Blue-pencil severance is therefore not applicable in this case.

l'expression [TRADUCTION] « l'agglomération de la ville de Vancouver » comme désignant « la ville de Vancouver, la dotation foncière universitaire de l'Université de la Colombie-Britannique, Richmond et Burnaby », elle devrait appliquer la technique du trait de crayon bleu et supprimer les mots « l'agglomération de ». À mon avis, la divisibilité pure et simple ne s'applique pas en l'occurrence.

[49] Comme je l'ai expliqué, la divisibilité pure et simple doit être appliquée restrictivement, et uniquement dans des circonstances particulières. Dans *Canadian American Financial Corp. (Canada) Ltd. c. King* (1989), 60 D.L.R. (4th) 293 (C.A.C.-B.), le juge Lambert a déclaré, aux p. 305-306, que

[TRADUCTION] les tribunaux n'auront [recours à la technique du trait de crayon bleu pour] diviser la clause et en retrancher un élément que s'il est honnêtement possible de dire que l'obligation qui subsiste est en soi une obligation sensée et raisonnable sur laquelle les parties se seraient incontestablement entendues sans changer quoi que ce soit aux autres clauses du contrat ni modifier autrement le marché. [. . .] C'est dans ce contexte qu'il est question, dans la jurisprudence, de la possibilité de diviser une clause invalide ou d'en supprimer des éléments qui sont dénués d'importance ou qui sont de pure forme, et qui sont étrangers à son objet principal, afin de la rendre valide . . .

[50] En supprimant les mots « l'agglomération de », il ne resterait que les mots « la ville de Vancouver ». KRG Western écrit dans son mémoire qu'il [TRADUCTION] « ressort clairement du contexte que, pour les parties, le secteur géographique visé par la restriction devait inclure non seulement la ville de Vancouver, mais également ses banlieues immédiates » (par. 82). La Cour d'appel a estimé que les parties [TRADUCTION] « avaient clairement en tête une portée géographique qui comprenait la ville de Vancouver et quelque chose de plus » (par. 57 (je souligne)). Cependant, aucun élément de preuve ne démontre que les parties se seraient « incontestablement » entendues pour supprimer les mots « l'agglomération de » « sans changer quoi que ce soit aux autres clauses du contrat ni modifier autrement le marché ». La divisibilité pure et simple n'est par conséquent pas applicable en l'espèce.

B. *No Case Made Out for Rectification*

[51]   KRG Western in its factum says that it was obvious that "something must have gone wrong with the language" of the covenant and that "Metropolitan City of Vancouver" is a "mistaken description" (paras. 75 and 78). This submission and KRG's pleadings at first instance invite the Court to apply the doctrine of rectification to clarify the mistaken description.

[52]   However, this is not a case in which rectification is properly applicable. In *Frederick E. Rose (London) Ld. v. William H. Pim Jnr. & Co.*, [1953] 2 Q.B. 450 (C.A.), Denning L.J. stated at p. 461:

Rectification is concerned with contracts and documents, not with intentions. In order to get rectification it is necessary to show that the parties were in complete agreement on the terms of their contract, but by an error wrote them down wrongly; and in this regard, in order to ascertain the terms of their contract, you do not look into the inner minds of the parties — into their intentions — any more than you do in the formation of any other contract.

Here, there was nothing to indicate what the parties intended by the use of the term "Metropolitan" when they entered into the covenant and nothing to indicate that they agreed on an area and then mistakenly wrote down "Metropolitan".

[53]   In *Performance Industries Ltd. v. Sylvan Lake Golf & Tennis Club Ltd.*, 2002 SCC 19, [2002] 1 S.C.R. 678, Binnie J., at paras. 37-40, set out the necessary requirements for rectification: (1) the existence and content of the inconsistent prior oral agreement; (2) that the party seeking to uphold the terms of the written agreement knew or ought to have known about the lack of correspondence between the written document and the oral agreement, in circumstances amounting to fraud or the equivalent of fraud; and (3) "the precise form" in which the written instrument can be made to express the prior intention.

B. *Le droit à la rectification n'a pas été établi*

[51]   Dans son mémoire, KRG Western affirme que, de toute évidence, [TRADUCTION] « il doit y avoir eu erreur dans le libellé » de la clause et que l'expression « l'agglomération de la ville de Vancouver » constitue une « description erronée » (par. 75 et 78). Cette prétention et les actes de procédure déposés par KRG en première instance invitent la Cour à appliquer la théorie de la rectification pour clarifier cette description erronée.

