# In the Court of Appeal of Alberta

**Citation: Anderson, Smyth & Kelly Customs Brokers Ltd. v. World Wide Customs Brokers Ltd., 1996 ABCA 169**

**Date:** 19960517
**Docket:** 14687
**Registry:** Calgary

**Between:**

### Anderson, Smyth & Kelly Customs Brokers Ltd.

Appellant
(Plaintiff)

- and -

### World Wide Customs Brokers Ltd. and Peter Kelly

Respondents
(Defendants)

**The Court:**

The Honourable Mr. Justice Harradence
The Honourable Mr. Justice Bracco
The Honourable Mr. Justice O'Leary

Reasons for Judgment of The Honourable Mr. Justice O'Leary
Concurred in by The Honourable Mr. Justice Harradence
And Concurred in by The Honourable Mr. Justice Bracco

**APPEAL FROM THE JUDGMENT OF THE HONOURABLE MR. JUSTICE MOSHANSKY OF THE COURT OF QUEEN'S BENCH OF ALBERTA DATED AUGUST 19, 1993**

COUNSEL:

D. Venturo and P. Anic, for the Appellant

S.D. Saville, for the Respondents

## REASONS FOR JUDGMENT OF
## THE HONOURABLE MR. JUSTICE O'LEARY

[1]     The Appellant and the Respondent World Wide Customs Brokers Ltd. ("World Wide") are customs brokers with offices at Edmonton and Calgary. The Respondent Kelly


EXHIBIT A-7

has been a licenced customs broker since 1972. He commenced employment with the Appellant in November, 1980. In February, 1985 he became a director, officer and minority shareholder of the Appellant and was placed in charge of the Edmonton office. At the same time he commenced sharing profits equally with William Anderson, the President and majority shareholder, and the corporate name was changed to reflect Kelly's status.

[2]     Kelly terminated his association with the Appellant on August 25, 1989 and immediately commenced employment with World Wide at its Edmonton office. Kelly solicited the business of the Appellant's clients and within weeks many of them ceased dealing with the Appellant and became clients of World Wide.

[3]     In 1985 World Wide agreed to act as the Appellant's agent at Coutts, Alberta, a port of entry on the Canada-United States border, and in that capacity became familiar with the identity and customs brokerage needs of many of the Appellant's clients.

[4]     The Appellant sued Kelly and World Wide alleging that by approaching and soliciting its clients immediately following his departure, Kelly breached fiduciary obligations owed to the Appellant. It is alleged that World Wide knowingly participated in Kelly's activities and shared the benefits of his wrongful conduct and is therefore jointly liable for the economic injury suffered by the Appellant. The Appellant seeks damages for the loss of past and future profits, damages for loss of goodwill and punitive damages.

[5]     The Trial Judge held that Kelly's conduct did not constitute a breach of any fiduciary duty owed to the Appellant and dismissed the action. In my opinion the Trial Judge was in error. Kelly was clearly in a fiduciary position. Notwithstanding the absence of an agreement restraining solicitation following termination, Kelly's conduct must be characterized as a breach of his fiduciary obligations to the Appellant. I would allow the appeal and direct that judgment be entered in favour of the Appellant against Kelly and World Wide jointly.

[6]     The principal witnesses on the issue of liability were Anderson, Kelly and Desmond Gouveia, President of World Wide. The Trial Judge made the following finding of credibility (A.B. p. 584):

> Mr. Kelly and Mr. Gouveia gave their evidence in a candid and straightforward manner. I perceived them to be credible witnesses. Mr. Anderson, on the other hand appeared evasive at times and less than forthcoming during his testimony. Wherever there is a conflict between his evidence and that of Kelly and Gouveia, I prefer and accept the evidence of the latter.

I do not question any of the findings of fact made by the Trial Judge based on the credibility of these witnesses.

1996 ABCA 169 (CanLII)

[7]     The Trial Judge found that Kelly did not solicit any of the Appellant's clients prior to leaving his employment (A.B. p. 586):

> I am satisfied from the evidence and I find that Kelly did not advise any clients of his intended move to World Wide prior to the actual share transfer and the proffering of his resignation to Anderson on August 25, 1989, although he did advise four individuals, …. shortly before August 25, 1989 that he was going to leave the Plaintiff. I further find that, with one exception … he did not contact any other client prior to August 25, 1989.

