## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| AGJUNCTION LLC,<br><br>    **Plaintiff,**<br><br>v.<br><br>AGRIAN INC., ET AL.,<br><br>    **Defendant.** | **Case No. 14-CV-2069-DDC-KGS** |

## MEMORANDUM AND ORDER

This matter comes before the Court on the Motion for Preliminary Injunction (Doc. 25) filed by plaintiff AgJunction, LLC. The Court conducted a hearing on this motion on June 24 and 25, 2014 and received additional submissions from the parties after this hearing. After considering the evidence, submissions, and the parties' arguments, the Court denies AgJunction's motion for preliminary injunction.

### I.  Introduction

Plaintiff AgJunction is in the business of developing and selling "precision" agronomy hardware and software. Defendant Agrian, historically, has developed and marketed "compliance" ag software and did not have its own line of precision ag software. In early April 2013, Agrian decided to begin developing a competing precision ag product as part of a new system it dubbed "NextGen." Over the next nine months, from April to December 2013, Agrian hired five employees who worked in AgJunction's precision ag division—Aaron Hunt, Matt Dedmon, Jeff

1

Dearborn, Derrick Anderson, and David Nerpel (the "Employee Defendants").[1] The Employee Defendants immediately began working to develop Agrian's precision ag business.

Over the past couple of years, a company named Crop Production Services, Inc. ("CPS") has been AgJunction's largest precision ag client. In January 2014, CPS' CEO called Rick Heiniger, AgJunction's CEO, to tell him that CPS would not renew its precision ag contract with AgJunction for 2015. Instead, CPS was switching to Agrian's new "NextGen" system, which had all the functionalities of AgJunction's precision ag software and would become available in early 2015.

AgJunction contends that Agrian could not possibly have developed a comparable precision ag software so quickly on its own. According to AgJunction, defendants "deliberately plotted the serial exodus of key employees and the misappropriation of proprietary information" to create a competing, nearly identical precision ag software platform.[2] AgJunction filed this lawsuit on February 16, 2014, and now seeks a preliminary injunction that prevents "Defendants from further development of features and functionalities of its NextGen product that exist in AgJunction's Precision Ag software."[3]

## II. Legal Standard

To prevail on a motion for preliminary injunction, the movant must prove that all four of the following equitable factors weigh in its favor: (1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury

---

[1] AgJunction's Complaint (Doc. 1) brought claims against Agrian and all five Employee Defendants. On July 9, 2014, the Court dismissed two of the defendants, Hunt and Dedmon, because this Kansas court lacks personal jurisdiction over them (Doc. 140). However, for simplicity, this Order will refer to all five individuals as the Employee Defendants—that Hunt and Dedmon are no longer defendants in this action is not material to the Court's decision on AgJunction's Motion for Preliminary Injunction.

[2] Doc. 143 at 2 (Pl.'s Supplemental Br.).

[3] Doc. 143 at 20 (Pl.'s Supplemental Br.).

outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction will not be adverse to the public interest. *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013). A preliminary injunction is an extraordinary remedy, so the right to relief must be "clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). "In general, a preliminary injunction … is the exception rather than the rule." *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

Because the limited purpose of a preliminary injunction merely is to preserve the relative positions of the parties until the Court can hold a full trial on the merits, the Tenth Circuit has identified three types of specifically disfavored preliminary injunctions: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief it could recover at the conclusion of a full trial on the merits. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258-59 (10th Cir. 2005). Such disfavored injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary in the normal course." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004). A party seeking a disfavored injunction must make a "strong showing" both with regard to the likelihood on the merits and with regard to the balance of harms. *Id.* at 976

An injunction disrupts the status quo when it changes the "last peaceable uncontested status existing between the parties before the dispute developed." *Schrier*, 427 F.3d at 1260. "In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." *Id.* Defendants argue that "none of the conduct alleged in the Complaint occurred before the first

[Employee Defendant]—Hunt—join[ed] Agrian."[4]  Defendants have provided evidence, which AgJunction apparently does not dispute, that Agrian decided to begin developing precision ag software on April 1, 2013, before AgJunction alleges any wrongdoing occurred.  AgJunction makes no argument in rebuttal—it claims it does not seek a mandatory injunction, but otherwise glosses over Defendants' status quo argument.[5]

Based on the facts before it, the Court concludes that the requested injunction would change the "last peaceable uncontested status" between the parties because Agrian had started developing NextGen before any alleged wrongdoing occurred.  The requested injunction asks the Court to halt defendants' development of NextGen.  This would disturb the status quo and is disfavored.  AgJunction therefore must make a "strong showing" both with regard to the likelihood on the merits and with regard to the balance of harms for the Court to grant an injunction here.

