## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| AGJUNCTION, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:14-CV-02069-DDC-KGS |
| | ) | |
| AGRIAN INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## RESPONSE IN OPPOSITION TO DEFENDANTS'
## MOTION FOR SANCTIONS UNDER RULE 11

AgJunction, LLC, plaintiff in the above-captioned matter, submits its response in opposition to defendants' motion for sanctions under Rule 11(c) of the Federal Rules of Civil Procedure and District of Kansas Rule 11.1.

Defendants' motion for sanctions is designed to immunize Agrian from further litigation and to extract defense costs from AgJunction, at a time defendants face the prospect of dismissal. Defendants seek to wrest attorneys' fees from plaintiff as a sanction even though they had no claim for, or any chance of, being awarded attorneys' fees on the substantive claims. The Court should not permit such an improper use of Rule 11. *See* FED. R. CIV. P. 11, Official Comment to 1993 Amendments (2014 ed. at p 89) (Rule 11 motions should not be "prepared to emphasize the merits of a party's position, to exact an unjust settlement, to intimidate an adversary into withdrawing contentions that are fairly debatable, …[or for other improper purposes].") "The main purpose behind Rule 11 sanctions is misconduct deterrence *not defense compensation*."

*Duprey v. Twelfth Judicial Dist. Court*, 760 F. Supp. 2d 1180, 1200 (D.N.M. 2009) (emphasis supplied).

Tellingly, instead of filing their motion at the outset of the case, after the Court's order on defendants' motion to dismiss, or even after the Court's denial of AgJunction's motion for a preliminary injunction, defendants did not file their Rule 11 motion until almost two months after AgJunction filed its motion to dismiss without prejudice. It is clear from the timing of defendants' Rule 11 motion, the fact that the claims were already being dismissed, and the lack of evidentiary support for their arguments, that defendants are merely attempting to use a favorable outcome on a preliminary injunction hearing as a means for paying their defense costs. No authority exists to support this type of abuse of the legal process.

Moreover, if the standard under Rule 11 permitted any winning party to seek sanctions against an opposing party solely on the basis of an outcome in the winning party's favor, the Rule would be meaningless. The purpose of Rule 11 is not to reward successful parties and punish unsuccessful parties or to compensate parties for their costs. Rather, Rule 11 is designed to deter the filing of frivolous actions or pleadings presented for an improper purpose. This lawsuit is neither frivolous nor improper. AgJunction had an objectively reasonable legal and factual basis for bringing this action. Accordingly, the imposition of sanctions is unwarranted and AgJunction respectfully requests that this Court deny defendants' motion.

## I.    LEGAL STANDARD

"Sanctions are an extraordinary remedy. Rule 11's purpose is to discourage frivolous litigation, not to punish litigants." *Marrie v. Nickels,* 2000 U.S. Dist. LEXIS 1037, *2 (D.Kan. 2000), citing *Brown v. Pierce Mfg., Inc.,* 169 F.R.D. 118, 119 (E.D. Wis. 1996). A frivolous

2

pleading is one that lacks a legal basis or legal merit and that is "not reasonably purposeful." *United States v. Lain,* 640 F.3d 1134, 1137 (10th Cir. 2011).

Sanctions are appropriate only if the Court finds that "'after reasonable inquiry, a competent attorney could not form a reasonable belief that [a] pleading is well grounded in fact and is warranted by existing law….'" *Duprey*, 760 F.Supp.2d at 1200, quoting *Adamson v. Bowen*, 855 F.2d 668, 673 (10th Cir. 1988). Objective reasonableness is the standard by which the Court must evaluate the conduct of litigation in this case. In other words, the Court must determine "whether a reasonable attorney admitted to practice before the district court would file such a document." *Adamson,* 855 F.2d at 673, citing *Burkhart v. Kinsley Bank*, 804 F.2d 588, 589-90 and n.3 (10th Cir. 1986); *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 829 (9th Cir. 1986).

