Agjunction LLC v. Agrian Inc. et al.
Case No. 2:14-CV-02069-DDC-KGS

# Exhibit
# 1

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF KANSAS
 2

 3    AGJUNCTION, LLC,

 4                   Plaintiff,
      vs.                                  Case No. 14-2069
 5
      AGRIAN, INC., et al.,
 6
                     Defendants.
 7

 8
           TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS
 9                          before
               HONORABLE DANIEL D. CRABTREE
10                            on
                       JUNE 24, 2014
11

12                        APPEARANCES

13    For the Plaintiff:    Gerald P. Dodson
                            Bryan J. Boyle
14                          Carr & Ferrell, LLP
                            120 Constitution Drive
15                          Menlo Park, CA 94025

16                          Douglas D. Silvius
                            Martin, Pringle, Oliver, Wallace &
17                          Bauer, LLP
                            4700 Belleview, Suite 210
18                          Kansas City, MO 64112

19    For the Defendants:   Joan K. Archer
                            Michael T. Raupp
20                          Husch Blackwell LLP
                            4801 Main Street, Suite 1000
21                          Kansas City, MO 64112

22                          Walter J. Kawula , Jr.
                            Husch Blackwell LLP
23                           120 South Riverside Plaza
                            Suite 2200
24                          Chicago, IL 60606

25
```

REBECCA S. RYDER, CSR, CCR, RMR
UNITED STATES COURT REPORTER
913-735-2334



EXHIBIT

tabbies®

1

1                    Mark Josselyn
                     Gowling Lafleur Henderson LLP
2                    160 Elgin Street, Suite 2600
                     Ottawa K1P 1C3 Canada
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    it, it looks pretty bad, but if you listen to Mr.

2    Nerpel's deposition, at his deposition where he

3    explained the points in Exhibit 25, if you look at

4    Mr. Dodson asking Mr. Dearborn to speculate about

5    what Mr. Nerpel meant in that document that he was

6    not a participant in, yeah, you can piece things

7    together, but that doesn't constitute actual factual

8    proof and certainly, I think the evidence will show,

9    is not sufficient proof to warrant the extraordinary

10   relief of a preliminary injunction in this matter.

11   Thank you.

12          THE COURT:  Thank you very much.

13     Mr. Dodson, I don't know how the plaintiff

14   wishes to proceed.  I take it you want to call a

15   witness at this point.

16          MR. DODSON:  Yes, your Honor.  We would

17   like to call Rick Heiniger, chief executive officer

18   of AgJunction.

19          THE COURT:  Very well.

20

21

22

23

24

25

```
 1                    RICK HEINIGER,

 2   having been duly sworn, was examined and testified as

 3   follows:

 4                  DIRECT EXAMINATION

 5   BY MR. DODSON:

 6            MR. DODSON:  May I proceed, your Honor?

 7            THE COURT:  You may.

 8   Q.   (By Mr. Dodson) Before we get into the meat of this

 9        case, Mr. Heiniger, I think that I would like you to

10        give the Court a little bit of background about

11        yourself, where you grew up, your age, your

12        experience growing up, and what led you into the

13        companies that you have built in Kansas that are now

14        all over the world.

