Agjunction LLC v. Agrian Inc. et al.
Case No. 2:14-CV-02069-DDC-KGS

# Exhibit 2

1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF KANSAS
2

3    AGJUNCTION, LLC,

4              Plaintiff,
     vs.                        Case No. 14-2069
5
     AGRIAN, INC., et al.,
6
               Defendants.
7

8       TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS
                          before
9             HONORABLE DANIEL D. CRABTREE
                           on
10                   JUNE 24, 2014

11
                        APPEARANCES
12
     For the Plaintiff:    Gerald P. Dodson
13                         Bryan J. Boyle
                           Carr & Ferrell, LLP
14                         120 Constitution Drive
                           Menlo Park, CA 94025
15
                           Douglas D. Silvius
16                         Martin, Pringle, Oliver, Wallace &
                           Bauer, LLP
17                         4700 Belleview, Suite 210
                           Kansas City, MO 64112
18
     For the Defendants:   Joan K. Archer
19                         Michael T. Raupp
                           Husch Blackwell LLP
20                         4801 Main Street, Suite 1000
                           Kansas City, MO 64112
21
                           Walter J. Kawula , Jr.
22                         Husch Blackwell LLP
                            120 South Riverside Plaza
23                         Suite 2200
                           Chicago, IL 60606
24

25

              REBECCA S. RYDER, CSR, CCR, RMR
              UNITED STATES COURT REPORTER
                      913-735-2334



EXHIBIT

2



```
 1                    Mark Josselyn
                      Gowling Lafleur Henderson LLP
 2                    160 Elgin Street, Suite 2600
                      Ottawa K1P 1C3 Canada
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        are a proper basis for concluding that functionality

2        has been copied?

3  A.   No, but it's a good basis for what I did conclude,

4        which is that the Agrian software is incomplete but

5        that it's capable of implementing -- even incomplete

6        parts indicate that there's capability for building

7        the functions and features that are found in the

8        AgJunction cloud services application.

9  Q.   In your direct examination yesterday I heard you

10       mention that you didn't receive different versions of

11       the Agrian source code.  Do you remember that?

12  A.   Yes, that is correct.

13  Q.   However, in the course of forming your opinions, you

14       didn't do anything to determine the state of the

15       AgJunction source code at the time Aaron Hunt left,

16       did you?

17  A.   So we're dealing here with a preliminary injunction

18       hearing.  This was an accelerated preliminary summary

19       that I was asked to prepare.  This is limited

20       production, and despite my request for additional

21       versions of software at the initial meet-and-confer,

22       there was agreement that either party would produce

23       one version of the software.  That was the agreement,

24       and that's what I had to live with in doing my

25       analysis, and I would say that my analysis would have

```
 1            been significantly richer if I had had greater

 2            production and if I had seen other versions of

 3            software, would have helped enormously in reaching

 4            conclusions.

 5    Q.      But you had the same from both sides, right, as far

 6            as the snapshot of software, one snapshot?

 7    A.      That's my -- that's correct.  My understanding is I

 8            had a snapshot in time from Agrian and a snapshot in

 9            time from AgJunction and that was agreed to by the

10            parties and that was all I was going to get.

11    Q.      Now, in the process of forming your opinions, you

12            asked AgJunction for their database schema, didn't

13            you?

14    A.      I did.

15    Q.      And AgJunction refused to provide that database

16            schema to you, didn't they?

17    A.      They provided what they said they had, which was very

18            incomplete, and it was impossible to draw a

19            conclusion from incomplete software, incomplete

20            schema.

21                      MR. KAWULA:  Thank you.  Nothing further at

22            this time, your Honor.

