Agjunction LLC v. Agrian Inc. et al.
Case No. 2:14-CV-02069-DDC-KGS

# Exhibit
# 5

# In the Court of Appeal of Alberta

**Citation: Globex Foreign Exchange Corporation v. Kelcher, 2011 ABCA 240**

**Date:** 20110810
**Docket:** 1001-0071-AC
**Registry:** Calgary

*2011 ABCA 240 (CanLII)*

**Between:**

### Globex Foreign Exchange Corporation

Appellant
(Plaintiff)

- and -

### David Kelcher, Mark MacLean, Luciano Oliverio, Axiom Foreign Exchange International Inc., Axiom Partnership, 1162134 Alberta Corporation, 1162170 Alberta Corporation, 1162174 Alberta Corporation, 1162127 Alberta Corporation, 1162168 Alberta Corporation, 1162816 Alberta Corporation

Respondents
(Defendants)

---

**The Court:**

### The Honourable Madam Justice Constance Hunt
### The Honourable Mr. Justice Peter Martin
### The Honourable Mr. Justice Frans Slatter

---

**Reasons for Judgment Reserved of the Honourable Madam Justice Hunt**
**Concurred in by the Honourable Mr. Justice Martin**

**Dissenting Reasons for Judgment Reserved of the Honourable Mr. Justice Slatter**

Appeal from the Judgment by
The Honourable Mr. Justice G.C. Hawco
Dated the 24th day of February, 2010
Filed the 3rd day of March, 2010
(2009 ABQB 471, Docket: 0501-08056)



**EXHIBIT**

5

2011 ABCA 240 (CanLII)

---

**Reasons for Judgment Reserved of
the Honourable Madam Justice Hunt**

---

## A.    Introduction

[1]     This appeal raises important issues of employment law. It concerns the three respondent employees who, either at the commencement or during the course of their employment with the appellant, Globex Foreign Exchange Corporation, accepted restrictions that purported to limit their future activities when they no longer worked for the appellant. MacLean, who accepted the restrictions as a term of his initial employment, was wrongfully dismissed by the appellant. Kelcher and Oliverio agreed to the restrictions during their employment, but received no new benefits for doing so. They eventually left when the appellant asked them to accept other more onerous restrictions. The facts are set out in trial judge's decision (*Globex Foreign Exchange Corp v Kelcher*, 2009 ABQB 471, 473 AR 219), and I underscore them as necessary.

[2]     The appellant's six grounds of appeal are that the trial judge erred in holding that:

     i.    MacLean's agreement was unenforceable due to the manner of his termination;

     ii.    no consideration was provided to Kelcher and Oliverio in exchange for their agreements;

     iii.    the non-competition covenants in the agreements were unreasonable and therefore unenforceable;

     iv.    only Kelcher was bound by the non-solicitation covenant;

     v.    Kelcher, MacLean and Oliverio did not breach their common law duties to the appellant; and

     vi.    the appellant's only recoverable loss and entitlement to damages was $17,927.

In addition, Kelcher cross-appeals as to whether the 2003 non-solicitation covenant is enforceable.

[3]     I conclude that, as asserted in the cross-appeal, the 2003 non-solicitation covenant is unenforceable, see Section C (Enforceability of the 2003 Non-Solicitation Covenant). I share Slatter J.A.'s opinion at paragraph [169] upholding the trial judge's decision that Oliverio's 2005 non-solicitation covenant was unreasonably wide. This disposes of the fourth ground of appeal. I also agree with Slatter J.A. (paragraph 163) that the trial judge made no reviewable error in finding that the non-competition clauses were overly broad. This disposes of the third ground of appeal. I explain why the respondents did not breach any non-contractual obligations in Section D (Non-Contractual Obligations), thereby rejecting ground five. These conclusions are sufficient to dismiss the appeal and allow the cross-appeal.

2011 ABCA 240 (CanLII)

[4]     Nonetheless, in Section E (Effect of Wrongful Dismissal on the Enforceability of Restrictive Covenants) I explain why, in my view, MacLean's wrongful dismissal relieved him of having to comply with the covenants (first ground of appeal). As regards the second ground of appeal, in Section F (Consideration for the Restrictive Covenants), I conclude that Kelcher and Oliverio are not bound by the covenants because, when they accepted them, they were given nothing more than that to which they were already entitled, namely, continued employment until dismissed for cause or with appropriate pay in lieu of notice.

[5]     To set the context, I begin with brief reference to the Supreme Court of Canada's views about the nature of employment contracts and to principles governing wrongful dismissal.

**B.     Nature of Employment Contracts and Principles of Wrongful Dismissal**

[6]     Employment contracts have many characteristics that set them apart from ordinary commercial contracts. They "rarely result from an exercise of free bargaining power in the way that the paradigm commercial exchange between two traders does": *Wallace v United Grain Growers Ltd*, [1997] 3 SCR 701 at para 91, 152 DLR (4th) 1. Moreover, the "power imbalance is not limited to the employment contract itself. Rather it informs virtually all facets of the employment relationship": *ibid* at para 92.

[7]     The unique nature of employment agreements is further described in the following passages from *Shafron v KRG Insurance Brokers (Western) Inc*, 2009 SCC 6, [2009] 1 SCR 157, where the Court assessed whether an oft-renewed restrictive covenant entered into by a former owner of an insurance agency should be construed as a purchase/sale (commercial) or an employment agreement:

> [22]     The same considerations will not apply in the employer/employee context. No doubt an employee may build up a relationship with customers of the employer, but there is normally no payment for goodwill upon the employee leaving the employment of the employer. It is also accepted that there is generally an imbalance in power between employee and employer. For example, an employee may be at an economic disadvantage when litigating the reasonableness of a restrictive covenant because the employer may have access to greater resources [citations omitted].

> [23]     The absence of payment for goodwill as well as the generally accepted imbalance in power between employee and employer justifies more rigorous scrutiny of restrictive covenants in employment contracts compared to those in contracts for the sale of a business.

> (emphasis added)

[8]     The appellant does not argue that the employment relationships in this case were atypical. Accordingly, the above principles underlie my approach.

[9]     "In the absence of just cause, an employer remains free to dismiss an employee at any time provided that reasonable notice of the termination is given": *Wallace* at para 65. If an employer fails to provide reasonable notice of the termination, the employee can bring an action for breach of the implied term: *ibid* at para 115; *Honda Canada Inc v Keays*, 2008 SCC 39 at para 50, [2008] 2 SCR 362. In other words, an "action for wrongful dismissal is based on an implied obligation in the employment contract to give reasonable notice of an intention to terminate the relationship in the absence of just cause": *Honda Canada Inc* at para 50. If an employer has ended the employment contract without notice, the employer is required to pay damages in lieu of notice: *Evans v Teamsters Local Union No 31*, 2008 SCC 20 from head note, [2008] 1 SCR 661.

[10]    To summarize, when an employer terminates an employee without cause and without providing proper notice, this "constitutes a wrongful dismissal, in breach of the employee's contract, and any payment by the employer in lieu of notice is an attempt at compensation for the breach": *Love v Acuity Investment Management Inc*, 2011 ONCA 130 at para 44 (available on CanLII), leave to appeal to SCC requested.

[11]    I now turn to whether the 2003 non-solicitation covenant was enforceable, the issue at the heart of Kelcher's cross-appeal.

## C.     Enforceability of the 2003 Non-Solicitation Covenant

[12]    In concluding that the 2003 non-solicitation covenant was enforceable, the trial judge simply said:

> [69]    The Plaintiff has a legitimate argument in protecting those clients with whom the Defendants had dealings. ... I do not believe the covenants were overly broad. They offered the Plaintiff reasonable protection for its business without unduly restricting Messrs. Kelcher and MacLean from carrying on business.

[13]    A reasonable restrictive covenant will be upheld. The notion of reasonableness embraces both the interest of the parties as well as those of the general public: *Shafron* at para 17. The extent of the activity sought to be prohibited is relevant: *ibid* at para 26. As the Supreme Court further held:

> [27]    However, for a determination of reasonableness to be made, the terms of the restrictive covenant must be unambiguous. The reasonableness of a covenant cannot be determined without first establishing the meaning of the covenant. The onus is on the party seeking to enforce the restrictive covenant to show the reasonableness of its terms. An ambiguous restrictive covenant will be *prima facie* unenforceable because the party seeking enforcement will be unable to demonstrate reasonableness in the face of an ambiguity.
>
> (emphasis added)

[14]    The 2003 non-solicitation clause provides:

2011 ABCA 240 (CanLII)

2. That for a period of twelve (12) months from the date of termination of the Employee's employment with Globex, for whatever reason, <u>he/she will not</u>, for any reason directly of indirectly as principal, agent, owner, partner, employee, consultant, advisor, shareholder, director or officer or otherwise howsoever, own, operate, be engaged in or connected with or interested in, the operation of or in any way guarantee the debts or obligations of, or have any financial interest in or advance, lend money to, or permit his/her name or any part thereof to be used, or employed in any operation whether a proprietorship, partnership, joint venture, corporation, or other entity, or otherwise carry on, engage in, <u>solicit customers in any manner whosoever, in any business or activity for any client of Globex with which he/she had dealings</u> on behalf of Globex at any time within the twelve (12) months preceding the date upon which the Employee left the employment of Globex.

(with emphasis)

[15]   Although several arguments were made on the cross-appeal, three persuade me that this covenant does not meet the test of reasonableness and that the trial judge erred in concluding otherwise.

[16]   First, the term "dealings" is ambiguous both in meaning and practical application. In cross-examination, the appellant's co-president, Oshry, testified:

Q And I believe you told me that it meant that if someone had a phone call with a client, talked to them, filled an order, even if it wasn't their client that was a deal?
A Yes.

Q Okay. So if I picked up the phone and answered Globex, and they said I want to speak to Mr. Kelcher, and I transferred him over to Mr. Kelcher would that constitute dealings?
A No.

Q What about if I answer the phone and it was a client of Mr. Oliverio's and the client wanted to ask what the exchange rate was for US dollars, and I gave it to them, would that be dealings?
A Yes.

Q And what's the difference?
A The -- there's a big difference in that situation. First of all, we wouldn't just give out rates, but that being said, in that situation you're starting to learn about the client because they would -- typically the traders were trained to ask questions about, for example, how much money are you looking for, what currencies. And then you

2011 ABCA 240 (CanLII)

> would be getting some information back from the client in response to those questions.
>
> Q Okay. And how was it that I was supposed to remember when I -- that was -- if that does constitute a dealing how was it -- I supposed to remember what date it was that I had that?
>
> Transcript at 188/33ff

[17]    The last question was not answered due to discussions between the judge and counsel. Oshry's subsequent testimony speaks for itself about the practical impact of the provision:

> Q How is that trader to know whether they had dealings with that individual within the previous 12 months or not?
> A If that trader had talked to the client on the phone I would consider that dealings. And I know you used the example of transferring a call. But typically over a period of time the traders, you know, got to know all the clients in the office. So I can't speak to specifically how they would know –
>
> Q No, but let's -- let's deal with your scenario that they -- they had a deal, they talked to the client, somebody was away. I'm saying how do I -- how does that dealer know when the last was they talked to the client?
> A I don't know.
>
> Transcript at 190/1-11<br>(emphasis added)

[18]    Other testimony about the way the business was operated further underscores the near-impossibility of knowing when the non-solicitation clause would be breached. Traders sometimes dealt with other traders' clients when the other traders were away from their desk or on vacation. While ex-employees might be expected to have knowledge of the identity of their own clients, it is hard to see how they could effectively know another trader's clients with whom they had only fleeting contact. In Oshry's view, however, even the latter category of clients would be caught by the clause.

[19]    If it is impossible to predict when you are breaching a restrictive covenant, it is in essence unreasonable.

[20]    Second, the clause is ambiguous in another way. Read literally, all it prohibited was soliciting customers "for" any client of the appellant. There is no suggestion that the respondents' new employer was a client of the appellant. It seems unlikely this is what the clause was meant to prohibit. But the example demonstrates the difficulty in ascertaining the reach of the clause. Although the trial judge noted at paragraph 68 that the non-solicitation clauses were "convoluted"

2011 ABCA 240 (CanLII)

and "poorly worded", he made no effort to delve into their meaning. If the meaning of a restrictive covenant cannot be ascertained, I do not think a court should enforce it.

[21]     Third, in any event the clause is overly broad because it prohibits the former employee from "solicit[ing] customers in any manner whosoever, in any business or activity for any client of Globex". The appellant's business was foreign currency exchange and undoubtedly it had an interest in protecting its customers (if they could be ascertained) <u>in that business</u>. But it is difficult to see what legitimate interest the appellant had in preventing its ex-employees from contacting customers as regards <u>other</u> businesses. Yet that is precisely what the 2003 non-solicitation clause purports to do.

[22]     A similar point was made in the context of a non-compete clause in *HL Staebler Company Limited v Allan*, 2008 ONCA 576 at para 51, 92 OR (3d) 107:

> Furthermore, there is no limit in the Restrictive Covenant on the type of work which the Employees are prohibited from conducting: the prohibition is against doing "business" with their clients and customers. Thus, had Messrs. Allan and Kienapple chosen to leave the field of commercial insurance and undertaken any other type of work, including work which in no way competed with Staebler, the breadth of the Restrictive Covenant is such that they would have been precluded from conducting business with their clients. <u>To preclude the Employees from conducting business of any sort with their clients goes well beyond protecting Staebler's "trade connections".</u> In this regard I disagree with the trial judge who found that the broad prohibition against "doing business" did not taint the reasonableness of the Restrictive Covenant.
>
> (emphasis added)

[23]     For these reasons, Kelcher's cross-appeal is allowed. I next consider the fifth ground of appeal.

## D.     Non-Contractual Obligations

[24]     The appellant argues that even if the agreements were not enforceable, the trial judge erred in concluding there was no breach of common law obligations. Specifically, the appellant contends that the trial judge overlooked evidence that the respondents breached their duty not to misuse confidential or proprietary information because they developed sales and risk strategies that were largely identical to those of the appellant; used a client brochure package identical to the appellant's; established a series of satellite offices; made a list of former clients that they later used; and did business with former clients. In oral argument, the emphasis was upon the respondents' reliance on client lists, which Kelcher and MacLean admitted using because they thought, respectively, that their contractual obligations were geographically limited or had expired, or did not apply because of the wrongful termination.

2011 ABCA 240 (CanLII)

[25]    A few elementary principles about an employee's non-contractual and non-fiduciary obligations help set the stage. First, an employee's duty of good faith and fidelity is generally restricted to the period of employment and will not normally prevent a departing employee from soliciting a former employer's clients: *Anderson, Smyth & Kelly Customs Brokers Ltd v World Wide Customs Brokers Ltd*, 1996 ABCA 169 at para 28, 39 Alta LR (3d) 411. Second, absent a binding contractual undertaking to the contrary, an employee is generally free to compete with a previous employer from the time of his notice, but may be liable for improper use of the employer's confidential information during the notice period: *RBC Dominion Securities Inc v Merrill Lynch Canada Inc*, 2008 SCC 54, [2008] 3 SCR 79 at paras 18-20. Third, post-employment there is a duty not to misuse confidential information: *ibid*. It would be improper, as well, for a departing employee to purloin his employer's customer lists: *WJ Christie & Co Ltd v Greer* (1981), 121 DLR (3d) 472, [1981] 4 WWR 34 (Man CA).

[26]    Because I consider the restrictive covenants to be unenforceable against the respondents, I must assess whether, as the appellant contends, the trial judge committed a palpable and overriding error in concluding that there was no evidence to show that the respondents misused "any confidential or proprietary information in any way": para 73.

[27]    There was no evidence that the respondents took confidential information when they left the appellant's premises. Had they done so, they would have arguably been in breach of their common law obligations: *WJ Christie & Co Ltd*. Instead, the trial judge found that they wrote down the names of all the clients they could recall (the "Do Not Call List"), with the purpose of ensuring that they complied with restrictive covenants and did not contact their previous clients: para 31. There were what the trial judge described as occasional "inadvertent and innocent breaches": *ibid*. Moreover, Oliverio contacted some of his former clients after the date on which he believed his non-solicitation obligation had expired when, in fact, the expiry date was two weeks later: para 32. The trial judge also found that the respondents attempted to abide by the non-solicitation agreement: para 33. These findings were supported by evidence.