[52]   Il ne s'agit cependant pas d'une affaire où la rectification est possible. Dans *Frederick E. Rose (London) Ld. c. William H. Pim Jnr. & Co.*, [1953] 2 Q.B. 450 (C.A.), le lord juge Denning a apporté les précisions suivantes, à la p. 461 :

[TRADUCTION] La rectification concerne les contrats et les documents, et non les intentions. Pour obtenir une rectification, il faut démontrer que les parties étaient parfaitement d'accord sur les stipulations du contrat, mais qu'elles ont fait une erreur lorsqu'elles les ont consignées par écrit; et il n'y a pas davantage lieu à cet égard, pour établir les conditions du contrat conclu, de sonder la pensée des parties — de sonder leurs intentions — qu'il n'y a lieu de le faire à propos de la formation de tout autre contrat.

En l'espèce, rien n'indiquait ce que les parties avaient en tête en utilisant le mot « agglomération » lors de la conclusion du contrat et rien n'indiquait qu'elles s'étaient entendues sur un secteur géographique, puis avaient écrit le mot « agglomération » par erreur.

[53]   Dans *Performance Industries Ltd. c. Sylvan Lake Golf & Tennis Club Ltd.*, 2002 CSC 19, [2002] 1 R.C.S. 678, le juge Binnie a énoncé, aux par. 37-40, les conditions préalables à la rectification : il faut (1) établir l'existence et la teneur de l'entente verbale antérieure incompatible; (2) prouver que la partie qui réclame l'application de l'entente écrite connaissait ou aurait dû connaître la discordance entre l'entente verbale et l'entente écrite, dans des circonstances qui constituent une fraude ou l'équivalent d'une fraude; et (3) démontrer « de façon précise » comment l'écrit peut être formulé pour exprimer l'intention antérieure.

[54]   In this case, KRG Western has shown no prior oral agreement, let alone the content of one. Rather, it simply asserts that "something must have gone wrong with the language" of the contract. Without pointing to a prior agreement that was departed from when the contract was put into writing, rectification is not available.

[55]   In Binnie J.'s discussion of the "precise form" requirement, at para. 40, he stated:

The third hurdle is that Sylvan (Bell) [the respondent in that case] must show "the precise form" in which the written instrument can be made to express the prior intention (*Hart*, *supra*, *per* Duff J., at p. 630). This requirement closes the "floodgates" to those who would invite the court to speculate about the parties' unexpressed intentions, or impose what in hindsight seems to be a sensible arrangement that the parties might have made but did not. The court's equitable jurisdiction is limited to putting into words that — and only that — which the parties had already orally agreed to.

In my view, the Court of Appeal imposed what in hindsight seemed to it to be a sensible arrangement that the parties might have made, but did not.

[56]   I would also note Binnie J.'s comments, at para. 31:

In *Hart*, *supra*, at p. 630, Duff J. (as he then was) stressed that "[t]he power of rectification must be used with great caution". Apart from everything else, a relaxed approach to rectification as a substitute for due diligence at the time a document is signed would undermine the confidence of the commercial world in written contracts.

[57]   In this case, KRG Western can point to no prior agreement, written or oral, that explains the term "Metropolitan City of Vancouver". Rectification is used to restore what the parties' agreement actually was, were it not for the error in the written agreement. In the present case, there is no indication that the parties agreed on something

[54]   En l'espèce, KRG Western n'a pas établi l'existence d'une entente verbale antérieure, et encore moins la teneur d'une telle entente. Elle affirme simplement qu'il [TRADUCTION] « doit y avoir eu erreur dans le libellé » du contrat. Pour demander une rectification, il faut impérativement faire valoir une entente antérieure à laquelle il aurait été dérogé lorsque le contrat a été consigné par écrit.

[55]   Le juge Binnie a fait les observations suivantes, au par. 40, sur l'obligation de démontrer « de façon précise » comment l'écrit peut être formulé :

Suivant le troisième obstacle, Sylvan (Bell) [l'intimée dans cette cause] doit démontrer [TRADUCTION] « de façon précise » comment l'écrit peut être formulé pour exprimer l'intention antérieure (*Hart*, précité, le juge Duff, p. 630). Cette exigence prévient « l'avalanche de poursuites » de la part de ceux qui inviteraient les tribunaux à spéculer sur les intentions inexprimées des parties ou à imposer ce qui, a posteriori, semble être un arrangement judicieux, qu'auraient pu conclure les parties mais qu'elles n'ont par ailleurs pas choisi. La compétence des tribunaux en equity se limite à exprimer en mots ce sur quoi — et uniquement ce sur quoi — les parties s'étaient déjà entendues verbalement.