[8]     The Trial Judge found that Anderson was aware before Kelly's departure that Kelly would be soliciting some of the Appellant's clients on behalf of World Wide (A.B. p. 587):

> It is clear from the evidence that both Kelly and Anderson on August 25 discussed clients and competition for clients, with three clients being specifically mentioned, they being Globe Import, C-Jet and Multipech. I believe and accept Kelly's evidence that Anderson told him 'you can have them'. Anderson in cross-examination admitted making that statement but claimed that he 'didn't mean it'. I am not persuaded by his explanation. Interestingly, Kelly's first contact was with Globe Import, the proprietor of which himself arranged for the other two mentioned companies to transfer their accounts to Kelly at World Wide.

[9]     Kelly frankly admitted that he had, in the two or three weeks following severance of his relationship with the Appellant, contacted and solicited the business of some clients of the Appellant. The Trial Judge found (A.B. p. 587):

> <u>It is the evidence of all concerned, and candidly admitted by Mr. Kelly, that he commenced contacting, on August 28, 1989. and over approximately the next two or three weeks, those clients whom he had personally served as customs broker while with the Plaintiff.</u> He advised them he was no longer with the Plaintiff and that he had moved to World Wide. <u>He asked each of them whether they wished to have him continue as their customs broker.</u>
>
> It is not in dispute that 21 of those clients executed cancellations of power of attorneys over a two to three week period, beginning on August 28, 1989, terminating the services of the Plaintiff company as customs broker. They also signed new general agency agreements appointing World Wide as their new customs broker. ….It is not in dispute that except for I.C. Steel, the Defendant World Wide has provided customs brokerage services to each of those 21 clients since the date of cancellation with the Plaintiff.
>
>                                                             (emphasis added)

[10]    Representatives of four of the twenty-one clients who followed Kelly to World Wide testified. Each of them said that he would have transferred his brokerage business to World Wide even if Kelly had not asked them to do so. With respect to this evidence, the Trial Judge found (A.B. p. 590):

1996 ABCA 169 (CanLII)

> These four were all credible witnesses. All of them testified that their personal loyalty was to the individual broker rather than to the brokerage firm. Based on all of the evidence which I heard I have no doubt that this is so and that the same is true throughout the industry generally.

[11]  In its capacity as the Appellant's agent at Coutts, World Wide learned the identity of many of the Appellant's clients and acquired information about the volume and nature of the brokerage business created by them, information considered confidential by the Appellant. The Appellant based its claim against World Wide in part on an allegation that the latter had made improper use of the confidential information. The Trial Judge rejected the characterization of the information as confidential. He found the significance of the Appellant's client list to be marginal. Moreover, he concluded that there was no evidence that either World Wide or Kelly ever used the list after the latter's termination (A.B. pp. 591-92, 604).

[12]  I accept that the foregoing findings are reasonable. They are supported by the evidence. I do not, however, agree with the conclusion reached by the Trial Judge on the basis of those findings. In my opinion, there was clearly a fiduciary relationship between the Appellant and Kelly and the latter's conduct breached the obligations implied in that relationship. The failure of the Trial Judge to draw those conclusions is a reviewable error of law. The facts found by the Trial Judge may bear on the extent of the remedy to which the Appellant is entitled, however they affirm rather than negate the existence of a fiduciary relationship.

[13]  Certain relationships have long been recognized as giving rise to fiduciary obligations. For example, director-corporation, trustee-beneficiary and principal-agent. Kelly, as a director, senior officer and key employee of the Appellant, was a fiduciary of the Appellant. With respect to his status as a director and officer, s. 117(1)(a) of the *Alberta Business Corporations Act,* S.A. 1981, c. B-15, says:

> Every <u>director and officer</u> of a corporation in exercising his powers and discharging his duties shall
>
> (a) act honestly and in good faith with a view to the best interests of the corporation ….
>
> (emphasis added)

[14]  The statute is a codification of the common law principle articulated in *Regal Hastings Ltd. v. Gulliver,* [1942] 1 All E.R. 378 (H.L.) and *Canadian Aero Service Ltd. v. O'Malley* (1973), 40 D.L.R. (3d) 371 (S.C.C.). Read together, these authorities establish

1996 ABCA 169 (CanLII)

that a director or senior officer of a corporation is presumed to stand in a fiduciary relationship to the corporation.