### III. Likelihood of Success on the Merits

AgJunction filed three briefs and gave testimony over two days as support for its motion for a preliminary injunction.  After combing through AgJunction's arguments, the Court has identified several "irreparable harms" AgJunction claims it has suffered and will continue to suffer because of defendants' wrongful conduct.  The alleged wrongdoing underlying those harms falls into two categories:  (1) defendants stole AgJunction's confidential and proprietary information; and (2) the Employee Defendants breached their contractual duty not to compete.  AgJunction must make a strong showing of likelihood that defendants committed at least one of those wrongful acts, and that the wrongful acts caused AgJunction irreparable harm, for the Court to grant a preliminary injunction.  The Court will address each in turn.

---

[4] Doc. 144 at 5 (Defs.' Supplemental Br.).

[5] Doc. 114 at 13 (Pl.'s Reply Br.).

## I.   Theft of Confidential and Proprietary Information

AgJunction alleges that Agrian and the Employee Defendants conspired to steal proprietary and confidential information from AgJunction which irreparably harms AgJunction in several ways.   Specifically, AgJunction claims that defendants' theft:  (1) gave Agrian an "unfair head start" in developing NextGen, allowing it to develop a competing product much faster than if it had competed fairly; (2) caused AgJunction to lose customers and goodwill and will lead to further losses of customers and goodwill; (3) threatens the viability of AgJunction's business; and (4) caused the collapse of a potentially lucrative joint venture.  For purposes of this motion, the Court will assume that each of those harms is irreparable.  However, AgJunction must still make a "strong showing" that it is likely to prove the wrongdoing underlying those harms:  that defendants have misappropriated its confidential and proprietary information.

AgJunction alleges that defendants misappropriated three types of information:  proprietary customer information and requirements, particularized know how, and the AgJunction Precision Ag product.[6]  AgJunction argues that this information is protected by both Kansas Trade Secret Law and the employment agreements signed by the Employee Defendants.  The Court will examine whether AgJunction is substantially likely to prevail under either theory.

### 1.   Trade Secrets

Kansas adopted the Uniform Trade Secrets Act's definition of a "trade secret."

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

> (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

---

[6] Doc. 143 at 16 (Pl.'s Supplemental Br.).

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

K.S.A. § 60-3320(4). Thus, to show that particular information is a trade secret, a plaintiff must demonstrate that it is valuable, not known to others who might profit by its use, and has been handled by means reasonably designed to maintain its secrecy. *Dodson Int'l Parts, Inc. v. Altendorf*, 347 F. Supp. 2d 997, 1010 (D. Kan. 2004). The plaintiff's burden is not met by general allegations; instead, the plaintiff must describe the subject matter of its alleged trade secrets in sufficient detail to establish each element of a trade secret. *Id.* "Although plaintiffs are not required to disclose all of their trade secrets, they must do more than merely allege that they had trade secrets." *Id.* "[C]ursory descriptions do not meet [a plaintiff's] burden of providing that legitimate trade secrets and confidential information are actually at stake." *Menzies Aviation (USA), Inc. v. Wilcox*, 978 F. Supp. 2d 983, 995 (D. Minn. 2013) (holding allegations that "information such as marketing information, internal reports, employment matters and financial condition were confidential" are not enough to prove the existence of trade secrets under the Uniform Trade Secrets Act's definition).

"Reluctance to be specific is understandable; the more precise the claim, the more a party does to tip off a business rival to where the real secrets lie and where the rival's own development efforts should be focused." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002). Still, the plaintiff must make a serious effort to identify its trade secrets or the court cannot do its job. *Id.*

### i.  Customer Information and Requirements

"Customer lists and other customer information may constitute a trade secret." *All West Pet Supply Co. v. Hill's Pet Prods. Div., Colgate-Palmolive Co.*, 840 F. Supp. 1433, 1438 (D. Kan. 1993). Customer lists containing merely public information that could be easily compiled

6

by third parties will not be protected as trade secrets; however, where the party compiling the

customer lists, while using public information as a source, expends a great deal of time, effort,

and expense in developing the lists and treats the lists as confidential in its business, the lists may

be entitled to trade secret protection. *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*,

86 F. Supp. 2d 1102, 1106 (D. Kan. 2000). "It is the tangible customer lists and notes, as op-

posed to the customers themselves, that are the protected trade secrets." *Dodson*, 347 F. Supp.

2d at 1010.

> AgJunction's allegations about stolen customer information are meager. It claims that:
>
> Defendant Dearborn, a director level employee, and Defendants Nerpel and Anderson regularly managed AgJunction's customer relationships, learning customer preferences and pain points, for example. During their periods of employment with AgJunction and after they defected to Agrian, the Employee Defendants took this proprietary information and used it to Defendant Agrian's advantage.[7]

AgJunction also asserts that Dearborn "made it a habit" to use a private email address to contact

AgJunction customers.[8]

AgJunction makes no further attempt to identify what customer trade secrets AgJunction

took. AgJunction did not produce a copy of its customer list or tell the Court, specifically, how

much it cost to develop, and there is no allegation that the list or even generic "customer infor-

mation" was not generally ascertainable by others in the industry. *See Bradbury Co., Inc. v.*

*Teissier-duCros*, 413 F. Supp. 2d 1209, 1228 (D. Kan. 2006); *Dodson*, 347 F. Supp. 2d at 1010-

11. AgJunction never alleges that defendants misappropriated a tangible customer list. AgJunc-

tion does claim that defendants "stole" its client CPS, but one cannot fairly classify the identity

of CPS as a trade secret—CPS was an existing Agrian client. Based on the evidence before it,

---

[7] Doc. 114 at 23 (Pl.'s Reply Br.).