As evident by the extent of the briefing and oral testimony and arguments in this case, there is nothing frivolous about this lawsuit. Indeed, AgJunction successfully withstood defendants' motion to dismiss for failure to state a claim.  And during the course of this litigation, the Court never once intimated that AgJunction's allegations or arguments were not made in good faith or were without merit.  In fact, even after a two-day hearing on AgJunction's motion for a preliminary injunction and extensive pre-hearing briefing, the Court allowed additional briefing due to the complexities of the case and the existence of viable competing issues of fact and law.  Defendants simply cannot meet their burden to show that AgJunction's First Amended Complaint was not objectively reasonable.

## II.     ARGUMENT AND AUTHORITIES

### A.     Plaintiff's breach of contract claim against defendant Derrick Anderson was well-grounded in fact and warranted by law.

AgJunction stated a viable breach of contract claim against defendant Derrick Anderson. It was undisputed that the employment agreement contained a signature at least purporting to be Derrick Anderson's, and during the preliminary injunction hearing, Mr. Anderson admitted that the signature "may very well" be his.  (Doc. 170-3 at 404: 5 – 19.)  That employment agreement provided, *inter alia,* "As an employee of Ag Junction…you have been, and will continue to be…in possession of confidential information.  You continue to agree to accept and retain all such information in confidence…, not to disclose or reveal such information to others and to refrain from using such information for purposes other than those authorized…."  (Doc. 112-1 at 51/53.)

Under these facts, plaintiff has stated a viable breach of contract claim against Mr. Anderson.  Defendants have never argued, and this Court has never found, that Canadian law does not enforce contractual confidentiality provisions.  Mr. Anderson admitted that his signature "may very well" be affixed to the employment contract requiring him to maintain the confidentiality of plaintiff's information.  Plaintiff has not violated Rule 11 in pursuing breach of contract claims against Derrick Anderson.

Plaintiff acknowledges that it has been unable to locate a separate "Confidentiality and Intellectual Property Agreement" signed by Derrick Anderson.  If plaintiff had not voluntarily moved to dismiss all of its claims, it would be appropriate to finalize discovery on this point.  If discovery disclosed a separate Confidentiality and Intellectual Property Agreement signed by Mr. Anderson, then the claim would proceed as plead.  If discovery did not disclose a separate Confidentiality and Intellectual Property Agreement signed by Mr. Anderson, then the breach of

contract claim would be revised to conform to the evidence, and the breach of contract claim would be based solely on the employment agreement Mr. Anderson admits he "may very well" have signed.[1]

In either event, plaintiff stated a viable breach of contract claim against Mr. Anderson. But for plaintiff's desire to dismiss this litigation without prejudice, Mr. Anderson would be called to defend against plaintiff's claims that he breached his contractual duties to plaintiff. Indeed, Derrick Anderson was already bound by other restrictions.   As defendants are well aware, the terms of Anderson's employment agreement provide:

> [a]s an employee of AgJunction and now Hemisphere GPS, *you have been, and will continue to be*, knowledgeable, aware of and in possession of confidential information. You *continue to agree* to accept and retain all such information in confidence, and at all times during or after the cessation of employment, not to disclose or reveal such information to others and to refrain from using such information for purposes other than those authorized by Hemisphere GPS. *You will continue to have* the confidentiality, trade secret obligations and restraint of trade you owed to AgJunction prior to the Closing Date.

(Doc. 112-1 at 51 – 53, emphasis supplied.)

In addition, the employment agreement specifically incorporates the Confidentiality and Intellectual Property Agreement as a condition of employment, stating:

> In addition, and *as is standard for all employees* employed by the Corporation or any affiliate of the Corporation, we require that you review, sign and return to us the Confidentiality and Intellectual Property Agreement attached as Appendix "A" to this letter."

*Id*. (emphasis supplied).  The issue of whether defendants are entitled to sanctions for the breach-of-contract claims asserted against Mr. Anderson was addressed at length in plaintiff's response to defendants motion for sanctions under 28 U.S.C. § 1927.  (Doc. 170.)  That discussion is adopted as if fully set forth herein.

---

[1] Nor does inclusion of the claims against Anderson in the Amended Complaint provide any basis for sanctions against plaintiff.  (Doc. 175 at 9.)  Plaintiff has already addressed this issue in the briefing.  (Doc. 170 at 5 - 6.)