15   A.   Okay.  Thank you, your Honor.  I am Rick Heiniger.  I

16        am 60 years old, will be 61 in just a few days, so

17        started my youth in Northeast Kansas, community of

18        Bern, Kansas.  Bern is a Swiss community.  I grew up

19        in a Swiss -- with Swiss heritage.  The whole

20        community was.  We are many, many generations of

21        agriculturalists, and I was fourth generation U.S.,

22        in the U.S, Went to school, naturally, at Kansas

23        State, one of the premier ag schools in the country,

24        majored in agricultural mechanization, which is now

25        called agricultural technology management.  My minor
```

```
 1   A.   The question our board had was, what are we paying
 2        $11 million for?  We have -- we are buying a
 3        business.  Of course it does have some revenue.  I
 4        think the revenues were about, I don't know, a
 5        million, million and a half a year.  So the revenues
 6        weren't the issue.  What are we buying?  And what we
 7        were told is you're really -- what we understood was
 8        we were buying intellectual property.  In other
 9        words, we're buying the know-how; we're buying the
10        software; we're buying the client base.  That's what
11        we are paying the money to buy.
12   Q.   Who told you that?
13   A.   The CEO.  And when we had meetings with GVM and so
14        forth, that's what we were told.
15   Q.   Okay.
16   A.   We were also told that this package was rare and it
17        was.  We looked all over for a cloud based -- this
18        extensive capability, as advanced as it was, the
19        popularity of it, the ease of use, a lot of the
20        problems had been solved.  That's all of the stuff we
21        wanted to avoid as a company trying to do it
22        ourselves.
23   Q.   Can you tell his Honor how that cloud-based
24        technology fits with what you currently had then
25        terms of company goals and missions?
```

1   A.   You can imagine precision agriculture is the art and

2        the science of farming by the square foot.  That

3        means there has to be a dance between the machinery

4        in the field and the agronomists and the

5        decision-makers that are managing that field and the

6        data and the massive amounts of data that's required

7        to interact between the machine and the agronomist.

8        And the concept that we had was that the best and

9        easiest way for that to happen is with a cloud-based

10       system.

11  Q.   What was the alternative at that point in terms of

12       the technology?

13  A.   You can find agronomy packages out there.  There's

14       software available but the best of it is PC-based,

15       but you can only imagine that PC-based software and

16       trying to interact massive amounts of data from a

17       machine in the field is much more difficult.

18  Q.   Was that the promise and the expectation your company

19       had when it acquired the cloud services division of

20       GVM?

21  A.   It fit perfectly with what we envisioned.  We

22       envisioned a business that incorporated cloud

23       information services, that incorporated agronomist,

24       the grower, retail industry with the people and the

25       machines that are right in the field.

```
 1    Q.    Now, were there particular people that were critical

 2          to this transaction taking place in terms of your

 3          board and GVM?

 4    A.    There absolutely were.

 5    Q.    Who were they?

 6    A.    Dearborn and Hunt were the primary ones, but the

 7          board said, If we're buying intellectual property,

 8          our question is, what is to keep that intellectual

 9          property from just walking out the door and competing

10          with us?  And so the decision was made that we would

11          ask our lawyers to frame the strongest possible

12          noncompetition and confidentiality contracts that

13          would be with those employees, in fact, all of the

14          employees, and that would be our only lock and key on

15          that business.

16    Q.    I want to ask you at this point, your lawyers --

17          we're talking about the employment agreements; right?

18    A.    The employment agreements, yes.

19    Q.    When you say your lawyers, did U.S. lawyers draft

20          those employment agreements, or Canadian lawyers?

21    A.    No, they were drafted by Canadian lawyers.  They

22          tried to embody the full intent of what we were

23          looking for, but those lawyers were at BDP in

24          Calgary, and they were the normal counsel for -- of

25          course at that time Hemisphere was Canadian based.
```

1   Q.   All right.  And so Dearborn and Hunt are critical.

2        Why is Dearborn critical?

3   A.   Dearborn is critical because he has been the creator

4        and I guess the business driver of that division for

5        many, many years.  His experience is vast.  His

6        credibility is high in the marketplace.  He has

7        relationships with virtually all the major retailers

8        in the country, well reported.  He's a guy that would

9        be rare to find with that broad coverage in this very

10       unique emerging subject matter.

11  Q.   And then Mr. Hunt, what did he bring to the table?

12  A.   Mr. Hunt is considered to be one of the best -- I

13       would say savant, you know, level developing

14       architects for this type of work.  Again, it's

15       unique, it's unusual, and to be able to deploy it and

16       have the vision to be able to guide many developers,

17       it's not just his work, but he's able to guide many

18       developers.  It was essential, we felt, to have those

19       two gentlemen if we were going to be able to achieve

20       what we wanted to achieve with the division.  The

21       million or million and a half in revenue wasn't where

22       we wanted to be.

23  Q.   Was that what the revenue was --

24  A.   When we bought it, yes.

25  Q.   You were looking at a growth curve; right?