23                      THE COURT:  Very well.  Is there redirect?

24

25
```

<pre>
 1                    REDIRECT EXAMINATION

 2   BY MR. BOYLE:

 3              MR. BOYLE:   Good morning, your Honor.

 4   Q.   (By Mr. Boyle) Good morning, Mr. Stillerman.

 5   A.   Good morning.

 6   Q.   Yesterday during your cross examination we were

 7        discussing soil sample, soil sampling source code.

 8        Do you recall that?

 9   A.   Yeah.  We were talking specifically about data

10        formats that are used for transferring soil sample

11        analyses and data from soil labs to Agrian or from

12        soil labs to AgJunction.

13   Q.   We were talking about soil sampling, but can you also

14        tell us some other examples of functionalities that

15        you found in the Agrian code that you also saw in the

16        AgJunction code besides the soil sampling?

17   A.   Yeah, for example, there's asset management software

18        that's functionality -- features and functionality

19        that are in both sets of software.  There is

20        functionality that's used to transmit information

21        between the AgJunction software and controllers.  And

22        these are controllers, these are hard-core devices

23        that reside in foreign vehicles.  And there's

24        software that's used -- similar equivalent software

25        in the Agrian production.  I remember these are
</pre>

```
 1        listed in my report but I don't have the report in

 2        front of me.

 3   Q.   If we opened your report, could we see that?

 4   A.   Do I have my report here?

 5             MR. BOYLE:  Maybe we can pull that up.

 6        It's 132.

 7   A.   Fundamentally what I also found is that if you look

 8        at what Agrian calls their core application in that

 9        core application you see what I call the entities.

10        These are the software representations of things that

11        you find in precision agronomy.  These are things

12        like growers and fields and farms and nutrients and

13        recommendations and samples, users, authorizations.

14        These are all features and functions that are --

15        these are all entities that represent real precision

16        agronomy things.

17   Q.   (By Mr. Boyle) Okay.  Perhaps we can go to Paragraphs

18        37 and 38 of your report.

19   A.   That would be fine.

20   Q.   Is this what you were referring to earlier?

21   A.   Yeah, this is part of it.  There are certain

22        algorithms I found as well.  Can we go up a little

23        bit in the report?  Is it possible for me to have a

24        paper copy of report so I can go through it?

25   Q.   Sure.
```

```
1    A.   So, you know, there are things like telematics in
2         there.
3    Q.   Can you direct us to where so I will see it, what
4         paragraph you're at?
5    A.   This is Table 3.  Okay.  It's further down, Table 3,
6         there's telematics; there's a lot of code relating to
7         GIS and mapping.  And again there's the -- in the
8         core application you see the relationship between a
9         grower can have multiple farms, a farm can have
10        multiple fields.  We have all these relationships
11        there.  They are built in.  There are some specific
12        algorithms that are not even listed in this table,
13        but I found in the code which are specific to data
14        interpolation as I compare the features and functions
15        from each set of source code, I found lots of
16        equivalent in the other.  Let me also turn to my
17        exhibit --
18   Q.   Go ahead.  If you could just give us a few examples.
19   A.   There's functionality relating to geographical
20        mapping and shapes and polygons in both, soil
21        analysis, recommendations.
22   Q.   If I could ask you another question?
23   A.   Sure.
24   Q.   In the interests of time.  During your cross
25        examination yesterday I believe you had mentioned in
```

1    what I have seen in the sample files provided to me

2    by AgJunction.

3  Q.  Is that the full sample file?

4  A.  That's not the full sample file.  That's just an

5    excerpt from the sample file.

6  Q.  Thank you.  Finally I wanted to ask you, in the cross

7    yesterday you were asked about copying and that there

8    was no evidence of direct copying, but we had

9    discussed whether or not you can copy without direct

10    verbatim copying.  Do you recall that?

11  A.  Yes, I do.

12  Q.  When you were doing a search of Agrian's code, how

13    does the fact that you found Mr. Hunt and Mr.

14    Dedmon's name in the code relate to copying?

15  A.  Let me see if I can explain the copying.  With the

16    exception of what we have seen with the soil lab data

17    formats, which appears to have some level of

18    copying -- although it's not precise and exact, it's

19    still -- I think the data I came up with was

20    89 percent of the tags were the same, and the file

21    structures were the same; that in my view what's

22    really at issue in this case when it comes to

23    software is, you know, not what software tools were

24    used, or what languages or frameworks, but what the

25    software actually does.  And when I -- that's why I

1        focused on the features and functions and how the

2        software got to where it is, and that's why my

3        methodology was so focused on the features and

4        functions and comparing that to the Agrian software.

5    Q.   This was a feature or function that you found Mr.

6        Hunt's name associated with?

7    A.   Yes.  So in my report I presented evidence that Mr.

8        Hunt and Mr. Dedmon contributed directly to the

9        development of the product, and what's significant

10       here is that Mr. Hunt and Mr. Dedmon were

11       contaminated with proprietary information that

12       belonged to AgJunction, and I presented evidence from

13       the JIRA issues that show that they were associated

14       with some of this proprietary information, and we

15       heard testimony from Mr. Heiniger about how deeply

16       involved they were in the production of the code, and

17       they are directly contributing to the development of

18       this product which has equivalent features and

19       functions.

20   Q.   I would like to bring up one of those pieces of

21       evidence that you spoke of both yesterday and today

22       so we can actually see it, which is Exhibit 31.  Just

23       at the top, if you can just show us the highlighted

24       portion, what does that mean?

25   A.   So this appears to be a software module from the

1    Agrian source code.  The module is called GISEngine.

2    The source code file is called -- it looks like it's

3    called saga underscore command dot RB.  It has Aaron

4    Hunt's name on it.  As I testified yesterday, there

5    were very few software modules that have people's

6    names on them.  With the limited discovery that we

7    have had, without the ability to look at all the

8    version control logs and see who contributed to what,

9    and other documentation that might exist, this is

10   evidence that Mr. Hunt directly contributed to the

11   development of the NextGen product.

12   Q.   Great.  Thank you.  No more questions.

13            THE COURT:  All right.  Recross, I take it?

14            MR. KAWULA:  Yes.

15       If I may, would you put the exhibit back up,

16   please, and the same callout.

17                 RECROSS EXAMINATION

18   BY MR. KAWULA:

19   Q.   Mr. Stillerman, did you determine what the purpose of

20        this particular module is?

21   A.   Well, there's a comment on the top that indicates

22        that it's a wrapper for the Saga GIS program command

23        line.

24   Q.   And saga GIS command line, what is Saga GIS?

25   A.   Saga is some service -- as I recall, counselor, you