[28]    It is necessary to examine each respondent's evidence about what use was made of the Do Not Call List, when, and why.

[29]    Kelcher incorrectly believed that, according to the terms of the Justice Ross interlocutory injunction order, "I was not allowed to compete or solicit clients in Calgary but I was allowed to go outside of Calgary": Transcript at 481/16-18. He agreed, when it was pointed out to him, that "there's no geographic ambit spelled out in paragraph 1 of the [Justice Ross] Order, is there?": Transcript at 481/31-33. However, Kelcher testified that his understanding of the scope of the covenant was based on "another document that I saw from Justice Ross that ... that we came to that conclusion from". This document may have been her reasons, reported as *Globex Foreign Exchange Corporation v Kelcher*, 2005 ABQB 676, 375 AR 275, see esp. paragraphs 23, 58, 60, 61, 66 and 68. Although the reasons are dated September 7, the order was not finalized until November 10

2011 ABCA 240 (CanLII)

(Transcript at 478/29), a short time before *Globex Foreign Exchange Corporation v Kelcher*, 2005 ABCA 419, 376 AR 133 (*CA No 1*) issued on November 30.

[30]   After the expiry of the 12 months in his restrictive covenants, Kelcher began calling his former clients. He agreed on cross-examination that the Do Not Call List was then used "like the phonebook, or just like the internet, or just like any other way to find leads": Transcript at 486-88.

[31]   MacLean testified that he began calling his former clients after "Justice Ross' Order it was -- I -- I started calling my clients. We deemed that I was released from -- from my obligations": Transcript at 516/4-5. On cross-examination he responded affirmatively to the question of whether, after "Justice Ross' Order, what you did was you went to the Do Not Call List and started contacting the clients of yours that were on that list, correct?": Transcript at 531/11-14. He understood that he was unable to contact Oliverio's and Kelcher's clients: Transcript at 516/7-10.

[32]   Oliverio testified that he did not use the Do Not Call List after his restrictive covenants expired: Transcript at 620-21. He contacted some of his former clients once he believed his 18-month restrictions had expired. However, he started two weeks prematurely because he incorrectly calculated the time with reference to his resignation date, not allowing for his two weeks' notice: Transcript at 623/22-39.

[33]   On these facts, did the trial judge commit a palpable and overriding error in concluding, on a question of mixed fact and law, that the respondents did not breach their common law obligation not to misuse confidential information? In my view he did not err.

[34]   Simply put, there is no evidence that Oliverio used the Do Not Call List to garner customers. Therefore, he cannot have breached any common law obligation.

[35]   As for Kelcher and MacLean, it is questionable whether the list of customers they made from memory, post-employment, was confidential information. There are conflicting authorities on this point. In *Monarch Messenger Services Ltd v Houlding* (1984), 56 AR 147, [1984] AJ No 1018, O'Leary J. (as he then was) awarded damages against a former employee who took no customer list when he departed, but who made immediate use of the identity of two of his ex-employer's customers, his knowledge of individuals within those companies and how they had been dealt with by his former employer.

[36]   This decision has been criticized by some appellate courts: *Barton Insurance Brokers Ltd v Irwin*, 1999 BCCA 73, 170 DLR (4th) 69; *Imperial Sheet Metal Ltd v Landry*, 2007 NBCA 51 at para 40, 315 NBR (2d) 328.

[37]   In *Barton* the Court suggested that there is nothing improper in using names and telephone numbers of former clients, since that information can easily be compiled from memory and a telephone book. It preferred this approach to that in *Monarch* because of the competing interests that

courts must consider. In *Imperial*, the Court concluded that knowledge of customer names is not confidential information, especially in the world of sales.

[38]    Even if a list of clients constructed from memory post-employment can be considered confidential information, the facts of this case are so different from *Monarch* that it is doubtful that it applies here. O'Leary J. found that the employee had formed an intention some time before the end of his employment to form his own company and solicit his employer's customers. Within days of leaving his employment, he contacted the two oil companies and solicited their business. In contrast, the respondents documented the appellant's customers so they (and their associates) could comply with the restrictive covenants. To the very limited extent the Do Not Call List may have been used later by two of the respondents for other purposes, that occurred only once they had good reason to believe that the restrictive covenants had expired.

[39]    A related hurdle for the appellant is the duration of the restrictive covenants. Although I have concluded the restrictive covenants are not binding, surely their duration reflects the appellant's views about what would be a reasonable period of non-solicitation. In this regard, I agree with Slatter J.A. that it would be artificial to impose a common law obligation more onerous (from a temporal perspective) than what the appellant obviously considered reasonable.

[40]    I also share Slatter J.A.'s view that the trial judge did not err in concluding that business methods used by the appellant were not sufficiently unique to be proprietary.

[41]    My earlier conclusion that all the covenants are unenforceable because they are overly broad or ambiguous, combined with my conclusion that the respondents did not breach non-contractual obligations, requires that I dismiss the appeal and allow the cross-appeal. In the following two sections, I nevertheless offer some views on the first and second grounds of appeal.

### E.    Effect of Wrongful Dismissal on the Enforceability of Restrictive Covenants

[42]    Since MacLean agreed to the restrictive covenants in 2003 when he accepted employment, his legal situation is different than that of Kelcher and Oliverio, who did not sign until they had been employed for some time. MacLean declined to accept more rigorous obligations proposed to him by the appellant in 2005, and was terminated at a meeting where he was handed a letter of termination.

[43]    I begin this section with a discussion of the law about the effect of wrongful termination on the enforceability of restrictive covenants. This requires a consideration of general principles about repudiation of contracts; the English House of Lords case *General Billposting Co Ltd v Atkinson*, [1909] AC 118, 25 TLR 178 (which holds that wrongful termination renders restrictive covenants in employment contracts unenforceable); whether *General Billposting* is still good law in Alberta; and the significance of the language of these restrictive covenants.

2011 ABCA 240 (CanLII)

*(i) Effect of Wrongful Dismissal on Restrictive Covenants*

a.      <u>The Appellant's Submissions</u>

[44]     The appellant relies on a trial decision, *Raymond Salons Ltd v Boucher* (1990), 47 BLR 217, 1990 CanLII 1763 (SC) where an injunction based on a restrictive covenant was granted against an employee despite her contention she had been wrongfully dismissed. Without analysis or discussion, the judge held that the restrictive covenant was enforceable despite a possible wrongful dismissal because the contract provided that it would apply notwithstanding the reasons for or circumstances of termination: paras 12-13. As the appellant cites no other authority, its argument is constructed on a weak foundation.

[45]     On the other hand, there is long-standing authority for the proposition that the restrictive covenants did not bind MacLean once the appellant repudiated the employment contract by wrongfully dismissing him, and he accepted the repudiation by taking up other employment. The fact that MacLean chose not to sue for damages is irrelevant since an innocent party is not obliged to sue for damages. Moreover, it seems likely that he mitigated any damages by accepting new employment. The effect of mitigation is touched upon further at paragraphs 55-57.

b.      <u>General Principles of Repudiation</u>

[46]     Repudiation occurs by words or conduct evincing an intention not to be bound by the contract. If the non-repudiating party accepts the repudiation, the contract is terminated and the parties are discharged from future obligations. Rights and obligations that have already matured are not extinguished: *Guarantee Co of North America v Gordon Capital Corp,* [1999] 3 SCR 423 at para 40, 178 DLR (4th) 1. Prospective obligations may be relevant to assessing *damages* to which the innocent party may be entitled: *ibid* at para 41, see also MP Furmston, *Cheshire, Fifoot & Furmston's Law of Contract,* 14th ed (Markham, Ont: Butterworths LexisNexis, 2001) at 605-6.

[47]     Waddams explains that repudiation terminology is often ambiguous:

> First, there is the question of excuse of the innocent party from further performance. As we have seen, a substantial breach or <u>a repudiation of substantial future obligations will have the effect of excusing the innocent party from the exchange performance</u> .... Thirdly, the expressions ... may indicate the release of the innocent party from future obligations, but they are sometimes used to indicate total abrogations of the contract with all its obligations. <u>A repudiation puts an end to the contract in the sense that it releases the innocent party from the duty of further performance, but it does not abrogate the whole contract — the innocent party can sue for damages.</u>

>       S.M. Waddams, *The Law of Contracts*, 6th ed (Aurora, Ont: Canada Law Book, 2010)
>                                                              at ¶629 with emphasis added

c.      The *General Billposting* Principle

[48]     When an employee is dismissed without cause or notice, the employer cannot enforce a restrictive covenant otherwise binding the employee: *General Billposting*. This early case remains the law in England: *Rock Refrigeration Ltd v Jones*, [1997] 1 All ER 1, [1997] ICR 938; *Explora Group Plc v Hesco Bastion Ltd*, [2005] EWCA Civ 646; and *Stone v Fleet Mobile Tyres Ltd*, [2006] EWCA Civ 1209. One rationale for the *General Billposting* principle is that it would be "morally unjust to permit an employer to recoup the benefit of a contractual restraint after it has acted reprehensibly by repudiating the contract": Peter Barnackle, *Employment Law in Canada*, 4th ed (Markham, Ont: LexisNexis, 2005) at §11.47.

[49]     *General Billposting* was cited by the Supreme Court in *Waugh v Pioneer Logging Co*, [1949] SCR 299, 2 DLR 577 and *American National Red Cross v Geddes Brothers* (1920), 61 SCR 143, 55 DLR 194. Neither concerned the specific principle from *General Billposting* that wrongful termination renders unenforceable the restrictive covenants in an employment contract. On the other hand, the Supreme Court has never cast doubt on that principle.

[50]     Other Canadian appeal courts have relied on *General Billposting* to relieve employees from restrictive covenants upon their wrongful dismissal: *Cohnstaedt v University of Regina* (1994), 116 Sask R 241, 113 DLR (4th) 178 (CA); *Poole v Tomenson Saunders Whitehead Ltd* (1987), 16 BCLR (2d) 349, 43 DLR (4th) 56 (CA). Some appellate cases have cited *General Billposting* for the more general principle that, on repudiation, prospective covenants are no longer binding: *Pitre v Gordie's Auto Sales Ltd* (1976), 73 DLR (3d) 559, 16 NBR (2d) 328 (CA); *Belgo-Canadian Real Estate Co v Allan*, [1925] 1 DLR 41, 34 Man R 545 (CA).

[51]     Alberta trial courts have relied on *General Billposting* for over 35 years: See *Allison v Amoco Production Co* (1975), 58 DLR (3d) 233, [1975] AJ No 490 at paras 21-22; *Burns v Oxford Development Group Inc* (1992), 129 AR 345, [1992] AWLD 351 at paras 26-28; *Windship Aviation Ltd v deMeulles*, 2002 ABQB 669, [2003] 1 WWR 393 at para 394. In *Burns*, for example, Conrad J. (as she then was) held that an employer who breached the contract by termination without notice could not rely on the contract to deprive the employee of benefits.

[52]     Other Canadian trial courts have also referred to *General Billposting* in the context of terminated employees and the enforceability of restrictive covenants, for example *Zesta Engineering Ltd v Cloutier*, 2010 ONSC 5810, 86 CCEL (3d) 1; *Psenica v Dee-Zee Construction Ltd*, 1999 SKQB 198, [2000] 5 WWR 206; *Jostens Canada Ltd v Zbieranek* (1992), 42 CCEL 264, 42 CPR (3d) 519 (Ont Ct J - Gen Div).

[53]     Authors and legal encyclopedias in Canada refer frequently to this principle from *General Billposting*, see e.g., S.R. Ball, *Canadian Employment Law*, vol 1, looseleaf, (Aurora, Ont: Canada Law Book, 2008) at 7:60; *Employment Law in Canada* at §11.47; CED (Western) and CED (Ontario) Employment Law; *Halsbury's Laws of Canada*, HEM-272.

2011 ABCA 240 (CanLII)

2011 ABCA 240 (CanLII)

[54]    I am not persuaded it is appropriate to deviate from this long-settled principle of employment law. Indeed, there are valid reasons for excusing a wrongfully dismissed employee from compliance with restrictive covenants. Most particularly, to hold otherwise would reward employers for mistreating their employees. For example, an employer could hire a potential competitor, impose a restrictive covenant on the employee, then wrongfully dismiss her a short time later and take advantage of the restrictive covenant. This would be a highly effective, but manifestly unfair, way of reducing competition. A second justification (alluded to by Simon Brown L.J. in *Rock Refrigeration*) may be that enforcing a restrictive covenant in the face of wrongful termination *prima facie* negates the consideration (whether continued employment or something else) given by the employer to the employee when she accepted the restrictive covenant. Said another way, because the employment was prematurely and wrongfully terminated the employee will not "have received, during the period of his or her employment, an extra amount of remuneration for having conceded to be bound by the restraint in the contract": *Employment Law in Canada* at §11.48.

[55]    There is an additional reason why wrongful dismissal ought to relieve an employee from compliance with covenants that restrict future employability. A wrongfully terminated employee is entitled to damages, but a defendant employer can argue that damages ought to be reduced because of the employee's unreasonable failure to mitigate the loss by taking other employment: *Red Deer College v Michaels*, [1976] 2 SCR 324, [1975] 5 WWR 575. The defendant's burden of demonstrating a failure to mitigate is onerous, however, because although in breach, he is demanding positive action from the innocent party: *Cheshire, Fifoot and Furmston* at 683. Defendants cannot complain of a failure to mitigate caused or materially contributed to by their own actions: *2438667 Manitoba Ltd v Husky Oil Limited*, 2007 MBCA 77, [2007] 9 WWR 642 at 654.

[56]    If a wrongfully terminated employee is prevented from doing similar work because of a restrictive covenant, the ability to mitigate will be severely constrained. In many such cases, the employee will be unable to mitigate damages until the expiry of the restrictive covenant and will be entitled to damages for the entire period of the covenant. The entitlement to damages might well be of a similar magnitude to the damages claimed by an employer based on a breach of the restrictive covenant.

[57]    Of course, that is not the situation here because MacLean's new employment made it unnecessary for him to pursue damages arising from his wrongful dismissal. Nevertheless, this analysis demonstrates the futility of binding a wrongfully dismissed employee to a covenant that restricts his employability: if the employee cannot work because bound by the covenant, the employee will be able to claim damages for the entire period and will not be able to mitigate the loss.

[58]    Nor, for the reasons that follow, do recent Supreme Court cases, including *Tercon Contractors Ltd v British Columbia (Transportation and Highways)*, 2010 SCC 4, [2010] 1 SCR 69 and *Guarantee Co of North America*, dictate a different approach. This issue was raised by the panel post-hearing and dealt with by the parties in supplementary written argument.

Page: 13

d.     Impact on *General Billposting* of Recent Supreme Court Cases·

[59]     *Tercon* and *Guarantee Co of North America* concern the doctrine of fundamental breach and whether, as against an innocent party, a wrongdoer can take the benefit of limitation of liability (exclusion) clauses and clauses requiring the commencement of suits within a specific time period. In both cases, the questions arose in the context of commercial contracts between large sophisticated entities of equal bargaining power, see e.g. Binnie J.'s dissenting reasons in *Tercon* at paragraph 82, and *Guarantee Co of North America* at paragraphs 46, 47, and 56.

[60]     As the respondents assert in their written submission, in these two cases and *Photo Production Ltd v Securicor Transport Ltd*, [1980] AC 827, the contract breaker was relying on an exclusionary or limitation clause to escape potential liability. In this appeal, the contract breaker is attempting to enforce prospective obligations on the innocent party under an agreement which it has breached. In effect, the prospective obligation is being used a sword, not a shield.

[61]     *Tercon*'s application may be even more circumscribed because it concerned tendering contracts. The majority noted that in interpreting such contracts, the Court has "been careful to consider the special commercial context of tendering" (para 67) especially "in the context of public procurement": para 68.