J'estime que la Cour d'appel a imposé ce qui, a posteriori, lui semblait être un arrangement judicieux qu'auraient pu conclure les parties, mais qu'elles n'ont par ailleurs pas choisi.

[56]   Je signalerais aussi les commentaires suivants faits par le juge Binnie au par. 31 :

Dans l'arrêt *Hart*, précité, p. 630, le juge Duff (plus tard Juge en chef du Canada) a souligné que [TRADUCTION] « [l]e pouvoir de rectification ne doit être utilisé qu'avec grande prudence ». Tout assouplissement de l'application de la rectification qui en ferait un substitut à l'exercice de diligence raisonnable lors de la signature d'un document aurait pour effet d'ébranler la confiance du monde des affaires à l'égard des contrats écrits.

[57]   En l'espèce, KRG Western ne peut faire valoir aucune entente préalable, écrite ou verbale, qui expliquerait l'expression [TRADUCTION] « l'agglomération de la ville de Vancouver ». La rectification a pour objet de rétablir l'entente véritablement conclue par les parties, n'eût été l'erreur commise dans l'entente écrite. Or dans le cas qui

and then mistakenly included something else in the written contract. Rather, they used an ambiguous term in the written contract. The original restrictive covenant was drafted by a Toronto lawyer who apparently did not know that "Metropolitan City of Vancouver" was not a legally defined term. The doctrine of rectification is not applicable.

VI. Conclusion

[58]   In my respectful opinion, the Court of Appeal erred when it rewrote the restrictive covenant in this case to substitute for the "Metropolitan City of Vancouver" the "City of Vancouver, the University of British Columbia Endowment Lands, Richmond and Burnaby". The term "Metropolitan City of Vancouver" was ambiguous and there was no context or other evidence demonstrating the mutual understanding of the parties at the time they entered into the contract as to what geographic area it covered. Further, the trial judge found that the restrictive covenant was unreasonable (para. 52). It was inappropriate for the Court of Appeal to rewrite the geographic scope in the restrictive covenant to what it thought was reasonable.

[59]   I would allow the appeal with costs here and in the courts below and restore the judgment of the trial judge dismissing KRG Western's action.

   *Appeal allowed with costs.*

   *Solicitors for the appellant: Clark Wilson, Vancouver.*

   *Solicitors for the respondent: Lindsay Kenney, Vancouver.*

nous occupe, rien ne permet de croire que les parties auraient convenu d'une chose, puis inscrit par erreur quelque chose d'autre dans le contrat écrit. En fait, elles ont plutôt utilisé une expression ambiguë dans le contrat écrit. La clause restrictive originale a été rédigée par un avocat de Toronto qui, semble-t-il, ne savait pas que l'expression [TRADUCTION] « l'agglomération de la ville de Vancouver » n'avait pas de sens défini en droit. La théorie de la rectification ne s'applique pas.

VI. Conclusion

[58]   À mon avis, la Cour d'appel a eu tort de récrire en l'espèce la clause restrictive pour remplacer [TRADUCTION] « l'agglomération de la ville de Vancouver » par « la ville de Vancouver, la dotation foncière universitaire de l'Université de la Colombie-Britannique, Richmond et Burnaby ». L'expression « l'agglomération de la ville de Vancouver » était ambiguë et il n'existait aucun contexte ni autre élément de preuve établissant que les parties s'étaient entendues, au moment de la conclusion du contrat, sur le secteur géographique visé par cette expression. Qui plus est, le juge de première instance a conclu que la clause restrictive était déraisonnable (par. 52). La Cour d'appel ne pouvait pas reformuler la portée géographique de la clause restrictive selon ce qui lui semblait raisonnable.

[59]   Je suis d'avis d'accueillir le pourvoi avec dépens devant notre Cour et devant les juridictions inférieures et de rétablir la décision du juge de première instance rejetant l'action de KRG Western.

   *Pourvoi accueilli avec dépens.*

   *Procureurs de l'appelant : Clark Wilson, Vancouver.*

   *Procureurs de l'intimée : Lindsay Kenney, Vancouver.*