[15] Kelly was both a director and a senior officer of the Appellant between February, 1985 and August 25, 1989, the date he severed his relationship with the Appellant. He is presumed to have been a fiduciary of the Appellant. His status as a fiduciary was not merely a formal one emanating from his status as a director and senior officer. He was also a key employee as the manager of the Appellant's Edmonton office, a position of trust with attendant power to affect the economic interests of the Appellant. As will be seen, Kelly's position as a key employee was sufficient in itself to give rise to fiduciary obligations.

[16] The Trial Judge accepted the principle that a director stands in a fiduciary capacity in relation to the corporation. The scope of Kelly's fiduciary duty *qua* director of the Appellant was, however, only cursorily examined, since the Trial Judge found that the information used by Kelly in soliciting the Appellant's clients was not acquired by him in his capacity as a fiduciary (A.B. 596):

> The knowledge alleged to have been exploited by Kelly is clearly not of the type gained by virtue of his position as a director of the Plaintiff, but rather through his position as an employee of the Plaintiff, if at all.

[17] The Trial Judge approached the issue of Kelly's fiduciary obligation from the standpoint of his position as an employee with a limited duty. The law has moved away from the use of formal and recognized relationships as limiting the circumstances in which fiduciary obligations may be found. The substance of the relationship between the parties is critical, not the nomenclature used to describe it. There are now few obstacles to characterizing an employee as a fiduciary of his employer. As noted by the Supreme Court of Canada in *Guerin v. R.* (1984), 13 D.L.R. (4th) 321, there is no comprehensive list of standard relationships giving rise to fiduciary obligations. At p. 341 Dickson J. (as he then was) said:

> It is sometimes said that the nature of fiduciary relationships is both established and exhausted by the standard categories of agent, trustee, partner, director, and the like. I do not agree. It is the nature of the relationship, not the specific category of actor involved that gives rise to the fiduciary duty.

[18] In *Frame v. Smith* (1987), 42 D.L.R. (4th) 81 (S.C.C.), Wilson J. identified the three essential characteristics of a fiduciary relationship (pp. 98-99):

> … there are common features discernible in the contexts in which fiduciary duties have been found to exist …

1996 ABCA 169 (CanLII)

> Relationships in which a fiduciary obligation have been imposed seem to possess three general characteristics:
>
> (1) The fiduciary has scope for the exercise of some discretion or power.
>
> (2) The fiduciary can unilaterally exercise that power or discretion so as to affect the beneficiary's legal or practical interests.
>
> (3) the beneficiary is peculiarly vulnerable to or at the mercy of the fiduciary holding the discretion or power.

[19]     In *LAC Minerals Ltd. v. International Corona Resources Ltd.* (1989), 61 D.L.R. (4th) 14 (S.C.C.), and again in *Hodgkinson v. Simms* (1994), 117 D.L.R. (4th) 161 (S.C.C.), both the majority and minority opinions cited the passage from Frame with approval.

[20]     Here, the evidence clearly indicates that in his capacity as an employee of the Appellant, Kelly was a fiduciary. He was the manager of the Appellant's Edmonton office and one of three employees at that location. Kelly was responsible for the day-to-day operation of the Edmonton office from 1985 until his departure on August 25, 1989. The other employees were clerical staff. As the Appellant's key employee in Edmonton, Kelly was in a position to unilaterally exercise his delegated authority to affect the Appellant's legal and economic interests. To put it another way, in his capacity as a director and officer and manager of the Appellant's Edmonton office, Kelly possessed the kind of authority typically found in a relationship of dependency or vulnerability. It was the kind of relationship in which equity will intervene to protect the dependant or vulnerable party by acting on the conscience of the fiduciary.

[21]     I turn now to consider whether the scope of Kelly's fiduciary obligation included a duty not to solicit the Appellant's clients after his departure.