[8] Doc. 114 at 23-24 (Pl.'s Reply Br.).

the Court finds that AgJunction has failed to provide sufficient evidence to establish a substantial likelihood that its customer information and requirements constitute trade secrets.

### ii.  Particularized Know How

The Court assumes for purposes of AgJunction's motion for preliminary injunction only that "know how" can constitute a trade secret.  "There must be a delineation between the general knowledge and experience of the employee and the trade secrets of the employer."  *Utah Med. Prods., Inc. v. Clinical Innovations Assocs., Inc.*, 79 F. Supp. 2d 1290, 1312 (D. Utah 1999) (applying the Uniform Trade Secrets Act).  A plaintiff "must define its claimed trade secret with the precision and particularity necessary to separate it from the general skill and knowledge" possessed by others.  *Id.* at 1313.  Here, AgJunction claims that Employee Defendants Hunt and Dedmon obtained "intimate knowledge of [the precision ag product], its functionalities, source code, and processes."[9]  The Court concludes that such bare allegations fail to provide sufficient detail to establish a substantial likelihood that any particularized know how possessed by the Employee Defendants constitutes a trade secret.

### iii.  AgJunction's Precision Ag product

AgJunction claims that confidential and proprietary code and other information used in its precision ag software system are trade secrets.  Specifically, AgJunction claims that defendants stole "compilations of data such as those embodied in AgJunction's proprietary databases, the methods or algorithms used by AgJunction's proprietary software," and "information stored and protected by JIRA, a proprietary issue tracking product."[10]  JIRA allegedly "contains all the knowledge that it takes to create the code," and "stores the secrets of development …[,w]hat it

---

[9] Doc. 143 at 18 (Pl.'s Supplemental Br.).

[10] Doc. 114 at 24 (Pl.' Reply Br.).

takes to create that product."[11]  The Court is skeptical that those allegations establish the existence of a trade secret.  AgJunction has not described in any detail the "compilations of data," "methods or algorithms," or information contained in JIRA that it alleges are trade secrets or demonstrated that they are valuable or unknown to others who might profit by their use.

Even if the Court assumes that AgJunction has alleged sufficiently that its confidential and proprietary information constitutes trade secrets, however, AgJunction also must show that defendants actually misappropriated the trade secrets.  To do so, a plaintiff must show either that: (i) another person acquired the trade secret with knowledge that the trade secret was acquired by improper means; or (ii) a person used or disclosed the trade secret without consent.  K.S.A. § 60-3320(2).

AgJunction's evidence that defendants acquired or disclosed information about its precision ag product is pure speculation.  In early April 2013, Agrian decided to begin developing precision ag software as part of NextGen.  Shortly thereafter, Agrian began hiring the Employee Defendants, who were working in AgJunction's precision ag division.  Things came to a head between the parties in January 2014 when CPS, AgJunction's largest client, told AgJunction that it had chosen not to renew its precision ag contract in 2015, but instead was switching its business to Agrian.

AgJunction claims that it took 10 years to develop its precision ag software and that Agrian could not possibly have developed a comparable product so quickly without misappropriating AgJunction's proprietary software information.[12]  Defendants dispute this claim, citing evidence that AgJunction did not start development of its software until 2008.  More significantly, defendants claim that it has devoted substantially more resources to the project than AgJunction,

---

[11] *Id.* at 24-25.

[12] Doc. 114 at 21 (Pl.'s Reply Br.).

allowing it to accelerate its development process.  According to defendants, AgJunction and its predecessor had only 3-5 developers working on its precision ag software at any one time; in contrast, Agrian has invested millions of dollars in development over the past year and has over 30 developers currently working on the product.

To be sure, AgJunction has produced some evidence suggesting that defendants, at best, acted in an underhanded manner in their departure from and dealings with AgJunction.  For instance, emails indicate that at least some Employee Defendants had agreed to work for Agrian months before they actually notified AgJunction of their plans and left it.  David Nerpel, while still an AgJunction employee, sent an email to Agrian CEO Nishan Majarian stating that Agrian needed to put AgJunction "out of the software business."[13]  Heiniger asserts that, as the Employee Defendants continued to leave for Agrian, Majarian repeatedly assured him that Agrian had no intention of competing in the precision ag business.  While a jury may conclude that defendants conducted themselves deceitfully and it thus points to actionable misconduct of some sort, it does not, without more, show a substantial likelihood that defendants stole AgJunction's proprietary product information.