Defendants' reliance on the fact that AgJunction has not yet located a signed copy of defendant Anderson's Confidentiality and Intellectual Property Agreement does not justify the extreme remedy of sanctions, especially given the fact that defendant Anderson is still bound by the terms of his valid employment agreement[2] and would still "bear the burden" of litigation based on his misconduct that forms the basis of the remaining claims against him. Accordingly, AgJunction's contract claim against Derrick Anderson does not support an award of sanctions under Rule 11. Sanctions are not appropriate. The claim allegations are objectively reasonable and were supported by the evidence adduced in discovery and at the preliminary injunction hearing concerning defendant Anderson's participation in the unlawful acts alleged in the First Amended Complaint.

**B.   AgJunction's claims based on defendants' misappropriation of AgJunction's intellectual property are well-grounded in fact and warranted by law.**

**1.   Defendants improperly limit the definition of copying.**

Defendants improperly attempt to frame the issue of software copying as requiring verbatim or "actual" copying. They conveniently ignore facts presented by both sides' experts that misappropriation of computer code can be accomplished beyond verbatim copying, and they offer no authority that verbatim copying is required. Additionally, "[t]he authorities recognize that a trade secret such as the one here claimed can consist of a combination of elements which are in the public domain." *Rivendell Forest Prods. v. Georgia-Pacific Corp.*, 28 F.3d 1042, 1045 (10th Cir. 1994). *See also Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 696 (E.D. Ill. 2004). Not only did plaintiffs discover that defendants planned to put AgJunction "out of the software business" while a number of them were still employed at AgJunction (Doc.

---

[2] Defendants have never challenged the authenticity of any of the defendants' employment agreements or the confidentiality provisions contained therein.

143 at 1), but they also based their allegations on substantial similarities in code modules and types of functionalities, and the fact that 31 USB drives had been inserted into the laptop used by two of the defendant programmers, many of which were unaccounted for.

> **2.     AgJunction's and defendants' experts agreed that: (1) direct copying is not required for copying of software; (2) there were several matches between the two parties' software; and (3) plaintiff's former employees were central to the authorship of defendants' software.**

Defendants contend it is "now clear" the claim plaintiff's intellectual property has been misappropriated is "based on pure speculation" and lacks any evidentiary basis.  (Doc. 175 at 6.) Defendants ask this Court to sanction plaintiff and its counsel under Rule 11 to prevent "yet another expensive fishing expedition" and to "signal" to plaintiff and its counsel "that litigation should not be initiated based upon speculation…."     (Doc. 175 at 6.)   This demand is unsupported, both factually and legally.

Defendants' argument continues to depend upon a highly restrictive, and legally errant, definition of misappropriation.  Under defendants' theory, plaintiff's claim that its intellectual property was misappropriated requires plaintiff to prove that its computer source code was directly copied.  (*See generally* Doc. 175 at 4 – 7.)  But both sides' experts agreed that verbatim copying is not required for the misappropriation and misuse of intellectual property.   (*See* excerpt of transcript of day 1 of preliminary injunction hearing at 228:9 – 230:16, attached hereto as Ex. 1; excerpt of transcript of day 2 of preliminary injunction hearing at 366:15 – 367:18, attached hereto as Ex. 2.)

As a practical matter, the differences in source code language used by plaintiff and defendants made direct copying impossible, and proof of copying difficult.  In a sworn declaration, Agrian's CEO, Nishan Majarian, claimed: "[b]ecause I did not want Agrian to be

accused of copying AgJunction's or any other Precision Ag company's software code, I had my development team investigating other development platforms not readily compatible with Plaintiff's CGI/Python development framework." (Doc. 79-1 at ¶ 14.)

The software experts for both sides also agreed that there are several matches between the two companies' software, not only in soil lab data but also in functionalities and features, like geographical mapping, asset management, and controller functions. (Ex. 1 at 244:15 – 246:18; Ex. 2 at 280:13 – 282:21, 284:6 – 286:11, 368:9 – 24.)