```
 1                      THE COURT:  Mr. Dodson, are you ready for
 2          your next witness?
 3                      MR. DODSON:  Yes, your Honor.  It will be
 4          Mr. Robert Stillerman and Mr. Brian Boyle will do the
 5          examination.
 6                      ROBERT STILLERMAN,
 7          having been duly sworn, was examined and testified as
 8          follows:
 9                      DIRECT EXAMINATION
10          BY MR. BOYLE:
11                      THE COURT:  And you're Mr. Boyle?
12                      MR. BOYLE:  Yes, your Honor.
13                      THE COURT:  Please proceed.
14                      MR. BOYLE:  Thank you, your Honor.
15          Q.   (By Mr. Boyle) Hello, Mr. Stillerman.  Could you give
16               us your full name and address for the record.
17          A.   My name is Robert Stillerman.  I live in Palo Alto,
18               California, with my wife of 30 years.  My address is
19               XXXX XXXXXXX Avenue.  That's Palo Alto, California.
20          Q.   Thank you.  Could you tell us a little bit about your
21               undergraduate education.
22          A.   Yeah.  I did my undergraduate work at Columbia
23               University School of Engineering, where I majored in
24               electrical engineering, and I graduated after four
25               years with a bachelor's of science in electrical
```

```
 1        in those documents.
 2               THE COURT:  I understand.  It's a
 3        preliminary injunction hearing.  The rules of the
 4        road aren't as strict as if we had a jury sitting in
 5        the courtroom with us.  I'm going to overrule the
 6        objection and encourage you to cross examine
 7        vigorously on subjects you deem appropriate.  The
 8        objection is overruled.
 9   Q.   (By Mr. Kawula) I think we were talking about why you
10        weren't surprised that there was no direct copying.
11   A.   I would be happy to explain that.  When I looked at
12        the two sets of source code, I noticed that the
13        software was structured differently.  The AgJunction
14        software was structured using more traditional client
15        server architecture where the browser would be used,
16        access the server through what's called a CGI common
17        gateway interface written in Python.  The Agrian
18        software was written in a different language, Ruby,
19        using a different framework, which was Rails,
20        sometimes called Ruby on Rails.  And as a result of
21        these differences there are syntactical differences
22        in the language.  There are structural differences in
23        the frameworks that were used.  So it would have been
24        surprising if someone could use source code from
25        AgJunction and directly use it in this different
```

1         environment, a different language, different

2         architecture.

3    Q.   If there's no direct copying, why don't you just stop

4         your analysis there?

5    A.   Well, because the copying could take other forms, and

6         so what I then did is I proceeded to use a process

7         that is difficult to automate.  I did comparisons

8         looking at some of the metrics that are involved in

9         the various source code sets.  So here I'm dealing

10        just with one version of each set of source code, so

11        I looked at the number of files in one set of code

12        compared to the number of files in the other set of

13        code.  I looked at the level of completeness of the

14        AgJunction code, which is a complete set of software,

15        compared to a set of software that's incomplete where

16        you see the folder architecture and the scaffolding.

17        That's typical of a Ruby on Rails installation, but a

18        lot of code is still missing or vacant.  So what I

19        did is, I did an analysis to see if there was any

20        commonality based upon my understanding of the

21        AgJunction features and functions, see if that

22        existed in the Agrian source code.

23   Q.   What do you mean by features and functions?

24   A.   So the features and functions, if you look at the

25        things that comprise the AgJunction software, you're

1       looking at things like being able to deal with

2       growers, what I call the entities, the software

3       entities that represent the real world things like,

4       you know, growers and farms and fields and nutrients

5       and recommendations.  These are all aspects of the

6       AgJunction software, and I find those same entities

7       and relationships among those entities present in the

8       Agrian software, for example.

9  Q.   Were you able to make a conclusion from this

10      analysis?

11  A.   I did make a conclusion.  My conclusion is that,

12      again based on limited discovery and limited

13      information that I've had available to me, but it's

14      my conclusion that it's more likely than not that the

15      Agrian software is in fact based upon the AgJunction

16      functionality.

17  Q.   When you looked at the two codes -- I understand you

18      were given source code from AgJunction and Agrian --

19      were there any overall characteristics that you

20      noted?

21  A.   Well, the AgJunction software is typical of a set of

22      software that's evolved over time that -- it's less

23      well structured; it's more what sometimes is called

24      spaghetti code, where it's just a little harder to

25      follow; whereas, the Agrian software is really