```
 1                    THE COURT:  Do you have that exhibit number
 2        handy for his report?
 3                    MR. KAWULA:  Exhibit 48.  And the
 4        attachments to that are Exhibits 481 through 488.
 5                    THE COURT:  Did you offer 481 through 488,
 6        or are you going to put that in the discussion piece
 7        with your cocounsel and offer it later?
 8                    MR. KAWULA:  We will put it in the
 9        discussion piece.
10                    THE COURT:  Very well.  Cross examination?
11                         CROSS EXAMINATION
12   BY MR. BOYLE:
13   Q.   Good afternoon, Dr. Edwards.
14   A.   Good afternoon.
15   Q.   I wanted to ask you first, at the beginning you were
16        talking about different ways of copying software.
17        During your deposition you were asked that question
18        too.  Now, verbatim, you would agree that verbatim
19        copying is not the only way to copy software; right?
20   A.   Yes, that is correct.
21   Q.   Okay.  And during your deposition I think you
22        elucidated another way that software could be copied.
23        You gave an example.  Do you recall that?
24   A.   I don't recall that specific example, no.
25   Q.   Okay.  Well, if I tell you that you said that it
```

1        was -- it's possible to copy parts of software that

2        are not simply source code, does that remind you of

3        what you may have said?

4    A.  It doesn't remind me of a specific example that I may

5        have given; however, the statement that there are

6        aspects to software that can be copied besides direct

7        copying of the source code is accurate.  As I stated,

8        you could have copied the internal structure or

9        design of the system, or you could have copied the

10       overall architecture of the system.

11   Q.  Also what you had given as an example, if I could

12       represent to you, is that a particular algorithm

13       could be copied as well?

14   A.  Yes, it's possible to copy an algorithm.

15   Q.  Okay.  So it is possible then to copy without

16       verbatim copying.  Is that -- that's a statement you

17       agree with?

18   A.  That's correct.

19   Q.  All right.  You also in your expert report, I

20       believe, searched for occurrences of Mr. Hunt and

21       Dedmon and other authorship in the Ruby source code;

22       is that correct?

23   A.  Yes, that's correct.

24   Q.  Do you remember how many instances of authorship you

25       found?