[62]     In *Tercon,* the Supreme Court seems to agree that when a party purports to rely on an exclusion clause, it should first be determined whether the clause was intended to apply to the circumstances at hand: para 62. The majority concluded it was not. If it was, according to Binnie J.'s dissenting reasons, two further questions arise: paras 121-22. Was the contract unconscionable when it was entered into, "as might arise in cases of unequal bargaining between the parties?" A final inquiry would be whether there are valid public policy reasons not to enforce the valid exclusion clause that would outweigh the public interest in enforcing it.

[63]     I doubt that the approach taken in *Tercon* and *Guarantee Co of North America* to fundamental breach in the context of exclusion clauses and contractually-agreed limitation periods (both of which concern the assessment or availability of damages against the breaching party) was intended to apply to the prospective enforceability of restrictive covenants in employment contracts against an innocent party whose employment contract has been repudiated. As set out in Section B, employment contracts are very different than commercial contracts between sophisticated parties. Moreover, the majority reasons in *Tercon, per* Cromwell J. at para 62, only indicate agreement with Binnie J.'s dissenting reasons about "the analytical approach that should be followed when tackling an issue relating to the applicability of an exclusion clause" (emphasis added). Binnie J. sets out, beginning at paragraph 121, the inquiries to be made "when a plaintiff seeks to escape the effect of an exclusion clause or other contractual term to which it had previously agreed." But in his dissenting reasons he also mentions many times that the issue was an exclusion clause: paras 81-82, 105, 107, 113-14, 119-23. Indeed, at paragraph 81 he frames the issue as being "whether, and in what circumstances, a court will deny a defendant contract breaker the benefit of an exclusion of liability clause to which the innocent party, not being under any sort of liability, has agreed."

2011 ABCA 240 (CanLII)

2011 ABCA 240 (CanLII)

Commentators have noted that *Tercon* and *Photo Production* (referred to by Binnie J. in *Tercon*) concern exclusion clauses, and whether their enforcement is unconscionable, see e.g., Waddams at ¶484-86.

[64]    To summarize, were it necessary to decide this appeal on the basis of *Tercon* and related cases, I doubt my view would change. Such cases concern parties who argue they are not bound by exclusion-type provisions that limit their damages. This case, in contrast, is about an employer which, having wrongfully dismissed its employee, nevertheless claims to control the way in which the employee can earn his living. Whatever the scope of *Tercon*, I doubt it goes that far.

e.    <u>Other Jurisprudence</u>

[65]    Some other cases relied on by Slatter J.A. do not affect my views. *Moschi v Lep Air Services Ltd*, [1973] AC 331, [1972] 2 All ER 393 (HL) concerned the enforceability of a personal guarantee by a creditor who had accepted the repudiation of the contract by a debtor. As the House of Lords explained at 351 (cited to AC), the guarantor's obligation did not depend on the primary obligation of the debtor (to pay instalments) continuing after the contract ended. Rather, it depended on the guarantor's primary obligation (to ensure the debtor paid the instalments) as well as its secondary obligation to compensate the <u>innocent party</u> for its loss once the debtor repudiated. *Heyman v Darwins Ltd*, [1942] AC 356, [1942] 1 All ER 337 (HL) is different from this case as it concerned an arbitration clause governing disputes between the parties, which is obviously relevant to how and by whom <u>damages</u> ought to be calculated. *Keneric Tractor Sales Ltd v Langille*, [1987] 2 SCR 440, 43 DLR (4th) 171, in contrast, stands for the proposition that a repudiated contract is not void *ab initio*, but parties are discharged from their prospective obligations from the date of termination except that "prospective obligations embodied in the contract are relevant to the assessment of <u>damages</u>": para 28 with emphasis.

[66]    This brings me to *Merrill Lynch Canada Inc v Soost*, 2010 ABCA 251, 487 AR 389, leave to appeal to SCC dismissed, April 14, 2011 (#33910), which concluded that damages for the mere fact of an employee's dismissal should not be awarded. At paragraph 9, Côté J.A. states there is "no such thing [in indefinite employment contracts] as wrongful dismissal" and that ending such a contract "is not a breach of contract." None of the three cases cited in support of these propositions contains such broad propositions of law. *Wallace* concerns whether there exists in law the concept of a "bad faith discharge" (the Supreme Court held that there is not). The paragraph cited from *Desforge v E-D Roofing Limited* (2008), 69 CCEL (3d) 115 at para 80, (available on CanLII), an Ontario trial case, concerns whether compensation for normal stress and hurt feelings resulting from dismissal are compensable (they are generally not). Paragraph 38 of *Marchen v Dams Ford Lincoln Sales*, 2010 BCCA 29, 282 BCAC 120 (which concerned a fixed term contract) says that termination of a non-fixed term contract is not "unlawful", but goes on to speak of an "actionable wrong". At paragraphs 12 and 13 in *Soost*, Côté J.A. specifically notes the employer's obligation (when terminating without cause) to either give reasonable notice or pay in lieu of notice. I consider, therefore, that his comments in paragraph 9 assume a situation where notice or pay in lieu has been

given, and are not intended to deviate from basic principles about wrongful dismissal set out above Section B.

f.      Termination "for whatever reason"

[67]    Should the *General Billposting* principle apply otherwise to MacLean, as the appellant argues, because his contract provided that the restrictive covenants would come into effect upon termination "for whatever reason"? A related issue arose in *Rock Refrigeration*, where the main question was whether a restrictive covenant was necessarily unreasonable and unenforceable because it was to take effect on termination "however occasioned". An employee who had <u>not</u> been wrongfully dismissed argued that the restrictive covenant was void *ab initio* because it sought to apply notwithstanding the circumstances of termination.

[68]    All three judges agreed that the employee was bound by the restrictive covenant, although their reasons differed in part. Simon Brown L.J. reiterated the principle in *General Billposting*, noting that "in cases of repudiatory breach by the employer, the employee is ... released from his obligations under the contract and restrictive covenants, otherwise valid against him, accordingly cannot be enforced": at 13. He added that it did not matter whether the covenants included phrases such as "whether lawfully or not", because "they are merely writ in water, unenforceable under the *General Billposting* principle."

[69]    Morritt L.J. expressed similar views, noting that the employee's lawyer accepted that "however expressed, the post-employment restrictions were unenforceable in the event of the employment terminating because of the employer's repudiation accepted by the employee": at 22. He considered extravagant the unnecessary claim that the restrictive covenants were "wholly invalid" simply because they purported to apply notwithstanding the manner of termination.

[70]    Phillips L.J. stated that "if a covenant, otherwise reasonable, purports to remain binding in circumstances where the law would otherwise strike it down, I can see no justification for holding that it is, on that account, in unlawful restraint of trade. ... this is the short and simple route which leads to the conclusion that this appeal should be allowed": at 29. In *obiter*, he expressed doubt about the continued appropriateness of the rule in *General Billposting*, specifically, whether its principle should apply to negative obligations placed on an employee by restrictive covenants. He described as "at least arguable" that "not every restrictive covenant will be discharged upon a repudiatory termination of the employment", adding that it was unnecessary to resolve the issue: at 32.

[71]    I am persuaded by the majority reasons in *Rock Refrigeration* that the contractual language here does not affect MacLean's rights. The same arguments apply to this point as those set out above concerning why restrictive covenants are not binding once there is wrongful dismissal. To hold otherwise would reward the employer who improperly terminates an employment contract.

*(ii) Conclusion*

2011 ABCA 240 (CanLII)

[72]    Once the appellant repudiated MacLean's contract by wrongfully dismissing him and he accepted that repudiation by taking another job, MacLean was not prospectively bound by the restrictive covenants. He was entitled (but not obligated) to sue for damages. Were it necessary to do so, I would conclude that the *General Billposting* principle has not been undermined by *Guarantee Trust Co of Canada* and *Tercon*, which concern the doctrine of fundamental breach in the context of sophisticated parties of equal bargaining power, and the extent to which exclusion and other limitation clauses pertaining to the determination of damages bind an innocent party who has accepted them. An employer that wrongfully terminates a contract of employment should not be able to capitalize on its failure to give notice or damages in lieu of notice by enforcing prospective obligations against an innocent employee.

## F.    Consideration for the Restrictive Covenants

[73]    This section concerns the interpretation of the Supreme Court of Canada's decision in *Maguire v Northland Drug Co*, [1935] SCR 412, [1935] 3 DLR 521, as discussed by this Court in *CA No 1* and earlier cases. If I had to decide the appeal on the basis of this issue, I would conclude that Kelcher's and Oliverio's restrictive covenants are not enforceable because they received nothing for signing them beyond that to which they were already entitled.

### (i) Kelcher

[74]    Kelcher signed two agreements containing restrictive covenants some time after he commenced employment in 2001, one in 2002 and the other in 2003. He resigned after declining to sign the more rigorous requirements proposed by the appellant in 2005.

[75]    The trial judge said he was "not satisfied that there was any promise made or implied or otherwise not to fire them [Kelcher and Oliverio (whose legal situation is discussed further below)] for any period of time if they signed their agreements": para 45. He based this fact finding on the appellant's co-president Oshry's evidence that "Kelcher was told to sign or lose his employment. Mr. Oshry considered Kelcher's continued employment to be consideration": para 46. Further, "[Oshry] admitted that there was nothing given to either Defendant to sign the agreements. They were not told that if they do sign, their employment would be guaranteed for any particular period of time": *ibid*. The trial judge added that he found no promises that "any of them would be given any type of security of employment": para 52. He therefore concluded there was no consideration. In reaching this conclusion he relied in part on *CA No 1*.

[76]    The appellant's argument largely concerns the interpretation of *Maguire* as applied by this Court in *Gestetner (Canada) v Henderson*, [1948] 3 DLR 64, [1948] 2 WWR 84 (CA). Among other things, the appellant contends that continued employment, by itself, is consideration for a new covenant: Factum at para 40. Therefore, in light of the trial judge's fact findings, says the appellant,

2011 ABCA 240 (CanLII)

he made a palpable and overriding error in concluding there was no consideration when Kelcher signed the 2003 agreement.

[77]     Although *CA No 1* concerned a different point (the appropriateness of the appellant's interim injunction), its interpretation of *Maguire* and related cases is highly persuasive. This Court held *per* McFadyen J.A.:

> The Supreme Court of Canada found [in *Maguire*] that there was ample consideration for the bond, stating that the evidence established two things: (1) "that the employee was given to understand, and did understand, that his refusal to execute the covenant would lead to an early termination of his employment", and (2) "that the employer tacitly promised that if the bond were signed, the employment would not soon be terminated". After the covenant was entered into the "employer refrained indefinitely from exercising its legal right to issue the notice which, at the expiration of one month, would terminate the employment."
>
> para 21
> (emphasis added)

[78]     In its detailed reasons on this issue in *CA No 1*, this Court referred (with apparent approval) to *Techform Products Ltd v Wolda* (2001), 56 OR (3d) 1, 150 OAC 163 and a case that the Ontario Court of Appeal relied on to interpret *Maguire, Watson v Moore Corp* (1996), 134 DLR (4th) 252, 1996 CanLII 1142 at para 28 (BC CA): para 23. *Techform* paraphrased *Watson* as follows at para 24:

> [C]ontinued employment without more could not serve as consideration for an amendment to the employment contract that was adverse to the employee. ... in return for the new promise received by the employer something must pass to the employee, beyond that to which the employee is entitled under the original contract. Continued employment represents nothing more of value flowing to the employee than under the original contract.

[79]     Relying on the standard of review, in *CA No 1* this Court upheld Justice Ross's finding that the appellant had "implicitly agreed" not to dismiss Kelcher and Oliverio for some reasonable period of time in return for their signing the restrictive covenants: para 26.

[80]     The trial judge, having heard all the evidence, found otherwise. Since the evidence referred to above supports his finding, it cannot be disturbed on appeal.

[81]     Is the appellant correct that, in Alberta, continued employment alone is valid consideration for fresh promises by an employee? As the above passages show, *CA No 1* does not stand for that proposition. Indeed, it suggests exactly the opposite.

[82]     *Gestetner* is not helpful since its focus was on whether the restrictive covenants were lawful, concluding that they were. The consideration issue received merely passing comment, where it was

2011 ABCA 240 (CanLII)

held that there was ample consideration "in the increase in salary and in the continuation of the existing employment at will": para 26. *Gestetner* is distinguishable because of the increase in salary.

[83]     It is true that, after the above observation, the Court in *Gestetner* approvingly referred to the statement by Davis J. in *Maguire* that the "continuation of the ... employee ... in the service of the respondent was in itself sufficient consideration for a reasonable restraint." However, it was Dysart J. who delivered the majority decision in *Maguire*. Justice Davis's views comprised only two paragraphs. In the first he explained that his conclusion was based upon "the simple ground that a master is not permitted to impose" unreasonable restraints of trade on a servant and that the plaintiff had failed to show that the agreement was reasonable. He then added the above sentence, reiterating that the action to enforce the agreement had to fail because the restraint had not been proven reasonable. The critical sentence, therefore, was *obiter* and bereft of analysis.

[84]     On behalf of the majority Dysart J., held at 414 that there was ample evidence that "the employee was given to understand, and did understand, that his refusal to execute the covenant would lead to an early termination of his employment <u>and</u> that the employer tacitly promised that if the bond were signed, the employment would not soon be terminated" (emphasis added). He observed that "[o]n this mutual understanding the covenant was entered into", adding that the employer refrained from exercising its contractual right to dismiss the employee on one month's notice. As well, he stated that the case had to turn on the larger question of whether the covenant ought to be enforced. The majority's views about consideration were not *ratio*, although in my view (and in the view of this Court in *CA No 1*) they suggest that forbearance to dismiss is insufficient consideration; there must <u>also</u> be a mutual understanding when the covenant is entered into that there will be such forbearance. As set out above, the trial judge found that such mutual understanding had not been established.

[85]     I acknowledge that the majority in *Maguire* cited an 1874 case, *Gravely v Barnard* (1874), LR 18 Eq 518 (Ch D), for the proposition that "this continuation of employment constitutes legal consideration, the adequacy of which will not be inquired into by courts." In *Gravely*, the Court found consideration when an apprentice, having been employed for some time, entered into a contract containing a restrictive covenant. Jessel M.R. inferred from the contract an agreement to continue the apprentice's employment, which he treated as consideration. In coming to this result, he relied on an even earlier case, *Davis v Mason* (1793), 5 TR 118, where consideration was found when the defendant accepted a restrictive covenant at the commencement of his employment by the plaintiff. That is an entirely different situation from this one, which concerns consideration for a new term imposed during the course of ongoing employment. Moreover (although not strictly relevant to this issue), it bears observing that the geographical and temporal restrictions upheld in *Gravely* and *Davis* would not likely pass muster today given greater judicial sensitivity to employer and employee inequality.

[86]     *Maier v E & B Exploration Ltd* (1986), 69 AR 239, 44 Alta LR (2d) 273 (CA) does not bolster the appellant's position either. There the issue was whether the employer's new stock option plan, accepted by the wrongfully dismissed employees, was supported by consideration or merely an *ex gratia* payment. The Court found consideration because the new plan replaced a bonus plan

2011 ABCA 240 (CanLII)

that existed at the time of employment and thus the new plan became an integral part of the wage structure. The Court concluded that the employees' ongoing employment was sufficient consideration to bind the employer, adding that it was implicit in the employer's offer (accepted by the employees) that the offeror would not prevent the employees from performing the contract after embarking on their performance. A unilateral contract was formed when the employees accepted the new terms of employment by continuing with their employment. Here there was no finding of an implicit promise that Kelcher would not soon be dismissed and no such promise was given by the employer.

[87]    I do not find it necessary to consider in detail the Ontario Court of Appeal cases discussed by Slatter J.A. since each turns largely on its own facts. The Ontario Court of Appeal takes the same view of *Maguire* as I do (and as did *CA No 1*): continued employment alone does not provide consideration for a new covenant extracted from an employee during the term of employment because the employer is already required to continue the employment until there are grounds for dismissal or reasonable notice of termination is given.

*(ii)  Oliverio*

[88]    As with Kelcher, the trial judge found Oliverio received no consideration for entering into the 2003 restrictive covenant: para 45. For the reasons that pertain to Kelcher, therefore, the 2003 agreement was not binding on him.