[22]     In *W.J. Christie & Co. v. Greer* (1981), 121 D.L.R. (3d) 472, the Manitoba Court of Appeal considered a situation similar to the case at bar. Greer was a high-ranking management employee as well as a director, officer and minority shareholder of the claimant insurance agency and real estate management company. He was found to occupy a fiduciary position which imposed a duty on him not to solicit business directly from the customers of his former employer after leaving the company. Huband J.A., delivering the judgment of the Court, made the following observations at pp. 473-475, 477:

> As director, officer, and senior management employee, the defendant stood in a fiduciary relationship towards W.J. Christie.
>
> …

1996 ABCA 169 (CanLII)

> There is no dispute that the clients in question were directly solicited by the defendant, Greer, and transferred their business as a consequence of that direct solicitation. The entire issue is whether the solicitation was contrary to a continuing fiduciary responsibility owed by the defendant, Greer, to W.J. Christie.
>
> …
>
> … it is my view that direct solicitation of clients by the defendant Greer after his resignation … constitutes a breach of fiduciary duty redressable in damages.
>
> …
>
> There is nothing to prevent an ordinary employee from terminating his employment, and normally that employee is free to compete with his former employer. The right to compete freely may be constrained by contract. <u>… But it is different for a director/officer/key management person who occupies a fiduciary position. Upon his resignation and departure, that person is entitled to accept business from former client, but direct solicitation of that business is not permissible.</u> Having accepted a position of trust, the individual is not entitled to allow his own self-interest to collide and conflict with fiduciary responsibilities. The direct solicitation of former clients traverses the boundary of acceptable conduct. The defendant, Greer, and the co-defendant, Sussex, should have been content to allow news of Greer's departure and the establishment of Sussex to reach the clientele of W.J. Christie, without resort to direct approach.
>
> (emphasis added)

[23]    A similar approach was taken in *Metropolitan Commercial Carpet Centre Ltd. v. Donovan* (1989), 91 N.S.R. (2d) 99 (N.S.S.C.T.D.). There, the defendant Donovan, a shareholder and the general manager of the plaintiff company, resigned and then competed directly with his former employer. As a key employee of the plaintiff, the defendant was held to owe the plaintiff a fiduciary duty. At p. 103, Davison J. described the scope of the duty in these terms:

> The extent of the fiduciary duty and the question as to whether there has been breach of such a duty would differ with the factual situations in each individual case. If Donovan, by reason of his own qualifications and abilities attracts customers to his new business, such a result accrues from a personal asset of Donovan. On the other hand, if Donovan acquires a connection or a relationship with a customer of the plaintiff during the course of his employment with the plaintiff and, <u>after his resignation, he affirmatively approaches that customer with a view of enticing the customer to cease doing business with the plaintiff, that would be an act which would pass over the boundary and constitute breach of a fiduciary duty</u>.
>
> (emphasis added)

[24]    In my view, the principle articulated in these two case represents a correct statement of the law. Direct solicitation of the former employer's clients by the departing or departed employee is not acceptable where the employee is a fiduciary of the employer. Having been vested with a high degree of trust and confidence, the indicia of a fiduciary

1996 ABCA 169 (CanLII)

relationship, a key employee is not then at liberty to betray the trust by soliciting the employer's clients for his own account or for someone else to his indirect benefit. To suggest otherwise would be to weaken the strong sense of duty and obligation which the term fiduciary connotes.

[25]     I am unable to agree with the reasoning of the Trial Judge which appears to ignore the distinction between the duty of fidelity and good faith owed to employers by all employees (including fiduciaries), and the higher duty springing from the existence of a fiduciary duty. While mere employees leaving their employment are not (in the absence of contract or some other consideration) prohibited from soliciting their former employer's clients for their direct or indirect benefit, the same is not true of employees who are fiduciaries. Such employees have a duty not to solicit their employer's clients upon departure. Thus, after finding Kelly to be "an integral part of the Plaintiff's Edmonton operation", and characterizing him as a "key employee" (A.B. 596), the Trial Judge should, in my view, have held him accountable to the Appellant on the basis of the higher fiduciary standard.

[26]     The Trial Judge accepted Kelly's evidence that "no solicitation was done by him prior to his leaving the Plaintiff's employ on August 28 [sic], 1989" (A.B. 598), although he was found to have advised four clients of his plan to change employment shortly before August 25, 1989. The informal announcement of his impending departure was not a breach of Kelly's fiduciary duty. In view of the Trial Judge's finding that "Kelly did … contact his former clients in the weeks following his resignation, inviting them to transfer their accounts to him at World Wide" (A.B. 598), his conduct immediately following termination cannot, in my view, escape characterization as a breach of his fiduciary duty. The reference by the Trial Judge to "his clients" was a slip; he obviously meant the Appellant's clients. Kelly not only invited the Appellant's clients to transfer their business to World Wide, he provided them with the documentation necessary to do so, including revocations of powers of attorney in favour of the Appellant and general agency agreements appointing World Wide as their new customs broker.