AgJunction did produce an expert, Robert Stillerman, who testified that it was "more likely than not" that part of Agrian's code was based on AgJunction software.  Stillerman identified overlapping "functionality" between the two software systems.  In addition, he identified several sections of Agrian's code that were electronically "signed" by Employee Defendants Hunt and Dedmon, indicating that they had authored those sections of the code.

In response, defendants presented their own expert, George Edwards, who testified that Agrian did not copy AgJunction's code.  To arrive at his conclusion, Edwards looked for any di-

---

[13] Ex. P25.

rect copying of code and then analyzed the structure and design of the code and its overall archi-

tecture.  He drew several conclusions.  First, he found no evidence of direct, line-for-line copy-

ing, a conclusion with which Stillerman agrees.   This finding is unsurprising because the two

systems are written in different programming languages—AgJunction uses "CGI/Python" while

Agrian develops code in what is called "Ruby on Rails."  Second, Edwards found that the code

in each system had different internal structures—if there had been copying, one would see simi-

larities in the structure.  Third, Edwards found only a small overlap in the technologies used in

both sets of code.  Edwards testified that he found a total of 40 technologies used between the

two systems, but only eight existed in both.  The overlap consisted of very common technologies

like JavaScript and JQuery which, he said, are present in thousands and thousands of software

programs worldwide.  Fourth, Edwards found that each product had a different software architec-

ture, which suggests no copying.  AgJunction used a traditional "three-tiered" system, whereas

Agrian used a newer "service-oriented" approach.  Finally, Edwards found that the AgJunction

code was much more mature—it contained 3.1 million lines of code compared to only 270,000

lines in Agrian's.  This suggests that the AgJunction code is much older and has been in devel-

opment for much longer than the new Agrian code.

     In response to Stillerman's evidence that Hunt and Dedmon wrote some of Agrian's

code, Edwards found that the sections purportedly authored by Hunt and Dedmon constituted

less than 1% of the code in Agrian's software system.  Furthermore, evidence that Hunt and

Dedmon wrote a portion of the code in Agrian's system does not establish that they misappropri-

ated AgJunction's code.

     The Court finds that on AgJunction's best day, so far, Stillerman's and Edwards' conclu-

sions are equally plausible and therefore it cannot grant a preliminary injunction based on Still-

erman's report.  This means AgJunction's case largely depends on its allegations that Agrian and the Employee Defendants schemed to leave AgJunction and "destroy" AgJunction's precision ag division.  The Court does not diminish AgJunction's claims that it suffered harm as a result of the Employee Defendants' wrongdoing.  However, the Court concludes, based on the evidence before it, that AgJunction has not shown the substantial likelihood that defendants misappropriated its proprietary and confidential software information necessary for a preliminary injunction.

### 2.  Employment Contracts

Four of the five Employee Defendants signed employment contracts with AgJunction which contained a "Confidential and Intellectual Property Agreement."[14]  The Employee Defendants agreed to "preserve as strictly confidential [] full particulars of" AgJunction's "Intellectual Property"[15] as well as to "hold all … Proprietary Information in strict confidence and trust …."[16]  The Agreements define the term "Intellectual Property" very broadly to include:

> [A]ll inventions, works of authorship, innovations, improvements, derivatives, discoveries, productions, research, results, assemblies of information, work, trade secrets, systems, models, devices, formulations, pre-formulations, computer programs, electronic media, computer technology, trade-marks, patents, copyrights, industrial design, source code, object code, methods of doing business, topography, business plans, know how, show how, and any other intellectual property ….[17]

"Proprietary Information" includes "any information of a confidential or sensitive nature that may be disclosed to [the Employee Defendants] by" AgJunction "that relates to the business of" AgJunction.[18]  The Agreements are governed by the laws of the province of Alberta.

---

[14] At the preliminary injunction hearing, Heiniger conceded that Employee Defendant Derrick Anderson never signed his employment agreement (Hr'g Tr., 171:10-12).

[15] *E.g.*, Doc. 1-1 at 43 (Ex. E to Comp.).

[16] *E.g.*, Doc 1-1 at 43, 45 (Ex. E to Comp.).

[17] *E.g.*, Doc. 1-1 at 43 (Ex. E to Comp.).

[18] *E.g.*, Doc. 1-1 at 45 (Ex. E to Comp.).

In their briefing and at the preliminary injunction hearing, the parties argue at some length whether the Agreements are enforceable as a matter of law.  However, those arguments concern only the validity of the non-compete and non-solicitation provisions of the Agreements; defendants never argue that the non-disclosure provisions covering "Intellectual Property" and "Proprietary Information" are unenforceable on their face.