It is also well established that even software fully comprised of open source code can garner trade secret protection. *Universal Engraving, Inc. v. Duarte,* 519 F. Supp. 2d 1140, 1152, n.39 (D.Kan. 2007), quoting *All W. Pet Supply Co. v. Hill's Pet Prods. Div.,* 840 F.Supp. 1433, 1438 (D.Kan. 1993) ("trade secrets often contain elements that by themselves may be in the public domain, but together nevertheless qualify as trade secrets.").

Plaintiff's expert testified about these principles at the preliminary injunction hearing:

Q.   If there's no direct copying, why don't you just stop your analysis there?

A.   Well, because the copying could take other forms, and so what I then did is I proceeded to use a process that is difficult to automate. I did comparisons looking at some of the metrics that are involved in the various source code sets. So here I'm dealing just with one version of each set of source code, so I looked at the number of files in one set of code compared to the number of files in the other set of code. I looked at the level of completeness of the AgJunction code, which is a complete set of software, compared to a set of software that's incomplete where you see the folder architecture and the scaffolding. That's typical of a Ruby on Rails installation, but a lot of code is still missing or vacant. So what I did is, I did an analysis to see if there was any commonality based upon my understanding of the AgJunction features and functions, see if that existed in the Agrian source code.

*          *          *

Q.      Were you able to make a conclusion from this analysis?

A.      I did make a conclusion.  My conclusion is that, again based on
limited discovery and limited information that I've had available to
me, but it's my conclusion that it's more likely than not that the
Agrian software is in fact based upon the AgJunction functionality.

(Ex. 1 at 229: 3 – 22, 230: 9 – 16.)

Defendants' own software expert testified that all ten of the authored files he located in

the Agrian source code were created by former AgJunction employees Hunt or Dedmon.  (Ex. 2

at 367:11 – 368:8.)  He also admitted that verbatim copying is not the only way to copy software:

Q.      [A]t the beginning you were talking about different ways of
copying software.  During your deposition you were asked that
question too.  Now, verbatim, you would agree that verbatim
copying is not the only way to copy software; right?

A.      Yes, that is correct.

(Ex. 2 at 366:15 – 20.)  For example, the internal structure, the design, the overall architecture, or

an algorithm could be copied without verbatim copying of software.  (Ex. 2 at 367:4 – 16.)

The expert testimony constitutes substantial circumstantial evidence supporting plaintiff's

claim that Agrian misappropriated AgJunction's intellectual property.

**3.      Plaintiff reasonably relied on the fact that 31 separate
USB drives, many of which were unaccounted for, were
inserted into the laptop used by two of the defendant
programmers.**

In addition, plaintiff's forensic expert determined that at least 31 separate USB drives had

been inserted into former AgJunction employee Hunt's laptop (which became former AgJunction

employee Dedmon's computer after Hunt left for Agrian).   (Stillerman declaration at ¶ 10,

attached hereto as Ex. 3.)  Although Dedmon testified he did not take any AgJunction data with

him when he followed Hunt to Agrian, he admitted that he used both personal and company USB

drives to transfer files from his laptop at AgJunction:  Dedmon claimed he took his "personal"

flash drives home when he left AgJunction, but he maintained he does not know where the company USB drives are now.  (Dedmon Depo. at 23:14 – 24:12, attached hereto as Ex. 4.)[3] Dedmon's conduct, combined with the "personal" USB flash drives he took with him when he left AgJunction (flash drives that he used to transfer AgJunction files), provided circumstantial evidence of a taking, and a reasonable basis for plaintiff to question Dedmon's veracity.

### 4.   Defendants' counsel's gamesmanship hindered discovery for plaintiff and makes an award of sanctions improper.

There is an evidentiary basis, "more than pure speculation," supporting plaintiff's misappropriation claims in other respects as well.  But again, plaintiff's efforts to fully discover and develop its claims were thwarted by defendants.  Plaintiff's software expert attended a meet-and-confer conference among counsel, where he specifically requested multiple versions of Agrian's software because he knew it would be helpful to his analysis.  (Ex. 1 at 238:13 – 19; Ex. 2 at 278:17 – 279:4.)  Plaintiff's expert wanted to compare what Agrian's software looked like before April 2013, when AgJunction's employees started joining Agrian.  (Ex. 1 at 239:12 - 21.)  Reviewing changes made over time, and who made those changes, would have allowed him to determine what contributions were made by former AgJunction employees, and from there to determine whether those contributions arose from use of AgJunction's intellectual property.  *Id.*