```
 1        the term element, there's an attribute which
 2        corresponds to an element, and the tag name on the
 3        right is element.  Then we see value; we see value
 4        unit; we see value type and value description; and
 5        then we see ExtractionMethod.  So there's a lot of
 6        similarity in the format as well as in the tag names.
 7   Q.   Thank you.  I was wondering if you could let us know,
 8        how many versions of each software were you given of
 9        AgJunction and Agrian?
10   A.   In this case I was only allowed to see one version of
11        each set of software.
12   Q.   And how did that come about?
13   A.   My understanding was -- I actually attended a
14        meet-and-confer when I first got involved in the case
15        where the attorneys were getting together to discuss
16        what would be exchanged in this case, and I
17        specifically requested multiple versions of the
18        software because I knew that would be helpful in my
19        analysis, but the attorney for the defendants said
20        there was only a single version.  She represented
21        that there was only one version of the software, so
22        the agreement that was reached during that
23        meet-and-confer was just to exchange one version of
24        each parties' software.
25   Q.   Did you see any indication that there was more than
```

| 1 | | one version? |
|---|---|---|
| 2 | A. | Particularly in the Agrian software I saw evidence |
| 3 | | that Agrian was using a version control system called |
| 4 | | GIT, or there were files embedded in the Agrian |
| 5 | | software which contained exclusions for GIT.  And I |
| 6 | | also saw evidence in the Agrian software that they |
| 7 | | were -- that the Agrian developers were using a |
| 8 | | repository for managing their source code called |
| 9 | | Bitbucket. |
| 10 | Q. | And how do you spell GIT? |
| 11 | A. | GIT is G-I-T. |
| 12 | Q. | Okay.  And how does analysis differ or change, if at |
| 13 | | all, if you have more than one version? |
| 14 | A. | Well, if I had more than one version of the software |
| 15 | | to look at, I would have, for example, been able to |
| 16 | | see what the Agrian software looked like prior to |
| 17 | | anybody joining Agrian, so prior to April of 2013.  I |
| 18 | | would have been able to see what changes were made |
| 19 | | over time and who made those changes and what those |
| 20 | | changes were.  All of that information is available |
| 21 | | through the version control system. |
| 22 | | MR. BOYLE:  Now, I may have just had this |
| 23 | | off before, your Honor, but I would like to ask about |
| 24 | | after -- since his deposition Dr. Edwards has done a |
| 25 | | report himself, and a deposition, and I would like to |

```
 1        ask a couple short questions about what

 2        Mr. Stillerman -- if he had any comments on it, but I

 3        expect we're going to have -- we might have to

 4        discuss --

 5                  THE COURT:  This is in the nature of a

 6        response to the expert that the defendant may call

 7        during this hearing?

 8                  MR. BOYLE:  Yes.  I believe he's on their

 9        witness list for tomorrow, and Mr. Stillerman hasn't

10        opined because he read this, obviously, after he did

11        his deposition and his report.

12                  THE COURT:  My recollection in the

13        scheduling governing the experts is there was no time

14        set for a rebuttal report.

15                  MR. BOYLE:  Right.  So --

16                  THE COURT:  All right.  Defense, do you

17        object to this testimony?

18                  MS. ARCHER:  [Shook head.]

19                  THE COURT:  Then we don't have a problem.

20        Please proceed.

21   Q.   (By Mr. Boyle) So you've read Dr. Edwards' opinion,

22        or his report?

23   A.   Yes, I have.

24   Q.   And his deposition transcript as well?

25   A.   Yes, I have, yeah.
```

```
 1   Q.   Okay.  Was there anything in that report that you
 2        wish to comment on after reading it, or not the
 3        report, but report or the deposition?
 4   A.   Well, there was one thing in particular in his
 5        deposition that I thought was interesting.  He was
 6        asked a question about migrations and Ruby.  And let
 7        me explain what migrations are.  Migrations are Ruby
 8        scripts or source code files that are used to make
 9        changes to the structure of a database.  So a
10        database, for example, might be a record of
11        customers.  So the database would have fields or
12        columns which contain street address, contain a city,
13        state, phone number, zip code.  Those are columns in
14        a database table that might be called customer.  And
15        what I recall from my experience with Ruby on Rails
16        is that migrations are used to create these database
17        structures and the file names also contain time
18        stamps and dates.  So I went back to the Agrian code
19        and looked at when these migrations occurred in the
20        Agrian code.
21   Q.   What did you find?
22   A.   I discovered that the first data tables that were
23        created were created in June of 2013.  There was a
24        little bit of work on the database in July, and then
25        starting in August, September, October there was a
```

1    lot more activity.  The Ruby is based a lot on

2    conventions.  One of the conventions is when you

3    automate the creation of a database these time stamps

4    in UTC, which is basically GMT, are attached to the

5    file names, and that was what I found in this

6    particular case.

7    Q.  Why is that date important at all?

8    A.  Why this is important is that it kind of validating

9    two things for me:  One is that it looks like --

10            MR. KAWULA:  One moment, please, your

11   Honor.  Now that I've heard the testimony -- I

12   understood this was going to be a rebuttal to an

13   opinion offered by defendants' expert; however, we

14   did not offer any opinion on Ruby migrations.  He was

15   asked a question about that, did not have an opinion

16   on it, and there's nothing to rebut.  This testimony

17   is coming in not in rebuttal to any opinion offered

18   by our expert.  It's a new opinion that we're

19   completely surprised by.  There's no reason they

20   couldn't have brought this out at their expert

21   report.

22            THE COURT:  Are you going to offer it

23   during Dr. Edwards' testimony?  Are you going to

24   offer this commentary?

25            MR. KAWULA:  I was not planning on offering