```
 1    A.    Yes.  I believe there were a total of ten files that
 2          included their full names as associated with the
 3          authorship tag that appears in those files.
 4    Q.    Okay.  And would you agree that five of those files
 5          had authorship by either Mr. Hunt or Dedmon?
 6    A.    Yes.  If I recall correctly, of the ten files, nine
 7          of them had Aaron Hunt's name and one had Matt
 8          Dedmon's name.
 9    Q.    Did you do any detailed analysis of whether the
10          functions and features of the AgJunction and Agrian
11          software, the actual functions and features matched
12          up in any way?
13    A.    Are you speaking of user level features?
14    Q.    Yes.
15    A.    Yeah.  So I did do an analysis of that, and I in
16          particular found that features that were found within
17          both of the systems, such as the asset management
18          module, features related to receiving alerts from
19          farming equipment, providing the status of that
20          equipment, for example, were features that were
21          outlined on AgJunction's public wiki and user manual.
22    Q.    But you saw both of those features in both of the
23          codes that you're speaking to now?
24    A.    Yes, that's correct.
25    Q.    Okay.  Now, you spoke about matches, and forgive me
```

1        elements.

2   Q.    Okay. And then -- so those elements you speak of

3        together could make up a proprietary product?

4   A.    I would characterize it as a product that includes

5        both open source and proprietary source code.

6   Q.    Earlier you were talking about the maturity of the

7        two, AgJunction and Agrian code, and in your

8        deposition on June 17 you were asked some questions

9        about Ruby migrations. Do you recall that?

10   A.    Yes, I do recall being asked that question.

11   Q.    And do you recall being unable to answer the question

12        as to what a Ruby migration file name looks like?

13   A.    Yes. As I recall, when I was asked that question, I

14        was unable to fully understand what I was being asked

15        about and asked for a clarification and the gentleman

16        who was taking my deposition declined to provide a

17        clarification and moved on.

18   Q.    Okay. Well, does that mean you don't know what a

19        Ruby migration file looks like?

20   A.    I know what Ruby migrations files are, yes.

21   Q.    If you know what Ruby migration files are, do you

22        understand that they can bear time stamps when the

23        migration occurs?

24   A.    Yes, I do.

25   Q.    Okay. And so we were talking about the maturity of

```
 1          the code, the Agrian code.  I believe you said
 2          AgJunction looked more older or more developed.  I'm
 3          not trying to put words in your mouth.  It's just how
 4          I recall what you said and so -- and the Agrian code
 5          was younger.  Would that be correct?
 6   A.     Yeah.  I said less developed or less mature.
 7   Q.     Okay, great.  And so what would you conclude if you
 8          knew that the first date of a Ruby migration file in
 9          the Agrian code was in June of 2013?
10   A.     That would be consistent with my findings.  June of
11          2013 is about a year ago, and I think that, you know,
12          reflects what I would expect, for a system to have
13          270,000 lines of code if the system were being
14          developed by a small to moderate team of software
15          engineers.
16   Q.     Okay.
17               MR. BOYLE:  Thank you, Dr. Edwards.
18               THE COURT:  Any redirect?
19                    REDIRECT EXAMINATION
20   BY MR. KAWULA:
21   Q.     Dr. Edwards, the ten files, nine by Aaron Hunt, one
22          by Matt Dedmon, you analyzed those files?
23   A.     Yes, I did.
24   Q.     How relevant in terms of size are those files
25          compared to the entirety of the Agrian NextGen
```

```
 1                         TODD RICKETS,

 2   having been duly sworn, was examined and testified as

 3   follows:

 4                     DIRECT EXAMINATION

 5   BY MR. KAWULA:

 6   Q.   Good morning, Mr. Rickets.  Would you please tell us

 7        your current place of employment?

 8   A.   Current place of employment is Agrian.

 9   Q.   And what is your position?

10   A.   I am the vice-president of product management.

11   Q.   How long have you been with Agrian?

12   A.   A little bit over two and a half years.

13   Q.   And what did you do before you joined Agrian two and

14        a half years ago?