[89]    Although the trial judge did not specifically consider the circumstances when Oliverio signed the 2005 agreement, he said "the same situation existed when the Defendants were presented with their new agreements in February or March 2005: sign or resign": para 48. I infer from this that he concluded there was no tacit promise in 2005 that the appellant would keep Oliverio in its employment for some reasonable period of time if he signed the 2005 agreement.

[90]    The appellant's testimony (through Oshry) supports this view of the evidence, since he specifically said that nothing was given for signing either agreement and that as far as he knew the employees were not told that they would be kept on if they signed: Transcript at 54, 169 and 170. Cowles, who presented the agreements to Kelcher and Oliverio for signature, was clear that they were promised nothing for signing: Transcript at 33/5, 358-360.

*(iii)  Conclusion*

[91]    Neither Kelcher nor Oliverio received anything beyond that to which they were already entitled when, during their employment, they accepted the restrictive covenants. The trial judge found, based on evidence, that there was no promise made or implied by the appellant that their employment would continue as a result of their signing. This Court has already interpreted *Maguire* in *CA No 1* to require a tacit understanding which was not found in this case. If I had to decide the point, I would conclude that Kelcher and Oliverio were not bound by the restrictive covenants due to the lack of consideration.

2011 ABCA 240 (CanLII)

2011 ABCA 240 (CanLII)

## G.   Conclusion

[92]   None of the respondents were bound by the restrictive covenants because they were too broad or were ambiguous (Section C). The list of the appellant's customers constructed from memory was made for a *bona fide* purpose, and trial judge reasonably concluded that the respondents did not misuse confidential information (Section D).

[93]   The appeal is dismissed and the cross-appeal allowed.

Appeal heard on April 7, 2011

Reasons filed at Calgary, Alberta
this 10th day of August, 2011

_____
                                                            Hunt J.A.

I concur:       _____
                    Authorized to sign for:        Martin J.A.

2011 ABCA 240 (CanLII)

---

**Dissenting Reasons for Judgment Reserved of
the Honourable Mr. Justice Slatter**

---

[94]     The issue on this appeal is whether certain non-competition and non-solicitation covenants given by the individual respondents to the appellant are enforceable. The trial judge found that the covenants were unenforceable because they were too widely worded, except for the non-solicitation covenant by the respondent Kelcher: *Globex Foreign Exchange Corp. v. Kelcher*, 2009 ABQB 471, 473 A.R. 219, 16 Alta. L.R. (5th) 185. He also found that the respondent MacLean's employment agreement had been breached, rendering his covenants unenforceable, and that Kelcher's and Oliverio's agreements were unenforceable for lack of consideration.

Facts

[95]     The appellant is in the foreign currency exchange business. All of the individual respondents were employees of the appellant, but they left that employment in 2005 and joined a competing business. None of the individual respondents had any experience in the currency exchange business before they commenced employment with the appellant, and they learned that business during their employment.

[96]     The appellant's business operates by buying and selling foreign currency for a profit. A lot of its transactions originated from "cold calling" by traders like the respondents. Once the traders identified a client who was in need of foreign currency exchange services, the personal contact between that trader and the client was an important component in generating further business. The three respondents were key traders in the appellant's Calgary office, each of them being the primary source for over 20% of the established clients of the office.

[97]     The individual respondents had all signed contracts containing non-competition and non-solicitation covenants. The respondent MacLean signed his agreement in December, 2003 at the time he commenced his employment. The respondents Kelcher (in July 2003) and Oliverio (in June 2003) signed the original form of agreement that is now in issue some two and one-half years after they began working for the appellant. The trial judge found at para. 9 that "it was made clear to [Kelcher] that he either signed the agreement or that his employment would not be continued". As will be discussed below, the respondent Oliverio signed a second form of agreement in March 2005, after having been employed for about four years.

[98]     The covenants in question are all contained in stand-alone "Non-Competition Agreements". The agreements contain the following preambles:

And whereas by reason of his/her employment, the Employee will receive value, training regarding the sale and purchase of foreign currency of which he/she had no prior experience, and the advantage of special training, skills, expert knowledge and experience of and contacts with customers of Globex;

And whereas during the course of his/her employment the Employee will be assigned to duties that will give him/her knowledge of confidential and proprietary information which relates to the conduct and details of the business of Globex and which will result in irreparable injury to Globex which could not adequately be compensated by money damages if the employee enters into employment with a rival or competitive concern;

In consideration of the employment and for other good and valuable consideration the Employee agrees as follows:

The original covenants were all identical, and read as follows:

2.     That for a period of twelve (12) months from the date of termination of the Employee's employment with Globex, for whatever reason, he/she will not, for any reason directly or indirectly as principal, agent, owner, partner, employee, consultant, advisor, shareholder, director or officer or otherwise howsoever, own, operate, be engaged in or connected with or interested in, the operation of or in any way guarantee the debts or obligations of, or have any financial interest in or advance, lend money to, or permit his/her name or any part thereof to be used, or employed in any operation whether a proprietorship, partnership, joint venture, corporation, or other entity, or otherwise carry on, engage in, solicit customers in any manner whosoever, in any business or activity for any client of Globex with which he/she had dealings on behalf of Globex at any time within the twelve (12) months preceding the date upon which the Employee left the employment of Globex.

3.     That for a period of twelve (12) months from the date of termination of the Employee's employment with Globex, for whatever reason, he/she will not for any reason, directly or indirectly as principal, agent, owner, partner, employee, consultant, advisor, shareholder, director or officer or otherwise howsoever, own, operate, be engaged in or connected with or interested in the operation of or in any way guarantee the debts or obligations of, or have any financial interest in or advance, lend money to, or permit his/her name or any part thereof to be used or employed in any operation whether a proprietorship, partnership, joint venture, corporation, or other entity or otherwise carry on, engage in, solicit customers in any manner whosoever in any business or activity, which is the same as, or competitive with the business of Globex including, but without limitation, any businesses related to foreign currency exchange within the City of Calgary, in the Province of Alberta.

2011 ABCA 240 (CanLII)

The agreements specified that the covenants were severable, that the restrictions were reasonable, and confirmed that the employees had been encouraged to seek independent legal advice.

[99]    In March of 2005 the appellant asked the individual respondents to sign a new form of agreement. The respondents Kelcher and MacLean declined to sign, left the office to obtain legal advice, and never returned to work for the appellant. The respondent Oliverio did sign the new agreement, which contained the following revised provisions:

> 1.      While the Employee is employed by Globex and for a period of eighteen (18) months after leaving the employment of Globex, for whatever reason, the Employee agrees that he/she will not, directly or indirectly:
>
>> (a)      solicit any customer of Globex or knowingly assist in any manner, any person (including individuals, sole proprietors, corporations or other legal entities) directly or indirectly to solicit any customer of Globex, if solicitation is intended or calculated to obtain the business or trade of such customer for a business that competes with the business of Globex in any manner;
>
>> (b)      induce or attempt to induce any customer of Globex to reduce or curtail its business or terminate its relationship with Globex;
>
>      . . .
>
> 2.      That for a period of eighteen (18) months from the termination date of the Employee's employment with Globex, for whatever reason, he/she will not, for any reason, directly or indirectly as principal, agent, owner, partner, employee, consultant, advisor, shareholder, director or officer or otherwise howsoever, own, operate, be engaged in or connected with or interested in, or associated with, or advise, or any way guarantee the debts or obligations of, or have any financial interest in or advance, lend money to, or permit his/her name or any part thereof to be used or employed in any activity, operation or business whether a proprietorship, partnership, joint venture, corporation, or other entity or otherwise carry on, engage in, in any manner whatsoever, any activity, business or operation which is the same as or in any manner competes with the Business of Globex within the Country of Canada in any City or municipality in which Globex operates or conducts business, in any manner.

The 2005 form of agreement contained similar preamble and collateral clauses to the original agreements.

[100]    Oliverio became dissatisfied and resigned his employment with the appellant about 10 days after he signed the new form of agreement. All three of the individual respondents joined Axiom

2011 ABCA 240 (CanLII)

Page: 24

Foreign Exchange International Inc. shortly thereafter. Axiom was an inactive company at the time, but upon the arrival of the individual respondents it commenced a foreign currency exchange business on the same model as that operated by the appellant.

[101]   When the respondents left to join Axiom, they did not take with them any of the property of the appellant, such as client lists. They did however know who their clients were, and in an attempt to respect the non-solicitation covenants they had granted, they prepared "Do Not Call" lists. Notwithstanding the preparation of these lists, some of the appellant's clients were contacted. Further, once the non–solicitation covenants had expired, the respondents used the Do Not Call lists as a source of clients, and actively solicited their previous contacts.

[102]   The appellant commenced this action, alleging damage from loss of clients, and also from having to reduce its profit margins on trades with other clients in order to keep their business. On September 7, 2005 the appellant obtained an interim injunction restraining Kelcher and Oliverio from competing with the appellant, and from soliciting its clients: *Globex Foreign Exchange Corp. v. Kelcher*, 2005 ABQB 676, 375 A.R. 275. The chambers judge did not grant an injunction against MacLean, because she found that there was not a strong *prima facie* case against him. The non-competition injunction (but not the non-solicitation injunction) was set aside on appeal on November 30, 2005: *Globex Foreign Exchange Corp. v. Kelcher*, 2005 ABCA 419, 53 Alta. L.R. (4th) 258, 376 A.R. 133. The decision of this Court is summarized as follows in para. 17:

> 17      We have concluded that the non-solicitation covenants are *prima facie* sufficient to protect Globex's proprietary interest in its clients and goodwill, and that the chambers judge erred in enforcing the non-competition covenants at this stage of the proceedings. We have also concluded that the doctrine of notional severance described by the Supreme Court of Canada in the *Transport North American* case cannot be used to re-write restrictive covenants as between employer and employee. Accordingly, the appeal is allowed with respect to the non-competition covenants in both the Kelcher and Oliverio Agreements. The order prohibiting the employees from competing with Globex is set aside. The interlocutory injunction will remain in place with respect to the non-solicitation portions of the Agreements.

Since no stay was granted, the end result is that there was an injunction against the respondents Kelcher and Oliverio based on the non-competition agreements between September 7 and November 30, 2005. There was an injunction against those same respondents under the non-solicitation clauses from September 7, 2005 until the clauses expired in 2006. The action went to trial in March and April 2009.

Reasons of the Trial Judge

[103]   The trial judge concluded that while the individual respondents had made efforts to respect the non-solicitation clauses in their agreements, some contact prohibited by the agreements did

2011 ABCA 240 (CanLII)

occur. He found that no attempt was made to respect the non-competition covenants, except while the injunction was in place.

[104]   The trial judge concluded that since the respondent MacLean had been wrongfully dismissed, the covenants were not enforceable against him. He also concluded that there was no consideration given for the agreements. He found that no separate consideration had been given for them, and there was no implied agreement that the respondents' employment would be continued if they did sign them, and that they were therefore wholly unenforceable.

[105]   In the alternative that the covenants were enforceable, the trial judge concluded that the non-competition covenants were wider than needed to protect the appellant's legitimate interests, and that they were therefore unenforceable. With respect to the non-solicitation covenants he found:

> (a)   The non-solicitation covenant granted by Kelcher was not overly broad, and if it had been supported by consideration it would have been enforceable.

> (b)   The second non-solicitation covenant granted by Oliverio was overly broad, because it prevented him from soliciting any customer of the appellant, not just those with whom Oliverio had any personal contact. For that reason, and because of the absence of consideration, it was unenforceable. The trial judge did not comment on the scope or status of the original non-solicitation covenant granted by Oliverio.

> (c)   The non-solicitation covenant granted by MacLean was unenforceable because he had been wrongfully dismissed, which had the effect of discharging him from any obligation to perform any other covenant in the agreement.

The trial judge provisionally calculated the damages from the breach of the non-solicitation agreements as $53,782, which he allocated evenly among the three respondents.

Standard of Review

[106]   The standard of review for questions of law is correctness. The legal standard to be used is a question of law, but whether that standard has been met is a mixed question of fact and law. The trial judge's findings of fact, and inferences drawn from the facts, will only be reversed on appeal if they disclose palpable and overriding error: *Housen v. Nikolaisen*, 2002 SCC 33, [2002] 2 S.C.R. 235. If an inference drawn by the trial judge is reasonable, an appellate court should not intervene just because other inferences could also have been reasonably drawn: *H.L. v. Canada (Attorney General)*, 2005 SCC 25, [2005] 1 S.C.R. 401 at para. 74.

[107]   The standard of palpable and overriding error is highly deferential, but it does not mean that decisions are immune from review: *H.L. v. Canada* at paras. 73, 75; *R. v. Regan*, 2002 SCC 12, [2002] 1 S.C.R. 297 at para. 118; *Wilde v. Archean Energy Ltd.*, 2007 ABCA 385, 82 Alta. L.R. (4th) 203, 422 A.R. 41 at para. 102. As was stated in *H.L. v. Canada* at para. 75: ". . . appellate

2011 ABCA 240 (CanLII)

courts not only may -- but must -- set aside all palpable and overriding errors of fact shown to have been made at trial. This applies no less to inferences than to findings of 'primary' facts, or facts proved by direct evidence."

[108]   The interpretation and application of contract principles to a settled set of facts is a question of law reviewed for correctness: *Diegel v. Diegel*, 2008 ABCA 389, 100 Alta. L.R. (4th) 1 at para. 20; *358296 Alberta Ltd. v. Phoenix Marble Ltd.*, 2008 ABCA 177, (*sub nom. Alberta Importers and Distributors (1993) Inc. v. Phoenix Marble Ltd.*) 88 Alta. L.R. (4th) 225, 432 A.R. 173 at para. 9; *Fenrich v. Wawanesa Mutual Insurance Co.*, 2005 ABCA 199, 46 Alta. L.R. (4th) 207, 371 A.R. 53 at para. 6; *Crawford v. Morrow*, 2004 ABCA 150, (*sub nom. McDonald Crawford v. Morrow*) 348 A.R. 118 at paras. 5 and 43. Many of the important terms of an employment contract are implied by law, and in that respect the setting of the terms of the contract is also reviewed for correctness.

[109]   The interpretation of a non-competition agreement, and the legal test for whether it is overly broad, and therefore contrary to public policy and unenforceable, is a question of law reviewed for correctness. Deciding if a particular set of facts meets a legal standard calls for the drawing of a legal inference from those facts, which in turn calls for a "higher standard" of review: *Housen* at paras. 26, 28. Setting that standard is a nuanced process, because "matters of mixed law and fact fall along a spectrum of particularity": *Housen* at para. 28. The application of the law on restrictive covenants to a particular contract, and a particular business relationship, is a mixed question of fact and law, on which some deference is owed: *Elsley v. J.G. Collins Insurance Agencies Limited*, [1978] 2 S.C.R. 916 at p. 923; *Atlantic Business Interiors Ltd. v. Hipson*, 2005 NSCA 16, 230 N.S.R. (2d) 76 at para. 43.

[110]   It is the role of the trial judge to assess and select the expert evidence: *Nova, an Alberta Corp. v. Guelph Engineering Co.*, 1989 ABCA 253, 100 A.R. 241 at para. 10; *Pedherney v. Jensen*, 2011 ABCA 9 at para. 19. This Court can interfere with the trial judge's preference for the opinion of one expert over another only if the trial judge's choice is unreasonable or patently wrong: *Bell v. Tilden Car Rental Inc.*, 1996 ABCA 318, 44 Alta. L.R. (3d) 152, [1997] 1 W.W.R. 356 at para. 10. "Where a trial judge is presented with competing explanations or conclusions from expert witnesses, there is no reversible error when he makes a reasoned choice between the two.": *Labbee v. Peters*, 1999 ABCA 246, 237 A.R. 382 at para. 19.

Consideration

[111]   The trial judge concluded that the covenants were unenforceable against Kelcher and Oliverio because no consideration was given for them. He concluded that those respondents gave these covenants when they were already employed by the appellant, without any additional consideration. He found that there was no express or implied promise made at the time that those respondents would continue to be employed for some period of time if they signed the non-competition agreements, and therefore there was no fresh consideration. He stated:

2011 ABCA 240 (CanLII)

> 46   Mr. Oshry's evidence was that Kelcher was told to sign or lose his employment. Mr. Oshry considered Kelcher's continued employment to be the consideration. On cross-examination he admitted that there was nothing given to either Defendant to sign the agreements. They were not told that if they do sign, their employment would be guaranteed for any particular period of time.