[27]     The Trial Judge referred to *W.J. Christie & Co. v. Greer, supra.* He accepted the principle articulated in that case, but distinguished it from the case at bar, saying: "In *Christie* however the defendant advised some former clients of his imminent departure and ascertained whether they would follow him prior to his resignation" (A.B. 599). In my view, the distinction between solicitation *before* and *after* termination is an artificial one where the solicitor is a fiduciary. It ignores the statement of principle by Huband J.A. in *Christie*

1996 ABCA 169 (CanLII)

(at p. 475) that "… direct solicitation of clients by the defendant Greer after his resignation … constitutes a breach of fiduciary duty redressable in damages".

[28]     Many of the authorities cited by the Trial Judge in support of his conclusion are illustrations of the application of the principle that every employee owes a duty of fidelity and good faith to his employer, a duty much narrower in scope than the duty owed by a departing employee who stands in the position of a fiduciary. These cases include *Reed Stenhouse Ltd. v. Foster* (1989), 98 A.R. 49 (Q.B.); *Faccenda Chicken Ltd. v. Fowler*, [1986] 1 All E.R. 617 (C.A.); *Bendix Home Systems Ltd. v. Clayton*, [1977] 5 W.W.R. 10 (B.S.S.C.); and *Bonar v. Smith*, [1991] B.C.J. No. 57 (B.S.S.C.). They make the point that an employee's duty of good faith and fidelity is generally restricted to the period of employment itself, and will not usually be extended beyond it so as to prevent a departing employee from soliciting a former employer's clients. The rule is broader where the departing employee is also a fiduciary. This explains the hesitation of courts to grant interlocutory relief restraining departing employees from competing with the former employers where no fiduciary relationship is evident: see, e.g. *AJD Input Data Service Inc. v. Uptown Data Services Inc.* (1991), 35 C.P.R. (3d) 395, and *Mercury Marine Ltd. v. Dillon* (1986), 30 D.L.R. (4th) 627 (Ont. H.C.).

[29]     The distinction between the duty of fidelity and good faith to which an ordinary employee is subject, and the fiduciary duty against which the conduct of a key employee like Kelly is to be measured, is clearly stated by Gallant J. in *Tree Savers International Ltd. v. Savoy* (1991), 81 Alta. L.R. (2d) 325, (aff'd (1992), 84 Alta. L.R. (2d) 384), at p. 328:

> An employee has a basic common law obligation to render faithful and loyal service to his employer during his employment. As a general rule, an employee may leave his employment and lawfully compete against his former employer, taking with him knowledge gained in his former employment, but he may not take or use against his employer any of his employer's trade secrets, confidential information or customer lists, whether during or after his employment. <u>If he was top or senior management of a key employee, he owes a fiduciary duty to his employer, which not only encompasses the ordinary duties of an employee but is an enlarged, more exacting duty which endures after termination</u>.

(emphasis added)

The correctness of that proposition was not questioned by this Court on appeal.

[30]     This enlarged and more exacting duty endures after termination to prohibit a departing fiduciary employee from actively soliciting his former employer's clients. In my view, the evidence in the present case, which supports the findings of fact made by the Trial Judge, establishes both the existence of such a duty and its breach by Kelly.

1996 ABCA 169 (CanLII)

[31]     The next issue is the temporal scope of Kelly's duty not to solicit the Appellant's clients. The duty prevails only as long as the fiduciary relationship between the parties subsists. Had there been no direct solicitation by Kelly, how long would he have been prohibited from asking the Appellant's clients to transfer their business to him and his new affiliation?

[32]     In my view, the duty of a departing fiduciary employee subsists for so long after his termination as is reasonable in the circumstances to enable the former employer to himself contact his clients and attempt to retain their loyalty. The length of that period will obviously be affected by the nature of the position held by the departing employee. Generally, the higher the level of trust and confidence reposed in the employee, with a corresponding vulnerability of the employer, the longer the period will be. Following the expiry of that period the departing employee is in the same position as any other former employee turned competitor -free to contact the clients of his former employer for the purpose of inducing them to follow him.