The Court evaluates whether AgJunction has made a strong showing that it is substantially likely to prevail on its breach of contract claims.  To prove a breach of contract under Canadian law, the plaintiff must prove:  (1) the existence of a contract for consideration, (2) the plaintiff fulfilled its part of the agreement, (3) the defendant breached its obligations, and (4) the plaintiff suffered damages.  *Rocky Mountain House (Town) v. Alberta Mun. Ins. Exch.*, 2007 ABQB 548, para. 74 (Can.).

### i.  Proprietary Customer Information and Requirements

Similar to the reasons stated previously, the Court finds that AgJunction has not shown a substantial likelihood that it will prevail on its claim that the Employee Defendants stole AgJunction's customer list and customer preference information.  AgJunction's only allegations on this front are that Dearborn and Hunt managed client relationships and that Dearborn contacted AgJunction clients through a private email address.  Such thin evidence does not make the "strong" showing necessary for the Court to find that AgJunction is substantially likely to prove that defendants misappropriated customer information.

### ii.  Particularized "Know How"

AgJunction alleges that Hunt and Dedmon obtained "an intimate knowledge of the [precision ag product], its functionalities, source code, and processes."[19]  This allegation gives the

---

[19] Doc. 143 at 18 (Pl.'s Supplemental Br.).

Court some pause; the Employee Defendants almost certainly learned much about the precision

ag business during their time at AgJunction and it is undisputed that when they left, they began

to compete directly in the precision ag field.  Furthermore, Dedmon admitted in his deposition

that he uses "software code knowledge" that he acquired while working for AgJunction in his job

at Agrian.[20]  Therefore, the Court finds it substantially likely that the Employee Defendants took

some type of "know how" with them to Agrian, which at least facially violates their Agreements.

But that finding is just the first step in the analysis.  The Court also must consider the enforcea-

bility of the Employee Defendants' contracts before it can determine whether AgJunction is sub-

stantially likely to prevail.

      Because the Agreements contain a Canadian choice of law provision, the Court looks to

Canadian law to determine if an employer can restrict its former employee's use of "know how."

"Once the employment relationship ends, the duty of non-disclosure persists.  However, confi-

dential information does not include the general skills and knowledge acquired by the employee

while working for his former employer …."  *Imperial Sheet Metal Ltd. v. Landry & Gray Metal

Prods. Inc.* (2007), 315 N.B.R. 2d 328, para. 33 (Can. N.B. C.A.).  "The information and training

which an employer imparts to his employee become part of the equipment in skill and

knowledge of the employee, and so are beyond the reach of such a covenant."  *Maguire v. North-

land Drug Co. Ltd.*, [1935] S.C.R. 412, 417 (Can.).  Thus, any provision preventing the Employ-

ee Defendants from taking their "general skills and knowledge"—their know how—to another

employer appears to be unenforceable under Canadian law.  AgJunction has not alleged in detail

any specific, particularized "know how" that Hunt and Dedmon took with them that goes beyond

"general skills and knowledge."  As a result, the Court finds that AgJunction has not made a

---

[20] Dedmon Dep. 9:5-10, 13-15.

strong showing that it is substantially likely that the Employee Defendants breached their employment Agreements by misappropriating "know how."

### iii.   AgJunction's Precision Ag product

For the reasons previously stated,[21] AgJunction has not presented enough evidence for the Court to find that it has a substantial likelihood of proving that defendants misappropriated confidential and proprietary information used to make its precision ag software. [22]

### 3.   Theft of Confidential Information cannot serve as the basis for an injunction

For the above reasons, the Court finds that AgJunction has failed to make a "strong showing" that it is substantially likely to prove that defendants stole its confidential and proprietary information.  For that reason alone, the Court cannot grant an injunction based on the irreparable harms defendants' alleged theft caused AgJunction.

## II.   The Employee Defendants' Duty Not to Compete

AgJunction also claims that it suffered irreparable harm because the Employee Defendants breached the non-competition provisions contained in each of their employment agreements.[23]  The Agreements contain two provisions governing the Employee Defendants' ability to compete with AgJunction:

> (1) For six (6) months following the cessation of my employment … I agree that I shall not, directly or indirectly, engage in, advise, invest in, participate, or perform services

---

[21] *See supra* pp. 8-12.

[22] AgJunction and Agrian entered into a "hybrid" agreement in 2012 under which Agrian allegedly had access to proprietary information about AgJunction's precision ag software.  That agreement provided that Agrian's "'access' and 'use' of AgJunction's software is restricted to internal purposes and must remain confidential."  Doc. 114 at 26 (Pl.'s Reply Br.).  AgJunction alleges that Agrian misappropriated confidential information in violation of this agreement.  However, the Court's analysis of AgJunction's breach of contract claims against the Employee Defendants applies equally to the contract claim against Agrian— AgJunction has not shown a substantial likelihood that Defendants have misappropriated its confidential information.