Defense counsel, however, represented that there was only one version of Agrian's software.  (*See* Ex. 1 at 238:7 – 239:21.)  When plaintiff's expert was able to access the software, and based upon his experience, he formed the opinion that defense counsel's representation about the versioning of Agrian's software was not accurate.  (*See id.* at 238:25 – 239:9; Ex. 3, Stillerman declaration at ¶¶ 2 – 5, 9.)  After plaintiff's expert was deposed, plaintiff's expert

---

[3] Although the cover page indicates the Dedmon deposition was designated "Confidential Attorneys' Eyes Only," the parties de-designated some testimony by agreement, including the testimony cited above.

determined that Agrian's software had the ability to document how many times the software was altered by programmers.  (Ex. 3, Stillerman declaration at ¶¶ 5, 9, 12.)  During the preliminary injunction hearing, plaintiff's expert attempted to testify that the alterations to Agrian's software occurred primarily after former AgJunction employee Hunt joined Agrian, but defense counsel objected, and he was not permitted to do so.  (Ex. 1 at 240:21 – 242:21; Ex. 3, Stillerman declaration at ¶ 11.)

Even defendant's software expert agreed that Agrian's development started primarily after Aaron Hunt left AgJunction and started work at Agrian.  During the preliminary injunction hearing, he opined that Agrian's software was only about one year old in June 2014.  (Ex. 1 at 241:18 – 23; *see* Ex. 2 at 370:6 – 371:15; Ex. 3, Stillerman declaration, at ¶ 8.)  Defendants' failure to produce earlier versions of Agrian's software, despite plaintiff's requests that it do so, was detrimental to plaintiff.  (*See* Ex. 3, Stillerman declaration, at ¶¶ 6 – 7.)

Defense counsel's gamesmanship directly impeded plaintiff's ability to determine to what degree misappropriation of trade secrets had taken place.  Plaintiff and its attorneys should not now bear the added insult of having sanctions imposed *upon them*.

In short, this is not a case in which plaintiff brought claims in bad faith, or despite a total lack of evidence supporting those claims.  Instead, it is a case in which defendants thwarted plaintiff's attempts to fully develop and prove its claims at every turn.

### C.   AgJunction's claims for breach of the non-solicitation and non-competition provisions of defendants' employment agreements are well-grounded in fact and warranted by law.

Defendants cite no evidentiary support for the bald allegation that AgJunction's counsel "did no investigation of Canadian law prior to filing the lawsuit."  (Doc. 175 at 3.)  Defendants' naked beliefs do not provide a sufficient basis for the imposition of the extreme remedy of Rule

11 sanctions.  In point of fact, plaintiff's counsel relied upon the advice and knowledge of plaintiff's Canadian corporate counsel, who drafted the employee agreements in the first place. At the preliminary injunction hearing, Rick Heiniger, plaintiff's CEO, testified that plaintiff was buying intellectual property, so it was vital to have noncompetition and confidentiality contracts with the employees at issue in this lawsuit.  (Ex. 1 at 36:1 – 11; 38:1 – 25.)  He described Dearborn and Hunt as "critical."  (*Id.* at 38:1 – 39:22.)  Plaintiff asked its Canadian lawyers "to frame the strongest possible noncompetition and confidentiality contracts…and that would be our only lock and key on that [intellectual property] business."  (*Id.* at 38:10 – 15.)  The agreements were drafted by lawyers at the Calgary firm, Burnet, Duckworth & Palmer, LLP. (*See id.* at 38:21 – 25; www.bdplaw.com.)

There is no evidence that AgJunction's counsel should not have had a good faith belief in the validity of the non-solicitation and non-competition provisions.  The extensive briefing and debate regarding these provisions supports a finding that AgJunction's counsel's reliance was objectively reasonable.  (*See* Doc. 170 for summary of briefing on this issue.)