```
 1                    CROSS EXAMINATION

 2   BY MR. KAWULA:

 3   Q.   Good afternoon.  Just let me get this straight.  We

 4        have got no direct copying of any software code;

 5        right?

 6   A.   So what I have said is that I found no evidence of

 7        software being lifted and directly copied into the

 8        Agrian software.  That's correct.

 9   Q.   Thank you.  And the two code bases use a completely

10        different structure?

11   A.   Yes.  The two code bases use a different structure,

12        yes.

13   Q.   Different framework?

14   A.   Yes.

15   Q.   If I understand it right, what you're basing your

16        opinion on is some commonality of features between

17        the two systems?

18   A.   It's a little more than that.  There's the fact that

19        the entities are replicated.  There's the fact that

20        the data formats for soil data transfer is -- the

21        features and functions that are embedded in the

22        Agjunction appear in the Agrian software.  The

23        relationships among the entities are similar.

24   Q.   What's your basis for saying that the soil transfer

25        data format is embedded in the Agrian source code for
```

```
 1        the NextGen system?
 2   A.   There's an application or a software module called
 3        field samples.  Field samples uses the Modus format.
 4        I believe there's a source code file, a Ruby file,
 5        called something like XML handler that handles the
 6        Modus format embedded in the Agrian software.
 7   Q.   Now, concerning the functions of the AgJunction
 8        software, you were in the gallery today, weren't you?
 9   A.   Yes.
10   Q.   Yes.  And you heard Mr. Heiniger identify the wiki
11        that has, the AgJunction wiki, all the information
12        about the features and functions; correct?
13   A.   I heard some questions about a wiki.  I don't know
14        that it had all of the features and functions.  I'm
15        not sure I recall that testimony.
16   Q.   Would you contend that the ensemble, the features and
17        functions that are in the AgJunction wiki are somehow
18        secret or confidential?
19   A.   I haven't done that analysis.  I haven't been asked
20        to do that.
21   Q.   Okay.  And what about the features and functions and
22        the relationships between those features and
23        functions in the user manual that's available on the
24        internet?  Would you contend that that is somehow
25        secret and confidential to AgJunction?
```

```
 1   A.   Again, I haven't done that analysis.  I was just
 2        asked to render an opinion on whether or not I found
 3        features and functions of the AgJunction software in
 4        the Agrian software.
 5   Q.   Right.  In preparing your opinion, you were told by
 6        counsel to assume that all the features and functions
 7        in the AgJunction system, you were told to just
 8        assume that the features and functions in the
 9        AgJunction system were proprietary to AgJunction.
10        Weren't you told that?
11   A.   I was told to assume that -- exactly, that's right.
12   Q.   So your opinion is based upon what counsel told you
13        to assume?
14   A.   So again what we're dealing with here is an
15        accelerated process with limited discovery, with
16        limited time, with only one version of the software
17        available.  And in order to get through the process,
18        I was asked to make those assumptions, that's right.
19   Q.   And you didn't do any independent verification to
20        determine what features and functions were
21        confidential or secret to AgJunction, did you?
22   A.   I didn't do any independent analysis on that, no.
23   Q.   When you rendered your opinion, is it also true that
24        you didn't do any analysis to determine what features
25        or functions Agrian was already implementing in its
```