15   A.   Before two and a half years ago I had spent

16        approximately 15 1/2 years developing software

17        information systems for agriculture.

18   Q.   For agriculture?

19   A.   For agriculture, yes.

20   Q.   What types of systems did you build?

21   A.   A number of systems, all the way from kind of grower

22        cost accounting systems, field-based recordkeeping

23        systems, grower contracting and settlement

24        applications, receiving and grading systems, asset

25        management systems, in-field labor tracking systems,
```

```
 1     he stands to benefit by maintaining that flexibility
 2     because if a customer still wants to use AgJunction
 3     it's better to keep them happy than to lose them
 4     altogether.
 5         Additionally, the Harvey's example, they
 6     testified that they were free to go anywhere, anytime
 7     as well.
 8         All right.  This is where I am going to step
 9     aside for a moment and let my colleague Mr. Josselyn
10     talk about Canadian law.
11             MR. JOSSELYN:  Good afternoon, your Honor.
12     My name is Mark Josselyn.  I was called to the bar of
13     Ontario in 1983.  I am a partner with the law firm of
14     Gowling Lafleur Henderson, and I head up the
15     employment and labor law practice group for our
16     Ottawa office.
17             THE COURT:  Welcome to Kansas.
18             MR. JOSSELYN:  Thank you very much.  And I
19     am only going to be addressing your Honor in a
20     limited capacity, commenting on the plaintiff's claim
21     that the employee defendants have breached
22     contractual duties owed to their former employer, and
23     that's all that I will be talking about.
24         I would like to start by saying we take no issue
25     with opposing counsel's summary of the elements of a
```

1 breach of contract under the laws of Alberta as set

2 out in their reply brief.  I won't go through that.

3 Where we diverge is with respect to the

4 enforceability of the subject employment agreements

5 and in particular the restrictive covenants.  Before

6 taking you to a detailed analysis of those

7 restrictive covenants, I think it would be

8 instructive to very briefly paint the landscape

9 within which Canadian employment law operates because

10 it is different in a couple of material aspects.

11  The defendants' brief cites a quote found at

12 Paragraph 57 of the New Brunswick Court of Appeals

13 decision in Imperial Sheet Metal v. Landry, which in

14 turn cites a famous aspect of the Supreme Court of

15 Canada decision in HOJ versus Machtinger.  And it's

16 up on your screen.

17  "Work is one of the most fundamental aspects in

18 a person's life, providing the individual with the

19 means of financial support and, as importantly, a

20 contributory role in society.  A person's employment

21 is an essential component of his or her sense of

22 identify, self-worth, and emotional well-being."

23  The new Brunswick Court of Appeal at Paragraph

24 57 of the Imperial Sheet Metal and Landry case

25 restated this proposition in this way:

1        "The fundamental right of everyone to pursue

2    meaningful employment and to earn a livelihood

3    remains a fundamental tenet of public policy

4    enshrined in the common law governing employment

5    relationships. "

6        Your Honor, it's in that context and backdrop

7    that our analysis must proceed, and it will come full

8    circle back to the know-how argument that we just

9    heard, and you'll find Canadian and American

10   jurisprudence are bang on on that issue.

11       We also take no issue with the plaintiff's

12   summary of the starting point found in the Supreme

13   Court of Canada decision in Elsley versus JG Collins,

14   and that stands for the proposition that the

15   reasonableness of a restrictive covenant is to be

16   assessed against three criteria:

17       "One, does the employer have a proprietary

18   interest entitled to protection; two, are the

19   temporal and spatial features of the clause too

20   broad; and three, is the covenant enforceable as

21   being against competition generally and not limited

22   to proscribing solicitation of clients of the former

23   employer?"

24       The Elsley decision is a decision of the Supreme

25   Court of Canada from 1978, and in the past 35 years

1        it has been much interpreted, most recently in 2009

2        by the Supreme Court of Canada in a case called

3        Shafron versus KRB Insurance Brokers.  In that case

4        the Court acknowledges that restrictive covenants

5        always give rise to a tension in the common law

6        between the concept of freedom to contract on the one

7        hand and the public policy considerations against

8        restraint of trade.

9            Coming back to the Imperial Sheet Metal and

10       Landry case, there the New Brunswick Court of Appeal

11       recognized the mobility of the workforce in the

12       Twenty-First Century, offering that most workers will

13       eventually find themselves being classified as former

14       employees and one -- on more than one occasion.

15       Justice Robertson sets out at Paragraph 37:

16            "To be blunt, if there is a clash between the

17       interests of former employers in protecting their

18       business interests and the interests of former

19       employees in earning a livelihood, coupled with the

20       public interest in free competition for goods and

21       services, it is the interests of the former employee

22       that generally prevail."

23            Your Honor, the restrictive covenants here are

24       not between corporations, nor are they restrictive

25       covenants arising from the sale of a business.  And