The trial judge concluded at para. 45 that: "I am simply not satisfied that there was any promise made or implied or otherwise to not fire either of them for any period of time if they signed their agreements". Since he had concluded that the agreement was unenforceable against MacLean, he did not discuss whether MacLean had received any consideration.

[112]   Kelcher was required to sign his non-competition agreement after he had been employed by the appellant for two and one-half years. He testified (AR p. 439, l. 4-10):

> Q.   And you understood that Globex required all of its employees to sign these types of agreements in order to continue their employment with Globex, correct?
>
> A.   That's what was said to me, yes.
>
> Q.   All right. And when you signed the July 25th, 2003, agreement you considered yourself bound by the covenants in that agreement, correct?
>
> A.   Correct.

In light of this answer, it is difficult to support the trial judge's conclusion that it was not made clear, at least to Kelcher, that his continued employment depended on him signing the agreement. Oliverio also signed the second non-competition agreement during the course of his employment. He testified that he had not been offered a raise of pay or other benefit for signing it. Earlier he had deposed that he thought he would lose his job if he did not sign the second agreement (2005 ABCA 419 at para. 26), and he admitted in para. 10 of his statement of defence that he was "advised that he had to sign the Agreement immediately or leave the office". MacLean was actually fired because he refused to sign the new form of agreement.

[113]   The common law would not enforce gratuitous promises, that is, those given without any consideration. Where the parties have an existing contractual relationship, any new promises must generally be supported by "fresh" consideration.

[114]   The issue of consideration in this appeal brings into the analysis the nature of employment contracts. Employment contracts are often unwritten, and are subject to a number of conditions that are implied by the common law. The nature of such agreements was summarized in *Merrill Lynch Canada Inc. v. Soost*, 2010 ABCA 251, 487 A.R. 389, 31 Alta. L.R. (5th) 201, leave to appeal denied, April 14, 2011 (#33910):

2011 ABCA 240 (CanLII)

> 9       . . . Under such a contract, either side may validly end the contract at any
> time. The employee neither has tenure, nor is indentured. The employee and the
> employer both have the right to end the contract, and ending it is not a breach of
> contract, nor a tort. . . .

Employment contracts are generally of indefinite duration. The employer may terminate them at any time, provided that reasonable notice, or pay in lieu of notice is given: *Honda Canada Inc. v. Keays*, 2008 SCC 39, [2008] 2 S.C.R. 362 at paras. 50, 56; *Machtinger v. HOJ Industries Ltd.*, [1992] 1 S.C.R. 986 at paras. 19-21. The mere termination of the contract is not a breach, because the right to terminate is one of the implied covenants of the agreement: *Evans v. Teamsters Local Union No. 31*, 2008 SCC 20, [2008] 1 S.C.R. 661 at paras. 28-9. Since the contract can be terminated with reasonable notice, it follows that the terms of the contract can also be changed with reasonable notice: *Farber v. Royal Trust Co.*, [1997] 1 S.C.R. 846 at para. 34. If the other side does not agree with the proposed change, it can exercise its right to terminate on reasonable notice.

[115]   Where an employee is offered employment, but on the condition that a non-competition covenant be given, the necessary consideration is clearly found in the employment itself. Therefore, no issue of consideration arises in this appeal with respect to MacLean's agreement, since it was signed at the time of his hiring. The enforceability of non-competition covenants given during the currency of an existing employment agreement is less clear. The cases are in conflict, leaving the situation of the respondents Oliverio and Kelcher open to analysis.

[116]   The issue is more complex with respect to Oliverio. His original non-competition agreement was signed by him during the course of his employment. Assuming the second non-competition covenant he signed is unenforceable because it is overly broad, his original non-competition agreement would potentially still be in force. If the second agreement was enforceable, it was undoubtedly the intention of the parties that it would replace the first agreement. But if the second agreement is ineffectual at law, the original agreement would remain in force.

[117]   The leading cases on consideration for supplemental covenants in an employment context have generated mixed results. Consideration was found in *Maguire v. Northland Drug Co.*, [1935] S.C.R. 412, *Gestetner (Canada) Ltd. v. Henderson*, [1948] 2 W.W.R. 84, [1948] 3 D.L.R. 64 (Alta. S.C., App. Div.), *Maier v. E & B Exploration Ltd.* (1986), 44 Alta. L.R. (2d) 273, 69 A.R. 239 (C.A.) and *Techform Products Limited v. Wolda* (2001), 56 O.R. (3d) 1 (C.A.) leave to appeal refused [2002] 3 S.C.R. xii. The opposite conclusion was reached in a series of Ontario decisions: *Francis v. Canadian Imperial Bank of Commerce* (1994), 21 O.R. (3d) 75, 120 D.L.R. (4th) 393 (C.A.), *Hobbs v. TDI Canada Ltd.* (2004), 192 O.A.C. 141, 246 D.L.R. (4th) 43 (C.A.) and *Braiden v. La-Z-Boy Canada Ltd.*, 2008 ONCA 464, 294 D.L.R. (4th) 172. This Court's decision in the injunction appeal (2005 ABCA 419) discussed some of these authorities, but did not express a final opinion on the point.

[118]   *Maguire* is the earliest of the decisions, and as a decision of the Supreme Court of Canada is binding. The defendant pharmacist Maguire was employed by the plaintiff to manage its pharmacy

2011 ABCA 240 (CanLII)

in Flin Flon. Eleven months after his employment commenced, Maguire (like all the plaintiff's other store managers) was asked to sign a non-competition covenant, which he did without protest. It appears from the record that he received no benefit or enhancement to the terms of his employment, excepting that his employment was continued when he signed the covenant. When he was dismissed four years later, Maguire commenced employment with another pharmacy, and the plaintiff sued to enforce the covenant.

[119]   While the Supreme Court was of the view that Maguire's covenant was unenforceable because it was too wide, the Court held (at pp. 415-6, 419) that "There was ample consideration for the bond", stating that:

> . . . the employee was given to understand, and did understand, that his refusal to execute the covenant would lead to an early termination of his employment, and that the employer tacitly promised that if the bond were signed, the employment would not soon be terminated. On this mutual understanding the covenant was entered into, and thereafter the employer refrained indefinitely from exercising its legal right to issue the notice which, at the expiration of one month, would terminate the employment. This continuance of employment constitutes legal consideration, the adequacy of which will not be inquired into by courts.

*Maguire* stands, at least, for the proposition that a "tacit promise" that the employment would "not soon be terminated", followed by an "indefinite refraining" from exercising the right to terminate the employment agreement is sufficient consideration for the covenant. The decision sets out the test for the existence of consideration in cases like this: a tacit agreement followed by a continuation of employment.

[120]   The legal principle set out in *Maguire* is not novel or limited to employment contracts. It has long been the law that the forbearance to exercise some legal right is sufficient consideration: *Francis v. Allan* (1918), 57 S.C.R. 373; *Re Ross* [1932] S.C.R. 57 at pp. 67-68; *Foot v. Rawlings*, [1963] S.C.R. 197 at pp. 202-4; *Ronald Elwyn Lister v. Dunlop Can.*, [1982] 1 S.C.R. 726 at pp. 742-3.

[121]   In *Gestetner* the employee was first hired in 1934, and he was required to sign a non-solicitation covenant in 1946. In 1947 he resigned to join a competing firm. This Court quoted from *Maguire*, holding at p. 91 that there was ample consideration "in the increase in salary and in the continuation of the existing employment at will". This Court also held that the 24-month non-solicitation covenant was reasonable, even though it contained no geographic limit.

[122]   In *Maier* the situation was reversed. A number of existing employees were advised that they would be receiving stock options, in addition to their other remuneration. A disagreement subsequently arose as to the terms of the stock options, and the employees were dismissed without cause. An issue then arose as to whether there had been any consideration for the promise to grant stock options. This Court noted that the employment contracts were of indefinite duration, and the employees were under no obligation to continue to work for their employer. It followed that

2011 ABCA 240 (CanLII)

"continuing in the employment of the company is sufficient consideration flowing to his employer to bind the employer to keep his offer open" (at para. 31).

[123]   In *Francis v. Canadian Imperial Bank of Commerce* a letter was sent to the plaintiff offering him employment, and he accepted it in writing. When he attended for his first day of work about one month later, he was presented with a large number of documents to sign, including an employment agreement. One of the terms of that agreement was that the bank could terminate his employment on three months notice, or pay in lieu of notice. When he was terminated about nine years later, an issue arose as to whether the employment agreement was unenforceable for lack of consideration. The Ontario Court of Court held that there was no consideration for the employment agreement, because the letter offering employment did not make the signing of such an agreement a condition of the employment, and the contract between the plaintiff and the bank was formed when the plaintiff accepted that offer. That the letter offering employment said that the plaintiff should report "for documentation" was disregarded as a "formality". Hence, there was no fresh consideration given for the employment agreement when it was signed one month later. The result appears startling, given that both the plaintiff and the bank continued with the employment relationship for some nine years on the full expectation that the agreement was binding. The Court in *Francis* did not cite *Maguire*. The Court also did not consider that if the plaintiff had refused to sign the employment agreement, the bank could have immediately exercised its common law right to terminate his employment, and accordingly did not consider whether refraining from exercising that right amounted to good consideration.

[124]   The Ontario Court of Appeal revisited the issue in *Techform Products*. The defendant engineer was first hired in 1981, and from 1989 to 1997 he worked on a series of one-year renewable contracts that could be terminated on 60 days written notice. In 1992 he was asked to sign an agreement confirming that all inventions he conceived were the property of the plaintiff. The agreement cited "continuing employment" as its consideration. The defendant signed the agreement because he thought that if he did not, his services would be terminated. In this action over the ownership of certain patent rights, an issue arose as to whether the 1992 agreement was unenforceable due to a lack of consideration. The Court regarded the 1992 agreement as binding and followed *Maguire*, holding at para. 28 that the tacit agreement to forbear from exercising the right to terminate the contract, at least when followed by an actual forbearance, constituted good consideration.

[125]   The issue arose again in *Hobbs v. TDI Canada Ltd.* The employee in this case was to be paid on commissions. An oral agreement was reached on commission rates prior to his employment, but the letter offering employment merely said that the rates would be "provided to you in a separate document". The employee was assured that the "separate document" would be consistent with the oral agreement that had been reached. The employee resigned his existing employment, and joined the defendant. Less than one month after he commenced employment the employee was presented with an agreement that recited commission rates consistent with the oral agreement, but which also stated that the rates were subject to change in the discretion of the defendant. Significantly, it limited the employee's entitlement to commissions if his employment was terminated. The employee signed

the agreement, because he had already resigned his previous employment, and he was told that the document was "non-negotiable". For various reasons the relationship broke down, and the employee resigned about five months after he had commenced employment. An issue subsequently arose as to whether any consideration had been given for the later document on commissions.

[126]   The trial judge in *Hobbs* followed *Maguire* and *Techform Products*, and found that there was sufficient consideration. The Ontario Court of Appeal concluded that the situation in *Hobbs* was governed by the law as set out in *Francis*. The Court concluded that the appeal should be dealt with as a case where a contract of employment had been reached, followed by a unilateral attempt by the employer to immediately change the terms of that contract. The Court held at para. 32: ". . . the law does not permit employers to present employees with changed terms of employment, threaten to fire them if they do not agree to them, and then rely on the continued employment relationship as the consideration for the new terms". The Court noted at para. 42 that an employee who has just resigned an established position to accept a new job, and then is faced with immediate termination, is in a very vulnerable position. It concluded that in circumstances of this sort, there was generally no "tacit agreement" to refrain from exercising the right to terminate the employment agreement if the new covenants were agreed to.

[127]   In *Braiden* the plaintiff commenced working for his employer in 1981. The terms of his employment changed over the years. In 1986 he became a sales representative, started to work from home, and was paid partly by commission. Commencing in 1987 he was paid by commissions alone. After 1995 the plaintiff (and all the sales agents) were retained through a series of annual contracts. Commencing in 1998 the employer required all the sales agents to incorporate private companies, and provide their services through those companies. The plaintiff testified that he acquiesced in or agreed to all of these various changes, because he assumed that if he did not agree his employment would be terminated. In 2003 (after 22 years of service) the employer terminated the plaintiff's employment. An issue arose as to whether a notice provision, first inserted in 1996, was enforceable. The Court relied on *Hobbs* in concluding that there was no consideration for this covenant. This provision of the arrangement was not enforceable, even though the parties had continued with their relationship for seven years on the assumption that it was. The Court acknowledged the decision in *Techform Products*, but concluded that there was no tacit agreement not to terminate the plaintiff's employment if he did not agree to the changes.

[128]   In Alberta, *Maguire, Gestetner* and *Maier* are the binding authorities. The facts of this appeal are not similar to those in *Hobbs* or *Francis*, and it is not necessary to express any conclusive opinion on those cases. The results in *Francis* and *Braiden* seem artificial, especially since those employment relationships continued for many years after the changes, and the decision in *Hobbs* was likely driven by the high handed conduct of the employer in that case. It follows that in most employment cases, the law in Alberta will recognize an implied "tacit agreement" to forbear from exercising the right to terminate the contract as being sufficient consideration to support any changes in an ongoing employment relationship.

2011 ABCA 240 (CanLII)

Page: 32

[129]   Employment relationships, being of indefinite duration, must adapt to changing times and circumstances. Further, since many of the key terms of employment agreements are implied by law, it is not unreasonable for the law also to imply the "tacit agreement" mentioned in *Maguire*. There is nothing unreasonable about either side seeking variations to the terms of an employment agreement from time to time. The employee may seek a raise in pay, or promotion, or transfer, or a different work schedule, or other changes. The employer may feel the need to change the arrangement to respond to competitive pressures or changing business conditions. It is unrealistic to establish a rule of law that prevents the parties to a long-term employment relationship from restating and reducing to writing, from time to time, the terms of employment. Both parties rely on the enforceability of the terms of employment, and should not have their expectations disappointed by an artificial rule of law which makes their covenants unenforceable after they have been relied on for years.

[130]   The problems of applying the law of consideration to "going-transaction adjustments" are summarized by A. Swan in <u>Canadian Contract Law</u> (2nd ed.) (Markham: LexisNexis 2009):

> §2.142 The law surrounding going-transaction adjustments is needlessly confused and complicated. It is important to remember what Karl Llewellyn said of promises which modify the terms of an existing relation.
>
> > A third and hugely important class [of problems with the doctrine of consideration] is that of either additional or modifying business promises made after an original deal has been agreed upon. Law and logic go astray whenever such dealings are regarded as truly comparable to new agreements. They are not. No business man regards them so. They are going-transaction adjustments, as different from agreement-formation as are corporate organization and corporate management; and the line of legal dealing with them which runs over waiver and estoppel is based on sound intuition.
>
> §2.143 A preferable position for the law to adopt is that when such promises arise in a commercial setting there should be a strong presumption that they are enforceable. If one party alleges that there was improper economic pressure - or any other kind of improper or illegitimate pressure - that party should have the onus of showing that the promise should not be enforced. If there is no reason not to enforce the contract with the modified terms, it should be enforced.

These comments apply particularly to employment contracts, in which the relationship between the employer and the employee can subsist for many years. The importance of enforcing contracts which have been performed by both parties for a lengthy period was noted in *Ronald Elwyn Lister* at p. 745.

2011 ABCA 240 (CanLII)

[131]   In the United States, the rule relating to the enforcement of promises made in the context of an existing agreement is known as the "pre-existing duty rule". J. M. Perillo and H. H. Bender in <u>Corbin on Contracts</u> (rev. ed.) (St. Paul: West Publishing Co., 1995) at para. 7.1 note that the rule is in decline:

> The very frequently stated rule is that neither the performance of duty nor the promise to render a performance already required by duty is a consideration for a return promise. This rule is known as the "pre-existing duty rule." The pre-existing duty rule is undergoing a slow erosion and, as a general rule, is destined to be overturned. No part of the doctrine of consideration has done more to put the entire doctrine in disrepute. . . . It is clear that there is widespread doubt as to the soundness of the pre-existing duty rule as a matter of social policy. As a result, a court should no longer accept this rule is fully established. It should never use it as the major premise of a decision, at least without giving careful thought to the circumstances of the particular case. . . .