[33]     The evidence at trial portrayed the customs brokerage business as one in which personal contact between individual brokers and clients is important. The Trial Judge found that in Kelly's case, and in the industry generally, the clients' "… personal loyalty was to the individual broker rather than to the brokerage firm …" [A.B. 590]. As a result, the Trial Judge concluded that the "… 21 clients who followed Kelly … did so by virtue of their personal relationship with him …", and that "… all 21 of the clients in question, because of their personal relationship with and loyalty to Kelly, would have followed Kelly whether or not he had personally contacted them about his move to World Wide" (A.B. 601, 607]. That conclusion is based largely on the evidence of representatives of four clients out of the twenty-one who changed allegiance as the result of Kelly's solicitation and is not founded on the credibility of the principal witnesses. Accepting that finding for the moment, it does not absolve Kelly of his breach of fiduciary duty. It does not lie in the mouth of a fiduciary to plead hypothetical end-results to justify his conduct. The finding is, however, relevant to the determination of the temporal scope of Kelly's fiduciary duty.

[34]     Given the degree of personal loyalty to the individual customs broker in this case and throughout the industry generally, I believe that it would have been reasonable for the Appellant to expect Kelly to have refrained from soliciting its clients for a period of one year after his departure. During this time, the Appellant would have had the opportunity to solidify and secure its relationship with its clients and to compensate for any destabilizing effect Kelly's departure may have had. After this one-year period, however, Kelly, like any

1996 ABCA 169 (CanLII)

other customs broker in the marketplace, would be entitled to approach the Appellant's clients to solicit their business.

[35] To apply a more extensive duty to Kelly in these circumstances would, in my view, be to ignore commercial reality. The law of fiduciary obligations does not seek to confer a privilege on one party by insulating it indefinitely against competition from another party unless the relationship between them is such that a fiduciary obligation can be said to subsist in perpetuity. That is not a tenable proposition in this case. Since Kelly had a personal relationship with the Appellant's clients and the Trial Judge found that the relationship would eventually have swayed these clients to Kelly's new situation, it would be wrong to impose a fiduciary obligation on Kelly which would, in essence, put him in a worse position than he would have been in had he not breached his fiduciary duty. I do, however, accept that, given the highly individualised relationship which Kelly had developed with the Appellant's clients (a relationship cultivated primarily for the Appellant's benefit, not Kelly's), he should have kept his distance from these clients long enough to allow the Appellant to minimize its vulnerability to solicitation. He should not have actively directed the Appellant's clients to his new affiliation. After the expiration of the period, Kelly's capacity to adversely affect the interests of the Appellant would no doubt have substantially diminished. In other words, the Appellant's vulnerability vis-à-vis Kelly would have been neutralized and the fiduciary duty therefore exhausted.

[36] In summary, Kelly breached his fiduciary duty by actively soliciting the Appellant's clients immediately after leaving the Appellant and commencing employment with World Wide. The likelihood that Kelly's personal relationship with the clients would have turned them from the Appellant to Kelly and World Wide in any event cannot justify or excuse Kelly's conduct. The fact is that Kelly actively and directly pursued the Appellant's clients when he was bound by his fiduciary duty to refrain from doing so. He is accountable to the Appellant for his conduct.

[37] I turn now to the liability of World Wide for whose benefit Kelly's breach of fiduciary duty accrued. In ray view, this issue can be easily resolved. The Trial Judge dealt with World Wide's liability on the basis of the agency agreement under which World Wide looked after the interests of the Appellant's clients at the Coutts port of entry. He found that World Wide had not breached the agreement. In light of the characterization of the relationship between Kelly and the Appellant as fiduciary in nature, the liability of World Wide must be considered from a different perspective.