[23] As mentioned above, Employee Defendant Derrick Anderson did not sign an Agreement with AgJunction and thus, he has no duty to refrain from competing.

for any person or entity that is engaged in any business or enterprise that competes with [AgJunction] or plans to compete with [AgJunction], or in which any disclosure of the Proprietary Information would be of material value to any person or entity other than [AgJunction].

(2) For six (6) months following the cessation of my employment … I agree that I shall not, directly or indirectly, solicit, accept from, do business with, or accept business relationships with, any person or entity or client with which/whom I know or should know that [AgJunction] did any similar business, or with which/whom I know or should know that [AgJunction] competed for business, during the six (6) month period preceding the cessation of my employment ….[24]

Defendants argue that these provisions are unenforceable.  The Agreements provide they are governed by the law of Alberta, Canada; as a result, this Court must conduct an analysis of Canadian law to determine their validity.

### 1.  Restrictive Covenants in Canada

Under Canadian law, a restrictive covenant is enforceable "only if it is reasonable between the parties and with reference to the public interest."  *Elsley v. J.G. Collins Ins. Agencies Ltd.*, [1978] 2 S.C.R. 916, 923 (Can.).  "While an overly broad restraint on an individual's freedom to compete will generally be unenforceable, the courts must recognize and afford reasonable protection to trade secrets, confidential information, and trade connections of the employer." *H.L. Staebler Co. Ltd. v. Allan* (2008), 98 O.R. 3d 107, para. 35 (Can. Ont. C.A.).  "[D]espite the presumption that restrictive covenants are *prima facie* unenforceable, a reasonable restrictive covenant will be upheld."  *Shafron v. KRG Ins. Brokers (W.) Inc.*, [2009] 1 R.C.S.157, para. 17 (Can.).  Because there is generally an imbalance in power between employee and employer, restrictive covenants in employment contracts receive rigorous scrutiny in Canada.  *Id.* at para. 23.

A restrictive covenant may restrain either competition or solicitation.  *H.L. Staebler*, 98 O.R. at para. 38.  "A non-competition clause restrains the departing employee from conducting

---

[24] *E.g.*, Doc. 1-1 at 21 (Ex. B to Comp.).

business with former clients and customers whereas a non-solicitation clause merely prohibits the departing employee from soliciting their business." *Id.* "[A] non-solicitation clause—suitably restrained in temporal and spatial terms—is more likely to represent a reasonable balance of the competing interests than is a non-competition clause." *Id*. at para. 42. "An appropriately limited non-solicitation clause offers protection for an employer without unduly compromising a person's ability to work in his or her chosen field." *Id.* "A non-competition clause, on the other hand, is enforceable only in exceptional circumstances." *Id.*

The Agreements contain two relevant clauses that restrain the Employee Defendants' conduct here. Clause 1 clearly is a non-competition provision—it prohibits the Employee Defendants from engaging in, advising, participating, or performing services for any entity that is engaged in any business that competes with AgJunction. While Clause 2 may appear at first blush as a non-solicitation provision, it actually is another non-competition agreement. It not only prohibits the Employee Defendants from soliciting AgJunction customers, but also from doing business with or accepting business relationships with recent or current AgJunction customers. Because both clauses are non-competition agreements, a Canadian court would enforce them "only in exceptional circumstances." *Id.*

### 2.   The Restrictive Covenants At Issue Are Likely "Unreasonable"

The Canadian Supreme Court in *Elsley* offers a three-factor framework for determining whether a given restrictive covenant is reasonable: (1) did the employer have a proprietary interest entitled to protection; (2) are the temporal or spatial features of the covenant too broad; and (3) is the covenant unenforceable as being against competition generally, and not limited to proscribing solicitation of clients of the former employee. *Elsley*, 2. S.C.R. at 925.

After reviewing the Canadian cases provided by the parties, the Court concludes that both Clause 1 and Clause 2 likely run afoul of the second reasonableness element because they are overbroad. As a general rule, the geographic coverage of the covenant and the period of time in which it is effective, as well as the extent of the activity sought to be prohibited are relevant to determine whether a restrictive covenant is reasonable. *Shafron*, 1 R.C.S. at para. 26. First, the clauses here contain no geographical limitations—they prohibit the Employee Defendants from conducting business with competitors or clients anywhere in the world. The Court recognizes that in today's global economy, and particularly in the software business, courts are more willing to enforce geographically broad employee non-compete agreements. *See Tank Lining Corp. v. Dunlop Indus. Ltd.* (1982), 40 O.R. 2d 219 (Can. Ont. C.A.) (finding reasonable a restrictive covenant in a sale agreement encompassing all of Canada). However, AgJunction has not identified a single Canadian case enforcing a global non-compete. *See H.L. Staebler*, 98 O.R. at para. 50.