The parties directly considered and analyzed Canadian law in their briefing on defendants' motion to dismiss for failure to state a claim.  (Doc. 34 at 8 – 9 and Doc. 41 at 12 – 14.)[4]  The parties again extensively briefed Canadian law for the motion for preliminary injunction both before the hearing and after the hearing at the Court's request.  (Doc. 143 at 7 – 12 and Doc. 144 at 15 – 18).  The parties agreed on many of the seminal cases, the applicable balancing tests, and the legal principles involved, in analyzing the viability of restrictive covenants under Canadian law.

---

[4] The page numbers cite the pagination on the pleading, not on the ecf file stamp.

Both parties analyzed the reasonableness of the restrictions under the *Elsey* standard. (The reference is to *Elsey Estate v. J.G. Collins Ins. Agencies, Ltd.,* (1978) 2 S.C.R. 916 (Can.) [Doc. 41 at 10].)  AgJunction provided rational arguments that the temporal limitations were particularly short and not burdensome, and that the business involved is specialized, so the hybrid covenants at issue are reasonable and necessary under Canadian law.

Mark Josselyn, defendants' Canadian counsel, acknowledged the validity of the Canadian cases AgJunction relied upon during the preliminary injunction hearing.  For example, Mr. Josselyn took "no issue with the plaintiff's summary of the starting point found in the Supreme Court of Canada decision in *Elsey....*"  (Ex. 2 at 537:11 – 13.)  Mr. Josselyn described *Elsey* as "much interpreted" over the "past 35 years."  (*Id.* at 537:24 – 538:2; *see also id.* at 540:1 – 541:4.)  The parties' disagreement centered upon the application of the law to the facts of this case, not upon identifying the seminal cases, analysis, and issues involved under Canadian law.

Ultimately, this Court ruled that AgJunction is unlikely to prevail on the non-competition and non-solicitation claims because those claims are "likely unenforceable under Canadian law." (Doc. 145 at 20.)  But asserting a position in good faith that is ultimately decided against a litigant is not grounds for sanctions.  Moreover, despite opportunities to do so, this Court has not ruled that Canadian law precludes any of AgJunction's claims.

In essence, defendants improperly equate this Court's denial of AgJunction's motion for preliminary injunctive relief with an entitlement to Rule 11 sanctions.  This Court, however, neither determined, nor implied, that AgJunction's position was unreasonable, lacked a factual or legal basis, or was frivolous. *See, e.g., Tank Lining Corp. v. Dunlop Indus. Ltd.*, (1982) 40 O.R. 2d 219 (Can. Ont. C.A.) (recognizing that today's global economy, particularly in the software industry, makes courts more likely to enforce geographically broad non-compete agreements,

and finding reasonable a restrictive covenant in a sale agreement encompassing all of Canada). (Doc. 116 – 8.)

A recent dissenting opinion from the Court of Appeal of Alberta demonstrates that reasonable minds can differ as to the viability of global non-compete provisions under Canadian law: "This particular business was not sensitive to geographic location." *Globex Foreign Exchange corp. v. Kelcher et al.,* 2011 ABCA 240 (Court of Appeal of Alberta) (Slatter, J., dissenting) (attached hereto as Ex.5 at 47, ¶ [166].) Therefore, "the absence of a geographic limit in the clause is not fatal to its validity." *Id.* (Slatter, J., dissenting).

Further, the orders entered by this Court are devoid of statements even suggesting that AgJunction's position might run afoul of Rule 11. To the contrary, this Court simply determined that AgJunction fell short of meeting the heightened burden on a motion for a preliminary injunction. In no way does such a finding mean that AgJunction or its attorneys engaged in sanctionable conduct.