```
1        that's important.  These are restrictive covenants
2        between a company and employees.  And the Ontario
3        Court of Appeals decision in Lyons versus Multari
4        sets the framework for our analysis, and has been
5        well regarded throughout the country.
6             If we could put up on the board Paragraph 1 of
7        the three paragraphs that are of the restrictive
8        covenants.
9             And these -- all of these agreements have the
10       same -- you know, they change from six to 12 months,
11       but the boilerplate is the same in one, two, three.
12       I think we can all agree that paragraph one is what
13       we would call a pure noncompetition clause.  And in
14       Canada the distinction between noncompetition clauses
15       and nonsolicitation clauses is crucial.  Unlike the
16       United States, Canadian courts will almost never
17       enforce a pure noncompetition provision in an
18       employment contract.  And that's a distinction.  To
19       quote Justice MacPherson of the Ontario Court of
20       Appeal at Paragraph 31 of Lyons versus Multari:
21            "The competition clause is a more drastic weapon
22       in an employer's arsenal.  Its focus is much broader
23       than an attempt to protect the employer's client or
24       customer base.  It extends to an attempt to keep the
25       former employee out of the business."
```

1      So this is the Ontario Court of Appeal decision

2  interpreting Elsley to mean that a nonsolicitation

3  clause is normally sufficient to protect an

4  employer's proprietary interests and that a

5  noncompetition clause is permitted only in

6  exceptional circumstances.

7      That same proposition was restated by the

8  Ontario Court of Appeal in Staebler verses Allan.   In

9  that case leave to appeal to the Supreme Court of

10  Canada was denied.

11      At Paragraph 40 of Staebler the Court said:

12      "Elsley makes it clear that a nonsolicitation

13  clause is normally sufficient to protect an

14  employers' proprietary interest and that a

15  noncompetition clause is warranted only in

16  exceptional circumstances."

17      Going on to quote Paragraph 33 from Lyons:

18      "Generally speaking, the courts will not enforce

19  a noncompetition clause if a nonsolicitation clause

20  would have adequately protected an employer's

21  interests. "

22      So, your Honor, as a general proposition

23  Canadian courts will not enforce a noncompetition

24  clause if a nonsolicitation clause would have

25  adequately protected an employer's business, and I

1    respectfully submit that the restrictive covenant in

2    Paragraph 1, the highlighted Paragraph 1, is on its

3    face unenforceable by virtue of the law to which I

4    have just referred.

5           THE COURT:  Can you just enlighten me on

6    one thing?  My recollection -- my understanding of

7    the contracts at issue is they choose the law of

8    Alberta.

9           MR. JOSSELYN:  They do.

10          THE COURT:  And you have referenced now

11    authorities from Ontario, which in our system would

12    be persuasive but not necessarily the final word

13    about what the law of the state means.

14          MR. JOSSELYN:  And I think that that is a

15    fair description of the way things work in Canada as

16    well, that stare decisis courts of coordinate

17    jurisdiction decisions are not binding, they are

18    highly persuasive.  The concepts of judicial comity,

19    which is respect the court holds for the decisions of

20    others, is closely related to stare decisis.

21       I would point out too, if I might, a bit of a

22    history lesson here, but the population of Canada is

23    about 35 million people.  The population of Ontario

24    represents about 40 percent of that.  The Ontario

25    Court of Appeal is, after the Supreme Court of