The modification of arrangements respecting existing duties is something that frequently arises in the employment context.

[132]   It is here that the decision in *Braiden* is difficult to support. The employment relationship in that case continued for 22 years. It is not surprising that economic, competitive, and tax changes over that time would require variations in the employment agreement. Of all the changes that were made, the Court appears to have found that one (relating to the notice provision) was not enforceable, while many or all of the others (such as those relating to the employee's duties, his method of pay, the rights to his commissions, and so forth) were implicitly found to be enforceable. How could there be consideration for some of these changes, but not others? The plaintiff in *Braiden* had testified that he believed he had to agree to the changes, or his employment would be terminated. It is difficult to see why the plaintiff's belief, along with his actual continued employment after he agreed to the various changes, did not support the finding of a "tacit agreement" on the part of the employer to forbear from exercising its rights of termination at the time of the changes.

[133]   As previously noted (*supra*, para. 21), the terms of an employment contract can be changed by either side on reasonable notice. Thus, the law would imply a term that the commission rates in *Hobbs* could have been changed on reasonable notice, even if they were fixed in the initial contract, and even if the original contract had been silent on the right to make changes. Likewise, the contract in *Braiden* could, with reasonable notice, have been amended by the employer to include a "reasonable notice" clause. At best, these are cases when the employer arguably attempted to make changes without giving that reasonable notice. However, the employee having acquiesced in the change cannot, many years later, argue that insufficient notice was given. It is artificial to render these clauses unenforceable through the doctrine of consideration when the law implies an ability to make such changes, and no objection is taken to the change until many years later.

2011 ABCA 240 (CanLII)

Page: 34

2011 ABCA 240 (CanLII)

[134]   The purpose of the law of consideration must also be considered. Its primary purpose is to draw a line between gratuitous or morally based promises, and legally enforceable obligations. It was never intended to provide an easy escape mechanism for parties who have second thoughts about the covenants they agreed to, and that they intended to bind them. As Prof. G.H.L. Fridman states:

> . . . the rigid approach to consideration found in the early nineteenth century is no longer necessary or desirable. Courts are more ready to find consideration so as to reflect the intentions of the parties, unless there is an element of fraud, duress or inequality of bargaining power present.

(The Law of Contract in Canada (5th ed.), (Toronto: Thomson Canada, 2006) at p. 98, citing *Williams v. Roffey Bros. & Nicholls (Contractors) Ltd.* (1989), [1991] 1 Q.B. 1 (C.A.) at pp. 18-9.) See also *Greater Fredericton Airport Authority Inc. v. NAV Canada*, 2008 NBCA 28, 329 N.B.R. (2d) 238 at paras. 27-8. In an arms-length, commercial context, like the law of employment, both parties clearly intend their obligations to be legally enforceable. Any element of fraud, duress or inequality of bargaining power found should be dealt with directly under the applicable doctrines, and not by an artificial application of the law of consideration.

[135]   Consideration is a threshold issue to the enforcement of contracts, but it should not be extended or applied in a mechanical and artificial way. It should not be used to undermine the legitimate commercial expectations of the parties as to the enforceability of their obligations. The employees in *Maguire* and *Gestetner* could not ignore any valid covenant given not to compete, any more than the employer in *Maier* could disclaim the promise to grant stock options. The courts should not bend over backwards to find that agreements, believed by the parties to be enforceable, are essentially toothless because of the doctrine of consideration. Here the appellant and the respondents signed the non-competition agreements in full expectation that they were enforceable, and they thereafter continued with their business relationship on that assumption. The respondents acknowledged in their evidence that they understood and believed the agreements to be binding on them. They even tried to respect the non-solicitation agreements. In applying the law of consideration, the courts should refrain, if possible, from relieving the parties of covenants freely entered into, absent some overriding public policy consideration: *Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, 2010 SCC 4, [2010] 1 S.C.R. 69 at paras. 107, 120; *Seidel v. TELUS Communications Inc.*, 2011 SCC 15 at paras. 2, 169. Where covenants are relied on for many years, at the least a promissory estoppel should arise.

[136]   An appropriate approach to varying existing contracts by "going-transaction adjustments" was set out by Swan in Canadian Contract Law:

> §2.144 The results in cases like *Foakes v. Beer* and *Gilbert Steel* seem to serve no purpose other than to encourage trickery and sharp practice - a consequence recognized by the prompt legislative reversal of the result in the former. The effort to reconcile the results in [the leading cases] leads to great uncertainty and creates a very serious risk that those without access to good legal advice will be unfairly, unnecessarily and unpleasantly surprised.

2011 ABCA 240 (CanLII)

§2.145 More recent cases . . . show that the real problem which the law has to deal with is not the doctrine of consideration but whether the enforcement of the promise will catch one of the parties by surprise. It is both unnecessary and unrealistic to expect an employer to threaten its employees with dismissal if they do not agree to a modification of their employment contracts. It is, however, reasonable to expect the employer to make sure that its employees know the terms of the contracts that govern them and equally reasonable to expect the employees to tell the employer if the terms offered by the employer are unacceptable: if that means that the employee has to resign, he or she is protected by the law of constructive dismissal if the modification is unfair or unreasonable. It may be assumed that an offer by the employer to give an annual pay raise is acceptable to an employee so that nothing more is required of the employee to make his or her right to the increase effective. On the other hand, the employer should be entitled to expect that its employees have accepted some disadvantageous change from the fact that, after the employer made reasonable efforts to inform its employees of the change (and gave them time to consider it), the employees nevertheless stayed with the employer. Such an attitude to the problem of adjustments in the employment relation would not only reflect what has generally been accepted as the law but would also acknowledge that the important question is not whether there was or was not consideration or some legalistic ritual like a formal threat to dismiss an employee whom the employer would very much like to retain, but whether the employee was fairly informed of the terms governing his or her employment.

In this case none of the employees were "caught by surprise". They knew exactly what terms their employer was proposing for them, they agreed to them, and both the employer and the employees thereafter conduct their affairs as if the "going-transaction adjustment", in the form of the non-solicitation clause, was binding. Invoking the law of consideration after the fact is the invocation of a legal fiction in aid of a particular result.

[137]   It is true that there might be a power imbalance between an employee and an employer demanding non-competition covenants: *Elsley v. J.G. Collins Insurance Agencies* at p. 924; *Wallace v. United Grain Growers Ltd.*, [1997] 3 S.C.R. 701 at para. 92. It must be remembered, however, that outside the human rights context the employer is under no obligation to hire anyone, retains the right to terminate the employee at any time, and is entitled to do so if it becomes dissatisfied with any of the terms of employment. That termination is not a breach of the agreement: *Merrill Lynch Canada Inc. v. Soost*. Termination on notice is a covenant in the agreement that may be exercised by either the employer or the employee at any time. Further, when a longtime employee leaves and immediately commences soliciting the customers of his former employer, the balance of power is singularly reversed; the employer at that point is very vulnerable to the employee.

[138]   In *Tercon Contractors* at paras. 62, 82, 117 the Supreme Court of Canada confirmed that there is nothing inherently unreasonable about exclusion clauses, and that generally parties should

be held to their bargains. Likewise, there is nothing inherently unreasonable about an employer attempting to protect its business from appropriation by its key employees, especially where the business is "information based", and heavily dependent on personal contact with the clients. Further, it is entirely reasonable for an entrepreneur to want to protect its proprietary information and other property. There are sufficient controls in the law to deal with issues of power imbalance, such as the laws of unconscionability (*Tercon Contractors* at paras. 122, 131), and the rule that renders overly broad anti-competition clauses unenforceable. In this case the non-competition covenants have been found to be unenforceable, showing that these other legal controls are effective. The courts should not, through an overenthusiastic application of the law of consideration, strive to render unenforceable reasonable covenants freely agreed to by the parties: *Maguire* at pp. 415-16.

[139]   It follows that the appellant was under no obligation to hire the respondents, and could, at any time, have terminated their employment on reasonable notice. Considering the nature of the employment contract, and the contents of this particular record, the following errors appear in the analysis of whether there was sufficient consideration given:

    a)     The trial judge stated at para. 49, without further explanation, that: "These contracts are to be distinguished from contracts which provide for any notice of termination. These contained nothing with respect to notice periods." It is unclear what significance the trial judge saw in this. Consideration is a threshold issue with respect to the enforceability of contracts, whether they contain notice provisions or not. In any event, the period during which these covenants were in force was contained in their very terms; they were in force for a set period of time following termination of the respondents' employment. The duration of these covenants was tied to the employment agreements, and since the law implies "termination on notice" in all unwritten employment agreements, the covenants did have an effective "notice period".

    b)     Another problem is the finding that there was no promise to "guarantee" the respondents' employment for "any period of time". It was not necessary that the appellant agree that the respondents' contracts would continue for any particular period of time, because employment contracts are always of indefinite duration, and the implied covenant in all such agreements is that they can be terminated at any time on reasonable notice. It was sufficient consideration if the appellant "tacitly agreed", at that moment in time, to refrain from exercising its right to terminate. A guaranteed fixed term of employment is not needed; an undertaking of indefinite future employment is enough. "Indefinitely refraining" from termination was enough in *Maguire*. It does not appear that the trial judge actually considered that factor.

    c)     The trial judge overstated the test by noting that "nothing was given" to the respondents in return for signing the agreement, and they were "not told" their employment would be preserved. It was not necessary that the appellant and the respondents advert to and discuss the exact arrangement. It is sufficient if the

2011 ABCA 240 (CanLII)

2011 ABCA 240 (CanLII)

arrangement is "tacit". A tacit agreement is, by definition, not an articulated agreement. That the employment continued for several years thereafter is compelling evidence of a common intention that if the agreement was signed, the employment would continue as before, that is for an indefinite term subject to termination on reasonable notice.

d)      The trial judge overlooked the recitation in the agreements that they were "in consideration of the employment and for other good and valuable consideration". Even if a recitation of consideration is not always conclusive, it is an important indication that the parties thought their agreement was enforceable, and that there was something of value being exchanged. The individual respondents, having signed the written agreements in this form, cannot easily disown this language.

e)      The trial judge erred in finding a distinction between telling the employee "sign or you will be terminated", and a tacit agreement that if the agreement was signed, the employment would continue the same as before, namely for an indefinite term subject to termination on reasonable notice. There is no distinction to be made between the two, and the continuation of the employment after such an ultimatum is sufficient consideration. As in *Maguire* "the employee was given to understand, and did understand, that his refusal to execute the covenant would lead to an early termination of his employment".

f)      When the respondents signed the covenants, their employment continued. When they refused to sign, their employment ended. The inference that there was a "tacit agreement" to continue their employment is compelling.

g)      The trial judge's finding is inconsistent with the admissions of Kelcher and Oliverio (*supra*, paras. 4 and 19).

In the circumstances of this case, the only reasonable inference on the undisputed facts is that the appellant implicitly agreed that if the non-competition agreements were signed, it would refrain from exercising its right to terminate the contracts at that point. If the covenants were signed, the employment agreements would continue, as before, for an indefinite period of time, subject as always to the right to terminate, but only on reasonable notice. The inference that there was no implied agreement that the respondents' employment would continue if they signed the non-competition agreements is not one that is available on this record, and reflects palpable and overriding error. Appellate intervention is necessary: *H.L. v. Canada*.

<u>Enforceability of Covenants after Breach</u>

[140]   The chambers judge who granted the interim injunction did not grant one against MacLean, because she found that there was not a strong *prima facie* case against him. The trial judge (at para. 40) stated that the chambers judge "considered, as do I, that MacLean was wrongfully terminated.

Page: 38

That being so, the restrictive covenants were not enforceable as against him." This overstates what the chambers judge had actually ruled (at 2005 ABQB 676):

> 22      . . . The Defendants argue that this dismissal was without cause, notice or payment in lieu, that it constituted a repudiation by Globex of its employment agreement with MacLean, and that MacLean is entitled to accept the repudiation and is no longer required to comply with terms of the employment agreement, including his covenant not to compete with Globex. There is authority to support this position as a matter of law: *Windship Aviation Ltd. v. deMeulles*, [2002 ABQB 669, 5 Alta. L.R. (4th) 133] at para. 34. Further, I agree that it is at least arguable as a matter of fact that MacLean's dismissal was without cause. Accordingly, I find that the Plaintiff has not established a strong *prima facie* case with regard to the MacLean Non-Competition Agreement, and is therefore not entitled to an interlocutory injunction in respect of that agreement. The remaining issues in this decision will be addressed in terms of the Kelcher and Oliverio agreements only.

Since there was no cross-appeal in the injunction litigation, the Court of Appeal reasons at 2005 ABCA 419 do not discuss this point.

[141]   The classical position on the rights of the parties after a breach of contract was summarized in *Keneric Tractor Sales Ltd. v. Langille*, [1987] 2 S.C.R. 440 at p. 455:

> The modern view is that when one party repudiates the contract and the other party accepts the repudiation the contract is at this point terminated or brought to an end. The contract is not, however, rescinded in the true legal sense, i.e., in the sense of being voided *ab initio* by some vitiating element. The parties are discharged of their prospective obligations under the contract as from the date of termination but the prospective obligations embodied in the contract are relevant to the assessment of damages: see *Johnson v. Agnew*, [1980] A.C. 367, [1979] 1 All E.R. 883 (H.L.), and *Moschi v. Lep Air Services Ltd*, [1973] A.C. 331, [1972] 2 All E.R. 393 (H.L.) Such is the law for contracts generally and it is this law which should apply equally to breaches of chattel leases.

It does not follow automatically that a breach of the contract ends the contract. If one party to a contract commits a breach that is serious enough to evince an intention "not to be bound by the contract", the other party can accept the repudiation of the contract and terminate it. Whether the breached covenant is important enough to justify terminating the contract depends on the construction of the contract.

[142]   It does not follow from this general principle that a party in breach of one clause of the contract cannot enforce any other covenants breached by the other party. If one party to a contract is in breach of an important covenant, the other party can accept the repudiation of the contract and terminate it. That ends the obligation of either party to perform the substantive or primary covenants

2011 ABCA 240 (CanLII)

in the agreement in the future, but it does not forgive any past lapses in performance, nor bring to an end all of the collateral covenants: *Rock Refrigeration Ltd. v. Jones*, [1997] 1 All E.R. 1 (C.A.), per Phillips L.J. at pp. 19-20 (dissenting on this point). There are many covenants in an agreement that survive its termination (for breach or otherwise): *Moschi v. Lep Air Services Ltd.*, [1973] A.C. 331 at p. 350; *Keneric Tractor Sales Ltd.* at p. 455; *Heyman v. Darwins, Ltd.*, [1942] A.C. 356. One of the most important functions of a modern, professionally drafted contract is to deal with the breach or termination of the agreement. Indeed, many covenants in agreements only take on their primary efficacy once there has been a breach: arbitration clauses, choice of forum and law clauses, confidentiality clauses, liquidated damage clauses, limitation of liability clauses, and generally all clauses that deal with how the parties will unwind their relationship upon termination. Non-solicitation and non-competition clauses generally fall into this category as well, as they are covenants primarily intended to apply only after termination.