1996 ABCA 169 (CanLII)

[38]     Where a fiduciary relationship exists between two parties, equity binds both the conscience of the fiduciary and that of a third party who knowingly assists or participates in the breach of the fiduciary's duty: see, e.g., *MacMillan Bloedel Ltd. v. Binstead* (1982), 22 B.L.R. (4th) 255 (B.C.S.C.). Here, World Wide had actual knowledge of Kelly's conduct and was content to accept the benefit of his breach of duty. This is evident from the trial testimony of Gouveia. In cross-examination he revealed that his main concern was that Kelly be cautious and not say anything defamatory about the Appellant when soliciting its customers [A.B. 564]:

> Q:  So you agreed back in June or July of '89 that he [Kelly] may approach Anderson Smyth clients, correct?
>
> A:  Yeah, I think, like I said, I don't have -- take an issue with that.
>
> Q:  All right, and you further agreed as to how he should go about doing that. In other words, he should be cautious when doing that, correct?
>
> A:  My statement, again, was as simple as that, if he should approach them, he should be cautious not to saying [sic] anything that would be construed as being defamatory about his former employer.

[39]     It is evident that World Wide knew that its new employee, Kelly, intended to and did solicit the clients of the Appellant for the benefit of World Wide. World Wide knowingly and willingly accepted the fruits of Kelly's efforts. Its complicity is illustrated by the fact, found by the Trial Judge, that it provided Kelly with the documentation necessary to transfer the business of the Appellant's clients to World Wide.

[40]     The circumstances demonstrate beyond doubt that World Wide knowingly assisted Kelly in the breach of his fiduciary duty to the Appellant. I find both Respondents liable to the Appellant.

[41]     The final issue is the appropriate remedy. No loss of goodwill was demonstrated. This is not a case for awarding punitive damages. The proper remedy is to compensate the Appellant in damages for the profit it has lost as a consequence of Kelly's breach of duty: *Canadian Aero Service Ltd. v. O'Malley, supra.* That measure should approximate the amount by which the Respondents have been wrongfully enriched. At trial, the Appellant claimed damages based on loss of past and future profits it claimed it would have realized had the lost clients remained loyal. The Trial Judge calculated the Appellant's damages premised on his finding that all twenty-one of the clients would soon have followed Kelly to World Wide even if he had not actively pursued them. He would have awarded nominal damages based on three months' lost profits, on the ground that "[t]he only possible side effect of Kelly's contacts with those clients was to marginally

escalate the process of their move from the Plaintiff by providing the necessary cancellation and new agency agreement form for signature" [A.B. 607]. This conclusion was based on the evidence of the four clients that they would have followed Kelly without encouragement and the finding that there is a high degree of personal affinity between the customer and the individual broker. In my view, the finding that all twenty-one clients would have followed Kelly within three months of his departure was not justified on the evidence. Had Kelly not solicited them, and had the Appellant been afforded the opportunity to retain their loyalty, the outcome may have been different.

[42]    As I have previously said, the presumed inevitability of the loss of these clients is not a relevant consideration in determining if there was a breach of the fiduciary duty. Neither is such speculation a relevant factor in assessing the Appellant's claim for loss of profits. The Respondents should not have the benefit of any such conjecture. Having found that in these circumstances Kelly should have refrained from actively soliciting the Appellant' s clients for a period of at least one year following his departure, I would calculate the loss of profits on the basis of the same period.

[43]    Timothy Whyte, a Chartered Accountant and Chartered Business Valuator called by the Appellant, projected the gross revenue which the Appellant would have realized from the lost clients in the 12-month period commencing September 13, 1989 at $148,000. He based the estimate on an extrapolation of the amounts billed to them in the preceding years and months. He suggested a contingency discount of 20% - 25% for business which would have been lost in any event. This allowance would include the four clients who testified that they would have followed Kelly to World Wide even if they had not been directly contacted by him, and another three whom Anderson advised Kelly he could take with him. Using 25%, the estimated gross revenue would be reduced to $111,000.

[44]    Whyte testified that historically the Appellant retained 22.8% of its gross revenue as profit. The Appellant would therefore have retained as profit the sum of $25,300. That amount, in my view, is the appropriate measure of the Appellant's loss.

[45]    The Plaintiff is entitled to interest at the rate prescribed by the *Judgment Interest Act,* R.S.A. 1980, C. J-0.5. Damages have been calculated on the basis of loss of profits for the one-year period following August 25, 1989. In the circumstances, it is just to direct that interest accrue from the approximate mid-point of that period, March 1, 1990.

[46]    I would therefore allow the appeal, set aside the judgment below and direct that judgment be entered for the Appellant against the Respondents jointly and severally in the amount of $25,300. plus interest as directed.

JUDGMENT DATED at Calgary,
Alberta this 17th day of
May, 1996.

1996 ABCA 169 (CanLII)