More significant is the fact that neither clause limits the *type of work* the Employee Defendants are prohibited from doing. The Court finds *H.L. Staebler v. Allan* instructive. *Id.* In that case, the Court of Appeal for Ontario[25] found unenforceable a restrictive covenant in an employment contract that sought to prevent an employee from "conduct[ing] business with any clients or customers of H.L. Staebler Company Limited that were handled or serviced by you at the date of your termination" for a period of two years. *Id.* at para. 45. The court held that the clause was overbroad because it prevented the defendants from doing any "business" with their former employer's clients, regardless of the type of work involved. *Id.* at para. 51.

---

[25] *H.L. Staebler* was decided by an Ontario court, while the Agreements instruct the Court to apply Alberta law. As in the United States, cases decided in other provinces in Canada are persuasive, but not binding.

18

Similarly here, the restrictive clauses prohibit the Employee Defendants from working for *any* entity engaged in *any* business that competes with AgJunction or plans to compete with AgJunction.  In an attempt to save the restrictions, AgJunction argues that the covenants are "not against competition generally and [do] not restrict any of the Employee Defendants from pursuing his livelihood in the fields of programming or sales, whether in agronomy or elsewhere."[26] But sleight of hand cannot change the words in the contracts.  A plain reading of the restrictive covenants shows that they prevent the Employee Defendants from working in any capacity for any company that competes in any way against AgJunction.  For instance, under the literal terms of the Agreements, the Employee Defendants could not work on an assembly line making John Deere lawn mowers because John Deere competes with AgJunction in the precision ag field.

These types of broad non-competition agreements were held invalid by the court in *H.L. Staebler*; because the two clauses prohibit a nearly unbounded scope of work with no geographical limitation, the Court finds that a Canadian court is likely to find them unenforceable.

### 3.   "Severance"

The Court also finds that Canadian law likely prohibits it from reforming the contract to make the terms more reasonable.  A recent Supreme Court of Canada case discussed whether courts may use the doctrine of "severance" to render an unreasonable restrictive covenant reasonable.  *Shafron*, 1 R.C.S. at para. 2.  There are two types of severance under Canadian law: "notional" severance and "blue pencil" severance.  *Id.* at para. 29.  Notional severance involves reading down an illegal provision in a contract that would be unenforceable so that it is legal and enforceable.  *Id.* at para. 30.  The Court in *Shafron* held that notional severance is never appropriate in the context of a restrictive covenant in an employment agreement.  *Id.* at para. 42.

---

[26] Doc. 143 at 12 (Pl.'s Supplemental Br.).

Blue-pencil severance is possible only where the judge can strike out, that is, literally draw a line through the offending portion of the contract, leaving the portions that are not tainted by illegality. *Id.* at para. 29. "[B]lue-pencil severance may be resorted to sparingly and only in cases where the part being removed is clearly severable, trivial and not part of the main purport of the restrictive covenant." *Id.* at para. 36. "However, the general rule must be that a restrictive covenant in the employment contract found to be ambiguous or unreasonable in its terms will be void and unenforceable." *Id.* Here, the Court cannot simply strike a portion of the restrictive covenants to make them reasonable. By their terms they do not contain a limitation on the type of work that is prohibited or a geographic limitation. As a result, the unreasonable portions of the restrictive covenants are not "trivial." They are part of the "main purport of the restrictive covenant." The Court will not employ severance to reform the covenants to make them reasonable.

For those reasons, after applying Canadian law, the Court concludes that AgJunction is not substantially likely to succeed on the merits of its claims that the Employee Defendants breached the non-competition provisions of their employment agreements because the agreements are likely unenforceable under Canadian law.

### III. Breach of Duties of Loyalty

AgJunction also alleges that the Employee Defendants "breached [their] common law duty not to compete with AgJunction for the duration of [their] employment and that Employee Defendants Dearborn and Hunt "breached their duties of loyalty, good faith, honesty, and avoidance of conflict of duty and self-interest."[27] Specifically, AgJunction alleges that the Employee Defendants conspired to leave AgJunction months before they actually went to Agrian and hid

---

[27] Doc. 143 at 4 (Pl.'s Supplemental Br.).

from AgJunction that they were leaving to work on NextGen.[28]  AgJunction claims that Dearborn and Hunt actively recruited the other Employee Defendants to Agrian, in violation of their fiduciary duties.[29]  Finally, AgJunction argues that the Employee Defendants breached the "Conflict of Interest" provisions in their employment agreements by "competing or preparing to compete" while still working for AgJunction.[30]

Even if true, however, the Court cannot see how those allegations caused the irreparable harms that AgJunction asserts.  As stated above, AgJunction claims that defendants' misconduct gave Agrian an "unfair head start" in developing its precision ag software, caused customer losses, threatens the viability of AgJunction's business, and caused the collapse of a potential joint venture.  However, in its briefing and at the preliminary injunction hearing, AgJunction focused almost exclusively on evidence that defendants stole their confidential and proprietary information, wrongdoing that allegedly allowed Agrian to develop competing software in a short period of time.  Indeed, in its Supplemental Brief, AgJunction argues that defendants' "conspiracy" to leave AgJunction for Agrian "assured that the conspirators would have continual, unfettered access to AgJunction's confidential information and data … and other trade secrets during the

---

[28] Doc. 114 at 35 (Pl.'s Reply Br.).