Additionally, defendants' allegation that AgJunction did not consult Canadian counsel until recently also is unsupported by any evidentiary citation. In terms of having Canadian counsel present at the preliminary injunction hearing, this Court specifically ordered that Canadian counsel retained by defendants could not address the Court directly without leave of the Court, could not sign papers or pleadings, and could not question witnesses during hearings, depositions, or at trial. (Doc. 47 at 4.) The Court's order allowed him to "assist" defense counsel in formulating questions for witnesses at hearing or trial, and allowed defense counsel to consult with him to determine appropriate questions for depositions or discovery. (*Id.*) Defendants did not seek leave for Mr. Josselyn to address the Court until the preliminary injunction hearing, so neither the Court nor plaintiff had a reason to anticipate that he would

14

make a presentation on Canadian law.  Accordingly, AgJunction had no reason to anticipate that its Canadian counsel should appear at the preliminary injunction hearing, or that he would be permitted to speak if he were to do so.

In light of the objectively reasonable position of AgJunction in it claims involving breach of the non-solicitation and non-competition against the individual defendants, defendants' motion for Rule 11 sanctions should be denied.

> ### D. Plaintiff's reliance on the *Brown* case is misplaced.

*Brubaker Kitchens, Inc. v. Brown*, 2008 U.S. App. LEXIS 11046 (3rd Cir. 2008), cited by defendants, is inapposite to the matter at bar.  (*See* Doc. 175 at 10.)  *Brown* is, of course, an unpublished case from the Third Circuit.   In *Brown*, plaintiff's counsel only had one substantiated allegation that did not even support plaintiff's claims against the defendant at issue. *Id.* at *24 – 26.   In this case, AgJunction produced discovery and elicited documentary and testimonial evidence from defendants supporting its claims against each of the defendants. The fact that the Court ultimately determined plaintiff did not sustain its high burden for a preliminary injunction does not diminish the fact that AgJunction had a reasonable legal basis and adequate evidentiary support for bringing its claims against defendants.

## III.   CONCLUSION

Defendants appear to believe they are entitled to Rule 11 sanctions because:  (1) they analyze the merits of this case differently than plaintiff does; (2) this Court denied plaintiff's motion for a preliminary injunction; and (3) plaintiff moved to voluntarily dismiss its claims, rather than moving to dismiss them with prejudice.  None of these facts, and none of the arguments defendants raise, warrant Rule 11 sanctions.

Plaintiff had moved to voluntarily dismiss the entire lawsuit more than six weeks before defendants served them with the Rule 11 motion and brief.  As such (and as outlined in Doc. 171), the purpose of Rule 11 has been satisfied.  Defendants have been attempting to voluntarily dismiss the litigation, including the three claims upon which defendants seek Rule 11 sanctions, since September 15, 2014.  (Docs. 152 and 153.)  They should be permitted to do so, without the imposition of sanctions.

Sanctions not only are unwarranted in this case, but defendants' conduct in filing its motion should not be endorsed by the Court. *See* Fed. R. Civ. P. 11, Official Comment to 1993 Amendments (2014 ed. at p. 89) (stating, "the filing of a motion for sanctions is itself subject to the requirements of the rule and can lead to sanctions").  Cross motions are unnecessary because the Court may award expenses and attorneys' fees to the prevailing party, whether the movant or the target.  *Id.*  Defendants' transparent attempt to recoup their defense costs in the event the Court grants AgJunction's pending motion to dismiss without prejudice and their attempt to avoid future litigation with AgJunction are not sufficient grounds for imposing Rule 11 sanctions against plaintiff or its counsel. Further, avoiding litigation is not a proper justification triggering the procedures authorized under Rule 11. While defendants ambiguously allude to possible patent claims or other future litigation that it believes AgJunction may file against the defendants at some other time, Rule 11 is not a prophylactic tool that a company may use against is competitors, or potential competitors, to prevent them from exercising their lawful rights to protect their intellectual property.

Based on the objective reasonableness of the claims AgJunction alleged against the defendants and defendants' improper use of Rule 11, AgJunction respectfully requests that the Court deny defendants' motion.

Respectfully submitted,

 /s/Teresa L. Adams
Teresa L. Adams, #16876
Martin, Pringle, Oliver, Wallace & Bauer, LLP
100 N. Broadway, Suite 500
Wichita, Kansas 67202
P: (316) 263-9311      F: (316) 265-2955
tladams@martinpringle.com

*Attorneys for Plaintiff AgJunction LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was served on this 18th day of December 2014, via the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Teresa L. Adams*