[143]   The difference between ending the obligation to perform substantive covenants in the future, and ending the whole contract, was summarized in *Photo Production Ltd. v. Securicor Transport Ltd.*, [1980] A.C. 827, an exclusion clause case. The point was made that a breach entitling one party to terminate the contract and cease *future* performance did not mean that all the clauses of the contract had somehow disappeared. The breaching party was still entitled to enforce whatever rights it had for past performance, or arising from cross-breaches by the other party:

> But what can and ought to be avoided is to make use of these confusions in order to produce a concealed and unreasoned legal innovation: to pass, for example, from saying that a party, victim of a breach of contract, is entitled to refuse further performance, to saying that he may treat the contract as at an end, or as rescinded, and to draw from this the proposition, which is not analytical but one of policy, that all or (arbitrarily) some of the clauses of the contract lose, automatically, their force, regardless of intention. (Lord Wilberforce at p. 844)

> Where such an election [to terminate the contract] is made (a) there is substituted by implication of law for the primary obligations of the party in default which remain unperformed a secondary obligation to pay monetary compensation to the other party for the loss sustained by him in consequence of their non-performance in the future and (b) the unperformed primary obligations of that other party are discharged. . . . (Lord Diplock at p. 849)

If his employment contract was breached by failure to give him reasonable notice (or pay in lieu), MacLean was relieved from any future obligation to provide his services, and was entitled to damages. But he was not entitled to simply ignore all the other covenants he made with, and duties he owed to the appellant.

[144]   The respondents rely on *General Billposting Co. v. Atkinson*, [1909] A.C. 118. This was an appeal involving a restrictive covenant granted by an employee, which was to be effective for "two years after his employment terminates". The clause did not include a modifier like "for any reason".

2011 ABCA 240 (CanLII)

The contract provided that the employee could be dismissed on 12 months' notice, but he was dismissed without proper notice. He received damages in lieu of the missing notice. When the employer attempted to enforce the restrictive covenant, the House of Lords held at p. 122:

> . . . I think the true test applicable to the facts of this case is that which was laid down by Lord Coleridge C.J. in *Freeth v. Burr* [(1874), L.R. 9 C.P. 208 at p. 213] and approved in *Mersey Steel Company v. Naylor* [(1884), 9 App. Cas. 434] in the House of Lords, "That the true question is whether the acts and conduct of the party evince an intention no longer to be bound by the contract." I think the Court of Appeal had ample ground for drawing this inference from the conduct of the appellants here in dismissing the respondent in deliberate disregard of the terms of the contract, and that the latter was thereupon justified in rescinding the contract and treating himself as absolved from the further performance of it on his part.

*General Billposting* is still treated as binding authority in England, and has been followed in some Canadian cases, but the decision appears to be inconsistent with the later English decision in *Photo Production*, and the binding Canadian authorities of *Tercon Contractors* and *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423.

[145]   *General Billposting* was discussed in *Rock Refrigeration v. Jones*, which involved a restrictive covenant granted by an employee stipulated to apply after termination "howsoever occasioned". The employee Jones resigned his position; in other words, he was not dismissed, and so there was no issue of the employer being in breach. The trial judge concluded, however, that *General Billposting* laid down a rule that restrictive covenants which even purported to apply after wrongful dismissal of the employee were necessarily, as a matter of law, void and unenforceable.

[146]   The three judges who decided *Rock Refrigeration* gave separate reasons. Simon Brown L.J. concluded that all non-competition covenants become unenforceable when the contract is repudiated by the employer, and the employee accepts that repudiation and terminates the contract. He treated the ruling in *General Billposting* as a principle or rule of law, which did not depend on the proper construction of the contract, and which had been wholly unaffected by the decision in *Photo Production*. However, in a case (like *Rock Refrigeration*) where the employer was not in breach, the ordinary rules applied. The issue is then whether the clause, considered at the time it was granted, was unreasonable as between the parties, or contrary to public policy, rendering it unenforceable. Since the employer was not in breach, this clause was enforceable.

[147]   Morritt L.J. concurred in the result. He assumed that *General Billposting* would prevent the enforcement of the clause if the employer was in breach, and the employee had accepted the employer's repudiation. Any particular wording used in the covenant would not change the result. However, the speculative possibility that the clause would not be enforceable when the employer was in breach, did not render the entire clause an unreasonable restraint of trade and contrary to public policy. If the employment was terminated without breach of the employer, the clause could still potentially be enforced.

Page: 41

[148]  Phillips L.J. also concurred in the result, but concluded at p. 18 that *General Billposting* "accords neither with current legal principle nor with the requirements of business efficacy". In his view *General Billposting* was inconsistent with the later decision in *Photo Production*. He continued at pp. 19-20:

> . . . I do not accept that it is unreasonable for an employer to seek to impose restraints on his employee that will subsist, even should the employment come to an end as a consequence of a repudiation by the employer. On the contrary, it seems to me commercially desirable that it should be possible to achieve this end, for the following reasons.
>
> Where an employer discloses to an employee confidential information, or otherwise puts the employee in a position to harm the employer's goodwill, it will usually be reasonable to impose negative restraints sufficient to protect those legitimate interests of the employer. Contracts of employment are now subject to complex statutory regulation, much of it designed to protect the employee. Cases of deliberate wrongful dismissal of employees, or repudiatory breach of the duties owed to them, are much less common than bona fide disputes as to whether or not there has been unfair or constructive dismissal. Employees who have been unfairly dismissed are entitled to statutory compensation. It does not seem to me necessarily fair or reasonable that an employer who is held liable to pay such compensation should also be at risk of losing the protection that is reasonably necessary to safeguard his confidential information or goodwill.

Since the clause in question was otherwise reasonable, and the employer in this case was not actually in breach, Phillips L.J. did not find it necessary to resolve the issue. He did however suggest that it is ". . . at least arguable that, having regard to the subsequent development of this area of the law, not every restrictive covenant will be discharged upon a repudiatory termination of the employment".

[149]  The argument that a party in breach cannot enforce any other covenant of the agreement is an over extension of the general principle that "the innocent party can accept the repudiation and terminate the contract". That is true as it relates to the obligation for future performance. But it should not be extended so as to suggest that all the collateral covenants in the agreement have disappeared. Some of the cases go so far as to suggest that a termination of the employment agreement by the employer without proper notice is not only a breach of contract, but is somehow "unlawful", in the sense of it being "illegal", so as to be contrary to public policy. Breaches of contract generate civil remedies, but a mere breach of contract has never been seen as rendering the contract unenforceable by the breaching party as a result of illegality.

[150]  This same argument was seen with so-called "fundamental breach". The theory was that if one party was in fundamental breach, it could in law no longer rely on the limitation of liability

2011 ABCA 240 (CanLII)

clauses in the contract. The Supreme Court of Canada has rejected this argument many times: *Tercon Contractors Ltd.* at paras. 62, 82, 106. Breach results in remedies, but not forfeiture of rights under the contract. Just because the employer is in breach of the employment contract does not give the employee the right to breach his own covenants, appropriate the employer's proprietary information for himself, or otherwise ignore his contractual obligations.

[151]   The extent of the parties' obligations after breach depends on the proper construction of the terms of the contract, and what the parties intended their obligations to be after termination: *Guarantee Co. of North America* at paras. 52-3, 56, 59-60. In that case the Supreme Court confirmed that *Photo Production* reflects the law of Canada. It confirmed that "whether fundamental breach prevents the breaching party from continuing to rely on an exclusion clause is a matter of construction rather than a rule of law". The Court rejected the argument that its prior decision in *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426 set out a special rule that only applied to exclusion clauses, holding "the construction approach as applied to exclusion clauses is equally applicable to provisions limiting the time in which an action can be initiated" and that "no reason exists in terms of policy to limit the construction approach to fundamental breach to exclusion clauses alone". There is no principled reason why the "construction approach" should not apply to all covenants, nor why employment agreements should be in an exceptional category with respect to this fundamental principle of the law of contract.

[152]   *Rock Refrigeration* raised, but did not resolve, the issue of whether the unenforceability of restrictive covenants after breach is a rule of contractual construction, or a rule of law. The contract in this appeal reads "termination . . . for whatever reason". What if the contract read "termination for whatever reason, including fundamental breach and repudiation"? (Leaving aside for the moment the fact that on a proper construction "whatever reason" must include "fundamental breach and repudiation" anyway.) Would the restrictive covenant still be unenforceable after breach? Logically, that should follow under the *General Billposting* rule, because the clause "including fundamental breach and repudiation" should be just as unenforceable after repudiation as the rest of it. That was the assumption of the majority in *Rock Refrigeration* about the effect of the rule. It appears, however, to be contrary to Lord Wilberforce's statement in *Photo Production* that the rule could not prevail "regardless of intention". It is also contrary to the conclusion of the Supreme Court of Canada in *Guarantee Co. of North America* at paras. 51-2 that the consequences of breach are a matter of construction, not a rule of law. *Tercon Contractors* also clearly holds that the issue of survival of covenants after breach is one of construction, and it follows that it rejects the underlying reasoning in *General Billposting*. If the issue is one of construction, and "whatever reason" includes "fundamental breach and repudiation", then MacLean's covenant remained enforceable after termination of his employment under any circumstances.

[153]   The general rule as set out in *Hunter Engineering*, *Guarantee Co. of North America* and *Tercon Contractors* is a part of the law of contract, and does not depend on the precise type of covenant involved: *Keneric Tractor* at p. 455. The generic issue is what it means to say that the innocent party may "accept the repudiation and terminate the contract". The generic answer is that

2011 ABCA 240 (CanLII)

2011 ABCA 240 (CanLII)

"the enforceability of a covenant after breach depends on the intention of the parties, derived from the proper interpretation of the contract". This principle has emerged in a variety of contexts:

>    (a)    In *Heyman v. Darwins* the defaulting party wanted to rely on an arbitration clause. The innocent party argued that he had accepted the repudiation, which discharged him from any future performance. The House of Lords found that the arbitration clause survived any termination. To the same effect is *Momentus.ca Corp. v. Canadian American Ass'n of Professional Baseball Ltd.*, 2010 ONCA 722, 103 O.R. (3d) 467, 325 D.L.R. (4th) 685, leave granted  May 19, 2011 (SCC # 33999) at para. 48 (arbitrability of a choice of forum clause after allegation of "fundamental breach").

>    (b)    In *Lep Air Services* a debtor defaulted on its obligation to pay a debt by installments. The creditor accepted the repudiation and sued a guarantor, who argued that the acceptance of the repudiation had "brought an end to the contract", and thus it was discharged. The House of Lords confirmed that the discharge of the primary obligations in the contract did not mean that all the secondary consequences of the breach vanished.

>    (c)    As previously noted, the principle has been applied to limitation of liability clauses, which by their very nature are only of interest to the defaulting party. Cases like *Photo Production* and *Tercon Contractors* have confirmed that the acceptance of a repudiation following even what could be described as a "fundamental breach", even if that "terminates the contract" in some sense, does not automatically mean that such clauses do not apply according to their terms.

There is no special rule for each type of covenant (e.g. arbitration clauses, limitation of liability clauses, etc.). Of course, the nature of some types of clauses is that they can only have any relevance and possible effectiveness after breach, leading to the obvious inference that the parties intended them to remain enforceable after breach. Arbitration clauses, exclusion of liability clauses and non-competition clauses share a common characteristic: they are all clauses that apply solely or primarily after termination of the contract.

[154]   To emphasize, *Tercon Contractors* does not set out any special rule with respect to tenders or exclusion clauses; on the contrary, it confirms that there is no special rule for them. The concept of "fundamental breach" was first posited by Lord Denning in a series of cases in the 1950s. The theory was that if the party was in "fundamental breach", it could no longer rely on any clause that purported to limit its liability. The point of cases like *Photo Production* and *Tercon Contractors* is that there is no special rule for exclusion clauses; those cases confirm that the rules that apply to all other contractual clauses also apply to exclusion clauses. Rather than creating an exception, these cases bring exclusion clauses into the mainstream of the law of contract. It is true that *Tercon Contractors* talks repeatedly about "exclusion clauses"; that is because that case is about exclusion clauses, and the point being made is that there is no special rule for them. *Tercon Contractors* lays out a rule of general application: whether any particular clause in the contract survives termination of the contract is a matter of construction of the contract.

2011 ABCA 240 (CanLII)

[155]   Assume, for the sake of argument, that an employment agreement contained valid non-solicitation covenants, and valid covenants protecting the proprietary information and other property of the employer. Absent a specific clause on termination, the law would assume that the agreement could be terminated on reasonable notice. As pointed out in *Merrill Lynch Canada Inc. v. Soost*, terminating the agreement is not a breach of the agreement at all. Any "breach" by the employer must consist of giving inadequate notice of termination. If the employer fails to give adequate notice, the remedy of the employee is to obtain damages for pay in lieu of notice. There is no basis for saying that, in addition to pay in lieu of notice, the employee need not comply with the other covenants in the agreement that were clearly intended to operate beyond the date of termination. Non-solicitation covenants are clearly intended to operate primarily, if not exclusively, after termination. There is no basis for saying that if the employer gives inadequate notice, the employee is entitled to take whatever proprietary information he chooses, or appropriate the employer's business by soliciting its clients. Any such self-help remedy could be entirely disproportionate to the breach. For example, assume the employer merely miscalculated the appropriate length of reasonable notice by one month. It would be completely disproportionate to that breach to thereafter excuse the employee from respecting any of the other covenants in the agreement.

[156]   It would be problematic to establish that, as a matter of law, a restrictive covenant is never enforceable where the employer has "wrongfully" terminated the employment. To repeat again, the right to terminate is one of the implied terms of a contract, and mere termination is not a breach, much less a repudiation of the contract. A termination of an employment contract is only "wrongful" in the sense that the employer has tendered inadequate notice, or pay in lieu of notice. An employer who wishes to exercise the right to terminate has a lot of opportunities to guess wrong, for example:

      a)     the employer can miscalculate what the common law would consider to be "reasonable notice", possibly being short by only a month or two, or

      b)     the employer may, in good faith, believe that there was "cause" for termination, only to have a court (with hindsight, several years later) rule that what happened was close, but not quite enough to be "cause".

To describe the termination in either case as "wrongful" is inaccurate: *Merrill Lynch Canada Inc. v. Soost* at paras. 9-14.

[157]   As *Soost* noted at para. 9: ". . . there is no such thing there as wrongful dismissal . . . either side may validly end the contract at any time." The termination is entirely consistent with the terms of the contract, it is only the miscalculation of the civil remedies that is contrary to those terms; there is no such thing as "wrongful dismissal", only "miscalculation of the notice period". This undermines the rationale sometimes suggested for the *General Billposting* rule, that it is "morally unjust to permit an employer to recoup the benefit of a contractual restraint after it has acted reprehensibly by repudiating the contract": Peter Barnackle, *Employment Law in Canada*, 4th ed

2011 ABCA 240 (CanLII)

(Markham, Ont: LexisNexis, 2005) at §11.47. As *Soost* confirms, merely giving inadequate notice is not wrongful, much less "reprehensible".

[158]   To go even further and suggest that a termination without adequate notice is a "repudiation", in the sense that it reflects an intention not to be bound by the terms of the contract, is artificial. Terminating a contract that is, according to its terms, subject to termination is not a repudiation of the contract, but rather the affirmation and invocation of one of its terms. Further, not every breach of contract (i.e., in this context, giving inadequate notice of changes to the terms of employment) amounts to "repudiation", that is an intention to "no longer be bound by the terms of the contract". Contracts can be broken by parties who act completely in good faith - that is not "repudiation".

[159]   In *General Billposting* the employee had sued for and had been awarded damages in lieu of reasonable notice. The House of Lords did not expressly deal with this fact, but obviously regarded it as being irrelevant. The law in Alberta, according to *Merrill Lynch v. Soost*, is that there is no such thing as "wrongful dismissal", only "miscalculation of the notice period", that employees are not indentured, and that all employment contracts can be terminated. Once an employer has paid the employee for work done, and paid compensation in lieu of reasonable notice, the employer has discharged all of its obligations under the contract. At that point there can be no equitable basis for saying that the employee should be relieved of his obligations in performing the contract, because somehow the employee has not received all of the consideration called for in the contract. The employer is in no sense getting "something for nothing"; indeed, there is a windfall to the employee, who is allowed to keep all his consideration but escape the covenant freely entered into.