[29] AgJunction also claims that Hunt and Dearborn breached their fiduciary duties by soliciting AgJunction customers, taking a maturing business opportunity from AgJunction, and taking confidential and selective customer lists.  Doc. 143 at 10 (Pl.'s Supplemental Br.).  First, Hunt is no longer a defendant in this lawsuit, so all breach of fiduciary duty claims against him have been dismissed.  Second, there is no specific evidence suggesting that Hunt and Dearborn, individually, committed the alleged misconduct.  Third, in making this argument, AgJunction cites to and applies Canadian law.  The Kansas Supreme Court has held that the law of the state where the tort occurs controls.  *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (1985).  Under this rule, the tort occurs where the wrong was felt.  *Id.*  In the case of alleged financial harm, as is the case here, the court looks to the state in which the plaintiff experienced the harm.  *Ayres v. AG Processing Inc.*, 345 F. Supp. 2d 1200, 1210 (D. Kan. 2004).  AgJunction asserts it experienced the alleged injuries in Kansas.  Therefore, Kansas law applies to its breach of fiduciary duty claim, and AgJunction's citation to Canadian law is not germane to the correct analysis.

[30] Doc. 143 at 13 (Pl.'s Supplemental Br.).

exodus."[31]  Thus, even if the Employee Defendants conspired to leave AgJunction in the staged

manner alleged, it is the claimed theft of confidential and proprietary information that allowed

Agrian to develop precision ag software quickly, not any breach of the duty of loyalty.  As a re-

sult, the Court cannot grant an injunction based on any breaches of the duty of loyalty or the

"Conflict of Interest" provisions in the Employee Defendants' employment agreements.

## IV. Balance of Harms

In addition to showing a likely success on the merits, AgJunction also must make a

"strong showing" that "its threatened injury outweighs the injury the opposing party will suffer

under the injunction."  *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d

973, 976 (10th Cir. 2004); *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013).

In making its case on this element, AgJunction argues that Agrian, "under suspicious timing,

started offering software competing directly with AgJunction" and that "Agrian's ability to enter

the [precision ag] software market on such a short time frame resulted entirely from its unlawful

activities ...."[32]

As the Court discussed above, AgJunction's evidence that defendants stole its proprietary

and confidential information, giving it an "unfair head start" in development, is speculative.  The

harm the requested injunction would cause defendants, however, is not.  Agrian testified that it

has invested millions of dollars and has over 30 developers currently working on its NextGen

software.  The requested injunction would, at the very least, prohibit those 30 developers from

continuing to work on NextGen until a trial on the merits could take place.  Furthermore, Agrian

has entered an agreement under which it promised to deliver completed software to CPS in early

2015.  Any injunction that temporarily prohibited development of NextGen likely would hurt

---

[31] Doc. 143 at 3 (Pl.'s Supplemental Br.).

[32] Doc. 27-1 at 6 (Pl.'s Br. in Support of Motion for Preliminary Injunction).

Agrian's ability to deliver on that promise.  Because the harm the injunction would cause defendants is certain, while the evidence that they stole AgJunction's confidential and proprietary information is not, the Court concludes that the balance of harms factor weighs against AgJunction.  The Court can deny AgJunction's motion for preliminary injunction on this basis alone.

## V.  Public Interest

The Court concludes it is not in the public interest to grant an injunction restraining Agrian's ability to compete in the precision ag market.  AgJunction has not established a substantial likelihood that defendants stole its proprietary and confidential information in developing NextGen.

## VI. Conclusion

The Court concludes that AgJunction has not produced enough evidence sufficient to establish that it is "substantially likely" to succeed on the merits of the claims underlying its alleged irreparable harms.  Furthermore, the Court believes AgJunction has not proven that the balance of harms weighs in favor of granting the injunction or that the injunction is in the public interest.

In so finding, the Court does not demean AgJunction's assertion that defendants injured it through various forms of misconduct.  The final assessment of AgJunction's evidence of wrong-doing and resulting harm is a task left for another day when, either at a full trial on the merits or otherwise, a different standard will apply.  For now, however, the Court is mindful that a preliminary injunction is an "extraordinary remedy," and the party seeking one must demonstrate a right to relief that is "clear and unequivocal."  AgJunction's evidence has fallen short of that mark, and the Court therefore denies its Motion for Preliminary Injunction.

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiff's Motion for Preliminary Injunction (Doc. 25) is denied.

**IT IS SO ORDERED.**

**Dated this 22nd day of July, 2014, at Topeka, Kansas**


**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**