[160]   One can of course imagine cases where it would be unconscionable to enforce the restrictive covenant. For example, if the employee was hired on a pretext only to obtain the restrictive covenant, and was then summarily dismissed within a short time, the court would be loath to enforce the agreement. In *Tercon Contractors* the Supreme Court discussed this situation in the context of limitation of liability clauses as follows:

> 118    There are cases where the exercise of what Professor Waddams calls the "ultimate power" to refuse to enforce a contract may be justified, even in the commercial context. Freedom of contract, like any freedom, may be abused. Take the case of the milk supplier who adulterates its baby formula with a toxic compound to increase its profitability at the cost of sick or dead babies. In China, such people were shot. In Canada, should the courts give effect to a contractual clause excluding civil liability in such a situation? I do not think so. Then there are the people, also fortunately resident elsewhere, who recklessly sold toxic cooking oil to unsuspecting consumers, creating a public health crisis of enormous magnitude. Should the courts enforce an exclusion clause to eliminate contractual liability for the resulting losses in such circumstances? The answer is no, but the contract breaker's conduct need not rise to the level of criminality or fraud to justify a finding of abuse.

The Supreme Court ruled that cases of this sort should be dealt with by the law of unconscionability, and the other rules of law that invoke public policy to prevent the enforcement of socially unacceptable clauses in contracts. The answer was not to create an artificial rule that after "fundamental breach" all limitation of liability clauses disappear. Likewise, issues of unconscionability surrounding restrictive covenants granted by employees should be dealt with in accordance of the law governing unconscionable transactions. As the Court said at para. 82, covenants should be enforced according to their terms unless the innocent party "can point to some paramount consideration of public policy sufficient to override the public interest in freedom of contact and defeat what would otherwise be the contractual rights of the parties". In addition, many abusive uses of non-solicitation clauses will be caught by the general rule that they are unenforceable unless they are "reasonable between the parties, and not contrary to the public interest". The law has ample tools for dealing with abusive situations without mandating that reasonable clauses which were clearly intended to apply after termination of the contract are nevertheless unenforceable.

[161]   Generally non-competition covenants will remain enforceable after termination for breach, because otherwise they are largely meaningless: *Guarantee Co. of North America* at paras. 61, 63. That is the intention of the parties, which prevails: *Tercon Contractors Ltd.* The clauses which are the subject of this appeal read: ". . . for a period of twelve (12) months from the date of termination of the Employee's employment with Globex, for whatever reason". Since they are specifically to operate "from the date of termination", it must have been the intention of the parties that they would survive termination. And since they specify that the termination may be "for whatever reason" there is no room for inserting an implied term that they only applied to "termination without breach", or more correctly only after "termination where adequate notice or pay in lieu was tendered": *Tercon Contractors* at para. 114; *Guarantee Co. of North America* at para. 63; *Photo Production Ltd.* at p. 846. There is therefore no reason why the non-solicitation and non-competition covenants cannot be enforced against MacLean according to their terms, subject to the law that governs such covenants.

[162]   There is no clear finding on this record as to whether MacLean was dismissed without cause, and without proper notice, and if so why. Even if he was dismissed in that manner, there is no finding that the conduct of the appellant amounted to "repudiation", in the sense that the appellant demonstrated an intention not to be bound by any of the terms of the agreement. There is no suggestion of unconscionability surrounding the non-solicitation clause. That clause was clearly intended to apply after termination of the agreement for whatever reason. In the circumstances, there is no reason why the clause is, as a matter of law, unenforceable merely because the contract has been terminated.

## The Reasonableness of the Covenants

[163]   Non-solicitation and non-competition covenants are not enforceable unless they are reasonable as between the parties, and not contrary to public policy: *Shafron v. KRG Insurance Brokers (Western) Inc.*, 2009 SCC 6, [2009] 1 S.C.R. 157 at paras. 16-7; *Elsley v. J.G. Collins Insurance Agencies Limited*. When this Court heard the appeal from the interim injunction, it

2011 ABCA 240 (CanLII)

expressed the view at paras. 35-8 that the non-competition covenants were over-broad, contrary to public policy and unenforceable. While this Court could have resolved that appeal on other grounds (e.g. balance of convenience, no irreparable harm) the Court in fact resolved the appeal at para. 41 on the basis that the appellant "had not made out a strong *prima facie* case", largely because of doubt about the validity of those covenants. It is arguable whether that previous decision created an issue estoppel, and whether the appellant was entitled at trial, and is entitled on this appeal, to revisit the validity of the non–competition covenants. It is indeed arguable that the first panel of this Court intended to resolve this issue finally. It is not, however, necessary to resolve that issue. The analysis in the first decision of this Court, which was echoed by the trial judge at paras. 58-63, correctly sets out and applies to the law on the subject. The appellant has not demonstrated any reviewable error.

[164]   In the appeal to this Court from the interim injunction, the present respondents did not attempt to set aside the portion of the injunction based on the non-solicitation clauses. Accordingly, there is no question of any issue estoppel being created with respect to that issue. Assuming consideration was given, the trial judge found the non-solicitation clause with respect to Kelcher to be enforceable. He found the non-solicitation clause with respect to MacLean to be reasonable, but unenforceable due to his wrongful dismissal. He found the second Oliverio non-solicitation clause to be overly broad, and therefore unenforceable. The appellants have appealed the finding as against Oliverio, and Kelcher has cross-appealed the finding against himself.

[165]   The trial judge noted that the non-solicitation covenants given by Kelcher and MacLean, and the first non-solicitation covenant given by Oliverio, only restricted their ability to solicit those of the appellant's clients with whom they had had personal contact. The prohibition was against soliciting ". . . any client of Globex with which he/she had dealings on behalf of Globex at any time within the 12 months preceding" the termination of employment. While the business was generally based on "cold calls" the established customers were no longer "cold". They had been established as a subset of the public who needed foreign exchange services, and were prepared to do business with the appellant. The interface between this class of client and the appellant was through the individual respondents. The trial judge correctly concluded that the appellant had a legitimate interest in protecting this category of its customers. The specified time period of 12 months is not so long as to be unreasonable between the parties, or contrary to public policy.

[166]   The respondents argue that this form of clause is unreasonable, because it contains no geographic limit. The nature of the business was, however, to solicit clients by telephone. In that type of business it would make little difference whether the client, or alternatively the employee, was located in Calgary or elsewhere: *Gestetner* at p. 90. For example, these respondents served clients in Kelowna and Red Deer, even though they were based in Calgary. This particular business was not sensitive to geographic location. An employee could leave his employment, locate to a different municipality, and easily solicit former clients in Calgary. As such, the absence of a geographic limit in the clause is not fatal to its validity.

[167]   The respondents also argue that the clauses are overly wide, because they cover any form of participation in the foreign exchange business. The challenged wording is:

2011 ABCA 240 (CanLII)

> . . . directly or indirectly as principal, agent, owner, partner, employee, consultant, advisor, shareholder, director or officer or otherwise howsoever, own, operate, be engaged in or connected with or interested in, the operation of or in any way guarantee the debts or obligations of, or have any financial interest in or advance, lend money to, or permit his/her name or any part thereof to be used, or employed in any operation whether a proprietorship, partnership, joint venture, corporation, or other entity . . .

This type of wording is commonly used in non-competition covenants to ensure that they are enforceable. If the agreement merely said that the covenantor could not be "employed" in a competing business, the covenantor could simply argue that he was not an "employee", but rather was a "consultant", "proprietor", "partner", "financier", etc. This appeal provides a good example. The individual respondents (and three other persons) each incorporated "single shareholder" numbered companies, which then formed a partnership, which itself carried on the foreign exchange business through a separate corporate vehicle. This was undoubtedly done for valid business and tax reasons, but simple wording like "be employed" would arguably not encompass this particular arrangement. Since it is the personal connection between the covenantor and the clients that is to be protected against, the form of business organization used is irrelevant, and the challenged wording does not make the covenants overly broad.

[168]   The suggestion by the respondents that the clauses do not define with sufficient certainty the clients who could not be contacted is artificial. The respondents in fact had no trouble identifying them at all. They prepared the Do Not Call lists, and used them to guide their conduct. Further, just because the word "dealings" might mean different things to different people does not justify the conclusion that it is too vague to mean anything. On that test, no restrictive covenant would ever be enforceable, because any word used will engage conduct at the fringes of its meaning. Again, the respondents knew what they were prohibited from doing, and attempted to comply. What "dealings" meant, as all the parties knew, was attempting to get foreign exchange business from the clients. The word "dealings", like any other word in the contract, must be ascribed a meaning in accordance with usual rules of contractual interpretation. Just because the parties might not agree on everything that the word covers, does not justify a conclusion that it is too vague to be used at all. The opinion of any one party on what the word does or does not include is irrelevant to its proper interpretation: *Dow Chemical Canada Inc. v. Shell Chemicals Canada Ltd.*, 2010 ABCA 126, 477 A.R. 112 at paras. 17-9; *C. N. R. v. Volker Stevin Contracting Ltd.*, (1991), 120 A.R. 39, 1 Alta. L.R. (3d) 167 (C.A.); *Lawson v. Lawson*, 2005 ABCA 253, 48 Alta. L.R. (4th) 224 at para. 52.

[169]   The trial judge found that the second covenant given by Oliverio was unreasonably wide, because it provided he would not "solicit any customer of Globex" for 18 months. In other words, this covenant was not limited to customers with whom Oliverio had a prior relationship. The trial judge concluded that the appellant had no legitimate interest in protecting this category of customers from solicitation by Oliverio. Further, this restriction would make entering the business impossible for Oliverio, because he would have no way of knowing whether any potential client had previously

2011 ABCA 240 (CanLII)

been a customer of the appellant. The conclusions of the trial judge on this question of mixed fact and law are reasonable, and no appellate intervention is warranted. The second covenant being unenforceable, Oliverio would remain bound by the original non-competition covenant he gave when he was first hired. As previously noted, it could not have been the intention that the second agreement would replace the first agreement, unless the second agreement was enforceable.

Common Law Duties

[170]   The appellant argues that the respondents owed it common-law duties, whether or not the non-competition agreements were enforceable. It argues that the respondents used its confidential client lists, and other proprietary information about its business methods, in competing with it.

[171]   It is true that at common law no employee is entitled to appropriate proprietary information or other property of the employer. However, where the employer and the employee have reduced their respective obligations on these subjects to writing, it should generally be assumed that the written contract is intended to be a substitute for the common law obligations. In this appeal any common law obligations of the respondents not to solicit the customers of the appellant are subsumed by the non-solicitation covenants in the agreements.

[172]   Common law obligations may continue to have some importance in cases of this type. For example, where the written agreement is unenforceable, any parallel common law obligations would remain intact. If the written agreements are limited in scope, the parallel common law obligations might still be important. The agreements in this appeal do not specifically deal with proprietary and other confidential information, and the common law rights and obligations of the parties on that subject are arguably intact.

[173]   In this case the appellant argues that the respondents used its valuable proprietary information, namely its client lists and the identity of its clients. The respondents acknowledge that after the expiry of the non-solicitation covenants they did begin to call previous clients, including those they had put on their "Do Not Call" lists in their initial attempts to comply with the non-solicitation covenant. While it has been recognized that client identities and client lists can be proprietary information, in this case the use of those lists overlaps with the non-solicitation covenants. It is obvious that the respondents could not solicit their previous clients without knowing their identities. If the respondents were prevented from using their knowledge of those identities after the expiry of the non-solicitation covenants, that would effectively amount to an extension of the 12 month period of non-solicitation agreed to by the parties. It would be artificial to suggest that, after the non-solicitation period expired, the respondents could only contact those clients they could remember, but not those whose names they had written down. In this case the written agreements regarding non-solicitation in effect amounted to a written agreement about the appropriate use that the respondents could make of client identities.

[174]   The appellant argued finally that the respondents had made use of its confidential and proprietary business methods. The trial judge found that the business methods amounted to "cold

2011 ABCA 240 (CanLII)

calling", and were not sufficiently unique to be proprietary. This finding of mixed fact and law does not disclose any reviewable error: *Shafron* at para. 13.

[175]   Since Oliverio's second non-solicitation covenant was found to be unenforceable, his first covenant would have remained in force. In the alternative, he may have been liable for breach of a common law duty not to use his former employer's proprietary client lists. On either alternative, his liability would have been similar. MacLean and Kelcher did not breach any common law obligations, only those contained in their written agreements.

Damages

[176]   The appellant also appeals the quantum of damages as calculated by the trial judge. The appellant notes that after Axiom commenced operations in Calgary, the appellant's market share dropped significantly. In addition, the profit margins the appellant was able to achieve dropped because of Axiom's aggressive pricing strategy and solicitation of clients. The appellant argues that Axiom, unlike the other foreign exchange businesses in Calgary, used the same business model and strategies as the appellant. Finally, the appellant argues that the respondents, through Axiom, aggressively solicited the appellant's clients, once the non-solicitation clauses expired.

[177]   The enforceability of the actual covenants granted by these respondents has previously been discussed. Excepting contingently with respect to Oliverio, there were no additional common law duties in play. The appellant is entitled to damages for breaches of the non-solicitation covenants found to be enforceable, but not losses that arise merely because other competitors (including the respondents, through Axiom) have entered the marketplace. Further, the trial judge having concluded that there was no misuse of proprietary information, no award can be made on that ground either. For the reasons previously discussed, the appellant is not entitled to damages for solicitation of its clients after the 12 month period set out in the non-solicitation agreements.

[178]   In calculating damages, it must be remembered that no entrepreneur, including the appellant, has any right to be free of competition. The appellant, at a general level, has no absolute right to complain about other persons, including former employees, entering its market: *RBC Dominion Securities Inc. v. Merrill Lynch Canada Inc.*, 2008 SCC 54, [2008] 3 S.C.R. 79 at paras. 18-9. It also has no right to be free of price competition by others who enter that market. The law generally favours open competition. This is why non-competition clauses must not only be reasonable as between the parties, but also in the overall public interest in order to be enforceable. The appellant is only entitled to complain of breaches of reasonable contractual covenants, or common law duties owed by the respondents, not competition generally.

[179]   The appellant presented expert evidence calculating its losses based on the presence of Axiom in the marketplace. The appellant's expert calculated all of the losses that the appellant had suffered as a result of that increased competition. The respondents presented expert evidence which, *inter alia*, calculated only the losses which resulted from breaches of the non-solicitation covenant. The trial judge, having found that the non-competition covenants were unenforceable, went on to

2011 ABCA 240 (CanLII)

find provisionally that the respondents' calculation of the damages was the proper approach. The trial judge's preference of one expert witness over another is, in the absence of any error of principle, subject to deference.

[180]   The trial judge calculated the quantum of damages that would have arisen from breaches of the non-solicitation clauses as $53,782. There being no reviewable error in the approach taken by the trial judge, or in his preference of one expert over the other, the appellant is entitled to damages of $53,782 from the respondents for those breaches.

[181]   The trial judge provisionally allocated those damages equally between the three respondents. Given that the extent of the solicitation by the three respondents varied, that allocation, while efficient, may not be strictly accurate. If any of the parties is not content with that allocation, the matter is remitted to the trial judge for recalculation.

[182]   The appellant also claimed damages for the decreased margins it experienced during the non-solicitation period. It argued that in order to retain its existing clients, it had to reduce its margins in order to prevent more clients being enticed away by the respondents. To the extent that these decreased margins arose during the non-solicitation period, related to the class of customers protected under the agreements, and were attributable to the efforts of the respondents in breach of their covenants, they would be a recoverable head of damage. The trial judge never made a finding of fact on this head of damages, and it is remitted to the trial judge for further adjudication.

Conclusion

[183]   The appeal should be allowed, and the cross-appeal dismissed. The appellant is entitled to judgment against the three respondents in the sum of $53,782, as well as one set of taxable costs of the appeal. The allocation of those damages between the three respondents is remitted to the trial

judge, if any party is dissatisfied with an equal allocation. The entitlement of the appellant to damages for decreased margins is also remitted to the trial judge. Whether the trial judge will accept further evidence on the remitted issues is in his discretion, in accordance with the principles on reopening a trial. The award of costs at trial is set aside, and the issue of trial costs is remitted to the trial judge.

Appeal heard on April 7, 2011

Reasons filed at Calgary, Alberta
this 10th day of August, 2011

_____
Slatter J.A.

2011 ABCA 240 (CanLII)

Page: 53

**Appearances:**

T.P. Chick
    for the Appellant

J.A. D'Andrea
    for the Respondents

2011 ABCA 240 (CanLII)